O

# Death Penalty

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FRANCIS HERNANDEZ, | ) | CASE NO. CV 90-4638 RSWL |
| Petitioner, | ) | **DEATH PENALTY CASE** |
| v. | ) | |
| MICHAEL MARTEL,* | ) | ORDER GRANTING IN PART |
| Acting Warden, California State | ) | PETITION FOR WRIT OF |
| Prison at San Quentin, | ) | HABEAS CORPUS |
| Respondent. | ) | |

This matter is before the Court on petitioner Francis Hernandez's petition for writ of habeas corpus. The Court has read the parties' briefs, together with supporting documentation. For the reasons and in the manner set forth below, the Court hereby GRANTS IN PART the petition for writ of habeas corpus based upon the ineffective assistance of counsel, jury misconduct and cumulative error.

## I.    Factual Background

An L.A. County jury convicted Francis Hernandez of two counts of first-degree murder, two counts of forcible rape and two counts of sodomy. The jury found true the special circumstance allegations that each murder occurred during the commission of rape and sodomy and that petitioner was convicted of more than

---

* Michael Martel is substituted for his predecessors as Acting Warden of the California State Prison at San Quentin, pursuant to Federal Rule of Civil Procedure 25(d).

one murder.  At penalty, the prosecution presented no evidence in aggravation. The defense presented evidence that petitioner was young and drunk at the time of the crimes, that he came from a dysfunctional home, that he probably had borderline personality disorder, that he once helped a friend and that his life should be spared due to the love of his family and friends and his chance for religious salvation.  Petitioner testified at the penalty phase, but only about the circumstances of the crime.  The jury recommended death.  The trial court condemned petitioner.  Petitioner was eighteen at the time of the crimes.

## II.   Procedural History

On direct appeal, the California Supreme Court vacated the multiple-murder special circumstance but otherwise affirmed petitioner's conviction and sentence. *People v. Hernandez*, 47 Cal.3d 315, 253 Cal. Rptr. 199, 763 P.2d 1289 (1988).

Petitioner filed a petition for writ of habeas corpus in this Court on August 28, 1990.  Two years later, petitioner filed his second state habeas petition in the California Supreme Court in order to exhaust claims contained in his federal petition.  The state court denied the exhaustion petition several months later. Petitioner returned to federal court, filing an amended petition on March 18, 1993. Litigation concerning a motion to dismiss and a motion for summary judgment ensued for many years.  The Court ultimately granted partial summary judgment to respondent.  The Court then granted an evidentiary hearing on three issues of jury misconduct and two claims of ineffective assistance of counsel ("IAC").  The Court bifurcated the evidentiary hearing on IAC, directing the parties to address deficient performance and prejudice separately.  For six years, the parties conducted a paper evidentiary hearing on juror misconduct and IAC.[1]

---

[1]   Petitioner filed his third state habeas petition in the California Supreme Court on June 26, 2007.  The California Supreme Court denied the petition on the merits on June 11, 2008.

**III.    Discussion**

    **A.    Mental Health Evidence**

Many of petitioner's claims involve mental health evidence, including whether he had the requisite mens rea at the time of the crime and whether counsel failed to investigate and present mitigating evidence, among others.  The mental health evidence falls into two categories:  evidence gathered before petitioner's capital trial and evidence gathered and presented as part of petitioner's federal evidentiary hearing.  Both are summarized here.

               **1.    Mental health evidence known before trial**

Prior to trial, seven experts had contact with petitioner.  Trial counsel had access to the opinions of each of these experts.

Petitioner had been incarcerated in the California Youth Authority ("CYA") following a conviction for second-degree burglary for breaking into a drug store.  CYA clinical psychologist Audrey Prentiss evaluated petitioner in August of 1979, about 18 months before the murders took place.  Dr. Prentiss found that petitioner functioned "within the high average range of intellectual ability."  (7 CDD[2] at P01214.)  Dr. Prentiss concluded:

> [Petitioner] showed confidence in himself and in his abilities and has good social skills.  He tends toward ingratiating behavior that is somewhat manipulative in quality.  His behavior is characteristic of an antisocial personality in that he is aware of what he is doing, realizes that he is capable of doing it and goes about doing it with impunity.  He perceives the environment in selfish terms without regard for the possible consequences that it may have on others.  This attitude appeared to have been related to the fact that this ward has had to assume a lot of responsibility for himself at a young age and has learned to manipulate the environment for his own needs.  Having had to assume this responsibility, he had difficulties in accepting the pressures that are part of it . . . .  There were no indications of organicity nor of a neurological dysfunction.  He is not suicidal or homicidal.

(*Id.* at P01215-16.)

---

[2]    CDD refers to the deposition of Charles Downing.

1    Deputy public defender John Torelli initially represented petitioner for his

2    capital prosecution, though Torelli withdrew before trial due to a conflict.  Torelli

3    consulted three mental health experts:  clinical psychologist Michael P. Maloney

4    and psychiatrists Michael B. Coburn and Alvin E. Davis.

5    Torelli provided Dr. Maloney with the preliminary hearing transcript; the

6    information, the autopsy, arrest and crime reports; and a five-page account of

7    petitioner's background, which focused mostly on petitioner's adoptive parents and

8    contained very little information about petitioner's biological parents.  (JTD[3] at

9    P00814-23 (Exhs. 12-16).)  Torelli asked Dr. Maloney to "conduct a full

10   psychological evaluation, including all the standard testing that you would

11   normally give to a prospective patient," and sought Dr. Maloney's opinion "as to

12   any major psychological or minor psychological disorder, including, but not

13   limited to, anything involving a defense, such as insanity, diminished capacity or

14   mitigation in the penalty phase."  (JTD at P00814.)  Dr. Maloney concluded that

15   while petitioner did not appear psychotic, the "data do suggest some potentially

16   serious psychological problems."  (*Id.* at P00829.)  Dr. Maloney found that

17   petitioner had a "highly pathological profile" and that he had significant elevations

18   on scales measuring hypomania, schizophrenia, psychopathic deviate and paranoia.

19   (*Id.*)  People with similar profiles "are often described as having episodes during

20   which they are seen a demanding, confused, hostile, hyperactive, panicky and

21   circumstantial.  They may additionally be restless, evasive and high strung."  (*Id.*)

22   Petitioner's profile suggested "a fair amount of hostility."  (*Id.*)  Dr. Maloney

23   explained that people with profiles similar to petitioner "show intense overreaction

24   to normal rejection" and may exhibit a "tendency to be susceptible to sexual

25   identity confusions."  (*Id.* (internal quotation marks omitted).)  Dr. Maloney stated

26   that "the most likely descriptive diagnosis is schizo-manic episode.  This would

27

28

---

[3]   JTD refers to the deposition of John Torelli.

1   suggest a state wherein there is some breakdown in the thinking processes

2   combined with an elevated or manic-like state. " (*Id.* at P00830.)  While the most

3   technical diagnosis would be schizophrenia, Dr. Maloney stated that petitioner

4   "shows no overt signs of schizophrenia, but he clearly does appear to have a

5   variety of psychological problems." (*Id.*)  Dr. Maloney concluded as follows:

6

7           The present data suggest that we have an individual who
        functions in the normal range of general intelligence with no
8        suggestion of any specific cognitive-intellectual or perceptual deficit.
        He also does not manifest any of the primary signs of a major
9        condition such as psychosis.  Present data do, however, indicate that
        he has significant psychological problems and comes from a very
10       unstable background with multiple noted difficulties relating to his
        parents as well as problems between his parents.

11          I was able to obtain from Mr. Hernandez a fairly specific
        account of the events occurring at the time of the present alleged
12       offenses.  As you know, at both of these times he was drinking
        heavily, but he is, nevertheless, able to recall a number of his activities
13       and behaviors.

14

15   (*Id.* at P00830.)  Dr. Maloney testified at the penalty phase.  He opined that he

16   "had no data to suggest that [petitioner] would not be responsible for his behavior"

17   at the time of the crime and that petitioner "was drinking at the time [of the crimes]

18   but beyond that, he should have had the capacity to understand what he was

19   doing." (14 RT 3473; *see also* 14 RT 2374 ("I have no information to indicate that

20   he shouldn't have been able to appreciate [what he was doing] . . . . I have no data

21   to indicate that he was psychotic or severely disturbed at [the time of the crime.]")

22       Torelli also consulted Dr. Coburn.  Torelli sent Dr. Coburn the same

23   materials sent to Dr. Maloney, but also added Dr. Maloney's report, the transcripts

24   of petitioner's confession and petitioner's statement to his girlfriend.  Torelli asked

25   Dr. Coburn to evaluate whether petitioner was competent to stand trial, insane,

26   capable of forming the specific intent to commit any crime, particularly rape, and

27   whether petitioner suffered from any mental disease or defect or an emotional or

28   psychological disorder that could provide mitigating evidence at the penalty phase.

5

1   (JTD at P00831-32.)  Dr. Coburn interviewed petitioner for a total of two hours.

2   Dr. Coburn concluded that petitioner was sane at the time of the offenses, that

3   petitioner "would have been capable of forming all of the requisite intents involved

4   in varying degrees of homicide" and that "there is no indication that he would have

5   lacked the capacity to form any specific intent in regards to the sexual aspects of

6   the case." (*Id.* at P00841.)  Dr. Coburn's primary diagnosis of petitioner was

7   "[s]imple intoxication due to alcohol at the time of the offenses." (*Id.* at P00840.)

8   Dr. Coburn also opined that petitioner suffered from "[v]ery severe mixed

9   personality disorder with passive-aggressive and antisocial components" and that

10  he experienced "[m]inimal environmental stress at the time of the offenses" along

11  with "[m]oderate early childhood psychosocial stressors." (*Id.* at P00840.)  Dr.

12  Coburn suggested that, using the data provided by Dr. Maloney, trial counsel could

13  argue that petitioner "did not in fact intend to kill, but merely intended to 'quiet'

14  the victims.  Given his passive-aggressive or explosive and antisocial demeanor,

15  one could technically argue that his need to quiet them was paramount, and that it

16  was his intolerance of defiance which led to the acts." (*Id.* at P00841.)  Dr. Coburn

17  added, however, that he "did not harbor an opinion with reasonable certainty that

18  would allow [him] personally to testify in that" manner. (*Id.* at P00841.)  Dr.

19  Coburn did not testify at trial.

20       Finally, Dr. Davis evaluated petitioner.  Torelli sent Dr. Davis the same

21  materials sent to Dr. Coburn.  Torelli asked Dr. Davis to evaluate whether

22  petitioner was competent to stand trial, insane, whether the defense of diminished

23  capacity could succeed and whether petitioner suffered from any mental disease or

24  difficulty that could provide mitigating evidence at the penalty phase. (*Id.* at

25  P00844-46.)  Dr. Davis diagnosed petitioner with passive-aggressive personality

26  disorder, which involves "anti-social and aggressive acting out," including drug

27  and alcohol abuse. (*Id.* at P00547.)  Dr. Davis concluded that petitioner was sane

28  at the time of the offenses and "had the mental capacity to form specific intent,

6

1    premeditate, and harbor malice," though "his capacity to deliberate or to maturely

2    reflect was impaired by intoxication." (*Id.* at P00547.)  Dr. Davis noted that it was

3    plausible that petitioner did not intend to kill the victims, but that his confession

4    showed a lack of overt emotion, consistent with antisocial personality disorder.

5    (*Id.* at P00548.)  Dr. Davis did not testify at trial.

6         At some point after obtaining these expert opinions, Torelli withdrew.

7    Charles Downing took over petitioner's representation.  Downing[4] represented

8    petitioner for many months preceding trial through sentencing.  Downing's

9    representation is the subject of petitioner's IAC claims.  Torelli transmitted his file,

10   which included correspondence with Drs. Maloney, Coburn and Davis, as well as

11   each expert's report, to Downing.  Downing consulted three additional experts:

12   clinical and forensic psychologist Faye Girsh, gastroenterologist Amer Rayyes and

13   forensic pathologist S. M. Rabson.

14        Downing provided Dr. Girsh with the reports of Drs. Maloney, Coburn and

15   Davis, as well as Torelli's correspondence with each expert.  Downing informed

16   Dr. Girsh that he was going to pursue an insanity defense because "Hernandez is

17   either insane or he will be gassed."  (5 CDD P00521.)  Trial counsel explained his

18   theory of the case to Dr. Girsh:

19

20            I have what I am sure is a hopelessly simplistic view.  I think
     that Francis was one way or another killing his mother.  I also am
21   convinced that he is an individual who is crazy that somehow or
     another keeps his insanity in check so long as he is sober but, with the
22   ingestion of alcohol, whatever it is that permits him to appear sane
     vanishes and his personality reverts to that which is normal for him,
23   namely nuts.  I guess in my simplistic view this is sort of the converse
     of diminished capacity.  In that condition one who is normally sane
24   ingests alcohol or whatever and does something crazy with the loss of
     inhibitions or whatever.  I should note that these offenses were
25   committed at a time when diminished capacity was available as a
     defense.

26

27

28   ────────────────────
     [4]   The terms "trial counsel" and "counsel" refer to Charles Downing.

1  (*Id.* at P00524.)

2      Dr. Girsh did not provide trial counsel with a written report, but the record

3  contains trial counsel's notes from a conversation he had with Dr. Girsh before

4  trial.  The notes include Dr. Girsh's assessment of petitioner:

5          Personality [illegible] a real puzzle:  Francis is an apparent anti-
6      social personality disorder type = sociopath.  Of 15 criteria, he meets
       12.  Can't diagnosis as such due to age.  Why age makes a difference?
7      Because, until age 24 or so, personality malleable, can change.
       Maturation is best therapy for sociopathic personality.  He is,
8      presently, classified as a juvenile with such tendencies.
       Characteristics of syndrome is that he doesn't care about anything:
9      kills just for hell of it, tortures to cause pain, etc.  Also, explosive,
       intermittent violent conduct; that's him.  [Illegible] drives through
10     plate glass window in van for burglary.  That is sociopathic stuff, not
       what I want.  Get Book:  "Clockwork Orange"—a profile of a true
11     sociopath.

12  (*Id.* at P00518.)  While counsel worried that the jury's rejection of a diminished

13  capacity defense at the guilt phase would harm the penalty phase, Dr. Girsh

14  disagreed.  (*Id.* at P00517.)  Counsel questioned whether he could use Dr. Girsh to

15  suggest that petitioner killed the victims by accident but without putting on a full-

16  blown diminished capacity defense.  That strategy would force the prosecution to

17  ask questions about specific intent on cross examination, ultimately supporting a

18  diminished capacity jury instruction.

19      Dr. Girsh testified at the penalty phase.  She opined that petitioner was

20  "essentially out of control" when he committed both crimes.  (14 RT 3583.)

21  "[A]pparently at the time that [petitioner] suffocated or strangled the women, he

22  had lost control.  He was in some kind of a fit of rage or panic or something that

23  was different from his usual state."  (*Id.* at 3584.)  Petitioner's behavior was

24  associated with substance abuse disorders and borderline personality disorder.

25  (*Id.*)  A person with borderline personality has periods of self-destructive behavior

26  because the individual is not sure of his identity.  (*Id.* at 3585.)  Dr. Girsh hesitated

27  to diagnose petitioner with borderline personality disorder, as the diagnosis can

28  only be made once a person is 18.  (*Id.*)  Because  petitioner was "just 18" at the

1   time of the murders, "the diagnosis really would not have applied." (*Id.*)  On

2   cross-examination, Dr. Girsh testified that self-destructive behavior also was a

3   symptom of antisocial personality disorder.  (*Id.* at 3599.)

4        Dr. Rayyes, a gastroenterologist specializing in alcoholism and drug

5   addiction, testified at the penalty phase.  Counsel and his wife both had suffered

6   from alcoholism.  Before trial, Dr. Rayyes had conducted an intervention with

7   counsel's wife, and, later, with counsel.  Dr. Rayyes diagnosed petitioner with

8   alcoholism.  Dr. Rayyes testified that petitioner would have been "severely

9   impaired" at the time of the crimes and, accordingly, that petitioner would have

10  been unable to form the specific intent to kill.  (12 RT 3069-70.)  On cross

11  examination, Dr. Rayyes initially repeated his belief that an alcoholic who has been

12  drinking cannot form a specific intent to kill.  (13 RT 3082.)  When pressed,

13  however, Dr. Rayyes testified that it is "possible" for an inebriated alcoholic to

14  form the specific intent to steal or to kill, and that an intoxicated alcoholic can form

15  the specific intent to commit rape or sodomy.  (12 RT 3083, 3084, 3085.)

16       Downing also consulted Dr. Rabson, a forensic pathologist.  Trial counsel

17  sent Dr. Rabson the autopsy photographs and reports,  a transcript of the coroner's

18  testimony from the preliminary hearing and petitioner's statement to the police.

19  Trial counsel asked Dr. Rabson to look for any evidence that either of the victims

20  was moved after death, if sexual intercourse could have been consensual, if the bite

21  marks on the breasts of the victims could have occurred during intercourse or if

22  they were post-mortem, if the vaginal and anal injuries could have occurred post-

23  mortem and if Dr. Rabson would come to any different conclusions from the

24  coroner.  (5 CDD at P00530.)  A document in trial counsel's file memorializes

25  counsel's discussion with Dr. Rabson.  Trial counsel noted that "Dr. Rabson tends

26  to be somewhat judgmental, probably due to his [J]ewish upbringing, and has

27  formed the opinion that Hernandez is an obvious, clear sociopath and ought to

28  spend the rest of his life behind bars. (*Id.* at P00532.)  Dr. Rabson concluded that

the condition of the victims' bodies was consistent with asphyxiation or strangulation, that Bristol may have been moved after she died, that the intercourse in both cases likely was not consensual and that the bite marks and the various vaginal and anal injuries were inflicted pre-mortem. (*Id.*) Dr. Rabson opined that the coroner conducted the autopsies in a professional and competent manner, other than her failure to investigate Ryan's abnormally large heart, which did not contribute to the victim's death. (*Id.*) Dr. Rabson did not testify at trial.

### 2. Mental health evidence presented in evidentiary hearing

As part of the evidentiary hearing, petitioner presented the testimony of psychologist June Madsen Clausen, psychiatrist Dorothy Otnow Lewis, criminologist Sheila Balkan, clinical psychologist Charles Sanislow and neuropsychologist Ruben Gur. Respondent presented the testimony of just one expert: clinical psychologist Daniel Martell.

### a. Psychologist June Madsen Clausen

Dr. Clausen is a psychology professor at the University of San Francisco, where she teaches advanced courses in clinical child psychology, counseling psychology, abnormal psychology and child maltreatment. She conducts research on children, adolescents and young adults who have been placed in the child welfare system due to abuse or neglect and provides outpatient psychotherapy to trauma survivors. (Clausen Decl. at 1, ¶ 2.) Petitioner asked Dr. Clausen to take his social history and to evaluate the effect his background had on both his psychological development and his functioning as an adult, including at the time of the crimes. (*Id.* at 2, ¶ 4.) Dr. Clausen reviewed witness declarations, educational reports, probation and Youth Authority reports, court records, psychological reports and other materials. She interviewed petitioner five times for a total of ten hours. She also interviewed petitioner's adoptive mother. (*Id.*)

Dr. Clausen provided a detailed social history of petitioner:

Francis Hernandez is an adopted child . . . . Francis was a child born into unfavorable circumstances.  He is the product of a brief, tumultuous union between a depressed, troubled fourteen-year-old girl and a disturbed, drug-addicted eighteen-year-old boy.  Both of Francis's [biological] parents reportedly have family histories of mental illness.  During Francis's in utero development, his mother consumed marijuana and alcohol, and his father was episodically violent toward his mother.  These circumstances often contribute to neurological and psychological vulnerabilities of the kinds that later complicated Francis's development.  He was a child born with special needs.

Francis's mother gave him up for adoption at birth, and soon after he was placed in the home of an adoptive mother and father[,] both of whom were struggling with severe psychiatric and psychological problems.  Both Francis's parents were raised and formed their ideas of family life in violent homes bereft of warmth, caring, nurturing, and attention to the developmental needs of others.  In addition, Francis's [adoptive] mother also suffered from schizophrenia and was episodically psychotic throughout Francis's childhood.  She attempted suicide more than once, spent months-long periods in psychiatric hospitals, and returned home so heavily medicated that she was unable to attend to her own daily living requirements, let alone Francis's.  She also failed to adhere to the prescribed regimen of psychotropic medication and she became psychotic, at times violently.

Francis's father was a paranoid man prone to sudden, violent, and angry outbursts, who never learned to recognize the emotional needs or the distress of others.  He was, by all accounts, either unable or unwilling to recognize the gravity of living with a psychiatrically ill spouse and a troubled young child.  During Francis's childhood, his father regularly left [Francis] home alone with his mother, often for week-long periods.

(*Id.* at 2-3, ¶¶ 6-8.)  Petitioner's birth mother, Patricia ("Pat") Ramos (formerly Urbano, originally Myers), has a family history of depression, bipolar disorder and chemical dependency, all heritable conditions.  (*Id.* at 4, ¶ 12.)  Pat takes Paxil, an antidepressant, and has taken Elavil, another antidepressant.  She suffers from anxiety and panic attacks, as well insomnia, for which she takes tranquilizers nightly.  (*Id.* at 7 ¶ 20.)

In addition, petitioner's biological father and his family also exhibited signs and symptoms of mental illness.  Dr. Clausen provided the following information:

Francis'[s] biological father, Anthony (Tony) Marquez, was the last of eleven children born to Paulino and Loretta Marquez, immigrants from Mexico. Anecdotal evidence gathered from surviving family members suggests that, of Francis's paternal grandparents, both exhibited behaviors consistent with those of individuals with affective disorders.

Family members report that at least twenty-three of [petitioner's biological paternal] cousins have had drug problems. Two have been diagnosed with schizophrenia, one with depression, and one was so extremely hyperactive as a child that he chewed on his hand, nearly capsized a refrigerator onto himself, and had to run circles around a building before he could enter and visit family members inside—behavior, not incidentally, that bears striking clinical resemblance to that of Francis Hernandez as a child.

Like many members of his family, Francis's biological father, Tony Marquez, has struggled with drugs and mental illness throughout his life. Tony is a sixty-year-old man whose limited intellectual functioning and obvious psychiatric impairments keep even a minimal level of self-sufficiency beyond his reach. He has spent most of his life incarcerated. According to Social Security[,] his only reported income was $74.20 in 1963 and $74.93 in 1967. Tony Marquez is a man whose impairments have made it impossible for him to function independently within the law and without the use of drugs.

(*Id.* at 9, ¶ 24; 13-14, ¶ 40; 14-15, ¶ 41.) Tony's prison records describe psychological symptoms that are consistent with clinical depression, mania, substance dependence, and florid psychosis. (*Id.* at 18, ¶ 51.) Prison staff described his condition as "acute psychosis" and as a "disassociation from reality." (*Id.* at 19, ¶¶ 55 (internal quotation marks omitted).) Tony's condition was sufficiently alarming to prison staff that he was transferred to the prison psychiatric ward after tearing up his sheets. (*Id.* at 19, ¶¶ 55 (internal quotation marks omitted).) Tony's psychosis continued:

[H]aving apparently failed to respond to the treatment offered by San Quentin, Tony was transferred to the California Medical Facility (CMF) in Vacaville, California, a hospital for acutely ill inmates of the California prison system. Within a few days of his arrival at CMF, he was written up for tearing up his bedding. The disciplinary report for the incident notes that he did so "to decorate his house."

1

2

3

While he was being treated at CMF, Tony was administered Prolixin and Thorazine—two powerful antipsychotic medications. The doctors at CMF discussed the use of electro-convulsive therapy on Tony. This consideration suggests that his psychosis was severe and that it failed to remit under his prescribed medication.

4

(*Id.* at 20-21, ¶¶ 58-59.)

5

6

Dr. Clausen also provided information about petitioner's adopted mother:

7

8

9

10

Naomi Schilling (now Kuhl)[,] Francis Hernandez's adoptive mother, also inherited a predisposition to mental illness. Naomi's parents, a prodromally schizophrenic mother and a depressed, alcoholic father, created a household characterized by extreme isolation, frequent violence and delusional religious fanaticism—the same poisonous atmosphere in which Francis would later be immersed.

11

12

13

14

15

One of Naomi's lifelong challenges manifested itself as a cognitive deficit. Even when she was a very young girl, Naomi's family considered her "different." During her childhood, she was uncommunicative, shy and visibly "unhappy all the time." Naomi recalls being socially isolated and exceptionally shy, attempting to pass the days in school with as few words as possible . . . . Naomi suffered from extreme social impairments and members of her family apparently worried that she might be retarded, and her mother openly stated that she thought Naomi was slow . . . .

16

17

18

19

20

21

Naomi's longstanding severe mental illness went undiagnosed until she was thirty years old when the doctors overseeing her months-long inpatient hospitalization in an Orange County psychiatric institution verified that she was suffering from schizophrenia. Since that time[,] she has been psychiatrically hospitalized no fewer than ten times. Over the course of these hospitalizations, medical and mental health professionals have documented many details of Naomi's life. These documents show that Naomi internalized and replicated the psychopathologies with which she grew up, in particular her family's violence, its obsession with sex, and its unwavering religious fanaticism.

22

23

(*Id.* at 21, ¶ 61; 28-29, ¶¶ 77-78 (citations omitted).) Additionally, Dr. Clausen gathered information about petitioner's adoptive father.

24

25

26

27

28

Frank Hernandez, Francis Hernandez's adoptive father, also came from a severely troubled family governed by the complicated interaction of a number of developmentally harmful psychopathologies. Among these were: the unwavering refusal to acknowledge and address grave familial problems; a complete failure to discuss and contextualize the issue of racism while residing in a community known for its remarkable racial prejudice; a mutually destructive and hostile relationship between the family's parents; the

13

noteworthy anger that underlay much of the family's disproportionate reactions to one another and to the outside world; verbal and physical abuse; and the father's emotional abandonment of his children.

(*Id.* at 31, ¶ 81.)

Naomi and Frank married on January 4, 1958.  (*Id.* at 42, ¶ 108.)  Petitioner was born on March 10, 1962.  (*Id.* at 44, ¶ 113.)  He was placed with Naomi and Frank on May 17, 1962.  (*Id.*)  Petitioner was a hyperactive baby and small child.  (*Id.* at 44, ¶ 113-14.)  He had incredible energy.  (*Id.* at 46, ¶ 117.)

More than thirty years after petitioner left his preschool, petitioner's former teacher described petitioner's family as "troubled to an unforgettable degree."  (*Id.* at 50, ¶ 130 (internal quotation marks omitted).)  Petitioner's preschool teacher stated that petitioner was "overwhelmed by stimuli and by interactions with other children; extremely labile; unable to sit still, finish projects or move from one activity to another; unable to interpret the social cues of other children; socially isolated; unable to read and respond to other children in a way that allowed friendship to happen; prone to seeing the most benign gesture as a threat; and subject to extreme tantrums that were beyond those of a normal child and in which he entered his own world."  (*Id.* at 51, ¶ 131 (internal quotation marks omitted).)  When petitioner was four and a half, his preschool teacher suggested that petitioner's parents seek the help of a psychologist or psychiatrist.  (*Id.* at 51, ¶ 131.)  Petitioner's father refused.  (*Id.*)

Naomi and Frank attempted to adopt another child in April 1966.  (*Id.* at 53, ¶ 137.)  The adoption agency notes reflect the problems petitioner's family faced:

The interviews revealed that Naomi had been candidly uncomfortable about the fact that Francis was an adopted child, that she was incapable of giving directions to her home, barely able to convey simple thoughts, and dependent on Frank to the extent that the adoption worker wondered what this young woman would do, or how she would respond in an emergency situation when her husband was not around . . . .  The case worker wondered if there might be some neurological basis for Francis's uncontrolled activity . . . . After an initial round of interviews, the adoption agency felt obliged to explore Naomi's mental health.  Later, during a home visit, Naomi was unable

14

1    to control Francis and ended up crying and needing the consolation of
2    the case worker.

3    (*Id.* at 54, ¶ 139 (internal quotation marks omitted).)  The case worker also

4    described the family as living in social isolation.  (*Id.* at 54, ¶ 140.)  Naomi and

5    Frank named petitioner's preschool teacher as a reference despite her earlier

6    criticism of their parenting; she did not recommend them as suitable for adopting

7    another child.  (*Id.* at 54-55, ¶ 141.)  The adoption agency referred the family for

8    counseling.  (*Id.* at 55, ¶ 142.)

9        The counselor found petitioner to have a short attention span, excessive

10   energy, a mind that was too active and an inability to differentiate between fantasy

11   and reality.  The psychologist recommended that petitioner undergo neurological

12   testing, that Frank and Naomi receive marital counseling and that Naomi receive

13   psychological help.  (*Id.* at 56, ¶ 143.)  Naomi, Frank and petitioner attended

14   monthly counseling sessions for a while but did not complete the recommended six

15   months.  (*Id.* at 57, ¶ 145.)  Ultimately, the adoption agency denied Naomi and

16   Frank's application to adopt another child and closed the case.  (*Id.* at 58, ¶ 149.)

17       One month after the denial of the application to adopt a second child, Naomi

18   attempted suicide for the first time.  She was hospitalized for several months and

19   diagnosed with schizophrenia during that time.  She was treated with Mellaril,

20   which prevented her from functioning normally.  (*Id.* at 54, ¶¶ 150-52.)  Her family

21   described her as a zombie who was flat in affect, moved in slow motion, dragged

22   her feet and was like a walking dead person.  (*Id.* at 60, ¶ 154.)  She was suicidal

23   upon her release from the hospital and fantasized about hanging herself.  She

24   attempted to overdose on sleeping pills.  (*Id.* at 58, ¶ 155.)

25       Naomi disciplined petitioner in unconventional ways.  When petitioner acted

26   up, Naomi sat on him until he calmed down.  Naomi also forcibly administered

27   enemas to petitioner as punishment.  The purpose of the enemas was to keep

28   petitioner clean and to calm him down when he was hyper.  (*Id.* at 57, ¶ 146.)

15

1    Frank disciplined petitioner by hitting him with a belt; Frank also gave petitioner

2    boxing lessons when he was a school-aged child.  (*Id.* at 58, ¶ 147.)

3         Naomi continued to struggle with her mental health, especially when she

4    stopped taking her medication.  In one incident, Frank dropped Naomi off at her

5    sister Barbara's house.  Barbara and her husband described Naomi's behavior that

6    night as "bizarre, terrifying, shocking, crazy as a person could be, psychotic, a

7    nightmare, something from a scary movie, sad, frightening, [] horrible, a horror,

8    gruesome and the kind of thing that any normal parent would protect his son from

9    seeing."  (*Id.* at 65, ¶ 166.)  After that night, Barbara would not allow her children

10   to be alone with Naomi and they worried about what impact Naomi's behavior

11   would have on petitioner.  (*Id.* at 66, ¶¶ 167-70.)  Frank did not appear to protect

12   petitioner from Naomi during these episodes.  (*Id.* at 67, ¶¶ 171-72.)

13        In another incident, Naomi threatened Frank's mother with a knife.  Naomi

14   demanded that her mother-in-law kneel and pray.  When her mother-in-law fled,

15   Naomi chased her mother-in-law outside with the knife.  (*Id.* at 67, ¶ 173.)

16        By age ten, petitioner withdrew from home life and came home after dark.

17   (*Id.* at 71, ¶ 185; 74 ¶ 190.)  Petitioner's friends describe his home as depressing,

18   unhappy, awful, messy, dark and full of junk.  (*Id.* at 71-73, ¶¶ 185-88 .)

19        Petitioner did not fit in with other children.  He was isolated, frequently

20   depressed and socially awkward.  (*Id.* at 74-78, ¶¶ 191-2.)  By thirteen, he was

21   drinking beer daily and smoking marijuana many times a day.  (*Id.* at 78, ¶ 202.)

22        When petitioner was eleven, he broke into his school.  (*Id.* at 79, ¶ 203.)  At

23   thirteen, he was caught with a marijuana pipe.  He was declared a ward of the court

24   at fourteen.  (*Id.* at 79, ¶ 204.)  Later that same year, Naomi suffered another

25   psychotic episode.  (*Id.* at 80, ¶ 206.)  She was hospitalized for several months,

26   during which she had sexual encounters with two male patients and said mass in

27   the patient lounge.  (*Id.* at 81, ¶ 206.)  She started smoking and believed the devil

28   was entering her body through cigarette smoke.  (*Id.* at 79, ¶ 204.)

Close in time to Naomi's psychotic break, petitioner was suspended from school for fighting.  Weeks later, petitioner arrived at school under the influence of marijuana and was suspended again.  A month later, petitioner crashed his motorcycle that he had been driving daily, with his father's permission, even though he was only fifteen and without a license.  *Id.* at 81, ¶ 207.)  Naomi came home for several weeks after her hospitalization but ultimately left to live with her schizophrenic mother in Atascadero.  Petitioner was fifteen.  Naomi divorced Frank and never lived with him or Francis again.  (*Id.* at 82, ¶ 208.)

With Naomi gone and Frank largely absent or uninvolved, petitioner's home became a hangout for drug dealers and users.  (*Id.* at 82, ¶ 209.)  People bought and sold drugs, including cocaine and marijuana.  Petitioner had access to and was using PCP, cocaine, amphetamine, LSD, marijuana, hash, mushrooms, heroin and an array of pharmaceutical drugs.  The house became even filthier and had broken windows that went unfixed.  Frank did nothing to stop the things going on in his home; he blamed the neighbors' complaints on racism.  (*Id.* at 82-83, ¶ 209-11.)

At age fifteen, petitioner began attending high school.  Two months later, he crashed his motorcycle, resulting in x-rays of his ankle, tibia and fibula.  He was sent to an alternative learning center.  (*Id.* at 84, ¶ 212.)

At sixteen, petitioner was arrested with two friends for malicious mischief.  His friends were bailed out quickly, but it took several days for Frank to learn that petitioner was in jail.  (*Id.* at 84, ¶ 213.)

At seventeen, petitioner crashed his motorcycle again.  He lost consciousness, suffered involuntary convulsions and was taken to the hospital by ambulance.  He had x-rays of his skull, face, chest and arm.  (*Id.* at 85, ¶ 215.)

A month later, petitioner was arrested for breaking into a drug store.  He was held in custody and sent to the California Youth Authority ("CYA").  While petitioner was incarcerated, Frank moved in with his girlfriend and sold his house.  He bought petitioner a van to live in after his release.  (*Id.* at 85, ¶¶ 215-16.)

Petitioner was released in April 1980. (*Id.* at 86, ¶ 217.)  He received his driver's license the same day. (*Id.* at 87, ¶ 218.)  In May 1980, he was cited for possession of marijuana and driving with an open container of alcohol. (*Id.* at 87, ¶ 218.)  In July 1980, he received another traffic citation. (*Id.* at 87, ¶ 218.)

Between April 1980 and February 1981, petitioner dated Heidi Williams.  Heidi told petitioner she was pregnant with petitioner's baby.  Petitioner proposed to Heidi, and she accepted.  Heidi told petitioner she miscarried. (*Id.* at 87, ¶ 219.)  In December 1980, the police told petitioner that he could no longer keep his dog, Prince, in his van. (*Id.* at 87, ¶ 221.)  Later that month, petitioner was pulled over for a traffic citation.  There was a warrant for petitioner in connection with change stolen out of a parked car.  The police impounded petitioner's car, which was his home.  It contained his clothing and possessions, as well as a large amount of marijuana that belonged to a drug dealer. (*Id.* at 88, ¶ 223.)

In mid-January 1981, Heidi broke up with petitioner.  On January 20, 1981, the DMV revoked petitioner's license.  In late January or early February 1981, petitioner ran his van into an apartment building.  Around the same time, Edna Bristol and Kathy Ryan were murdered. (*Id.* at 89, ¶¶ 225-26.)

From April 1980 until his arrest for the underlying crimes in 1981,

> [Petitioner] was an eighteen-year-old, unemployed, parolee who was homeless, isolated from his family, drug addicted and living in a van. Other than an uncertain relationship with a girlfriend and the continued association with a homeless, drug abusing friend, Francis had little social support or contact.  He no longer shared a home with either of his parents.  He was not in school.  He was not incarcerated. He was not in any of the various forms of treatment that teachers, social workers, and mental health professionals had been urging for him since he was a toddler . . . .  Francis was a young man with insufficient social and psychological resources attempting to grapple with unmanageable stressors.

(*Id.* at 86, ¶ 217.)

In addition to creating petitioner's social history, Dr. Clausen also provided a  psychological analysis.  Dr. Clausen pointed to literature demonstrating that

18

children raised by a schizophrenic parent tend to suffer from cognitive, behavioral, emotional and social difficulties. (*Id.* at 93-94, ¶ 235.)  In addition, the key task during the first eighteen months of life is to form an attachment to the primary caretaker, but that process cannot take place with a psychotic primary caretaker. (*Id.* at 94, ¶ 236.)  The failure to form a healthy primary attachment results in a consequent failure to develop basic trust. (*Id.*)  Naomi failed to form an attachment bond to petitioner.  (*Id.* at 95-96, ¶¶ 237-40.)

From ages two to six, children should develop a sense of autonomy and initiative.  Again, Naomi's psychosis prevented petitioner from developing appropriately, leaving petitioner anxious, depressed, exposed to physical danger, prone to uncontrolled behavior and resorting to self-reliance and pseudo-maturity. (*Id.* at 96-100, ¶¶ 241-46.)   Naomi and Frank's inability to cope with petitioner's normal attempts to develop independence and initiative-taking resulted in rage, beatings with a belt, yelling and the forcible administration of enemas.  (*Id.* at 100-01, ¶¶ 247-48.)  Naomi engaged in inappropriate play with petitioner, such as by tying him up with rope.  She allowed petitioner to take dangerous items to school for play, including screwdrivers, other tools, wood, rope and toy guys.  (*Id.* at 101, ¶¶ 249.)  Dr. Clausen described petitioner as "a young child without a healthy self-concept who was not equipped with basic skills in social comprehension and interpersonal communication, and who did not understand the expectations and consequences in his environment." (*Id.* at 103, ¶¶ 251.)

From ages six to twelve, a child's primary task is to develop a sense of industry.  (*Id.* at 103, ¶ 252.)  For petitioner, these years were filled with tension, chaos, violence, the deterioration of a psychotic mother and an often-absent father. (*Id.* at 104-07, ¶¶ 254-61.)  To make up for his parents' shortcomings, petitioner was charged with great responsibility, including learning how to turn off the power in case of an emergency at age five and learning how to drive a car at age 10.  (*Id.* at 107, ¶ 262.)  Petitioner developed symptoms of anxiety and depression.  (*Id.* at

109, ¶ 264.)  Petitioner started staying away from home as much as possible.  (*Id.* at 109, ¶ 265.)  During his elementary and pre-teen years, he had a great deal of freedom, no supervision, no chores and no family dinners or obligations.  (*Id.* at 109, ¶ 266.)  Petitioner began to self-medicate by using marijuana and alcohol on a regular basis in the summer after fifth grade and by getting drunk and high every day by seventh grade.  (*Id.*)

From ages twelve to eighteen, a child's primary task is to develop a sense of personal identity.  (*Id.* at 110, ¶ 267.)  Petitioner used drugs regularly as an adolescent, with his parents' knowledge; they did nothing about it and Naomi recalls that she may have smoked marijuana with her son.  (*Id.* at 110, ¶ 268.)  Naomi continued to suffer from schizophrenia and engaged in sexually inappropriate behavior, such as by having a man she met while hospitalized come to her home to have sex.  (*Id.* at 112, ¶ 273.)  Petitioner started acting out.  He fought and used drugs at school and was arrested for burglary.  (*Id.* at 113, ¶ 274.)  Petitioner's mother left the family without saying goodbye.  *(Id.* at 113, ¶ 275.)  With petitioner's mother gone and his father rarely home, petitioner started using drugs and alcohol more regularly.  (*Id.* at 113, ¶ 276.)  The house petitioner and Frank lived in was filthy and in shambles.  (*Id.* at 113-14, ¶ 277.)  Petitioner was arrested for breaking into a drug store and then spent ten months in the CYA.  (*Id.* at 114, ¶ 278.)  Less than a year after his release, petitioner was arrested for the underlying crimes.  (*Id.*)

Petitioner also struggled to distinguish reality from fantasy:

The evidence suggests that Francis's genetic predisposition for impaired reality testing, together with his chronic exposure to his adoptive mother's psychotic thoughts and chaotic, disorganized behavior, and with his father's paranoid thinking and minimization of his wife's symptoms, resulted in a marked inability to accurately perceive his social environment.  Francis grew up to be an adolescent who was confused by the signals he received from people around him and, when confused, experienced distortions of reality and, at times, became paranoid.

1   (*Id.* at 117-18, ¶ 283.)  In addition, petitioner dissociated as a way of coping with

2   the world around him.  Francis had a genetic predisposition to dissociative

3   disorder, dissociated at various times during his childhood and experienced

4   incredible stress in the weeks leading up to the crimes.  (*Id.* at 118-19, ¶¶ 284-86;

5   121, ¶ 291.)  Petitioner knows about many of the circumstances of the crime, but

6   he cannot actually remember many of them.  (*Id.* at 119-21, ¶¶ 287-89.)

7   Petitioner's confession, despite the level of detail, contains evidence that petitioner

8   dissociated during the crimes.  (*Id.* at 122, ¶ 292; 123 ¶ 295.)  The taped statement

9   also suggests that petitioner's thought processes were psychotic during the crimes.

10  (*Id.* at 122, ¶ 294.)  Petitioner's testimony at the penalty phase provides further

11  evidence of dissociation.  (*Id.* at 123-24, ¶ 296.)

### b.  Psychiatrist Dorothy Otnow Lewis

13          Dr. Lewis is a professor of psychiatry at New York University School of

14  Medicine and a clinical professor at the Yale University Child Study Center.

15  (Lewis 8/15/03 Decl. at 1, ¶ 2.)  Dr. Lewis evaluated petitioner's neuropsychiatric,

16  medical and family background.  She also considered how those factors may have

17  affected petitioner's conduct on the night of the crimes, including his capacity to

18  form the specific intent to commit rape and murder.  (*Id.* at 1, ¶ 1.)

19          Dr. Lewis interviewed petitioner for three days in 1990 and two days in

20  2003.  She interviewed petitioner's adoptive mother, Naomi; adoptive father,

21  Frank; biological mother and father; adoptive paternal aunt; and adoptive paternal

22  uncle.  She also reviewed the declarations of petitioner's adoptive and biological

23  relatives, as well as others.  (*Id.* at 2, ¶ 3.)

24          Dr. Lewis provided a detailed social history of petitioner, emphasizing the

25  "biopsychosocial factors" that affected petitioner's mental state at the time of the

26  crimes.  She explained her approach as follows:

27

28          It is impossible to understand Francis Hernandez's psychiatric
        condition throughout childhood and during adolescence, the

development period at which time the offenses were committed, without a clear understanding of the interactions among his genetic vulnerabilities to severe mental illness which he inherited from his biological mother and father, the effects of in utero exposure to alcohol and drugs, repeated head injuries beginning in early childhood, and an upbringing in a psychotic, physically and sexually abusive, and severely neglectful adoptive family.

(*Id.* at 4, ¶ 8.) Dr. Lewis considered the mental health of petitioner's biological relatives, which included major depression and bipolar mood disorders. (*Id.* at 6-12, ¶¶ 11-30.) "[O]ne can trace psychiatric illness of psychotic proportions through three generations of Francis Hernandez's paternal biological relatives as well as three generations of his maternal biological relatives." (*Id.* at 12, ¶ 30.)

Dr. Lewis also reviewed the psychiatric history of petitioner's adoptive family. Naomi was raised by a "psychotic," "violent, [] strict disciplinarian" who "harbored religious delusions (e.g. being raped and having her vagina probed by the Devil)." (*Id.* at 13, ¶ 33.) Ultimately, Naomi's mother was diagnosed with chronic schizophrenia, paranoid type. (*Id.* at 14, ¶ 34.) Dr. Lewis concluded that "Naomi's childhood experience of being raised by a violent, delusional mother undoubtedly influenced the psychotic manner in which she treated" petitioner. (*Id.* at 13, ¶ 33.) Naomi's father was both "a depressed, unfeeling, verbally abusive man—a 'hermit' who isolated his wife and children from the rest of society" and simultaneously "a hard drinking man about town who infuriated his wife with his overspending and affairs with women." (*Id.* at 13, ¶ 32.)

Naomi was always considered different as a child: shy, withdrawn, unable to express herself, slow and possibly retarded, paranoid, confused, disoriented and unable to relate to others. While she was diagnosed with thyroid dysfunction as a teen, Dr. Lewis opines that these symptoms relate to Naomi's developing psychosis. (*Id.* at 14, ¶ 36.) Naomi had difficulty coping as an adult. Her family and her in-laws described her as immature, incompetent and unable to cope with the demands of her life. (*Id.* at 14, ¶ 37.) Naomi attempted suicide when petitioner was 5; she was admitted to a psychiatric hospital for three months and diagnosed

with schizophrenia.  She was hospitalized in a psychiatric facility for four months when petitioner was seven and involuntarily committed again when petitioner was eight.  Hospital records describe her as "agitated, confused, homicidal and delusional." (*Id.* at 15, ¶ 39 (internal quotation marks omitted).)  After Naomi's first hospitalization, Frank removed all of the kitchen knives from the house.  (*Id.* at 15-16, ¶ 39.)  When medicated, Naomi could barely function.  The house was dark and very disordered, and people described Naomi as weird or zombie-like. (*Id.* at 17, ¶ 42.)

Naomi acted so bizarrely at times that her sister and brother-in-law never left their children alone with Naomi and feared for petitioner's safety in his mother's care.  (*Id.* at 17, ¶ 41.)  Naomi believed that petitioner was possessed by the devil; she gave him enemas to make him clean and to improve his behavior.  (*Id.* at 18, ¶ 45.)  Frank would help get control of petitioner and have him bend over the tub with his bottom in the air so that Naomi could insert the enema nozzle up petitioner's rectum.  Naomi would make petitioner hold the liquid as long as he could, up to fifteen minutes, before she would allow him to relieve himself.  "This particular manifestation of Naomi's psychosis is important because of its relevance to aspects of the offense in question (i.e. inserting objects into his victims' bodily orifices)." (*Id.*)  "Children who have had objects shoved into their rectums repeatedly against their will are at a high risk of perpetrating similar acts on others." (*Id.*)

Naomi also behaved in sexually inappropriate ways around petitioner, such as wanting to do a striptease in front of petitioner, dressing seductively and bringing home a former fellow patient, with whom she had sexual intercourse while hospitalized, at a time when petitioner may have been there.  (*Id.* at 18, ¶ 46.) Frank believed that Naomi may have molested petitioner, noting that petitioner and his mother shared a bed when petitioner was nine and ten.  (*Id.* at 18-19, ¶ 46.)  Dr. Lewis described petitioner's relationship with his adoptive mother as follows:

1

2

3

4

5

6

> The influence of [petitioner's] mother's sexually provocative, inappropriate behaviors, anally assaultive acts, and the emotional reaction they engendered in Francis, clearly contributed to the nature of . . . the offenses. Children who have been repeatedly stimulated sexually and/or teased sexually by an adult, especially by a mother, are at a very high risk of acting out sexually and aggressively toward women other than their abusers . . . [O]ne cannot overemphasize the effects on Francis, a psychiatrically vulnerable child to begin with, of being raised by a chronically psychotic, sexually abusive mother.

7   (*Id.* at 19, ¶ 46.)

8   Since leaving petitioner and his father, Naomi has been hospitalized many

9   times, often following suicide attempts. She has spent years in group homes and

10  residential treatment homes, as well as some time homeless on the streets of San

11  Francisco. (*Id.* at 17, ¶ 43.)

12  Frank, petitioner's adoptive father, was raised in a violent home in which the

13  father drank to excess. (*Id.* at 19, ¶ 47.) Relatives and others describe Frank as

14  quiet, withdrawn, socially isolated and oblivious to his surroundings, including

15  Naomi and petitioner's mental health problems. (*Id.* at 20, ¶ 49.) Frank also

16  suffered from paranoia. (*Id.* at 20-22, ¶¶ 50-54.) He had grandiose opinions about

17  petitioner's capabilities, including buying petitioner a motorbike powerful enough

18  for an adult at age five, allowing petitioner to back a van out of the driveway at age

19  eight, to drive a car at age ten and to drive a motorcycle without a license as a

20  teenager. (*Id.* at 22, ¶ 55.) Frank also abandoned petitioner. Frank expected

21  petitioner to take care of his mother when he was just five years old. (*Id.* at 22,

22  ¶ 56.) When Naomi left, Frank left fifteen-year-old petitioner to fend for himself,

23  leaving food in the refrigerator or money on the table. (*Id.* at 23, ¶ 57.)

24  Dr. Lewis also reviewed petitioner's medical and psychiatric history.

25  Petitioner experienced multiple events that are known to increase vulnerability to

26  psychiatric illnesses, social and academic maladaption and violence, including his

27  biological mother's ingestion of alcohol and marijuana. (*Id.* at 23, ¶ 59.)

28  Petitioner's hyperactivity, his adoptive mother's incompetence and his father's

1    poor judgment combined to put petitioner at great risk for injuring himself.  (*Id.* at
2    23, ¶ 60.)   Petitioner's injuries included the following:  riding a tricycle into an in-
3    ground pool at age two; ingesting a bottle of baby aspirin around the same age;
4    crashing a mini-bike into a wall at age five, requiring stitches to his chin; numerous
5    bike and skateboard accidents during his elementary and middle school years that
6    resulted in head injuries; eleven motorcycle accidents in his teens, including one on
7    which his helmet was dented.  (*Id.* at 24, ¶ 60.)  These sorts of head injuries likely
8    exacerbated the psychiatric symptoms of bipolar disorder.  (*Id.* at 24, ¶ 61.)

9          Dr. Lewis attributed petitioner's early hyperactivity to any of the following:
10   the drugs and alcohol to which petitioner was exposed in utero, early
11   manifestations of mania that petitioner inherited from his episodically psychotic
12   biological parents, the effects of inadequate mothering or a combination of all
13   three.  (*Id.* at 25, ¶ 63.)  As a preschooler, petitioner engaged in psychotic behavior,
14   including misperceiving reality, misreading social cues, attacking other children
15   without provocation, bringing dangerous items to school, engaging in dangerous
16   acts, being unable to switch from one activity to another without extreme distress
17   and experiencing episodes of uncontrollable yelling and crying.  (*Id.* at 26-27, ¶¶
18   67-68.)  Dr. Lewis described these behaviors as "characteristic of a traumatized
19   child who is out of touch with reality" and "characteristic of severely
20   psychiatrically ill young children who have witnessed and/or been victims of
21   extreme, bizarre violence."  (*Id.* at 27, ¶¶ 67-68.)  Moreover, these behaviors are
22   also characteristic of dissociative children.  (*Id.* at 27, ¶ 69.)  Dr. Lewis explained
23   that "[r]ecurrently traumatized, dissociative children exhibit trancelike states,
24   impaired memory for behaviors and events, and dramatic and instantaneous
25   fluctuations in behavior."  (*Id.* at 28, ¶ 70.)  "They often have aggressive
26   overreactions in response to neutral stimuli because they are misperceived as
27   threats."  (*Id.*)

28          Due to petitioner's bizarre behavior, the adoption agency referred five-year-

old petitioner for a psychological evaluation.  Joseph Sawaya observed that petitioner had endless energy; was restless and demanding; acted out, suffered from a short attention span; performed poorly on a test of central nervous system functioning, indicating possible brain impairment; was destructive and fantasized profusely.  (*Id.* at 28-29, ¶ 72.)  These observations and test results show that petitioner was psychotic and that "he was a danger to himself and others and desperately needed removal from his home and psychiatric hospitalization.  Instead of hospitalizing and treating this frantic, very disturbed, five year old, however, Francis was allowed to remain in his psychotic adoptive home."  (*Id.* at 29, ¶ 73.)  The physical condition of petitioner's home added to petitioner's problems.  Dr. Lewis testified that "[n]o child raised in such an environment could be expected to develop normally.  He or she would have no models for normal social interaction and no experiences of the kind of ongoing nurturing and cognitive stimulation that every human being requires for normal adaptation."  (*Id.* at 30, ¶ 76.)

Petitioner's struggles continued into adolescence.  (*Id.* at 31, ¶ 78.)  Petitioner was paranoid and experienced rapid, wild mood swings.  (*Id.* at 32, ¶¶ 70, 78-79.)  He also experienced trance-like states, unrelated to the use of drugs or alcohol.  (*Id.* at 32-33, ¶ 80.)  Petitioner's rapid mood swings, trance-like states and strikingly different use of penmanship and spelling depending on mood suggest pathological dissociation, "characteristic of people who, as children, experienced severe[,] ongoing, intolerable abuse, usually of sexual as well as physical and emotional in nature."  (*Id.* at 33, ¶ 81.)  Dr. Lewis concluded that petitioner's history with sudden self-injury, property damage, impaired memory and trance-like episodes related to the murder of Kathy Ryan.  Petitioner intended to see her later in the week, and nothing indicated he intended to kill her on the night of the crime.  The murder does not seem premeditated, but, rather, suggests that petitioner was in a dissociative state.  (*Id.* at 33-34, ¶ 82.)

Dr. Lewis also diagnoses petitioner with bipolar mood disorder.  (*Id.* at 34-36, ¶ 84; *see also* 2 Lewis Depo. at 278 ("[W]hether you wish to call it the manic phase of bipolar mood disorder or the manic phase of Schizoaffective, schizophrenic disorder . . . he was severely psychiatrically ill at the time . . . and the psychotic nature of the illness was manifested in childhood, which tells you about the severity of the disorder.").)

No single factor accounts for petitioner's behavior at the time of the crimes. (Lewis 8/15/03 Decl. at 36, ¶ 85.)  A combination of several factors worked together, including that petitioner suffers from bipolar mood disorder and appeared to be in a manic or hypomanic state at the time of the offenses; petitioner's struggle with dissociative symptoms, which include violent responses to misperceptions and impaired or distorted memory; multiple head injuries; and being raised by a psychotic mother and a paranoid father prone to physical aggression in an abusive home.  (*Id.* at 36-37, ¶ 85.)  Moreover,

> Francis Hernandez had [a] constellation . . . of intrinsic neuropsychiatric vulnerabilities (i.e.[,] bipolar mood disorder, pathological dissociation, history of numerous head injuries) and extreme intra-family stressors (i.e.[,] an upbringing in a psychotic, physically and sexually abusive, and severely neglectful household) which engendered his extreme[,] uncontrollable[,] violent acts.  The knowledge of these biopsychosocial vulnerabilities and the appreciation of their role in Francis Hernandez's offenses are vital to understanding his compromised mental functioning on the nights of the murder in question.

(*Id.* at 37, ¶ 86.)  In sum, petitioner's "capacity to premeditate and deliberate[ and] his capacity to form the specific intent to rape and kill, was substantially impaired." (*Id.* at 37, ¶ 87.)

Moreover, Dr. Lewis opined that testimony about petitioner's mental health could have provided helpful evidence at the penalty phase.  The difference between the psychotic household in which petitioner was raised and the "minimally nurturing, stimulating and protective environment required for normal

27

1   development and adaptation would have been powerful information to present

2   during the mitigation phase of Francis's trial." (*Id.* at 30, ¶ 77.) Moreover, "[i]t is

3   hard to imagine how a more genetically resilient child could have weathered the

4   family environment and adapted appropriately to society, much less a child with

5   Francis's inherent vulnerabilities to mental illness." (*Id.* at 31, ¶ 77; *see also* 2

6   Lewis Depo. at 283 ("[W]hen you get a vulnerable child who is then adopted into

7   or raised in a psychotic environment in which you don't know what your mother or

8   your father will be like and in which there are such stressors . . . then you are

9   creating an aberrant human being, a person who cannot function the way other

10  people do.").)

11                  **c.      Criminologist Sheila Balkan**

12          Criminologist Sheila Balkan obtained her doctorate in sociology, with a

13  specialization in criminology, deviant behavior and mental health. (Balkan 8/15/03

14  Decl. at 1, ¶ 2.) The stated purpose of her declaration is to provide a social history

15  of petitioner and identify the issues in his life and background that help explain the

16  crime. (*Id.* at 1-2, ¶ 4.) Dr. Balkan reviewed the trial testimony of Drs. Rayyes,

17  Girsh and Maloney. (*Id.* at 2, ¶ 6.) She also reviewed the findings of Dr. Lewis,

18  including Dr. Lewis's 1990 assessment of petitioner and her 2003 declaration. (*Id.*

19  at 2, ¶ 4.) Dr. Balkan conducted interviews of petitioner, his former girlfriend, his

20  childhood friend Morris Silverstein and the mother of childhood friend Douglas

21  "Eddie" Duffey. (*Id.* at 4, ¶ 9.) Dr. Balkan also reviewed declarations, notes of

22  interviews or both for many individuals, including petitioner's biological parents

23  and other biological relatives, his adoptive parents, other members of his adoptive

24  family, petitioner's preschool teacher and the parents of petitioner's former

25  girlfriend, among others. (*Id.*) Dr. Balkan reviewed extensive records, including

26  petitioner's adoption, school, CYA, prison, juvenile criminal and probation

27  records, as well as earlier psychological assessments of petitioner. (*Id.* at 4, ¶ 10.)

28          Dr. Balkan's declaration provided a social history of petitioner's life, very

28

1   similar to that provided by Drs. Clausen and Lewis.  (*See id.* at 5-77.)  She added

2   that the those who knew petitioner found it hard to believe that he committed the

3   crimes because they were so out of character.  (*Id.* at 78-79, ¶¶ 262-63.)

4        Dr. Balkan criticized the trial testimony of Drs. Rayyes, Girsh and Maloney,

5   stating that "none of these experts were given adequate information to form

6   opinions that would have be[en] helpful to the jury's understanding."  (*Id.* at 2-3,

7   ¶¶ 6-8.)  Ultimately, she concurred in Dr. Lewis's diagnosis of petitioner with

8   psychosis, bipolar disorder and dissociation.  (*Id.* at 2, ¶ 5; 77-78, ¶¶ 260-261.)

9   Dr. Balkan concluded:

> While the role of each of the factors that Dr. Lewis identifies is difficult to quantify, it seems safe to say that if Francis' genetic susceptibility to mental illness or the high degree of dysfunction and neglect in the home in which he was raised were removed, the offenses would never have occurred.  Evidence of this can be seen in the 22 years that Francis has conformed himself to prison life.  He is a model prisoner and, although he states that he has become mad on occasion, he has always controlled his temper.  One of the sad facts of Francis' life is that he has been on his own since as early as he could walk and talk.  Lacking any supervision or structure, Francis' yearning for security can be seen in the reports of the many adults that Francis reached out to.  With Francis' impaired understanding of the social interactions and the lack of any involvement from either parent, it is only with having been incarcerated that Francis has been given the benefit of a set of comprehensible social rules within which he can form expectations and conform his conduct.

19  (*Id.* at 80, ¶ 265.)

20       **d.    Psychologist Daniel Martell**

21       Dr. Martell is a clinical psychologist, retained by respondent as a "forensic

22  neuropsychological expert."  (Martell Decl. at 1, ¶ 4.)  He reviewed the California

23  Supreme Court opinion, trial counsel's file, various lay declarations, the penalty

24  phase transcript, the declarations of Drs. Clausen, Balkan and Lewis, and the

25  examination notes of Drs. Lewis and Clausen.  (*Id.* at 1-2, ¶ 5.)  Dr. Martell

26  examined petitioner for a full day in 2003.  (*Id.* at 2, ¶ 6.)

27       Dr. Martell administered various tests to petitioner.  (*Id.* at 2, ¶ 7.)  Petitioner

28  provided a personal history, which included "reports of significant mental illness in

1   his biological and adoptive families; lack of parental supervision; extensive drug

2   and alcohol abuse beginning at an early age (5th grade); early onset of conduct

3   disorder; and recurrent criminal and antisocial behavior." (*Id.* at 2, ¶ 8.) Dr.

4   Martell offered the following summary of his evaluation of petitioner:

6           [Petitioner's] thoughts were expressed in a logical, coherent and goal
            directed fashion, with no evidence of formal thought disorder. He was
7           in good contact with reality, and reported no history of psychotic
            symptoms (e.g., hallucinations or delusions) except during periods
8           w[h]ere he has been intoxicated with drugs/alcohol. Emotionally, his
            observable affect was stable and mildly blunted. There was no
9           evidence of symptoms of any major affective disorder (e.g.,
            depression or mania) and he denied any affective symptomatology
10          with the exception of periods when he has been intoxicated with drugs
            and/or alcohol. His underlying mood was euthymic. He denied any
11          history of dissociative symptoms, except during periods when he was
            intoxicated with drugs and/or alcohol.

13  (*Id.* at 2-3, ¶ 8.)

14          Based on his evaluation of petitioner, Dr. Martell described the "claim that

15  Mr. Hernandez suffers from psychosis, bipolar disorder, brain impairment, and/or

16  dissociation" as "unsupported and misleading." (*Id.* at 4, ¶ 13.) Dr. Martell

17  explained that "examining doctors have not found [petitioner] to be so impaired,"

18  citing to the evaluations by Joseph Sawaya and Drs. Prentiss, Minton, Davis and

19  Maloney. On cross-examination, however, Dr. Martell admitted that none of those

20  individuals had access to records concerning petitioner's biological parents or to

21  declarations from petitioner's biological and adopted families, preschool teacher,

22  lifelong friends or ex-girlfriend's parents. (Martell Depo. at 131-134.) Dr. Martell

23  concluded that his examination of petitioner, "which failed to indicate any major

24  mental disorder or significant brain impairment other than Antisocial Personality

25  Disorder" was consistent with the historical evaluations of petitioner. (Martell

26  Decl. at 5, ¶ 17.) Moreover, Dr. Martell opined that petitioner's "extensive history

27  of alcohol and substance intoxication appears to completely account for and

28  underlie the symptoms described by Dr. Lewis and attributed to Bipolar disorder,

1    psychosis, or dissociation." (*Id.*)  Dr. Martell testified that petitioner's troublesome

2    childhood behaviors "are well captured by the diagnosis of Conduct Disorder,

3    Childhood-Onset Type." (*Id.*)  Moreover, petitioner's genetic predisposition to

4    mental illness "does not mean that he actually manifests any mental disorder," as

5    "it is still most likely that the offspring will not manifest the disorder." (*Id.* at 6,

6    ¶ 18.)  Dr. Martell added that petitioner may meet the diagnostic criteria for Sexual

7    Sadism. (*Id.* at 6, ¶ 19.)  Finally, Dr. Martell concluded that "other than being in a

8    state of intoxication, there was no major mental disorder operating to 'substantially

9    impair' Mr. Hernandez's thinking or behavior at the time of the crime." (*Id.* at 7,

10   ¶ 20.)

11        There are serious reasons to doubt the credibility of Dr. Martell's testimony.

12   Petitioner's experts have questioned Dr. Martell's methodology.  For instance,

13   Dr. Lewis criticized Dr. Martell for "tak[ing] issue with the fact that Francis has

14   close relatives who suffer from severe mood disorders, because they have not been

15   diagnosed at a hospital," but notes that "any experienced clinician would recognize

16   the kinds of signs, symptoms and behaviors . . . [as] characteristic of bipolar

17   (manic-depressive) or schizoaffective disorders.  (Lewis 5/8/04 Decl. at 4-5, ¶ 7.)

18   Dr. Lewis also commented on Dr. Martell's testimony that petitioner had a thirty

19   percent risk of having bipolar disorder, when a prominent study by the National

20   Child Institute concluded that children with two bipolar parents and extended

21   families with mood disorders had nearly a one hundred percent risk of developing

22   a similar disorder. (*Id.* at 5-6, ¶¶ 8-11.)  Dr. Lewis also scrutinized Dr. Martell's

23   failure to note the increased risk of mental illness petitioner suffered due to in utero

24   exposure to alcohol and drugs, as well as head injuries throughout childhood and

25   adolescence. (*Id.* at 7, ¶ 14.)

26        Although he offered opinions about petitioner's childhood and possible

27   diagnosis with child-onset conduct disorder, Dr. Martell admitted that child and

28   adolescent psychology were not his major interest, that he had not treated any child

31

1   or adolescent for at least ten years, that he had not studied or written in the area for

2   ten to fifteen years and that he had never sought board certification in that area.

3   (*Id.* at 281; *see also* Lewis 5/8/04 Decl. 8-9, ¶¶ 20-21.)  Dr. Martell did not note the

4   clinical significance of petitioner's absence of childhood memories, which,

5   according to Dr. Lewis, is "characteristic of severely abused, dissociative children,

6   adolescents and adults." (Lewis 5/8/04 Decl. at 9, ¶ 23.)  Dr. Lewis rejected Dr.

7   Martell's diagnosis of petitioner with conduct disorder, noting that he dismissed

8   the indicators of petitioner's early severe psychopathology observed by petitioner's

9   preschool teacher and others.  (*Id.* at 10, ¶ 26.)  Dr. Martell failed to rule out

10   organic, bipolar, schizophrenic, dissociative and other psychiatric disorders before

11   diagnosing petitioner with conduct disorder.  (*Id.* at 11, ¶ 28.)

12        Dr. Martell testified that the administration of enemas to petitioner was not

13   sexual abuse.  (Martell Depo. at 432-33.)  Dr. Lewis strongly disapproved of this

14   conclusion:

15

16        Another sign of Dr. Martell's lack of clinical experience with
     children and adolescents is his assertion that being given ritual enemas

17   twice a week throughout childhood by a psychotic mother is not
     indicative of sexual abuse.  Repeatedly holding a child down and

18   inserting objects into that child's rectum is a form of sodomy.
     Whether or not the perpetrator intends to sexually abuse the child or

19   not is irrelevant.  The acts are experienced by the child as repeated
     anal sexual assaults.  Any minimally trained child psychiatrist, child-

20   psychologist or pediatrician would recognize the sexually abusive
     nature of the enemas to which Francis was subjected for years.

21

22   (Lewis 5/8/04 Decl. at 11, ¶ 30.)  In addition, Dr. Lewis criticized Dr. Martell's

23   evaluation of petitioner with respect to physical abuse.  Dr. Lewis observed that

24   when petitioner began to report instances of physical abuse that would lead to

25   dissociation, Dr. Martell cut the answer short or ignored petitioner's answer.  (*Id.*

26   at 11-12, ¶ 31.)  For instance, petitioner reported to Dr. Martell that once his father

27   beat him so badly that he broke his thumbs, but Dr. Martell did not ask for

28   elaboration.  Instead, he asked if petitioner's parents got along.  Later, Dr. Martell

32

asked petitioner if he was ever abused, but petitioner had already reported being

beaten frequently with a strap on his bare buttocks and that he once broke his

thumbs at his father's hands.  (*Id.* at 12, ¶¶ 31-32.)  According to Dr. Lewis, a

clinician trained in child psychiatry, psychology or pediatrics "would know that

dissociation occurs to enable a child to forget abuse and its sequela[].  Hence, one

must rely on scars, records and the accounts of observers to obtain an accurate

picture of the abused individual's past."  (*Id.* at 12, ¶ 33.)

Dr. Lewis noted that in evaluating petitioner, Dr. Martell elicited important

indicators of dissociation, but he either ignored or failed to recognize them.  (*Id.* at

13, ¶ 35.)  Dr. Lewis listed many such examples in her declaration.  (*Id.* at 13-15,

¶¶ 36-41.)  Similarly, Dr. Lewis catalogued the many instances in which petitioner

provided Dr. Martell with information suggestive of bipolar disorder, which

Dr. Martell either did not explore or address.  (*Id.* at 16-17, 18, ¶¶ 43-46, 48.)

Dr. Lewis concluded:

> Francis Hernandez provides Dr. Martell with ample evidence of
> severe physical and sexual abuse, of severe dissociative
> psychopathology, and manic or hypomanic states.  That Dr. Martell
> fails to appreciate the significance of the signs and symptoms and
> behaviors he elicited on interview is puzzling.  In all likelihood, his
> lack of clinical experience with children and adolescents explains his
> inability to recognize the significance of what he is told.  Similarly,
> probably for the same reasons, he misinterprets the copious evidence
> of severe psychopathology in school records, the early psychological
> testing, and the declarations of family and friends.  Dr. Martell elicited
> valuable information.  One would be reluctant to believe that he
> deliberately ignored or distorted what he saw.

(*Id.* at 18, ¶ 49.)

In addition, Dr. Lewis explained that to make a valid diagnosis, the examiner

must consider evidence of the patient's early behavioral, psychological,

educational and medical history.  The examiner must take the observations of

family and friends seriously and must be able to recognize the early signs and

symptoms of childhood and adolescent mental illness.  She faulted Dr. Martell for

33

his failure to do these things.  (*Id.* at 19, ¶ 50.)  Dr. Lewis also observed that the "neuropsychological and personality testing on which Dr. Martell relies are not adequate diagnostic tools for recognizing the existence of severe psychopathology" in a capital defendant.  (*Id.* at 19, ¶ 51.)

Dr. Lewis also rejected Dr. Martell's diagnosis of petitioner with antisocial personality disorder, given the evidence of bipolar disorder and significant dissociative psychopathology.  (*Id.* at 19, ¶ 52; *see also* Gur 2/8/05 Decl. at 39 (noting that during the developmental and formative years, the behavior of individuals who have a genetic vulnerability to a psychiatric disorder and who acquire a head injury is often confused with and misinterpreted as conduct disorder).)  In fact, Dr. Lewis concluded her 2004 declaration with the following statements:

> Finally, a word should be said about Francis Hernandez's genuine sense of guilt. In my relatively long career studying violence, I have never heard any other condemned offender articulate, not only the magnitude of his offense, but also the depth of his remorse as does Francis Hernandez.  Francis says it far better than I could paraphrase it.  Francis asks himself, "Am I sorry it happened?  Hell yes." Dr. Martell then asks simply, "Why?"  Francis replies:  "Because I actually—because apparently, without knowing what I was doing or not knowing why, apparently killed a friend.  I also killed another girl, Edna—I'm sorry for myself because it fucked up the rest of my life. But it cut short her life, cut short their lives.  Fucked up their families, fucked up my family.  Had all kinds of repercussions.  Besides being wrong, besides being something . . . that I never thought I would do, yeah, all kinds of things.  Why do I feel sorry?  There's nothing I can do about it.
>
> He continues, "What can I do?  Even to say I'm sorry to the family?  I feel sorry for the family.  I am sorry.  I'm not adverse to saying it, but I don't think I should, because I don't think it would do any good."  The following words bespeak a kind of compassion that is rarely observed in the violent offender population.  Francis has, clearly, thought as much about the bereaved families of his victims as he has about himself and what the effect of an apology might be.  He goes on:  "I think it would probably be worse for them than for me—to hear from me, 'I'm Sorry'—You remind them, it's like a slap in the face.  He's still alive, I'm sitting here [while] their child's dead. You can never replace a child."  These are not the words of a sociopath.

34

1    (Lewis 5/8/04 Decl. at 21-22, ¶¶ 57-58.)

2        Additionally, Dr. Lewis took issue with Dr. Martell's testimony about

3    recessive genes; about his opinion that there is one "gene" for bipolar disorder,

4    when it is thought to result from the interactions of multiple genes coupled with

5    environmental factors; his failure to appreciate the effects of an adverse

6    environment on the manifestation of mental illness in petitioner; his testimony that

7    abused children have a four percent chance of developing aggressive tendencies

8    when numerous studies show that neuropsychiatrically vulnerable children are at a

9    high risk of developing abusive behaviors if they have been abused or raised in

10   violent homes; and his unsupported suggestion that petitioner may suffer from

11   sexual sadism.  (*Id.* at 7, ¶ 15; 8, ¶¶ 16-17; 8, ¶ 19; 19-20, ¶¶ 53-54.)

12       Dr. Ruben Gur, a psychologist retained by petitioner, also questioned

13   Dr. Martell's methodology.  Dr. Gur summed up his criticism this way:

14   Dr. Martell "reaches his conclusions without properly pursuing several

15   conspicuous leads to the contrary disclosed by the results of the tests he gave, and

16   without integrating many of the details of Mr. Hernandez's history contained in the

17   lay witness declarations with the results of his testing."  (Gur 6/8/04 Decl. at 7-8,

18   ¶ 13.)  Moreover, "[t]here is a discrepancy between data obtained in the interview

19   and testing and contained in the social history documents on the one hand, and the

20   direction of the interview and interpretation relating to the issue of memory and

21   executive functions on the other."  (*Id.* at 8, ¶ 14.)

22       Dr. Gur reviewed Dr. Martell's tape-recorded examination of petitioner.  Dr.

23   Gur testified:

24

25           I was, frankly, quite perturbed by the whole interview and the
         tone of it starting from the get go. It was not a clinical interview.  It
26       did not follow any of the standards that I learned about how to
         conduct a clinical interview.  It was almost designed to hide any sign
27       of psychopathology, which is the opposite of the purpose of a clinical
         interview . . . . He goes on to present it as almost a legal interrogation
28       rather than a clinical interview, including this strange statement that
         has a veiled—thinly veiled threat, where he says something to the
         effect that, if you are straight with me, I'll be straight with you.

35

1
2
3
4
5
6
7

     It's just, I have never heard anybody, any clinician, in training or after training or in teaching, who would make any statement like that when trying to interview someone in a clinical—in an effort to arrive at a clinical diagnosis.  Granted that he is not there to treat him, he still wants to probe into areas that are very difficult for most people to talk about and are especially difficult to talk about for people who have deficits or dysfunction in that area.  Because if you suffer from a mental illness, one thing that is very clear to you in your own mind is that there are lots of things that go on in your mind that are strange; that if other people knew about them, they will freak out.  They will consider them scary or appalling.  And so it takes a lot of sensitivity and support to allow someone to talk about those things.

8
9
10
11

     Anybody who has clinical experience interviewing folks with brain damage, or any major psychiatric disorder, knows that one major feature of brain damage and psychiatric disorder is denial of symptoms . . . And if you ask them, is there anything the matter with you?  They'll say no, I'm fine.  Everything is cool.  Everything is great.  Then, it takes a while and probing and encouragement, and then they'll start revealing some strange things about themselves.

12
13
14

     So I was impressed with Martel[l]'s interviewing style that was almost designed to make Mr. Hernandez look healthy and go with the natural tendency of people with severe mental illness to deny that there is anything wrong with them or at least to have difficulties exposing things about them that are scary and socially unacceptable.

15  (Gur Depo. at 430-32.)  Dr. Gur also noted many instances where petitioner

16  indicated a problem that Dr. Martell ignored or failed to appreciate as significant.

17  (*Id.* at 432-33.)  Dr. Gur explained that "[w]henever Mr. Hernandez came up with a

18  statement that could imply some emotional pain or some insult to him, instead of

19  encourag[ing] . . . him to go in that direction, [Dr. Martell] would then either skip

20  to the next question or ask a question that implied he is not really interested in that

21  stuff or that it's not important.  So it almost looked as if [Dr. Martell] reached his

22  conclusion before he started the interview and discouraged any information that

23  will counter his conclusion from emerging."  (*Id.* at 434.)

24       Specifically, Dr. Gur testified that the record includes many indicators that

25  petitioner is neuropsychiatrically impaired, despite Dr. Martell's conclusion that

26  petitioner had a mild to moderate impairment in verbal learning.  (Gur 6/8/04 Decl.

27  at 4, ¶ 9.)  Dr. Gur noted that the petitioner's "environment was replete with child

28  abuse and neglect, psychological and physical, of the kind that can lead to brain

1   damage, PTSD or dissociative disorders." (*Id.* at 5, ¶ 9.)  Also, the "existence of

2   such disorders is substantiated by poor impulse control and rather rock-bottom

3   scholastic performance starting at first grade, despite IQ scores falling 'within the

4   normal to superior range,' as noted by Dr. Martell." (*Id.*)  Dr. Gur explained that

5   petitioner's head injuries, along with extensive substance abuse starting at an early

6   age, could have disrupted brain development and function. (*Id.* at 5-6, ¶ 10.)

7          Dr. Gur noted that although petitioner reported amnesia about the crime and

8   his early childhood and adolescent years, Dr. Martell failed to conduct further

9   testing related to petitioner's memory. (*Id.* at 8, ¶ 14.)  The administration of the

10  California Verbal Learning Test ("CVLT") suggested impairment to petitioner's

11  frontal lobe, relevant to impulse control, but Dr. Martell failed to conduct further

12  testing to determine the effects of head injuries and substance abuse on the same

13  area of the brain. (*Id.* at 8, ¶ 15.)  Dr. Martell also relied on petitioner's denial of

14  any learning disabilities, when his academic performance starting in first grade,

15  belied that assertion, particularly in light of normal IQ scores. (*Id.* at 9, ¶ 16.)

16  Dr. Martell depended on various tests performed by Dr. Prentiss in 1979 to support

17  his conclusion that petitioner did not have brain damage, but the tests on which

18  Dr. Prentiss relied have been outmoded since 1974.  Dr. Gur testified that

19  Dr. Martell's conclusions about brain damage are, therefore, unreliable. (*Id.* at 9,

20  ¶ 17.)  Dr. Gur also faulted Dr. Martell for failing to consider evidence that brain

21  maturation is incomplete at age eighteen, and in petitioner's case, that substance

22  abuse may have delayed this process further. (*Id.* at 9-10, ¶ 17.)  Dr. Gur

23  concluded:

24

25          Neuropsychological testing, by itself, cannot show whether a
        person has bipolar disorder.  Neither can neuropsychological testing
26      show the presence or absence of brain trauma.  Like a thermometer in
        general medicine, it is a useful tool but does not provide a diagnosis.
27      Neuropsychological testing needs to be done in the context of
        medical, neuropsychiatric and neuroradiologic assessment and a
28      complete history of the patient.  Dr. Martell refers only in passing to a
        history of "significant mental illness in his biological and adoptive

37

families, lack of parental supervision, extensive drug and alcohol abuse beginning at an early age," and head trauma, but his findings do not take into account the extensive medical and social history information regarding Mr. Hernandez and his biological and adoptive families contained in the declaration of Drs. Balkan, Lewis and Clausen.

To summarize, although neuropsychological evaluation is a major part of diagnostic workup for any major psychiatric disorder, indeed for any disorder of complex behavior where brain dysfunction needs to be considered, it is not intended to be used as the sole procedure for arriving at a neuropsychiatric diagnosis, or ruling it out. The results of history and tests already available to Dr. Martell simply indicate the likelihood of brain dysfunction, and the interview and tests . . . conducted by him further support this diagnosis. Follow-up testing is indicated and a more focused evaluation, targeting frontal lobe functioning. There is also enough evidence implicating brain dysfunction to suggest the utility of further studies with structural and functional imaging.

(*Id.* at 10-11, ¶¶ 18-19 (citations omitted).)

Dr. Gur also noted that Dr. Martell's regular work as a testifying expert, rather than a clinician, made him an ineffective expert:

I would be concerned about someone who spends all of their time testifying, especially if they just testify for one side, without having clinical experience with people who come for help. It would distort their ability to understand the effects of brain dysfunction, since they always see through a prism of the medical-legal context. I would have a problem with someone like that. I don't think it gives them an advantage. I think, in some ways, it makes them less able to understand how the brain impacts behavior in general and when it comes to specific patients.

(Gur Depo at 482-83.)

Dr. Martell holds himself out as an expert in forensic neuropsychology. (Martell Depo. at 259.) Although eligible for at least a decade prior to the deposition, he had not sought board certification[5] in neuropsychology. (*Id.* at 277.) Dr. Martell testified that he "might" apply for board certification in neuropsychology, depending on "[t]ime and energy," as certification in

---

[5] It is unclear which board the parties mean when discussing board certification. (*See, e.g.*, Martell Depo at 257.) There appear to be many different kinds of boards, some of which are considered vanity boards. Both parties seem to agree, however that board certification has some value. (Martell Depo. at 281.)

1   neuropsychology "would be nice." (*Id.* at 279, 281.) Dr. Martell did obtain board

2   certification in forensic psychology in 2002. (*Id.* at 260.) When asked about how

3   many failed attempts he had made to become board certified in forensic

4   psychology, Dr. Martell refused to answer, citing the "peer review privilege" and

5   noting that he threw out all documentation related to his prior failed attempts to

6   obtain board certification. (*Id.* at 256, 259, 260, 263, 264, 265-68, 269-70, 271,

7   278-79; 281.) The peer review privilege does not apply to these proceedings. *See,*

8   *e.g.*, *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005) (declining to

9   recognize the peer review privilege in federal court); Fed. R. Evid 1101(3).

10  Dr. Martell testified that he threw out the documents in 2000 or 2001 because they

11  were "old" and "irrelevant," despite being asked to produce them in 1999 when he

12  was working on another death penalty case. (Martell Depo. at 267-268, 271.)

13  Accordingly, the Court gives little weight to Dr. Martell's testimony.[6]

14

---

15  [6]      Two incidents may give additional reason to doubt Dr. Martell's credibility. While

16  retained as an expert for the prosecution in the Ted Kaczynski case, Dr. Martell interviewed
    Dr. Gur, retained by Kaczynski, by telephone. (*Id.* at 305.) Dr. Martell recorded the

17  conversation without informing Dr. Gur. (*Id.* at 305-06.) Dr. Park Diet., who was present during
    the recorded phone call, told Dr. Martell that he should not be recording the call, but Dr. Martell

18  persisted. (*Id.* at 328, 336.) Upon learning that the conversation had been recorded, the
    prosecutor asked for a copy of the tape, which Dr. Martell provided. (*Id.* at 338.) Dr. Gur also
    requested a copy of the tape, which Dr. Martell did not provide, though Dr. Martell ultimately

19  apologized for what happened. (*Id.* at 339-340, 344.) Dr. Martell described the incident as
    creating a "black mark that would be an obstacle to [his] work in the future" and that he thought

20  it was "unfair." (*Id.* at 375.)
         Dr. Martell also was retained by the federal government in the capital prosecution of

21  Everett Spivey in New Mexico. (*Id.* at 346-47.) The prosecution retained Dr. Martell to
    examine the defendant. (*Id.* at 347.) The judge ordered Dr. Martell to file his report under seal

22  and to not discuss his findings or opinions with the prosecution team. (*Id.* at 348.) The defense
    filed a motion to remove the prosecutor, contending that the court's order had been violated. (*Id.*

23  at 348-49.) In opposing the motion, the prosecutor prepared an affidavit that Dr. Martell
    reviewed, edited and signed. (*Id.* at 351.) The affidavit stated that Dr. Martell did not disclose

24  any statements or information related to his examination of Spivey. (*Id.* at 353.) The court
    denied the defense motion. (*Id.* at 354.) After jury selection began, the U.S. Attorney's Office

25  conducted an internal investigation into Dr. Martell's declaration. (*Id.* at 359.) Following that
    investigation, the U.S. Attorney wrote to the Department of Justice, stating that Dr. Martell's

26  affidavit was incomplete and that the court's order was violated. (*Id.* at 370.) The prosecutor
    initiated plea negotiations that resulted in a dismissal of the death penalty against Spivey. (*Id.* at

27  370-71.) Subsequently, Dr. Martell was removed from a number of federal murder prosecution
    cases nationally. (*Id.* at 372.)

28       What seems to have happened is that one of the prosecutors hosted a dinner party, to
    which she invited the prosecution team and Dr. Martell. At that party, Dr. Martell posed a

1

### e.   Psychologist Charles Sanislow

2      In rebuttal, petitioner offered two additional experts:  clinical psychologist

3  Charles Sanislow and neuropsychologist Ruben Gur.

4      Dr. Sanislow is an assistant psychiatry professor at Yale Medical School and

5  a clinical psychologist.  (Sanislow Decl. at 1, ¶ 1.)  Dr. Sanislow reviewed

6  Dr. Martell's declaration, as well as raw test data and other materials relating to the

7  MMPI-2 administered to petitioner by Dr. Martell.  Dr. Sanislow also reviewed Dr.

8  Maloney's 1982 report and the results of the 1981 MMPI given to petitioner.

9  Finally, Dr. Sanislow reviewed Dr. Lewis's 2003 declaration.  (*Id.* at 4-5, ¶ 7.)

10      Dr. Sanislow testified that a profile derived from the MMPI or MMPI-2 is a

11  starting point for making a psychiatric diagnosis.  (*Id.* at 10, ¶ 19.)  The "gold

12  standard" in psychiatric diagnosis is called LEAD, which stands for "information

13  that is collected over a *L*ongitudinal period by *E*xperts who come to a consensus

14  based on *A*ll *D*ata available to them."  (*Id.* at 10-11, ¶ 20.)  A clinician must gather

15  as much information as possible from multiple sources in order to assess the

16  reliability of the information.  The more sources from whom a clinician gathers

17  information, the more confident that clinician can be in the final diagnosis.  (*Id.* at

18  11, ¶ 20.)  Therefore, a clinician should not only interview the patient thoroughly

19  and conduct appropriate psychological testing, but the clinician also should review

20  all available documentation about the individual's background.  (*Id.* at 11, ¶ 21.)

21

_____

22  hypothetical, asking whether a comment Spivey made about the prosecutors would be protected
by the court's order.  The prosecutors advised Dr. Martell that the court's order would not apply.

23  Knowing that the prosecutors were frightened of Spivey and feared for their physical safety,
Dr. Martell told them "you don't need to worry about [Spivey].  He feels sorry for you.  He

24  thinks you're a tortured soul."  (*Id.* at 467.)  Spivey made the comments to Dr. Martell after the
mental health examination, while the two men waited to be let out of the examination area.  (*Id.*

25  at 467-468.)  Dr. Martell asked the prosecutors who drafted his declaration if the statements
Spivey made should be put in the declaration but was advised that they fell outside the court's

26  order.  (*Id.* at 465, 479-80.)  Dr. Martell testified that Spivey's statements about the prosecutor
"had no relevance to [his] opinions or findings in the matter."  (*Id.* at 468.)  Dr. Martell believed

27  that the prosecutors initially denied that Dr. Martell told them about Spivey's statements but
ultimately "scuttled the case and blamed it on" him.  (*Id.* at 472.)  Before Dr. Martell's

28  deposition, respondent apparently did not know about this incident.  (*Id.* at 368-369.)

With respect to the 1981 MMPI results and Dr. Maloney's related report, Dr. Sanislow concluded: "The elevations noted by Dr. Maloney are indicative of confusion, disorientation, extreme stress and distortions of reality, and are consistent with the psychotic or dissociative thinking that can occur in a bipolar person and noted by Dr. Lewis." (*Id.* at 15, ¶ 27.)

Dr. Sanislow noted that the 2003 MMPI-2 administered by Dr. Martell revealed an elevation on Scale 4 but was otherwise within normal limits. The results were insufficient alone to rule out bipolar disorder, as the MMPI is less likely to reflect the relevant symptoms if the person is not experiencing a manic or depressed episode at the time of testing or if the subject has been stabilized for a long time prior to testing. Also, when an individual has been institutionalized for an extended period, the structured environment may help contain symptoms so well that the individual would appear asymptomatic. (*Id.* at 15-16, ¶ 28.) Moreover, Dr. Sanislow testified that the different results on the 2003 MMPI-2 as compared with the 1981 MMPI do not rule out the existence of a psychological disorder at the time of the murders. (*Id.* at 16, ¶ 30.) The results from petitioner's 1981 MMPI undermine Dr. Martell's conclusion that petitioner was not bipolar or in a dissociative state at the time of the crimes, particularly because Dr. Martell based his conclusion on the results of the MMPI-2 that he administered in 2003. (*Id.* at 17, ¶ 31.) "[T]he presence of elevated Scales 6, 8 and 9 on Mr. Hernandez's 1981 MMPI, at a time much closer to the date of the offenses and the stress which preceded the crimes, cannot be ignored or dismissed without comment." (*Id.*) Dr. Sanislow concluded that the 2003 MMPI-2 "is not a reliable instrument for determining whether Mr. Hernandez was bipolar or dissociative at the relevant times some 22 years prior in 1981." (*Id.* at 16, ¶ 30.)

Dr. Sanislow also testified that petitioner could have an elevated score on Scale 4 without suffering from antisocial personality disorder. (*Id.* at 17, ¶ 32.) The score could reflect petitioner's incarceration with others convicted of murder

41

or the abuse he suffered as a child.  (*Id.* at 17, ¶ 31.)  Moreover, "an elevation on [Scale 4] alone provides no reliable information about the subject's overall clinical status or functioning (e.g., whether he or she will act impulsively).  Only when the scale is considered as part of the overall profile, and in the context of convergent clinical information, can a clinician reliably draw conclusions regarding the subject's actual psychological condition."  (*Id.* at 18, ¶ 32.)

### f.    Neuropsychologist Ruben Gur

Dr. Gur is a clinical and research psychologist with a specialty in neuropsychological assessment, and the neurobiological basis and neurobehavioral aspects of schizophrenia.  He is a tenured professor at the University of Pennsylvania and serves as director of the neuropsychology department as well as the director of the Brain Behavior Laboratory.  (Gur 6/8/04 Decl. at 1, ¶ 1.) Dr. Gur reviewed Dr. Martell's testing data and testimony, the raw data from tests administered by Dr. Maloney and Joseph Sawaya, the testimony of Drs. Lewis and Sanislow, the report of Dr. Prentiss, petitioner's school transcripts, petitioner's statement to the police, petitioner's penalty phase and deposition testimony, the declarations of various lay witnesses, the trial testimony of Drs. Girsh, Maloney and Rayyes, the pretrial reports of Drs. Coburn and Davis, the California Supreme Court opinion on direct appeal, the autopsy records, the pathologist's trial testimony and petitioner's adoption records.  (Gur 2/8/05 Decl. at 3, ¶ 8; Gur 6/8/04 Decl. at 3, ¶ 7.)  Dr. Gur conducted a neuropsychological assessment of petitioner in 2004.  (Gur 2/8/05 Decl. at 3, ¶ 8.)

Dr. Gur testified that petitioner's test results were "highly abnormal."  In fact, Dr. Gur hadn't "seen profiles like that in a long time.  When [he] see[s] them, they've always been associated with severe brain damage."  (Gur Depo. at 462.) Dr. Gur concluded that petitioner suffers from brain damage that includes the left temporal lobe, the right superior temporal and the dorsal parietal sensorimotor cortex.  (Gur 2/8/05 Decl. at 10, ¶ 18.)  Petitioner's brain damage is "of unclear but

most likely congenital etiology, probably reflecting a neurodevelopmental disorder such as schizophrenia or affective illness, complicated by adverse perinatal and postnatal stressors." (Gur 2/8/05 Decl. at 10, ¶ 18; *see also* Gur Depo. at 268 ("I did think that either schizophrenia or bipolar illness is probably applicable in his case, although there may be other neural-developmental disorders as well that could have been applicable in his case such as attention deficit, hyperactivity disorder, impulse control.")

Dr. Gur explained that damage to the left temporal lobe causes verbal memory impairment, impeding one's ability to organize and recall information. (Gur 2/8/05 Decl. at 10-11 ¶ 19.) Damage to the temporal limbic and right parietal regions would cause difficulty interpreting emotional information, controlling and modulating one's emotional response and could lead to misperceptions or distortions of reality by impairing the ability to distinguish emotions. (*Id.* at 10-11, ¶¶ 19-20.) Extreme emotion and stress can exacerbate these impairments. (*Id.* at 11, ¶ 20.) Neuropsychological tests available in 1982 and 1983 would have shown these impairments, but counsel did not request a neuropsychological evaluation of petitioner. (*Id.* at 11-12, ¶¶ 21, 22.) The limited neuropsychological testing that Dr. Maloney gave to petitioner was "not intended to be, and was not an adequate substitute for, a comprehensive neuropsychological evaluation under the then-prevailing professional standards." (*Id.* at 12, ¶ 22; *see also* Gur Depo. at 454 ("I believe any competent clinical neuropsychologist who would go over the test results, even without the use of the behavioral image, would come to very similar conclusions, namely, that there is evidence" of brain damage.)

According to Dr. Gur, petitioner's brain damage has affected his perception of the world and the way he has functioned in relationships. He has an impaired ability to perceive reality accurately. Specifically, petitioner suffers from a profound impairment in his ability to perceive happiness and sadness, instead misperceiving these emotions as anger and fear. This long-held impairment,

43

1    experienced by petitioner as early as preschool, is more severe when petitioner is

2    experiencing extreme emotion or stress.  (Gur 2/8/05 Decl. at 12, ¶ 23.)

3         Dr. Gur testified that petitioner has attempted to cope with his inability to

4    perceive emotions accurately by relying on other cues to interpret feelings.

5    However, petitioner's efforts were unsuccessful due to the mental illness exhibited

6    by petitioner's adoptive parents.  His mother suffered from schizophrenia, and his

7    father met the criteria for paranoid delusional disorder.  Dr. Gur opined that the

8    "significant cognitive impairments and thought disorder associated with such

9    illnesses necessarily made it all the more difficult for Francis to learn to rely on

10   other cues."  (*Id.* at 12-13, ¶ 24.)  Petitioner's childhood behavior and the

11   psychological testing conducted by Joseph Sawaya on petitioner at age five support

12   the conclusion that he suffers from damage to the right parietal and left temporal

13   areas of his brain.  (*Id.* at 13-14, ¶ 25.)

14        Dr. Gur concluded that petitioner's brain damage is likely organic, meaning

15   that it was caused by a head injury, sustained either in utero, later or both.

16   Evidence exists that petitioner's mother was beaten during her pregnancy,

17   petitioner was delivered with the help of forceps and petitioner was involved in

18   many accidents as a child and adolescent.  (*Id.* at 14, ¶ 27.)

19        Dr. Gur opined that petitioner's deficits existed at the time of the crimes, and

20   his brain damage impacted petitioner's conduct during the crimes.  Due to his

21   impairments, petitioner could not understand or respond appropriately to his

22   victims' expressions of resistance and fear.  Petitioner's "misperception of reality

23   significantly interferes with his ability to make the right judgment, particularly in

24   an emotionally charged situation."  (*Id.* at 15, ¶ 29.)  Moreover, petitioner's brain

25   damage also may explain his inability to recall the details of the crime when first

26   question by the police.  Petitioner testified at his deposition that the police spent

27   several hours going over the details of the crime and showing him pictures before

28   they recorded his statement.  When petitioner testified at the penalty phase, he

44

1    repeatedly answered that he could not recall what happened.  (*Id.* at 15-16, ¶¶ 30-

2    32.)  The clinical data supports the conclusion that petitioner actually cannot recall

3    significant parts of the crime, and not that he is being evasive or feigning

4    forgetfulness.  (*Id.* at 16, ¶ 31.)

5         Dr. Gur also testified that petitioner's brain damage indicates that he was in

6    a dissociative state when he committed part or all of the crimes.  The combination

7    of left temporal and right parietal lesions can produce dissociation, or a state in

8    which a person can engage in a complex set of behaviors without intent or

9    premeditation.  Petitioner's statement to police, his inability to recall the details of

10   the crimes and his persistent inability to explain why he committed the crimes,

11   despite his acknowledgment that he is responsible for the crimes, are all consistent

12   with him having been in a dissociative state.  (*Id.* at 17, ¶ 35.)

13        Dr. Gur also created behavioral imaging, or a computerized algorithm

14   designed to identify brain dysfunction by region based on standard

15   neuropsychological batteries, for petitioner.  Dr. Gur and several colleagues from

16   various universities have developed a series of neuropsychological tests, as well as

17   an objective method for interpreting the results.  Dr. Gur and his colleagues use the

18   test scores, together with a computer program, to create a three-dimensional visual

19   depiction of brain dysfunction and damage.  (Gur 6/8/04 Decl. at 6, ¶ 11.)  The

20   images that Dr. Gur created for petitioner show dysfunction in various parts of

21   petitioner's brain, including areas associated with verbal learning deficits,

22   difficulties in abstraction, learning disabilities, attention deficit and hyperactivity,

23   affects on memory consolidation and poor impulse control.  (*Id.* at 7, ¶ 12.)

24        On cross examination, Dr. Gur testified that, while in existence for fifteen

25   years at the time of his deposition, the behavioral imaging he has created has not

26   been accepted generally by neuropsychologists in everyday clinical practice across

27   the country.  (Gur Depo. at 217.)  However, it was subjected to the peer review

28   process in "highly respectable refereed journals," and it was "accepted by the

45

leadership." (*Id.*)  The standardized neuropsychological tests Dr. Gur uses are in the public domain, not proprietary, are used all over the world and have been administered to thousands of people.  (*Id.* at 228.)  Dr. Gur has testified about these objective tests in many states, including Arizona, California, Delaware, Maryland, Pennsylvania, South Carolina, Tennessee and Virginia.  Dr. Gur's tests are used by Cornell Medical School, Dartmouth, Duke University, the Mayo Clinic, Washington University in St. Louis, as well as the Universities of Alabama, California (San Diego), Indiana, Pennsylvania, Pittsburgh, South Carolina and the University of Washington in Seattle.  (Gur Depo. at 480-81.)  The tests have been translated and are used in various countries, including Germany, Austria, Japan, Korea, Holland, Israel, Portugal and Brazil.  (*Id.* at 481.)

**B.    Mental Health Claims**

**1.    Counsel's failure to investigate and present the defense of diminished capacity (Claims 5(B)(1), 5(B)(2), 5(B)(3)(a), 5(B)(3)(b) & 5(B)(5))**

Petitioner claims that trial counsel performed deficiently by failing to realize that the defense of diminished capacity was available to petitioner and by failing to investigate and present evidence in support of a diminished capacity defense. Petitioner also alleges that counsel failed to provide petitioner's experts with information about mental culpability, diminished capacity and related facts.  To successfully bring an IAC claim, petitioner must show that counsel performed deficiently and that this deficient performance prejudiced petitioner.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish deficient performance, petitioner must show that trial counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  A showing of prejudice requires petitioner to demonstrate a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland* 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

At the time of petitioner's trial, the doctrine of diminished capacity existed in California.[7]  *People v. Saille*, 2 Cal. Rptr. 2d 364, 368 (1991) ("[S]omeone who is unable, because of intoxication or mental illness, to comprehend his duty to govern his actions in accord with the duty imposed by law, cannot act with malice aforethought.")  A defendant's diminished capacity could result from a physical or mental condition.  *Saille*, 2 Cal. Rptr. 2d at 367 (discussing *People v. Wells*, 33 Cal.2d 330, 351 (1949)).  Nevertheless, trial counsel apparently believed that the defense was unavailable at trial, other than for voluntary intoxication.  (1 CDD at 19-20, 68; 11 CDD at 136.)

Counsel was deficient for failing to realize that a diminished capacity defense was available to petitioner at trial.  *See, e.g.*, *Morris v. California*, 966 F.2d 448, 454-55 (9th Cir. 1992) (holding that failure to investigate and discover a defense to the crime fell far below any objective standard of reasonableness).  In order to obtain relief, however, petitioner must show that counsel's failure to investigate and present a diminished capacity defense also was deficient and that this deficiency prejudiced petitioner.

Petitioner has established deficiency.  It is true that Dr. Prentiss, along with Drs. Coburn and Davis, concluded that petitioner had the capacity to commit the

---

[7]  The California legislature enacted California Penal Code Sections 28 and 29 in September 1981.  Section 28 excludes evidence of "mental disease, defect or mental disorder" in order "to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation or malice aforethought."  Cal. Penal Code § 28. Such evidence is "admissible solely on the issue of whether or not the accused actually formed a required specific intent . . . ."  *Id.*  Section 29 excludes expert witness testimony "as to whether the defendant had or did not have the required mental states."  Cal. Penal Code § 29.  In June of 1982, the electorate abolished the diminished capacity defense by initiative.  Cal. Penal Code § 25(a) ("In a criminal action . . . evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged.")  Because these changes to the law took place after petitioner's crime, the diminished capacity defense was still available to petitioner at his trial, which began in March 1983.  Cal. Penal Code § 3.

crimes charged and that he suffered from antisocial personality disorder.
Dr. Rayyes provided testimony that supported a diminished capacity defense due
to voluntary intoxication, but he also testified that even an impaired alcoholic
could form the specific intent to commit all of the charged crimes. Dr. Rabson
concluded that the condition of both victims' bodies was inconsistent with
consensual sex. In addition, Dr. Girsh diagnosed petitioner with borderline
personality disorder and testified at the penalty phase that petitioner could suffer
from antisocial personality disorder.

However, Dr. Maloney told trial counsel that petitioner was "OK now but
had been psychotic." (9 CDD at P00738 (Exh. L-5).) Dr. Maloney concluded that
"the data . . . suggest [that petitioner suffered from] some potentially serious
psychological problems." (JTD P00829.) Petitioner's profile was highly
pathological and indicated a fair amount of hostility. (JTD at P00829.) Counsel
did not put Dr. Maloney on the stand during the guilt phase. At penalty,
Dr. Maloney testified that he "had no data to suggest that [petitioner] would not be
responsible for his behavior" and that petitioner "should have had the capacity to
understand what he was doing." (14 RT 3473.) In coming to these conclusions,
however, Dr. Maloney did not review various materials gathered since trial but
that were reasonably available to counsel before trial. These documents include
records and background information regarding petitioner's birth family as well as
social history information from petitioner's adopted family, preschool teacher and
others.

Moreover, Dr. Girsh told trial counsel before trial that there was some
indication of an organic, neurological basis for petitioner's behavior. (9 CDD at
P00427 (Exh. L-7). In addition, various records from petitioner's childhood
showed that petitioner displayed behavior at preschool that might indicate
neurological or psychiatric problems, that petitioner was described as troubled and
hyperactive as a child, that he was referred for a neurological examination and that

48

he performed poorly on psychological tests.

Despite the many clues that petitioner may have been suffering from a neurological problem since childhood, counsel did not request a neurological examination of petitioner, nor did he pursue a diminished capacity defense based on petitioner's psychological problems.  Counsel repeatedly testified that his failure to realize that the defense was available or to pursue it based on petitioner's psychological impairments was not tactical or strategic.  (1 CDD 22, 33-34,37-39; 9 CDD 49-50.)  Moreover, trial counsel failed to follow-up with Drs. Coburn and Davis.  Neither Dr. Coburn nor Dr. Davis reviewed records related to the Hernandez family's failed attempt to adopt a second child, which included an evaluation of petitioner by a family counselor at age five.

Trial counsel performed deficiently.  Trial counsel failed to realize that the defense of diminished capacity due to mental defect or condition was available to petitioner.  Trial counsel failed to investigate evidence that would have supported a diminished capacity defense.  He failed to arrange for a neurological examination of petitioner, despite many red flags suggesting that petitioner suffered from a psychological deficit or condition from early childhood.  Trial counsel also failed to follow-up with various psychological experts, both with respect to pursuing a potential guilt phase defense based on petitioner's mental condition and also in terms of providing them with pertinent social history information and records.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  Counsel's failure to realize the defense existed and to investigate it was unreasonable.

Although petitioner has established deficiency, he has failed to show prejudice.  Petitioner must show that had counsel investigated and presented a diminished capacity defense, the jury likely would have found that petitioner lacked the intent to commit capital murder or rape.  This probability must be

1    sufficient to undermine confidence in the jury's guilty verdict.  Even if trial

2    counsel had presented expert and documentary evidence suggesting that petitioner

3    did not have the capacity to act with malice aforethought or the specific intent to

4    rape, other circumstances would have undermined a diminished capacity defense.

5    Petitioner's confession recounted many details of the crime.  Confronted with the

6    level of detail in petitioner's confession, the jury reasonably could have rejected a

7    defense that petitioner lacked the capacity to form the requisite intent due to

8    intoxication or mental defect.  In addition, the victims suffered very similar

9    injuries, and their deaths took place just days apart.  These facts could have

10   convinced the jury that some amount of preparation or deliberation was involved

11   in the crimes, undercutting an argument that diminished capacity prevented

12   petitioner from planning, deliberating or harboring malice aforethought.  Finally,

13   the majority of California voters elected to abolish the defense of diminished

14   capacity due to mental disease, defect or mental disorder about eighteen months

15   prior to petitioner's trial.  *See* Cal. Penal Code § 28.  While the change in the law

16   did not affect petitioner's trial because he committed the crimes before the

17   referendum passed, the existence of the initiative may lend some context to

18   petitioner's trial.  It could be that a jury would be less likely to accept a defense of

19   diminished capacity due to mental disease, defect or disorder, given the change in

20   the law.  While petitioner has raised some doubt about whether the jury would

21   have come to a different verdict at the guilt phase, that doubt is not sufficient to

22   undermine confidence in the jury's guilty verdict.  It is not reasonably probable

23   that the jury would have voted differently upon hearing mental health evidence in

24   support of a diminished capacity defense at the guilt phase.

25          Accordingly, the Court DENIES Claims 5(B)(1), 5(B)(2), 5(B)(3)(a),

26   5(B)(3)(b) and 5(B)(5), but will consider counsel's deficiency in the cumulative

27   error analysis.

28

1
2
3

    **2.**    **Counsel's failure to gather and present appropriate**
    **evidence of petitioner's problems with alcohol and drugs**
    **(Claims 5(B)(3)(d), 5(B)(4), 5(C)(5), 5(C)(6), 5(C)(8))**

4       In Claims 5(B)(4) and 5(C)(6), petitioner contends that trial counsel failed

5   at both the guilt and penalty phases to arrange for an appropriate test of

6   petitioner's reaction to the combined effect of alcohol and drugs.  In Claims

7   5(B)(3)(d) and 5(C)(5), petitioner alleges that trial counsel failed at both the guilt

8   and penalty phases to properly use significant evidence of petitioner's drug and

9   alcohol abuse problems.  Finally, in Claim 5(C)(8), petitioner asserts that trial

10  counsel failed to call medical expert Dr. Amer Rayyes to testify during the penalty

11  phase.  Dr. Rayyes could have offered testimony about the combined effect of

12  drugs and alcohol on petitioner's neurological and mental functioning.  Petitioner

13  further contends that trial counsel failed to consult a toxicologist to develop

14  additional evidence regarding the impact of drugs and alcohol on petitioner's

15  mental and physical condition on the night of the crimes.

16       Again, to prevail on a claim of IAC, petitioner must show deficiency and

17  prejudice.  *Strickland*, 466 U.S. at 687.

18       Torelli arranged for an electroencephalogram, or EEG, which examines the

19  electrical activity of the brain.  The EEG given to petitioner was intended to

20  measure his response to alcohol, and the result was normal.  Petitioner contends

21  that the EEG arranged by Torelli was improperly performed because the

22  examination concluded before the alcohol took effect and because it did not

23  measure petitioner's response to drugs.  Petitioner argues that trial counsel should

24  have arranged for a second EEG to be administered but that counsel failed to do so

25  because he became ill with cancer.  In petitioner's view, a properly administered

26  EEG would have shown evidence of neurological impairment, which would have

27  been useful at both the guilt and penalty phases.

28       Petitioner cannot show deficiency.  Petitioner alleges that the EEG was

1  improperly administered to him, but he has not pointed to facts in support of this

2  claim.  Moreover, petitioner has failed to cite record facts that should have put

3  counsel on notice that the EEG was administered incorrectly.  The record, together

4  with the evidentiary hearing evidence, fail to support petitioner's conclusory and

5  speculative claim of deficiency.  *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir.

6  1995) (holding that "conclusory allegations which are not supported by a

7  statement of specific facts do not warrant habeas relief") (internal quotation marks

8  and citation omitted); *cf. Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) ("[T]he

9  petition is expected to state facts that point to a real possibility of constitutional

10  error.") (internal quotation marks and citation omitted).

11      Petitioner also cannot show prejudice.  Petitioner's allegation that a second

12  EEG—with a longer gap in time between the administration of alcohol and the

13  examination—would have revealed neurological or other brain damage is pure

14  conjecture.  Petitioner's "claim of prejudice amounts to mere speculation."  *Cooks

15  v. Spalding*, 660 F.2d 738, 740 (9th Cir. 1981).

16      Relatedly, petitioner asserts that trial counsel failed at both the guilt and

17  penalty phases to present significant evidence of petitioner's drug and alcohol

18  abuse.  In particular, petitioner contends that trial counsel failed to present

19  evidence that alcohol and drugs exacerbated petitioner's neurological

20  abnormalities, including at the time of the crimes, either through the testimony of

21  Dr. Rayyes or another expert.  Petitioner also argues that counsel failed to consult

22  a toxicologist to develop additional evidence about the impact of drugs and alcohol

23  on petitioner's mental and physical condition.  (Pet. at 36, 40.)

24      Counsel presented the theory petitioner suggests.  In his opening statement

25  at guilt, trial counsel stated that "Francis Hernandez is essentially a Dr. Jekyl[l]

26  and Mr. Hyde when it comes to the use and abuse of alcohol and drugs" and that

27  "when he utilizes [drugs or alcohol], the fact of the matter is he would essentially

28  go crazy, particularly with reference to the use of alcohol."  (12 RT 2999.)

52

1   Counsel outlined that the defense would rely in large part on petitioner's

2   inebriation at the time of the crimes and Dr. Rayyes's opinion that petitioner

3   suffered from alcoholism.  (12 RT 3000, 3002.)  Dr. Rayyes did in fact testify that

4   petitioner suffered from alcoholism and that he was impaired to such a degree on

5   the night of the crimes that he could not form the specific intent to commit murder.

6   (12 RT 3061-70.)  Counsel argued at the close of the guilt phase that petitioner

7   lacked the specific intent to commit the murders.  (12 RT 3167-74.)  Counsel also

8   argued at the penalty phase that alcoholism prevented petitioner from

9   remembering the details of the crime.  (14 RT 3659.)

10        Petitioner argues that counsel did not tie petitioner's problems with

11   substance abuse to petitioner's mental condition, particularly by showing that

12   alcohol and drugs exacerbated petitioner's neurological deficiencies.  Petitioner

13   also faults counsel for not consulting a toxicologist to explain the physiological

14   impact of alcohol and drugs on petitioner.  Petitioner fails to demonstrate deficient

15   performance.  Trial counsel relied on an EEG ordered by prior counsel and

16   administered by a professional, without any objective indication that the test was

17   administered improperly.  Trial counsel also consulted with an expert on

18   alcoholism, and that expert testified that petitioner suffered from alcoholism and

19   explained the effects that alcohol would have had on petitioner's conduct.

20   Counsel's performance was not deficient.  "*Strickland* does not guarantee perfect

21   representation, only a 'reasonably competent attorney.'"  *Harrington v. Richter*,

22   131 S.Ct. 770, 791 (2011) (quoting *Strickland*, 477 U.S. at 687); *see also U.S. v.

23   Burroughs*, 613 F.3d 233, 246-47 (D.C. Cir. 2010) ("The Sixth Amendment . . .

24   does not pledge perfection.") (quoting *United States v. Hurt*, 527 F.3d 1347, 1357

25   (D.C. Cir. 2008).)  Petitioner suggests, without demonstrating, that counsel could

26   have used an additional expert or put Dr. Rayyes on at the penalty phase to

27   connect petitioner's substance abuse problems to his neurological deficits.  While

28   more specific or nuanced expert testimony about alcohol and drugs could have

53

been desirable, it is not constitutionally required.  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003); *cf. Richter*, 131 S.Ct. at 791 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight for failing to prepare for what appear to be remote possibilities.")  Petitioner's claims of deficiency and prejudice fail.

Accordingly, the Court DENIES Claims 5(B)(3)(d), 5(B)(4), 5(C)(5), 5(C)(6) and 5(C)(8).

### 3.    Counsel's failure to investigate petitioner's biological family (Claims 5(B)(6) & 5(C)(10))

In Claims 5(B)(6) & 5(C)(10), petitioner argues that trial counsel failed to investigate the identity and psychological background of petitioner's biological parents, even though counsel knew petitioner was adopted.  Petitioner alleges that if trial counsel had conducted an investigation, he would have discovered:  (1) that petitioner's biological parents had a long history of serious psychiatric impairments, (2) that the psychiatric problems petitioner's biological parents suffered from had a genetic component and, therefore, resulted in petitioner having a predisposition to severe adaptation and psychological problems, (3) that petitioner's biological father has been psychiatrically institutionalized and evaluated as a schizophrenic; (4) that petitioner's biological mother also had been institutionalized; (5) that some of petitioner's biological maternal siblings suffered from serious psychiatric and emotional difficulties requiring at least one of them to be hospitalized for mental health disorders; and (6) that petitioner's biological mother abused alcohol while pregnant with petitioner, was a victim of abuse during her pregnancy with petitioner and that forceps were used in petitioner's delivery.  Petitioner contends that the presentation of this evidence would have supported a theory that his severe psychological disorders prevented him from

54

1  forming the specific intent necessary to support a first degree murder conviction or

2  would have provided significant mitigating evidence.

3      Petitioner must demonstrate deficiency and prejudice to obtain relief on a

4  claim of IAC.  *Strickland*, 466 U.S. at 687.

5      Counsel performed deficiently by failing to investigate petitioner's birth

6  family.  Trial counsel knew that petitioner was adopted and, believing that mental

7  illness had a genetic component, counsel intended to investigate petitioner's birth

8  family.  (10 CDD 52.)  Torelli's file, which he handed over to trial counsel,

9  included the name of petitioner's birth mother.  (9 CDD 52, 10 CDD 50-51, 11

10  CDD 86.)  Trial counsel sought a court order authorizing him to access all records

11  regarding the Hernandez family's attempt to adopt a second child.  (1 CT 279-84.)

12  The trial court granted petitioner's request.  In fact, the trial court authorized

13  petitioner to access the adoption records regarding the failed adoption, including

14  all adoption records related to the Hernandez family for an eight-year period.  (1

15  CT 285-86) (authorizing access to adoption records for the Hernandez family from

16  1962, the year of petitioner's birth and adoption, through and including 1970).

17  Moreover, the judge who granted petitioner access to adoption records concerning

18  the Hernandez family testified in these proceedings that petitioner's capital

19  prosecution would have been good cause to open the adoption records and that she

20  would have authorized access to information identifying petitioner's birth parents.

21  (Pokras Decl. at 1, ¶2.)  Trial counsel never attempted to obtain petitioner's

22  adoption records.  He testified that he had no tactical reason for this decision.  (9

23  CDD 52, 10 CDD 50-51, 11 CDD 86.)  No reasonable basis supports counsel's

24  failure to acquire petitioner's adoption records. Trial counsel performed

25  deficiently.  *Silva v. Woodford*, 279 F.3d 825, 842 (9th Cir. 2002) ("[A]n

26  attorney's failure to investigate, during either the guilt phase or the sentencing

27  phase of a capital trial, can amount to constitutionally deficient performance.")

28      Moreover, trial counsel failed to conduct any investigation into petitioner's

55

1    birth family, despite all experts agreeing that such evidence would have been

2    germane to petitioner's defense at trial.  A letter from the Los Angeles Department

3    of Children's Services to counsel on direct appeal shows the following:

4    petitioner's birth mother was an unmarried 14-year-old; the birth father was an 18-

5    year-old unemployed man who was incarcerated for robbery after being sentenced

6    to a five-year term in 1961; the relationship continued in defiance of the wishes

7    expressed by the birth mother's family; the birth mother deliberately disobeyed her

8    parents; the birth parents frequented "drinking parties" and had a violent

9    relationship, "as the birth father beat [the birth mother] on numerous occasions and

10   appeared to enjoy the brutal treatment"; and the birth father told the birth mother

11   to take quinine tablets to terminate the pregnancy.  (4/27/05 Joint Stipulation

12   Exh. C.)  The records also show that forceps were used in petitioner's birth.  (*Id.*)

13   In investigating petitioner's birth family, appellate counsel learned that petitioner's

14   birth mother and members of her family suffer from depression and other mental

15   disorders and that petitioner's birth father suffers from substance abuse and

16   schizophrenia.  Trial counsel's failure to investigate petitioner's birth family was

17   deficient.  *See Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1998) (noting that

18   a complete mental evaluation must contain information about a petitioner's

19   personal background); *see also* Lewis 8/15/03 Decl. at 4, ¶ 8 ("It is impossible to

20   understand Francis Hernandez's psychiatric condition . . . without a clear

21   understanding of the interactions among his genetic vulnerabilities to severe

22   mental illness which he inherited from his biological mother and father, the effects

23   of in utero exposure to alcohol and drugs, repeated head injuries beginning in early

24   childhood, and an upbringing in a psychotic, physically and sexually abusive, and

25   severely neglectful adoptive family.")  "Thus, [the Ninth Circuit has] found

26   counsel ineffective where he neither conducted a reasonable investigation nor

27   made a showing of strategic reasons for failing to do so."  *Sanders v. Ratelle*, 21

28   F.3d 1446, 1456 (9th Cir. 1994).

1    ### a.    Guilt phase prejudice

2        Petitioner has not shown that the failure to investigate his birth family

3    caused him unconstitutional prejudice at the guilt phase.

4        Petitioner argues that the evidence related to his birth family would have

5    enabled him to assert a successful diminished capacity defense.  Specifically,

6    petitioner contends that with information about his birth family, he could have

7    shown that he was in a dissociative state during the crimes.  (Ptr's Corrected Brief

8    on Prejudice at 106.)  Evidence that petitioner inherited a vulnerability to mental

9    illness also would have supported the argument that petitioner did not and could

10   not premeditate or deliberate the killings with the requisite specific intents.  (*Id.* at

11   107.)  As discussed with respect to guilt phase claims concerning counsel's failure

12   to pursue a diminished capacity defense, this defense likely would have failed.

13   Even bolstered in part by evidence of mental illness in petitioner's birth family, as

14   well as the poor circumstances of petitioner's in utero development and birth, a

15   diminished capacity defense due to petitioner's mental condition likely would have

16   gained little traction at trial.  Petitioner's detailed confession would have undercut

17   evidence that petitioner dissociated during both crimes.  Moreover, the crimes

18   were incredibly similar and took place close in time.  A reasonable jury could have

19   concluded that petitioner did in fact deliberate and premeditate the crimes.  Also as

20   discussed *supra*, California voters had passed a referendum that eliminated the

21   defense of diminished capacity due to mental disease, defect or mental disorder a

22   year and a half before petitioner's trial.  *See* Cal. Penal Code § 28.  Though the

23   defense technically applied to petitioner's case, the general culture at the time may

24   have been hostile to accepting this sort of defense at the guilt phase.  The

25   additional evidence about petitioner's biological family does not support a

26   conclusion that the jury would have voted differently at the guilt phase.

27        Accordingly, the Court DENIES Claim 5(B)(6) but will consider counsel's

28   deficient performance in the cumulative error analysis.

1

### b.   Penalty phase prejudice

2      The prejudice analysis requires the Court to "evaluate the totality of the

3   available mitigation evidence—both that adduced at trial, and the evidence

4   adduced at the habeas proceeding—in reweighing it against the evidence in

5   aggravation." *Williams (Terry) v. Taylor*, 529 U.S. 362, 398 (2000).

6      The prosecution's penalty phase case in aggravation relied solely on the

7   circumstances of the crime.  Petitioner presented the brief testimony of several

8   family members, a friend, petitioner's ex-girlfriend and two clinical psychologists

9   in mitigation.  Petitioner also took the stand.  The penalty phase lacked a coherent

10  narrative, but some themes included that petitioner abused alcohol; that his mother

11  had suffered several mental breakdowns during his childhood; that petitioner had

12  some emotional problems; that petitioner would probably not be dangerous in

13  prison and that petitioner's life should be saved due to familial love, his potential

14  for religious salvation or both.

15     Dr. Girsh testified that petitioner likely suffered from borderline personality

16  disorder and, on cross-examination, that petitioner may have suffered from

17  antisocial personality disorder.  (14 RT 3584, 3599.)  Dr. Maloney testified that

18  petitioner suffered from "emotional disturbances" from an early age, but that

19  Dr. Maloney had no data to suggest that petitioner was psychotic, disturbed or

20  unable to understand what he was doing at the time of the crimes.  (14 RT 3473-

21  74, 3475.)  Neither Dr. Girsh nor Dr. Maloney knew the circumstances of

22  petitioner's in utero development or his inherited predisposition to mental illness.

23     The brief testimony from petitioner's family members did not evoke much

24  mercy.  Petitioner's adoptive mother provided largely scattered testimony about

25  her mental illness, with no testimony about how her incapacitation affected

26  petitioner.  Petitioner's adoptive father testified that petitioner was upset about his

27  mother's breakdowns but that he tried to be helpful, that petitioner was harassed a

28  lot by the police due to his race, that petitioner was able to take care of himself

starting around age seven or eight and that petitioner got angry when he did not get

his way.  Petitioner's uncle testified that petitioner had too much responsibility

heaped on him, that he did not have a backyard with grass growing up and that had

a bad experience at Montessori preschool.  Petitioner's paternal aunt testified that

she saw petitioner only two or three times a year since his adoption, but that she

would commit to writing petitioner every month and visiting him every other

month if he were sentenced to life without parole.  A friend testified that petitioner

convinced her to give up drinking and smoking because she had Diabetes.

Petitioner's ex-girlfriend testified that they had normal sex and only one violent

episode, when petitioner slapped her after she hit him with a pipe.

     "It is imperative that all relevant mitigating information be unearthed for

consideration at the capital sentencing phase." *Caro v. Calderon*, 165 F.3d 1223,

1227.  Moreover, "[t]he Constitution prohibits imposition of the death penalty

without adequate consideration of factors which might evoke mercy." *Hendricks*

*v. Calderon*, 70 F.3d 1032, 1044 (9th Cir. 1995) (internal quotation marks and

citation omitted).  Petitioner's adoption and birth records would have shown that

petitioner was born to a fourteen-year-old girl in a physically abusive relationship

with an incarcerated eighteen-year-old.  Petitioner was exposed to violence, drugs

and alcohol in utero.  Petitioner was delivered with forceps, which are known to

cause neurological damage.  (*See* Gur 2/8/05 Decl. at 14, ¶ 27.)  Limited additional

investigation into petitioner's birth family would have shown that petitioner's birth

mother suffered from depression and that his father suffered from serious mental

illness.  Petitioner's mental health experts did not know about the circumstances of

petitioner's birth family or in utero development, and the jury did not hear any

such evidence.  Had petitioner's experts considered and testified about petitioner's

inherited vulnerability to mental illness, his exposure to toxins in utero and his

forceps delivery, a substantially different case in mitigation would have been

presented.  The question is whether it is reasonably probable that the jury would

1  have reached a verdict of life without parole.

2         The Ninth Circuit has held "that overwhelming evidence of guilt does not

3  ameliorate the failure to present mitigating evidence at the penalty phase." *Caro*,

4  165 F.3d at 1277.  In fact, "the determination of whether to impose a death

5  sentence is not an ordinary legal determination which turns on the establishment of

6  hard facts.  The statutory factors [in California] give the jury broad latitude to

7  consider amorphous human factors, to weigh the worth of one's life against his

8  culpability." *Id.* (quotation marks and citations omitted).  Petitioner's brain

9  damage was rooted in part in his biological background:  being born to fourteen-

10  year-old girl who abuses alcohol during pregnancy and a forceps delivery.  (Gur

11  Depo. at 461.)  Counsel's failure to investigate and present evidence concerning

12  petitioner's biological roots certainly caused him prejudice.  Evidence about

13  petitioner's biological background, prenatal circumstances and birth certainly

14  would have made a marked improvement to the weak mitigation case presented.

15  Weighed against the aggravating circumstances of the crime, and considering the

16  damaging effect of petitioner's penalty phase testimony, however, petitioner has

17  not shown prejudice sufficient to undermine confidence in the jury's verdict.

18         Accordingly, the Court DENIES Claim 5(C)(10) but will consider this claim

19  in the cumulative error analysis.

20         **4.      Counsel's failure to investigate and present evidence of**

21                  **petitioner's dysfunctional adoptive family (Claims**

22                  **5(B)(3)(c) & 5(C)(3))**

23         In Claim 5(C)(3), petitioner claims that trial counsel failed at the guilt and

24  penalty phases to properly use evidence regarding the unstable and dysfunctional

25  nature of petitioner's family background.

26         To prevail on a claim of IAC, petitioner must show deficiency and

27  prejudice.  *Strickland*, 466 U.S. at 687.

28         Trial counsel knew that petitioner had been abused.  (1 CDD 13.)  Counsel

did not attempt to obtain petitioner's childhood medical records, to interview the family's doctor or to investigate allegations of abuse.  Moreover, counsel did not attempt to obtain the medical or psychiatric records for petitioner's adoptive mother, Naomi, who was diagnosed with schizophrenia when petitioner was six. Counsel did not contact Naomi's treating psychiatrists.  Counsel did not interview family members about Naomi's behavior before, during and after her breakdowns. Counsel did not attempt to locate or interview the person hired to help in the Hernandez home after Naomi's first breakdown.  Trial counsel testified that he did not have a tactical reason for failing to conduct this investigation.  (1 CDD 13, 31-32, 55-56.)  Counsel never learned that petitioner's mother used to sit on him to calm him down, that she and petitioner would tie each other up or to a chair as a form of play and that she forcibly administered enemas to petitioner as discipline, making him hold the fluid inside for ten to fifteen minutes.  (7/16/03 Kuhl Decl. at 6-7, ¶ 24; 7, ¶¶ 26, 29.)

At trial, Naomi testified that she had several breakdowns, that she was in and out of mental hospitals and that she was depressed.  No one testified about Naomi's behavior at the time or about how it affected petitioner.  As part of the evidentiary hearing, Naomi testified.  She suffered hallucinations and was hospitalized for several times for many months.  (7/16/03 Decl. at 9, ¶ 36.)  During her time in the hospital, she "didn't know who was taking care of Francis" and "just wasn't able to think about that."  (*Id.* at 9, ¶ 37.)  She remembers Francis coming to visit and that he "didn't look like he was being taken care of very well. He looked disheveled."  (*Id.*)  When she was released, she took Mellaril, a fact the jury did hear.  However, no one explained the medication's effects at trial.  Naomi felt "so lethargic" that it was like she "was in slow motion all the time."  Her "breakdowns also affected Francis badly.  I did so many odd things that it must have confused Francis when he was a little boy.  My medication also made me unable to be a mother to Francis.  I was just too slow and depressed to do the

things a mother should do for her son.  I feel very sad about that.  My mental illness made me so depressed and miserable that I think our home was a bad place for a little boy."  (*Id.* at 17-18, ¶ 73.)

Counsel also did not investigate and present evidence that when Naomi suffered her second breakdown and was hospitalized, petitioner's adoptive father got a job working in Palmdale.  Because his father commuted from Long Beach, petitioner was often on his own starting at age eight.  (*Id.* at 11-12, ¶ 47.)

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  The scope of counsel's investigation was inadequate and unreasonable, given the various leads evident in the information counsel did know.  *Wiggins*, 539 U.S. at 525 ("[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background.")  "[T]he investigation should include inquiries into social background and evidence of family abuse."  *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc).  Moreover, the record reflects that "counsel uncovered no evidence in [his] investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless . . . ."  *Wiggins*, 539 U.S. at 525.

"[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation will be a waste."  *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (quoting *Wiggins*, 539 U.S. at 525).  In this instance, however, effective representation would not have required counsel to do anything as dramatic as scour the globe in the hope that he would find something helpful.  Instead, the record shows that counsel's failure to investigate

1   and present evidence about petitioner's unstable and dysfunctional upbringing was

2   objectively unreasonable, given what counsel knew at the time.

3        In addition, "[c]ounsel have an obligation to conduct an investigation which

4   will allow a determination of what sort of experts to consult.  Once that

5   determination has been made, counsel must present those experts with information

6   relevant to the conclusion of the expert."  *Caro v. Calderon*, 165 F.3d 1223, 1226-

7   27 (9th Cir. 1998).  Counsel did not realize the importance of having an expert

8   explain how petitioner would have been impacted by his adoptive mother's

9   schizophrenia.  Moreover, counsel failed to provide the clinical experts who

10  testified at the penalty phase with a full picture of the family's difficulties, as

11  counsel inadequately investigated petitioner's home life. Counsel's failure to

12  conduct an adequate investigation was deficient.

### a.  Guilt phase prejudice

14       As with the other guilt phase claims discussed, petitioner has not shown that

15  counsel's failure to investigate and present the dysfunctional nature of his adopted

16  family caused him unconstitutional prejudice at the guilt phase.

17       Again, petitioner argues that his adoptive mother's psychotic behavior and

18  the physical abuse that both parents inflicted on him interfered with petitioner's

19  ability to premeditate, deliberate and harbor the specific intent to kill. (Ptr's Brief

20  on Deficiency at 20-21.)  As discussed, a diminished capacity defense due to

21  petitioner's mental condition—whether bolstered by his adoptive mother's

22  psychosis, the abuse petitioner suffered at his adoptive parents' hands or

23  both—was not likely to succeed at the guilt phase.  The detail contained in

24  petitioner's confession and the nearly identical nature of the crimes could cause a

25  reasonable jury to reject a claim that petitioner could not deliberate or premeditate

26  or that he dissociated during the crimes.  Also as discussed, about eighteen months

27  before trial, an initiative had passed in California that abolished the defense of

28  diminished capacity due to mental disease, defect or mental disorder.  *See* Cal.

1   Penal Code § 28.  This context may have undercut the potential efficacy of a

2   diminished capacity defense at the guilt phase.

3       Accordingly, the Court DENIES Claim 5(B)(3)(c) but will consider

4   counsel's deficiencies in the cumulative error analysis.

5                    **b.    Penalty phase prejudice**

6       Again, the Court must weigh the evidence in mitigation, including the

7   evidence adduced at trial together with the evidence presented at the evidentiary

8   hearing, against the evidence in aggravation.  *Williams (Terry)*, 529 U.S. at 398.

9   As discussed, the aggravating evidence in this case is limited to the circumstances

10  of the crime.

11      The jury heard petitioner's adoptive parents, Naomi and Frank, testify about

12  Naomi's nervous breakdowns.  Their trial testimony makes clear that Naomi was

13  severely depressed and in and out of mental hospitals from when petitioner was

14  age six until he was about fifteen, when Naomi left Frank.  However, some of

15  Frank's testimony downplayed the seriousness of Naomi's illness.  (*See, e.g.*, 13

16  RT 3371 (testifying that when Naomi had her second breakdown when petitioner

17  was eight that "Francis was older and he seemed to be able to take care of himself

18  a little better in that situation, and I think that my wife showed some

19  improvement" despite subsequent nervous breakdowns requiring lengthy

20  hospitalizations).  No one testified about the effect that Naomi's very serious

21  mental illness had on petitioner.  Even the clinical psychologists who testified had

22  little to offer.  Dr. Girsh testified only that petitioner's upbringing was

23  "amorphous," "haphazard and unstructured."  (14 RT 3589.)  When asked how

24  petitioner's home life affected petitioner, Dr. Maloney responded:  "Well, the

25  mother left the scene not—somewhere during Francis'[s] childhood.  So she was

26  not there at all for guidance, and previous to that, was fairly incapable of handling

27  him.  The father tended to excuse any problem Francis had.  The net effect of all

28  this was [petitioner] never got treated for anything."  (14 RT 3478-79.)  Counsel

1    did not investigate or present any evidence about how being raised by a psychotic,

2    schizophrenic mother and a paranoid father affected petitioner.

3          Trial counsel's failure to investigate and present the dysfunctional nature of

4    petitioner's adoptive family had dire consequences at the penalty phase.  Counsel

5    presented some testimony that petitioner was raised by a mentally ill mother, but

6    "[t]he jury did not . . . have the benefit of expert testimony to explain the

7    ramifications of these experiences on [petitioner's] behavior.  Expert evidence is

8    necessary on such issues when lay people are unable to make a reasoned judgment

9    alone."  *Caro v. Calderon*, 165 F.3d at 1227.  The evidence presented about

10   petitioner's unfortunate home life was limited and without context.

11         Dr. Clausen, who specializes in children and adolescents, offered

12   evidentiary hearing testimony about the impact that petitioner's schizophrenic

13   mother would have had on him.  Children raised by a schizophrenic parent tend to

14   suffer from various difficulties, including cognitive, behavioral, emotional and

15   social.  (Clausen Decl. at 93-94, ¶ 235.)  Naomi's schizophrenia prevented

16   petitioner from forming a heathy attachment to his primary caretaker as an infant,

17   resulting in a failure to develop basic trust.  (*Id.* at 94-96, ¶¶ 236-40.)  Naomi and

18   Frank's poor parenting also prevented petitioner from developing a sense of

19   autonomy and initiative, the appropriate developmental task for a child ages two to

20   six.  Consequently, petitioner lacked a healthy self-concept, as well as basic skills

21   in social comprehension and interpersonal communication.  Petitioner had no

22   grasp of the expectations of him or the consequences for failing to meet those

23   expectations.  (*Id.* at 96-103, ¶¶ 241-49, 251.)  In his early school years, petitioner

24   developed anxiety and depression, and he avoided going home.  (*Id.* at 109, ¶ 264.)

25   In fifth grade, petitioner began coping by using drugs and alcohol regularly, and

26   his substance abuse habits grew worse with time.  (*Id.* at 109, ¶ 266.)  Petitioner

27   had no boundaries or structure and began acting out during his teen years.  (*Id.* at

28   110, ¶ 268; 112, ¶ 273; 113 ¶ 274.)  Petitioner's mother abandoned the family

1    without saying goodbye when petitioner was fifteen.  (*Id.* at 113, ¶ 275.)

2    Petitioner turned more often to drugs, and the physical condition of his home

3    deteriorated further.  (*Id.* at 113-14, ¶¶ 276, 277.)

4         Dr. Lewis opined that Naomi's inadequate mothering affected petitioner in

5    significant ways.  As early as preschool, petitioner manifested psychotic behavior,

6    such as attacking his peers without provocation, misperceiving reality, misreading

7    social cues, bringing dangerous items to school, engaging in dangerous behavior

8    and being unable to transition from one activity to another.  (Lewis 8/15/03 Decl.

9    at 25-27, ¶¶ 63, 67-68.)  A psychological evaluation of petitioner at age five

10   showed that he was "frantic" and "very disturbed."  (*Id.* at 29, ¶ 73.)  The horrid

11   physical condition of petitioner's home added to the problem.  Dr. Lewis

12   concluded that "[n]o child raised in such an environment could be expected to

13   develop normally.  He or she would have no models for normal social interaction

14   and no experiences of the kind of ongoing nurturing and cognitive stimulation that

15   every human being requires for normal adaptation."  (*Id.* at 30, ¶ 76.)

16        Dr. Lewis also testified that a connection existed between the administration

17   of enemas to petitioner as a child and the sodomy aspect of the crimes.  (*Id.* at 19,

18   ¶ 46.)  Specifically, Dr. Lewis testified that "[c]hildren who have been repeatedly

19   stimulated sexually and/or teased sexually by an adult, especially a mother, are at a

20   very high risk of acting out sexually and aggressively toward women other than

21   their abusers."  (*Id.*)  In fact, "[r]epeatedly holding a child down and inserting

22   objects into that child's rectum is a form of sodomy . . . . The acts are experienced

23   by the child as repeated anal sexual assaults. (Lewis 5/8/04 Decl. at 11, ¶ 30.)

24   Although the Supreme Court has held that a nexus between a petitioner's crime

25   and his or her mental condition is not required, an expert's opinion that petitioner

26   sodomized his victims because of the abuse he suffered as a child would have been

27   powerful mitigating evidence.  *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 287

28   (2004).

1    Finally, Dr. Gur testified that petitioner's biological background, coupled

2    with his adoptive parents' problems, was "a prescription for disaster.  It's a

3    prescription for someone who will really never develop normally and will not have

4    much of a chance to develop the mental and intellectual and personal capacity to

5    cope with life's stresses."  (Gur Depo. at 447.)

6        "[D]efense counsel's penalty phase performance was constitutionally

7    deficient where counsel 'failed to adequately investigate, develop, and present

8    mitigating evidence to the jury even though the issue before the jury was whether

9    [the defendant] would live or die." *Ainsworth v. Woodford*, 268 F.3d 868, 874

10   (9th Cir. 2001); *see also Caro*, 165 F.3d at 1226-27 (remanding for an evidentiary

11   hearing where counsel failed to investigate and present "precisely the type" of

12   mitigating evidence "most likely to affect a jury's evaluation of the punishment"

13   petitioner should have received).  Dr. Lewis testified that "one cannot

14   overemphasize the effects on Francis, as a psychiatrically vulnerable child to begin

15   with, of being raised by a chronically psychotic, sexually abusive mother."  (Lewis

16   8/15/03 Decl. at 19, ¶ 46.)  Mitigation evidence about how petitioner's

17   dysfunctional family circumstances affected him would have provided compelling

18   evidence at the penalty phase.  "[E]vidence about the defendant's background and

19   character is relevant because of the belief, long held by this society, that

20   defendants who commit criminal acts that are attributable to a disadvantaged

21   background . . . may be less culpable than defendants who have no such excuse."

22   *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).

23       The excluded evidence about petitioner's home life, including testimony

24   about the abuse petitioner suffered and the relationship between that abuse and the

25   crime, would have provided powerful and compelling mitigating evidence.  When

26   weighed against petitioner's damaging penalty phase testimony, however,

27   petitioner has not demonstrated a reasonable probability of a different penalty

28   phase verdict.  (*See* Discussion of Claim 5(D)(27) *infra.*)

1    Accordingly, the Court DENIES Claim 5(C)(3) but will consider counsel's
2    deficiencies in the cumulative error analysis.

3    **5.      Counsel's failure to present evidence of petitioner's mental**
4    **condition (Claims 5(C)(1), 5(C)(2), 5(C)(4) & 5(C)(9))**

5    In Claims 5(C)(1), petitioner argues that counsel failed to present evidence
6    of petitioner's mental condition that would have been compelling mitigating
7    evidence, including that petitioner suffered from clinically significant
8    manifestations of schizophrenia, hypomania, manic depression, hyperactivity,
9    psychotic deviations and impulse disorders.  In Claim 5(C)(2), petitioner contends
10   that trial counsel failed to introduce psychiatric reports describing petitioner's
11   clinical profile as "highly pathological" and "schizo-manic."  In Claim 5(C)(4),
12   petitioner asserts that trial counsel failed to introduce documentary evidence that
13   would have corroborated these diagnoses.  In Claim 5(C)(9), petitioner argues that
14   trial counsel limited the testimony of petitioner's clinical and forensic psychologist
15   Dr. Faye Girsh at the penalty phase.  Counsel also failed to call witnesses who
16   could have offered first-hand accounts of petitioner's lack of dangerousness in
17   custody.

18   A successful claim of IAC requires a showing of both deficiency and
19   prejudice.  *Strickland*, 466 U.S. at 687.

20   **a.      Deficiency**

21   In advance of trial, Dr. Maloney examined petitioner.  Dr. Maloney reported
22   that the "data do suggest some potentially serious psychological problems" and
23   that petitioner had a "highly pathological profile."  (JTD at P00829.)  Dr. Maloney
24   found that petitioner had significant elevations on scales measuring hypomania,
25   schizophrenia, psychopathic deviate and paranoia.  (*Id.*)  He explained that people
26   with similar profiles have episodes in which they come across as demanding,
27   confused, hostile, hyperactive, panicky and circumstantial, and that they may also
28   be restless, evasive and high strung.  (*Id.*)  Moreover, people with similar profiles

exhibit intense overreaction to normal rejection.  (*Id.*)  Dr. Maloney opined that the most likely diagnosis is schizo-manic episode, which involves some breakdown in the thinking processes coupled with a manic-like state.  (*Id.* at P00830.)  The most technical diagnosis would be schizophrenia, but petitioner did not show any overt signs of schizophrenia.  Petitioner did seem to have a variety of psychological problems, however.  (*Id.*)  Dr. Maloney concluded:

> The present data suggest that we have an individual who functions in the normal range of general intelligence with no suggestion of any specific cognitive-intellectual or perceptual deficit. He also does not manifest any of the primary signs of a major condition such as psychosis.  Present data do, however, indicate that he has significant psychological problems and comes from a very unstable background with multiple noted difficulties relating to his parents as well as problems between his parents.

(*Id.* at P00830.)  Dr. Maloney testified at penalty that petitioner's "emotional disturbances" were evident starting in childhood and went untreated, that petitioner had the mental capacity to commit the crimes and that he would do well if he had "extreme limits" placed on him.  Counsel did not ask Dr. Maloney to explain the many psychological problems discussed in his report or to testify about petitioner's familial problems.  Dr. Maloney's testimony, including cross-examination, comprised just eighteen pages of transcripts.  (14 RT 3458-84.)

As part of the evidentiary hearing, counsel offered the following testimony:

> Dr. Maloney determined that Francis suffered from potentially serious psychological problems, that he exhibited symptoms of hypomania, schizophrenia and paranoia, suggestive of a state in which there is some breakdown in the thinking processes combined with an elevated or manic-like state.  Data also indicated that Francis suffered from feelings of being closed in or trapped and a tendency to become mad or irritated by fairly mild provocation.  Dr. Maloney also concluded that Francis came from a very unstable background with multiple difficulties relating to his parents as well as between his parents.  In my examination of Dr. Maloney, I brought out his opinion that Francis knew what he was doing at the time of the crimes, was not psychotic and was legally responsible when he committed the crimes, but failed to elicit his additional opinions regarding the symptoms of mental problems he noted in his report, and the degree of problems within the family.  I had no tactical reason for failing to elicit this testimony from Dr. Maloney or for not giving him an

69

1    opportunity to explain the reasons for his opinion.

2    (1CDD 25-26.)

3         Dr. Girsh testified that petitioner was intoxicated at the time of the crimes

4    and that his behavior was out of control and atypical.  She diagnosed petitioner

5    with borderline personality disorder but admitted on cross-examination that

6    antisocial personality disorder could apply.  Petitioner's history of substance abuse

7    and his many accidents fit with the kind of self-destructive behavior typical of

8    borderline personality.  She briefly touched on petitioner's home life, describing it

9    as haphazard, unstructured and amorphous.  She testified that nothing indicated

10    that petitioner would be difficult in prison.  (14 RT 3577-3603.)

11         As to the testimony of Dr. Girsh, counsel testified as follows:

12

13        I recall that Dr. Girs[]h was upset with me after her testimony.  I had
        prepared her to testify extensively about Francis'[s] adoptive

14        mother's inability to bond with him and the significance of that fact,
        which I thought was important for the jury to understand.  Faye

15        complained that I cut her off and did not give her an opportunity to
        present the information she was prepared to give.  I did not have a

16        tactical reason for curtailing my examination of Dr. Girs[]h or for
        failing to give her an opportunity to explain the bases for her

17        opinions.

18    (1 CDD 25.)

19         In advance of trial, counsel gathered various documents and had

20    Dr. Maloney and Dr. Girsh review them.  These records included files from the

21    Montessori school petitioner attended, documents concerning the Hernandez

22    family's attempt to adopt a second child and records from the St. Thomas More

23    Clinic where petitioner and his family received counseling while the application to

24    adopt a second child was pending.  Trial counsel had his paralegal prepare these

25    documents as exhibits for trial.  (1 CDD 24.)  In his opening statement, counsel

26    referenced these records twice and said that  "[t]he records are somewhat extensive

27    in that the—there are a number of records from a number of different sources that

28    indicate how the defendant got to where the defendant is."  (13 RT 3326.)  He also

1   told the jury that the experts had examined the records.  During his examination of

2   both experts, counsel established that both Dr. Maloney and Dr. Girsh reviewed all

3   of the records.  (14 RT 347, 3581.)  Counsel did not introduce these documents

4   into evidence, and he failed to ask both Dr. Maloney and Dr. Girsh to discuss the

5   contents of the records or to explain their significance.  Counsel explained:

> I know that I did not have a tactical reason for not introducing the
> records or their substance into evidence.  I thought they were more
> helpful to the defense than harmful and for that reason gave them to
> the experts to review.  Once the records were reviewed by the experts,
> the prosecutor was entitled to a copy and to cross-examine about their
> contents if he chose to do so.  That prospect did not bother me.

11   (1 CDD 24-25.)

12       The Court "'must indulge [the] strong presumption' that counsel 'made all

13   significant decisions in the exercise of reasonable professional judgment.'" *Cullen*

14   *v. Pinholster*, 131 S.Ct. 1388, 1407 (2011) (quoting *Strickland*, 466 U.S. at 689-

15   90).  However, "[i]t is imperative that all relevant mitigating information be

16   unearthed for consideration at the capital sentencing phase." *Caro*, 165 F.3d at

17   1227.  Moreover, counsel had a "duty to investigate and present mitigating

18   evidence of mental impairment." *Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir.

19   1998).  The Court must consider whether "'under the circumstances, the

20   challenged action[s] might be considered sound trial strategy.'" *Pinholster*, 131

21   S.Ct. at 1407 (2011) (quoting *Strickland*, 466 U.S. at 689).

22       This is not a case where "a defense attorney . . . reasonably decide[d] that

23   another strategy [was] in order." *Pinholster*, 131 S.Ct. at 1407 (quoting

24   *Strickland*, 466 U.S. at 691).  Nor is it a case where counsel chose a different

25   strategy "that any reasonably competent counsel would be compelled to select . . .

26   over the one actually used." *Crittendon v. Ayers*, 624 F.3d 943, 969-70 (9th Cir.

27   2010).  Counsel knew that Dr. Maloney could offer testimony about petitioner's

28   many psychological problems, which Dr. Maloney outlined in his report.

Dr. Girsh could offer testimony about Naomi's inability to bond with petitioner. Both experts could have testified about petitioner's dysfunctional and unstable home life and how that environment affected petitioner. Moreover, the preschool, adoption and counseling records would have offered various contemporaneous sources of information about petitioner's early emotional problems and the very unfortunate environment in which petitioner was raised. The documents would have buttressed and augmented the expert testimony. Counsel's failure to elicit appropriate mitigating testimony from his experts and to present the documents he had obtained and prepared for trial was deficient.

The record belies respondent's assertion that counsel made a strategic decision to avoid putting this evidence, particularly the documents, before the jury for fear that it would open the door to evidence that petitioner had always been a troubled child. Part of counsel's approach was to show that petitioner's emotional problems began in childhood and that he came from a troubled home. The information contained in the preschool, adoption and counseling records would have shown just that. Moreover, counsel elicited testimony from Dr. Maloney that petitioner suffered from emotional difficulties from an early age. Testimony from Dr. Girsh and Dr. Maloney would have explained the source and effect of those problems, as well as how those problems evolved for petitioner. The records would have provided additional, corroborating information. Trial counsel intended to explore these issues with Dr. Girsh, particularly the effect of Naomi's inability to bond with and care for petitioner. Counsel prepared Dr. Girsh extensively for the penalty phase. In the end, Dr. Girsh's testimony consumed just twenty-six pages of transcripts, and counsel asked her no questions about Naomi's illness. "In this case, it is undisputed that [petitioner] had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel . . . failed to offer." *Williams* (*Terry*), 529 U.S. at 393.

Moreover, counsel had both experts testify that petitioner had the capacity to

1    commit the crimes at the penalty phase when that issue was not the primary one

2    before the jury.  The jury had already found petitioner guilty of murder, rape and

3    sodomy.  Counsel focused the experts' testimony on petitioner's mental state at the

4    time of the crimes but failed to ask the experts about how petitioner's home life,

5    familial stresses or psychological problems would have mitigated his culpability.

6    This approach made little, if any, sense.  Counsel's performance was deficient.

### b.    Prejudice

8    Petitioner must demonstrate prejudice flowing from counsel's errors.

9    "[T]he question is whether there is a reasonable probability that, absent the errors,

10   the sentencer . . . would have concluded that the balance of aggravating and

11   mitigating circumstances did not warrant death." *Pinholster*, 131 S.Ct. at 1408

12   (quoting *Strickland*, 466 U.S. at 695).  The Court must "reweigh the evidence in

13   aggravation against the totality of available mitigating evidence."  *Pinholster*, 131

14   S.Ct 1408 (quoting *Wiggins*, 539 U.S. at 534).

15   Trial counsel's deficiencies certainly impacted the penalty phase.  Trial

16   counsel's failure to question Dr. Maloney about petitioner's highly pathological

17   clinical profile, his "schizo-manic" condition and his many other psychological

18   problems was certainly prejudicial.  The jury heard only that petitioner had

19   emotional problems and that he suffered from either borderline personality

20   disorder or antisocial personality disorder.  Counsel failed to present other

21   evidence, in his possession, that would have explained other potential diagnoses,

22   the source of petitioner's psychological problems and how petitioner's difficulties

23   affected petitioner's development and explained his conduct.  Trial counsel elicited

24   just enough testimony from Drs. Girsh and Maloney so that the jurors knew

25   petitioner had some problems, but he did nothing to explain the extent or meaning

26   of those problems or to give them context.  Counsel failed to put before the jury

27   testimony that petitioner suffered from psychological problems that would have

28   made him less culpable for the crimes.  *See, e.g.*, *Mickey v. Ayres*, 606 F.3d 1223,

1239 (9th Cir. 2010) ("In the penalty phase, mental health evidence would explain

why, though he had capacity, he was less culpable.")

Moreover, Dr. Girsh could have testified about how Naomi's schizophrenia

affected petitioner.  Dr. Clausen testified at the evidentiary hearing that Naomi's

schizophrenia would have made it impossible for petitioner to form a healthy

attachment to his mother, resulting in his inability to develop basic trust.  (Clausen

Decl. at 93-96,¶¶ 235-40.)  Naomi's severe mental illness also would have

prevented petitioner from developing a sense of autonomy, initiative and self-

identity.  (*Id.* at 96-103, ¶¶ 241-49, 251.)  While the jury heard testimony that

Naomi was schizophrenic, that label did not explain to them the realities of how

her illness would have impacted petitioner's childhood.  The jury was deprived of

readily available expert testimony that would have allowed the jurors to make

sense of the evidence presented.  *Caro v. Calderon*, 165 F.3d at 1227.

Petitioner's emotional struggles were well documented, starting with

preschool and continuing during the Hernandez family's attempt to adopt a second

child.  Counsel sought records that captured petitioner's emotional tumult as a

preschooler and young child, gave them to his experts for review and prepared

them as exhibits for trial.  Nevertheless, counsel failed to question the experts

about these issues and failed to seek to admit the documents into evidence.  The

records would have allowed the experts to explain the impact of Naomi's

schizophrenia on petitioner.  Counsel also could have used the records to give

contemporaneous, illustrative examples of Naomi's deficient mothering and the

consequent behavioral and emotional difficulties petitioner displayed.  Expert

testimony using the documents would have given context to petitioner's life.

Nevertheless, while counsel's failures to present evidence he had in his

possession certainly prejudiced petitioner, it is not reasonably probable that

appropriate expert testimony, admitted together with the omitted records, would

have caused the jury to come to a different verdict.  While significant, the

1    prejudicial effect of counsel's deficiencies does not rise to the level of prejudice

2    found in the many cases granting relief.  *See, e.g.*, *Rompilla*, 545 U.S. at 390-93

3    (granting relief where counsel failed to investigate and present evidence of

4    petitioner's abusive and neglectful childhood and petitioner's organic brain

5    damage); *Williams* (*Terry*), 529 U.S. at 395-99 (finding ineffectiveness where

6    counsel failed to investigate and present graphic evidence of petitioner's

7    nightmarish childhood, including severe beatings and foster care while petitioner's

8    parents served prison terms for criminal neglect); *Stankewitz v. Woodford*, 365

9    F.3d 706, 723 (9th Cir. 2004) (granting evidentiary hearing on claim of IAC where

10   counsel failed to investigate and present "an excess of privation and abuses"

11   experienced by petitioner as a child, including severe beatings, foster care and

12   organic brain damage to the point of borderline mental retardation); *Ainsworth*,

13   268 F.3d at 874-78 (granting petition where counsel failed to investigate, develop

14   and present evidence of petitioner's troubled background and emotional

15   instability); *Wallace v. Stewart*, 184 F.3d 1112, 1115-16 (9th Cir. 1999) (granting

16   petition where counsel conducted no factual investigation into petitioner's very

17   dysfunctional background); *Seidel v. Merkle*, 146 F.3d 750, 756 (9th Cir. 1998)

18   (granting petition upon counsel's failure to investigate and present a mental illness

19   defense at penalty); *compare Campbell v. Kincheloe*, 829 F.2d 1453 (9th Cir.

20   1987) (finding counsel's decision not to present mitigating evidence reasonable

21   and, assuming deficiency, no prejudice).  While petitioner has not demonstrated

22   prejudice sufficient to undermine confidence in the penalty verdict, the Court will

23   consider counsel's deficiencies in the cumulative error analysis.

24        Lastly, petitioner alleges as part of Claim 5(C)(9) that trial counsel failed to

25   call a youth authority counselor to testify that petitioner had not been dangerous

26   when previously incarcerated.  Both Dr. Girsh and Dr. Maloney testified that

27   petitioner likely would do well while incarcerated.  Evidence from an additional

28   person would have been cumulative and may have opened the door to negative

1    evidence about petitioner's juvenile violations.  Counsel was not deficient, nor did

2    his alleged deficiency cause petitioner prejudice.

3         Accordingly, the Court DENIES Claims 5(C)(1), 5(C)(2), 5(C)(4) and

4    5(C)(9) but will consider counsel's deficiencies in the cumulative error analysis.

5         **6.     Counsel's failure to investigate and present evidence of**

6         **petitioner's neurological impairment and to obtain a**

7         **complete social and medical history of petitioner (Claims**

8         **5(C)(7) & 5(D)(32))**

9         In Claim 5(C)(7), petitioner contends that trial counsel failed to investigate

10   and develop evidence of petitioner's neurological and mental impairment,

11   including by failing to use petitioner's expert witnesses effectively on the issue of

12   petitioner's mental state at the time of the offenses.  In Claim 5(D)(32), petitioner

13   asserts that trial counsel inadequately prepared for petitioner's defense.  Counsel's

14   alleged shortcomings include:  (1) failure to retain a social historian; (2) failure to

15   obtain a complete medical history or neurological examination of petitioner;

16   (3) failure to consult with experts about the impact of (a), physical, sexual and

17   emotional abuse and neglect, (b) drug and alcohol abuse (c) petitioner's father's

18   views about racism and (d) being an adopted child of mixed-race heritage; and

19   (4) failure to provide all relevant information to experts.

20              **a.     Deficiency**

21        As discussed, some evidence in the record may have suggested to counsel

22   that a neurological examination of petitioner was unnecessary.  Every expert

23   consulted found that petitioner had the capacity to commit rape and murder.

24   Dr. Girsh diagnosed petitioner with antisocial personality disorder but also

25   testified that petitioner might meet the criteria for antisocial personality disorder.

26        At the same time, Dr. Girsh also told counsel before trial that there was

27   some indication of an organic, neurological basis for petitioner's behavior and that

28   petitioner suffered from dyslexia.  (9 CDD at P00427 (Exh. L-7).  Dr. Maloney

1    told counsel that petitioner had been psychotic, that petitioner suffered from

2    potentially serious psychological problems and that he had a highly pathological

3    profile.  (9 CDD at P00738 (Exh. L-5); JTD P00829.)  Ultimately, Dr. Maloney

4    testified at penalty that nothing suggested that petitioner lacked the capacity to

5    commit the crimes.  (14 RT 3473.)

6         Ample data did exist, however, that was reasonably available to counsel and

7    that may have influenced both counsel's approach to trial and the experts'

8    evaluations of petitioner.  Counsel failed to retain a social historian or to otherwise

9    investigate petitioner's background, and he also failed to obtain petitioner's

10   complete medical history.  Due to counsel's failure to conduct basic investigation,

11   none of the experts who evaluated petitioner before trial reviewed records

12   regarding petitioner's birth family, or social history information from petitioner's

13   adopted family, preschool teacher and others.  Dr. Maloney and Dr. Girsh knew

14   that petitioner had been referred for a neurological examination at age five, that he

15   had performed poorly on psychological tests and that he engaged in behavior

16   suggesting neurological or psychiatric problems during his preschool years.

17   However, none of the experts knew the following key information:  that petitioner

18   inherited a genetic vulnerability to mental illness; that he was born to a 14-year-old

19   mother who abused drugs and alcohol during her pregnancy and who was in a

20   violent relationship; that petitioner's birth father was unemployed, incarcerated

21   and suffered from serious mental illness; that petitioner was delivered with the

22   help of forceps, which are known to cause brain injury; that petitioner suffered

23   many head injuries as a child; that petitioner's preschool teacher was very

24   concerned about petitioner and his home life; that petitioner was described as a

25   troubled and hyperactive child; that petitioner had endured the forcible

26   administration of enemas and other abuse at the hands of his adoptive parents; or

27   that petitioner was largely neglected by both his parents.  In addition, various

28   indicators suggested that petitioner suffered from neuropsychiatric impairments.

1   (Gur 6/8/04 Decl. at 4, ¶ 9.)  Petitioner's upbringing included child abuse and

2   neglect, both psychological and physical, which can lead to brain damage or

3   dissociative disorders.  (*Id.* at 5, ¶ 9.)  Petitioner also had poor impulse control and

4   poor scholastic performance despite normal IQ scores.  (*Id.*)

5       "Counsel has a duty to make reasonable investigations or to make a

6   reasonable decision that makes particular investigations unnecessary."  *Strickland*,

7   466 U.S. at 691.  "In assessing counsel's investigation, [the Court must] conduct

8   an objective review of [his] performance, measured for reasonableness under

9   prevailing professional norms, which includes a context-dependent consideration

10  of the challenged conduct as seen from counsel's perspective at the time."

11  *Wiggins v. Smith*, 539 U.S. at 523.

12      Here, "[c]ounsel's failure to investigate [petitioner's] mental condition

13  cannot be construed as a trial tactic."  *Evans v. Lewis*, 855 F.2d 632 (9th Cir.

14  1988).  At the time of petitioner's trial, which took place in 1983, competent

15  counsel had a duty to investigate a defendant's background.  *See*, *e.g.*, *Penry*, 492

16  U.S. at 319 (holding, in reviewing a case tried in March of 1980, that "evidence

17  about the defendant's background and character is relevant because of the belief,

18  long held by this society, that defendants who commit criminal acts that are

19  attributable to a disadvantaged background, or to emotional or mental problems,

20  may be less culpable than defendants who have no such excuse"), *overruled on*

21  *other grounds in Atkins v. Virginia*, 536 U.S. 304 at 321 (2002); *Bean*, 163 F.3d at

22  1080 ("[W]e have previously recognized an attorney's duty to investigate and

23  present mitigating evidence of mental impairment in the context of a 1979 capital

24  sentencing hearing.") (citing *Evans v. Lewis*, 855 F.2d 631, 636-37 (9th Cir.

25  1988).); *Cf. Bean*, 163 F.3d at 1080 ("[T]he ineffectiveness at issue in this case did

26  not arise from failure to employ novel or neoteric tactics.  Rather, it resulted from

27  inadequacies in rudimentary trial preparation and presentation:  providing experts

28  with requested information, performing recommended testing, conducting

1    adequate investigation, and preparing witnesses for trial testimony.  These were

2    not alien concepts in 1981, but were an integral thread in the fabric of

3    constitutionally effective representation.")

4          Counsel's failure to investigate petitioner's background and his medical

5    history were not sound trial strategy.  *See, e.g.*, *Williams* (*Tery*), 529 U.S. at 395-

6    99 (holding that counsel's failure to investigate and present evidence of

7    defendant's mental defect and social history constitutes deficient performance);

8    *Caro*, 280 F.3d at 1254 ("[C]ounsel's failure to investigate and provide

9    appropriate experts with the information necessary to evaluate [petitioner's]

10   neurological system for mitigation constituted deficient performance within the

11   meaning of *Strickland*."); *see also Frierson v. Woodford*, 463 F.3d 982, 989 (9th

12   Cir. 2006) ("The imperative to cast a wide net for all relevant mitigating evidence

13   is heightened at a capital sentencing hearing because 'the Constitution prohibits

14   imposition of the death penalty without adequate consideration of factors which

15   might evoke mercy.'") (quoting *Caro*, 165 F.3d at 1227).

16         Moreover, counsel relied in part on a clinical psychologist retained by prior

17   counsel.  While trial counsel did retain an additional clinical psychologist, he

18   failed to conduct enough investigation to make an informed decision about what

19   sorts of other experts to consult or about what information to give the experts he

20   did retain.  Counsel has an obligation to conduct an investigation that will allow

21   counsel to figure out what sort of experts to consult, and then counsel must present

22   those experts with relevant information.  *Caro*, 165 F.3d at 1226-27.  Counsel's

23   inadequate investigation resulted in counsel failing to consult a neurologist,

24   neuropsychologist or neuropsychiatrist, or to arrange for a neurological

25   examination of petitioner, despite information in counsel's file suggesting the

26   utility of such an approach.  Counsel had no tactical reason for not requesting a

27   neurological examination.  (1 CDD 34; *see also* 1 CDD 34-35 ("Evidence of

28   neurological impairment is the type of evidence I wanted because it would have

1  helped to explain and mitigate Francis'[s] state of mind at the time of the

2  killings.")) Counsel owed a duty to locate experts who could explain medical or

3  neurological issues to the jury.  For example,

4

5          Although the defendant in *Caro* was examined by four experts
        prior to trial, including a medical doctor, a psychologist, and a
6        psychiatrist, none of whom indicated that the defendant suffered from
        mental impairment severe enough to constitute diminished capacity,
7        [the Ninth Circuit] concluded that defense counsel was ineffective for
        failing to consult an appropriate expert with expertise in neurology or
8        toxicology.  [Petitioner] had been exposed to high levels of toxic
        chemicals and pesticides as a child, and because none of the experts
9        were neurologists or toxicologists, none was able to conduct the
        neurological testing needed to evaluate the effects that the pesticides
10        and chemicals had on [petitioner's] brain.

11  *Frierson*, 463 F.3d at 992 (internal quotation marks omitted).  Likewise, petitioner

12  was exposed to alcohol, drugs and violence in utero; was delivered with the help of

13  forceps; suffered many accidents as a child, many of them involving head trauma;

14  was abused by his parents; and began abusing alcohol and drugs in elementary

15  school.  Also, readily available information that counsel could have obtained

16  through an adequate investigation would have raised additional questions about

17  whether petitioner suffered from neurological problems.  None of the experts was

18  capable of conducting the neurological testing necessary to evaluate the effects of

19  these circumstances on petitioner's brain.  Counsel performed deficiently.  *See*

20  *Kenely v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991) ("Failing to interview

21  witnesses or discover mitigating evidence relates to trial preparation and not trial

22  strategy."); *cf Bean v. Calderon*, 163 F.3d at 1079 (Counsel's "presentation of

23  the[] mental health experts' testimony did not arise from the requisite informed

24  judgment.") (internal quotation marks omitted).  Counsel also failed to elicit

25  testimony at trial regarding the impact of Naomi's schizophrenia on petitioner.

26  (*See*, *supra*, Discussion of Claims 5(B)(3)(c) & 5(C)(3).  Moreover, although

27  counsel testified that he knew petitioner had been abused by his parents, counsel

28  apparently did not explore this issue with his experts or elicit testimony regarding

1   the abuse at the penalty phase.

2               **b.**     **Guilt phase prejudice**

3        Petitioner argues that had counsel investigated petitioner's mental and

4   neurological impairments and conducted a social history, then counsel could have

5   presented a guilt phase defense that petitioner was unable to form the requisite

6   intents.  Petitioner has failed to show guilt phase prejudice.

7        Petitioner suffers from brain damage that is likely organic, meaning that it

8   was caused by a head injury, either in utero, later or both. (Gur 2/8/05 Decl. at 14,

9   ¶ 27.)  Petitioner's mother abused substances and was in a violent relationship

10   during her pregnancy, petitioner was delivered with the help of forceps and

11   petitioner was involved in many incidents of head trauma as a child, adolescent

12   and teen.  (*Id.*)  Petitioner's congenital brain damage probably was complicated by

13   the home life in which he was raised.  (*Id.* at 10, ¶ 18.)  The brain damage affects

14   various regions of petitioner's brain and causes petitioner to struggle with verbal

15   memory impairment and interpreting emotional information, both of which are

16   exacerbated by extreme emotion or stress.  (*Id.* at 10-11, ¶ 18-20.)

17        Neuropsychological tests available in 1982 and 1983 would have uncovered

18   these impairments, but no one conducted a neuropsychological evaluation of

19   petitioner at the time of trial.  (*Id.* at 11-12, ¶¶ 21- 22.)  The limited testing given

20   to petitioner by Dr. Maloney was not equivalent to "a comprehensive

21   neuropsychological evaluation under the then-prevailing professional standards."

22   (*Id.* at 12, ¶ 22.)  According to Dr. Gur, petitioner's brain damage existed at the

23   time of the crimes and prevented petitioner from understanding or responding

24   appropriately to his victims' expressions of resistance and fear.  His inability to

25   perceive emotion accurately makes it difficult for petitioner to judge things

26   correctly, especially in an emotionally volatile situation.  (*Id.* at 15, ¶ 29.)

27   Moreover, Dr. Gur concluded that petitioner's brain damage caused petitioner to

28   be in a dissociative state when he committed the crimes, preventing him from

1   forming the intent to commit murder and rape.  Petitioner's dissociation would

2   have helped explain petitioner's detailed confession, his inability to recall the

3   details of the crimes during his testimony and his persistent inability to explain

4   why he committed the crimes.  (*Id.* at 17, ¶ 35.)  Specifically, evidence of

5   dissociation would have allowed counsel to argue that petitioner did not actually

6   remember the details of the crime, but, instead, that the police fed him much of the

7   information following his arrest.  Petitioner subsequently confessed in great detail.

8   Despite his confession, petitioner could not in fact remember many things about

9   the crime because he was in a dissociative state.  Accordingly, counsel could argue

10  that petitioner was testifying truthfully at the penalty phase when he stated that he

11  could not recall many things about the crimes.

12         Dr. Lewis also testified that petitioner's capacity to form the specific intent

13  to rape and kill was substantially impaired on the night of the crimes due to "a

14  constellation of neuropsychiatric vulnerabilities . . . and extreme intra-family

15  stressors . . . which engendered his extreme[,] uncontrollable[,] violent acts.  The

16  knowledge of these biopsychosocial vulnerabilities and the appreciation of their

17  role in [the] offenses are vital to understanding his compromised mental

18  functioning on the nights of the murder[s]."  (Lewis 8/13/03 Decl. at 37, ¶ 86.)

19         This evidence certainly could have helped at trial.  Evidence that petitioner

20  could not in fact form the specific intent to murder or rape would have provided a

21  more solid defense than one relying only on petitioner's intoxication alone.  While

22  petitioner has put forth evidence that could have caused at least one juror to vote

23  differently, petitioner has not demonstrated by a reasonable probability that this

24  new evidence would have been successful at the guilt phase.  Even if petitioner

25  used experts to explain why the confession was detailed but petitioner later could

26  not recall much at trial, a reasonable jury likely would have rejected a diminished

27  capacity defense.  The very similar factual circumstances of the crimes, taking

28  place just a week apart, could support a conclusion that petitioner was able to

82

1  premeditate, deliberate or plan, all of which undercut a diminished capacity

2  defense.  Finally, within a year and a half of trial, a voter referendum changed the

3  law to eliminate the dense of diminished capacity due to mental disease, defect or

4  mental disorder.  *See* Cal. Penal Code § 28.  That context may have lessened the

5  likelihood of success of a diminished capacity defense at the guilt phase.

6      Accordingly, the Court DENIES Claims 5(C)(7) and 5(D)(32) to the extent

7  they raise guilt phase claims but will consider counsel's deficiencies in the

8  cumulative error analysis.

9               **c.    Penalty phase prejudice**

10      In evaluating prejudice at the penalty phase, the Court must weigh the

11  evidence in aggravation against the evidence in mitigation, including the evidence

12  counsel could have presented but did not.  Petitioner must show a reasonable

13  probability of a different verdict.  *Williams (Terry)*, 529 U.S. at 398.

14      "More than any other singular factor, mental defects have been respected as

15  a reason for leniency in our criminal justice system.  *Caro*, 280 F.3d at 1258.

16  While counsel presented some evidence of petitioner's emotional problems, that

17  testimony did not come close to painting an accurate picture of petitioner's

18  neurological deficits.  Dr. Gur testified that petitioner's brain damage has greatly

19  impacted the way petitioner both perceives the world and functions in

20  relationships.  Petitioner harbors a skewed picture of reality.  He suffers from a

21  profound impairment in his ability to perceive emotions accurately, often

22  mistaking happiness and sadness for anger and fear.  Petitioner has suffered from

23  this problem as early as preschool, and it is heightened when he is experiencing

24  extreme emotion or stress.  Petitioner attempts to cope with his inability to

25  perceive emotions accurately by using other cues, but this coping mechanism is

26  quite limited due to the mental illness of petitioner's adoptive parents.  (Gur 2/8/05

27  Decl. at 12, ¶¶ 23-24.)

28      Moreover, petitioner's brain damage also may explain his inability to recall

1    the details of the crime when questioned by the police.  Petitioner testified in his

2    deposition that the police spent several hours discussing the crime and showing

3    him pictures before recording his detailed statement.  However, petitioner's

4    penalty phase testimony was replete with assertions that petitioner could not

5    remember what happened.  (*Id.* at 15-16, ¶¶ 30-32.)  The clinical data suggest that

6    petitioner actually cannot recall significant parts of the crime, not that he is being

7    evasive or feigning forgetfulness.  (*Id.* at 16, ¶ 31.)  Dr. Clausen also opined that

8    petitioner dissociated as a coping mechanism and that he dissociated during the

9    crimes.  (Clausen Decl. at 188-124, ¶¶ 284-89, 291-92, 294-96; *see also* Lewis

10   8/15/03 Decl. at 33-34, ¶ 82 (opining that the circumstances of Ryan's murder

11   suggest that petitioner was in a dissociative state).)

12        Counsel's failure to investigate and present petitioner's deeply troubled

13   home life was also quite damaging.  As part of the evidentiary hearing, several of

14   petitioner's experts have created social histories.  Dr. Clausen testified that

15   petitioner has experienced recurring trauma, from his conception through the

16   crime.  This trauma included having a neglectful primary caretaker afflicted with

17   schizophrenia and a paranoid, oft-absent father.  She discussed, at length, the

18   impact of petitioner's schizophrenic mother on petitioner.  Dr. Lewis diagnosed

19   petitioner with bipolar mood disorder.  (Lewis 8/15/03 Decl. at 36, ¶ 84.)

20        Counsel's failure to investigate petitioner's background and medical history

21   and to have a neurological exam conducted resulted in a haphazard, incoherent

22   mitigation case.  Counsel failed to put on evidence that would have served

23   counsel's stated goal in his penalty phase opening argument:  to "indicate how the

24   defendant go to be where the defendant is" and "the type of individual that the

25   defendant was at the time of the commission of the offenses and potentially the

26   type of individual he is today."  (13 RT 34326.)

27        Counsel could have presented evidence, however, that would have

28   explained how petitioner became who he was at the time of the crimes.  Dr. Gur

explained the effect of petitioner's brain damage this way:

> I would think that he started off with a bad brain because of his biological background.  Growing up as a fetus in a 14-year-old girl who abuses alcohol during pregnancy, I mean, we already know that children born to 14 year olds and 15 year olds or even 16 year olds have significant deficits as a group.  So some brain damage comes just right from there.
>
> Mother consuming alcohol, the more we know about the effects of alcohol during pregnancy, the more we find that they are much more devastating than we ever thought . . . . Then you have the forceps delivery, and then you have evidence of child neglect, abuse, physical punishments, inept parenting by the adoptive parents.
>
> You then have a series of head injuries from motorcycle crashes and other forms of head injuries.  You add to that early substance abuse, which often happens with those kids.  They know there is something screwed up about their brains, so a lot of times they medicate themselves.  Street drugs make them feel better in the best case or give them a rational explanation for their abnormal thought processes in the worst case.  And they, themselves, as I mentioned, they go straight to the frontal lobe and retard the development of the frontal lobe.
>
> You put all of that together, and the mystery becomes how he managed to reach 18 without committing serious crimes before that?

(Gur Depo. at 461.)  Dr. Gur also touched on the impact of petitioner's home life: "At best, I understand, his mother was ineffective and withdrawn and eventually left the home.  And his father was prone to outbursts of anger and rage and was abusive psychologically and physically.  So you put that factor in with someone who has the vulnerability that Francis had growing up, and it's a prescription for disaster.  It's a prescription for someone who will really never develop normally and will not have much of a chance to develop the mental and intellectual and personal capacity to cope with life's stresses."  (Gur Depo. at 447; *see also* Lewis 8/15/03 Decl. at 31, ¶ 77 (testifying that "[i]t is hard to imagine how a more genetically resilient child could have weathered the family environment and adapted appropriately to society, much less a child with Francis's inherent vulnerabilities to mental illness."); 2 Lewis Depo. at 382 (testifying that a vulnerable child raised in a psychotic environment with incredible stress creates an

1  aberrant human being who cannot function as others do).)

2      In addition, counsel completely missed an opportunity to tell a narrative that

3  could have evoked mercy.  As Dr. Clausen testified:

4

5          The story of Francis Hernandez is a harrowing tale of genetic
            and environmental risk, extensive child abuse and profound child
6          neglect, chronic traumatization by a severely mentally ill primary
            caretaker in the context of a markedly impaired co-parent unable
7          and/or unwilling to provide minimal protection, and a baffling series of
            missed opportunities for intervention and tertiary prevention by family
8          members and mental health, education, and juvenile justice professionals.
            As was feared by and foreshadowed with the comments of his closest family
9          members, Francis lived a childhood that was literally a recipe for disaster
            and tragedy.  His genetic and adoptive families, together with the
10         community in which he lived, produced an adolescent entirely unequipped
            to understand his social world, negotiate interpersonal relationships,
11         appropriately manage strong emotions, and seek help for himself.  He was
            rejected in utero, abandoned at birth, neglected during infancy, abused
12         throughout childhood, and ignored during adolescence.  It is impossible to
            place oneself in the shoes of Francis Hernandez at the time of the capital
13         crimes for which he has been convicted simply because the rest of us cannot
            possibly imagine the daily hell in which he spent his life.

14

15  (Clausen Decl. at 127, ¶ 305; *see also* Clausen Depo at 119 ("I see more the

16  psychotic mothering that he received growing up as the most central factor in

17  developing who he was as an individual, and resulting in who he was and what

18  sorts of coping strategies he had, and the resources he didn't have; that the

19  physical and sexual abuse and the role that his father played and the role that his

20  genetic history played were all important and significant, but the most central

21  feature about what was going on was the psychotic mother.").)

22      Counsel's failure to conduct an adequate investigation into petitioner's

23  background, his medical history and his neurological impairments had serious

24  consequences at the penalty phase.  Counsel's failures deprived petitioner of the

25  effective assistance of counsel.  *See, e.g.*, *Rompilla*, 545 U.S. at 390-93 (granting

26  petition where counsel failed to uncover evidence that petitioner suffered from

27  organic brain damage, that petitioner often had no a caretaker as a teenager and

28  that the house was filthy); *Williams* (*Terry*), 529 U.S. at 395-99 (finding counsel

1    ineffective upon failing to investigate and present evidence of petitioner's

2    nightmarish childhood); *Ainsworth*, 268 F.3d at 874-78 (granting relief where

3    counsel failed to investigate and present evidence of petitioner's troubled

4    background and emotional instability); *Wallace v. Stewart*, 184 F.3d 1112, 1115-

5    16 (9th Cir. 1999) (granting petition where counsel conducted no factual

6    investigation into petitioner's dysfunctional background).  Petitioner has

7    demonstrated prejudice sufficient to undermine confidence in the penalty verdict,

8    by showing a likelihood of a different verdict at the penalty phase.

9          Accordingly, the Court GRANTS Claims 5(C)(7) and 5(D)(32) as to the

10   penalty phase and will also consider counsel's deficiencies in the cumulative error

11   analysis.

### 7.    Counsel's failure to challenge petitioner's competence to confess, testify and stand trial (Claim 5(D)(26))

14         In Claim 5(D)(26), petitioner contends that trial counsel failed to investigate

15   the gravity of petitioner's mental, emotional and psychological impairment before,

16   during and after the crime, as well as during his confinement in county jail.  As a

17   result, trial counsel failed to challenge petitioner's competence to give a statement

18   to the police, to testify and to stand trial.

19         "It has long been accepted that a person whose mental condition is such that

20   he lacks the capacity to understand the nature and object of the proceedings against

21   him, to consult with counsel, and to assist in preparing his defense may not be

22   subjected to a trial."  *Drope v. Missouri*, 420 U.S. 162, 171 (1975).  The test for

23   competence to stand trial is whether the defendant "has sufficient present ability to

24   consult with his lawyer with a reasonable degree of rational understanding—and

25   whether he has a rational as well as factual understanding of the proceedings

26   against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)

27   (internal quotation marks omitted).  "[C]ompetence to stand trial does not consist

28   merely of passively observing the proceedings.  Rather, it requires the mental

1    acuity to see, hear and digest the evidence, and the ability to communicate with

2    counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d

3    1084, 1089 (9th Cir. 2001). "Although no particular facts signal incompetence,

4    suggestive evidence includes a defendant's demeanor before the trial court,

5    previous irrational behavior, and available medical evaluations." *Moran v.*

6    *Godinez*, 57 F.3d 690, 695 (9th Cir. 1994).

7        "[A]lthough retrospective competency hearings are disfavored, they are

8    permissible whenever a court can conduct a meaningful hearing to evaluate

9    retrospectively the competency of the defendant." *Id.* at 696 (internal citations

10   omitted). "[M]edical reports contemporaneous to the time of the initial hearing

11   greatly increase the chance for an accurate retrospective evaluation of a

12   defendant's competence." *Id.*; *see also Deere v. Woodford*, 339 F.3d 1084,

13   1086–87 (9th Cir. 2003) (pointing to a doctor's examination of petitioner within

14   several days of guilty plea as particularly probative of his mental status at trial).

15       Petitioner has submitted a great deal of evidence concerning his mental state

16   as part of the evidentiary hearing. This evidence includes testimony that petitioner

17   suffers from bipolar mood disorder and organic brain damage. (Lewis 8/15/03

18   Decl. at 34-36, ¶ 84; Gur 2/8/05 Decl. at 10, ¶ 18.) Brain damage impairs

19   petitioner's ability to organize and recall information, causes petitioner to

20   misperceive emotions and  makes it difficult for petitioner to modulate his

21   emotional response appropriately. (Gur 2/8/05 Decl. at 10-11, ¶¶ 18-20.) This

22   evidence does not suggest, however, that petitioner lacked the capacity to

23   understand that he was being tried for capital murder and faced the death penalty.

24   While many of petitioner's experts have testified that he lacked the capacity to

25   form the requisite intents at the time of the crime, none has testified that he was

26   incompetent to stand trial. (Lewis 8/15/03 Decl. at 37, ¶ 87; 6/8/04 Decl. at 15-17,

27   ¶¶ 30-32, 35.) Moreover, none of the experts who evaluated petitioner at the time

28   of trial found him incompetent. Petitioner has not met his burden of establishing

88

1    by a preponderance of the evidence that he was incompetent to stand trial.

2         Accordingly, the Court DENIES Claim 5(D)(26).

3        **8.    Counsel's decision to put petitioner on the stand at the**

4             **penalty phase (Claim 5(D)(27))**

5        In Claim 5(D)(27), petitioner contends that trial counsel made a misguided,

6    inappropriate and ill-considered decision to put petitioner on the stand during the

7    penalty phase.  Petitioner also argues that his mental condition caused him to

8    appear unsympathetic and cold, which alienated the jury.  Furthermore, trial

9    counsel exacerbated the prejudice to petitioner by failing to investigate and present

10   mental health evidence that would have explained petitioner's affect.

11       Counsel moved for separate juries for the guilt and penalty phases because

12   he wanted petitioner to testify at the guilt phase.  Counsel thought that petitioner

13   would need to testify at the guilt phase to establish the amount of alcohol he

14   consumed before the crimes.  However, counsel did not want petitioner to testify at

15   the penalty phase due to his appearance, his ability to testify and the content of his

16   testimony.  (10 CDD 40-41.)  The trial court denied the motion.

17       Inexplicably, counsel put petitioner on the stand at the penalty phase.

18   Counsel wanted petitioner to testify about his background and home life, but

19   counsel asked only about the facts of the crime.  (1 CT 289; 10 CDD 40-43; 13 RT

20   3398-3415.)  On cross examination, the prosecutor questioned petitioner

21   extensively about the facts of the crime.  (13 RT 3416-65; 14 RT 3486-3551.)

22   Petitioner testified countless times that he could not remember many of the

23   gruesome details of the crimes to which he had confessed, making him seem cold,

24   callous and uncaring. (*See generally*, 13 RT 3416-65; 14 RT 3486-3551.)  He also

25   testified that neither victim was crying or upset during the crimes.  (13 RT 3432-

26   33; 14 RT 3534-3.)  Petitioner's testimony, including lengthy cross examination,

27   consumed much more time than any other penalty phase witness.

28       Counsel performed incompetently.  First, counsel put petitioner on the stand

1    at the penalty phase, despite his earlier decision that petitioner would not make a

2    good penalty phase witness.  This is not a case where counsel "could not have

3    predicted just how damaging placing [petitioner] on the stand would be." *Allen v.*

4    *Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005).  No rational, reasoned basis

5    supported this decision.  Moreover, counsel questioned petitioner only about the

6    facts and circumstances of the crime, rather than about petitioner's personal

7    background.  *See Harris v. Wood*, 64 F.3d 1432, 1437 (9th Cir. 1995) (finding

8    deficient counsel's failure to question defendant in accordance with counsel's

9    purpose in calling defendant to testify).  Even worse, petitioner's testimony that he

10   could not remember many details of the crime made petitioner seem unremorseful

11   and cruel.  Petitioner's testimony that the victims were not crying or upset during

12   the crime were statements that "a reasonable jury could have easily chosen to

13   disbelieve" as "self-serving uncorroborated testimony." *United States v.*

14   *Nicholson*, 677 F.2d 706, 709 (9th Cir. 1982); *see also United States v. Cisneros*,

15   448 F.2d 298 (9th Cir. 1971) ("A trier of fact is not compelled to accept and

16   believe the self-serving stories of vitally interested defendants.  Their evidence

17   may not only be disbelieved, but from the totality of the circumstances, including

18   the manner in which they testify, a contrary conclusion may be properly drawn.")

19   Counsel's performance fell below an objective standard of reasonableness.

20        Petitioner's penalty phase testimony, which focused exclusively on the

21   circumstances of the crime, caused petitioner unmitigated prejudice.  Petitioner's

22   testimony consumed the bulk of the evidence presented at the penalty phase.  As

23   counsel predicted before trial, petitioner's ability to testify and the content of his

24   testimony did nothing to mitigate the crime.  Petitioner appeared callous and

25   dishonest, and the prosecutor argued those points.  (14 RT 3636-64 ("[H]e was not

26   telling the truth.  Either—when he says[,] [']I don't remember,['] he is either such

27   a callous individual that he really doesn't remember—what would a normal person

28   remember concerning what happened in this case?  A normal person would

1  probably think about it constantly, have nightmares about it, and relive it every

2  moment of the day.  Is that the type of individual we have . . . or a person who

3  isn't and won't admit what he did and who lies about it when he say[s], 'I don't

4  remember.  After all it was 20, 25 months ago[.]"))

5       Moreover, petitioner's testimony did not make him seem less culpable.  In

6  fact, his repeated assertions that he could not recall the facts of the crime and his

7  testimony that the victims did not cry or seem upset made him seem markedly

8  *more* culpable than less.  Counsel also failed to take other steps that would have

9  ameliorated the harm caused by petitioner's testimony, and those errors

10  exacerbated the situation.  For example, counsel could have had Dr. Maloney

11  testify about petitioner's psychological problems, and that testimony might have

12  explained petitioner's odd affect while testifying.  (JTD at P00829-30; *see also*

13  Discussion of Claim 5(C)(1), 5(C)(2), *supra*.)  Moreover, if counsel had requested

14  a neurological examination of petitioner, an expert could have testified about

15  petitioner's inability to accurately perceive emotions and to modulate his

16  emotional response appropriately.  (Gur 2/8/05 Decl. at 10-11, ¶¶ 18-20; *see also*

17  Discussion of Claim 5(C)(7), *supra*.)  Such testimony would have helped to

18  explain petitioner's testimony that the victims were not upset or that he did not

19  know they were upset.  Finally, if counsel had conducted an adequate investigation

20  into petitioner's background, he could have put other witnesses on the stand to

21  discuss petitioner's background.  Many lay witnesses were able and willing to

22  discuss petitioner's life, other than those who offered thin pleas for mercy at the

23  penalty phase.  (*See, e.g.*, declarations of Barbara Graziano (maternal aunt), Joy

24  Turner (preschool teacher), Judy Williams (ex-girlfriend's mother), Morris

25  Silverstein (childhood friend); *see also* Discussion of Claims 5(B)(3)(C) and

26  5(C)(3), *supra*.)  An adequate investigation also would have revealed evidence that

27  petitioner had a history of dissociation.  Expert testimony that he was in a

28  dissociative state at the time of the crimes would have explained petitioner's

1   inability to recall the details of the crimes at the penalty phase. (Clausen Decl. at

2   118-24, ¶¶ 284-89, 291-92, 294-96; Lewis 8/15/03 Decl. at 27-28, ¶¶ 68-70 & 36-

3   37, ¶ 85-87; Gur 6/8/04 Decl. at 17, ¶ 35; *see also* Discussion of Claims 5(C)(7),

4   5(D)(32), *supra*.)

5   Counsel's decision to put petitioner on the stand, without any psychological

6   evidence to explain petitioner's demeanor, was utterly devastating.

7   Accordingly, the Court GRANTS Claim 5(D)(27).

8   **C.   Other IAC Claims**

9   **1.   Counsel's failure to challenge the State's theory that Kathy**

10  **Ryan was kidnapped (Claim 5(D)(2))**

11  In Claim 5(D)(2), petitioner alleges that trial counsel failed to challenge the

12  State's contention that Kathy Ryan was kidnapped from her home on the evening

13  of her murder, as evidence tending to show that Ryan willingly met petitioner on

14  the night of the murder would have supported petitioner's claim that Ryan

15  consented to having sex with him.

16  Again, petitioner must show that counsel performed deficiently and that this

17  deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

18  Petitioner cannot show deficiency or prejudice. Kathy Ryan's stepmother,

19  Barbara Ryan, offered the following testimony at trial: At about 5:30 the morning

20  Kathy's body was discovered, Barbara awoke to find the living room lights on and

21  the front sliding glass doors and screens open. She went to Kathy's bedroom and

22  found that Kathy's lights were on, Kathy's bed was still made and Kathy's

23  bedroom window was open with no screen in it. A few hours later, Barbara

24  discovered Kathy's pool cue and jacket on the living room floor near the open

25  sliding glass door. On her way to her car, Barbara found Kathy's purse outside by

26  the pool with the contents spilled out on the ground. (8 RT 1831-35.)

27  Given this evidence, petitioner can show neither deficiency nor prejudice.

28  Counsel could have concluded that it would have been futile, and potentially

92

damaging to counsel's credibility, to attempt to argue that Kathy Ryan left willingly with petitioner. *See Rupe v. Wood*, 93 F.3d 1434, 1440 (9th Cir. 1996) (holding that failure to take futile action can not be ineffective). Moreover, even if counsel did attempt to challenge the kidnapping allegation, it would be quite attenuated for counsel to argue successfully that because Kathy Ryan may have met petitioner willingly on the night of the murder, she also consented to having sex with him. The physical evidence strongly suggested that Kathy Ryan was raped prior to hear death and that she likely was penetrated forcefully by an object. (9 RT 2002, 2017-20, 2029-30.) Petitioner cannot prevail on Claim 5(D)(2).

Accordingly, the Court DENIES Claim 5(D)(2).

## 2. Counsel's failure to put on evidence about petitioner's level of inebriation on the nights of both crimes (Claim 5(D)(3))

In claim 5(D)(3), petitioner argues that trial counsel failed to elicit corroborating evidence from eye witnesses that petitioner consumed large quantities of alcohol and drugs on the nights of both crimes.

As with the other claims of IAC, petitioner must show that counsel performed deficiently and that counsel's inadequate representation prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

Trial counsel put Christopher Esparza on the stand. Esparza spent the afternoon preceding Kathy Ryan's murder with petitioner. (12 RT 3023-26.) Esparza testified that while he and petitioner were together, they stopped at a liquor store and purchased two six-packs of beer. (12 RT 3024.) Esparza saw petitioner drink at least four beers during their last hour together. (12 RT 3025-26.) In addition, trial counsel presented the testimony of Dr. Amer Rayyes, who testified that petitioner is an alcoholic and that every time petitioner drank, he would drink until he was intoxicated. (12 RT 3058.) Petitioner's confession stated that he was drunk on the night of Edna Bristol's murder. (Confession Transcript at 3.)

93

Petitioner cannot prevail by alleging that counsel failed to put on cumulative evidence. *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (holding that "it was not unreasonable for counsel not to pursue such testimony when it was largely cumulative of the testimony" already offered). Moreover, petitioner cannot show prejudice. The jury heard evidence that petitioner had been drinking heavily preceding both murders and heard expert testimony about the effect alcohol had on him. Petitioner has shown neither deficiency nor prejudice.

Accordingly, the Court DENIES Claim 5(D)(3).

### 3.   Counsel's failure to investigate the audio-taped confession for tampering (Claim 5(D)(4))

In Claim 5(D)(4), petitioner contends that trial counsel failed to conduct an adequate investigation of the audio-taped confession for any possible tampering with the tape. Trial counsel also failed to have petitioner listen to the tape and provide his comments on it, or to question petitioner about the circumstances surrounding the confession.

Again, petitioner must show that counsel performed deficiently and that counsel's deficiency prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

Petitioner has not put forth any allegations or evidence to show what counsel would have learned if he had conducted an independent examination of the audio-taped confession for possible tampering. He also has not provided any evidence of what petitioner would have told counsel if petitioner had listened to and commented on the confession. Petitioner's "claim of [deficiency and] prejudice amounts to mere speculation." *Cooks v. Spalding*, 660 F.2d 738, 740 (9th Cir. 1981); *see also James v. Borg*, 24 F.3d at 26.

Accordingly, the Court DENIES Claim 5(D)(4).

94

**4.    Counsel's failure to challenge probable cause to arrest petitioner and search his van (Claim 5(D)(5))**

In Claim 5(D)(5), petitioner alleges that trial counsel failed to rebut the prosecution's contention that the arresting officers had sufficient probable cause to arrest petitioner and to search his van.

As stated, petitioner must show that counsel's performance fell below the standard of care and that this deficiency prejudiced petitioner. *Wiggins*, 539 U.S. at 521. "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

Petitioner argues that "[a] significant aspect of probable cause to search [his] van was the alleged observation of a carpet that was similar to fibers found in one of the victim's pubic hairs." (Petr's 8/23/07 Brief at 21). Petitioner also contends that "[t]he police claimed to have seen a 'rust-brown' carpet on the floor of Mr. Hernandez's van." (*Id.*) In support of these contentions, petitioner points to the prosecutor's opening argument, which noted that the coroner found burnt orange and rust-colored carpet fibers, the same as the carpet found in petitioner's van, on victim Edna Bristol. (8 RT 1750.) He also cites the statements of police officer Ronald Nelson. Officer Nelson testified that carpet was pulled over the backseat of petitioner's van, but that he could still see part of the carpet, which appeared to be "red" or "rust-colored" and that he saw "several rubber bands, green and brown, on the shifting column of the vehicle." (1 RT 68A-69A.)

Petitioner alleges that the arresting officer could not have observed the carpet in the back of petitioner's van and that counsel performed deficiently in both failing to discover that impossibility and arguing that there was no probable

1  cause to search the van.  For example, police officer Mac Lyman testified at trial

2  that "[y]ou could only see the driver's compartment of the van.  There was a

3  blanket covering the rear portion of the van." (11 RT 2858, 2861.)  Another

4  witness, Robert Beeler, testified that he thought the windows on petitioner's van

5  had been painted.  (9 RT 2196.)

6       At the motion to suppress the confession, however, the prosecution offered

7  the testimony of Long Beach police officer Paul Chastain, who located and looked

8  inside petitioner's van before it was searched.  (1 RT 213A-214A.)  Officer

9  Chastain testified that he saw orange carpet inside the van.  (1 RT 214A.)  While

10 he testified that he could not see anything in the rear of the van (1 RT 221A-

11 222A), he did see orange-colored carpet "between the seats," and "on the driver's

12 side," "on the floor."  (1 RT 225A.)  Given this testimony, it is difficult for

13 petitioner to establish that counsel performed deficiently by failing to argue that

14 the police could not see the color of the carpet from outside the van.

15      Even if counsel performed deficiently, petitioner cannot show prejudice.  As

16 stated in *Strickland*, "a court need not determine whether counsel's performance

17 was deficient before examining the prejudice suffered by the defendant as a result

18 of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim

19 on the ground of lack of sufficient prejudice, which we  expect will often be so,

20 that course should be followed." *Strickland*, 466 U.S. at 697.  Petitioner "must

21 establish that had" counsel challenged the visibility of the carpet fibers from

22 outside the van, then "there was a reasonable probability that the evidence would

23 have been suppressed" and petitioner would have enjoyed a more favorable

24 verdict. *Lowry v. Lewis*, 21 F.3d 344, 346-47 (9th Cir. 1994) (citing *Morrison*,

25 477 U.S. at 375).  First, the conflicting testimony about the visibility of the carpet

26 from outside the van might have caused counsel to raise different arguments at the

27 suppression hearing, but those arguments would not necessarily have negated a

28 finding of probable cause. *Cf. Gerstein v. Pugh*, 420 U.S. 103, 121 (1974) ("[A

probable cause determination] does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt.")  In addition, there likely was probable cause to search petitioner's van even without the orange-colored carpet fibers.  The police found "[t]wenty-three small turquoise rubber bands . . . on the ground near [Edna Bristol's] body."  *Hernandez*, 47 Cal. 3d at 328.  Before arresting petitioner and searching his van, the police looked inside the van from the outside and saw "several greenish-turquoise rubberbands on the driver shifting column."  (11 RT 2859; *see also* 1 RT 69A ("[T]here was [*sic*] also several rubber bands, green and brown, on the shifting column of the vehicle.").)  The rubberbands, on their own, probably supported a finding of probable cause to search petitioner's van, given the other facts and circumstances suggesting that the same perpetrator committed the two murders, placing petitioner with Kathy Ryn on the night of her murder and connecting petitioner to Edna Bristol about a month before Bristol's murder.[8]  *See,*

---

[8]       Officer William Collette testified that the police noted many similarities between the two murders and suspected that the same perpetrator committed both crimes:  (1) both victims were found in the early morning hours; (2) both victims were on grassy parkways; (3) both victims were found adjacent to schools; (4) both victims were on a non-residential side of a street, across from residential areas; (5) both victims were found in the vicinity of El Dorado Park, a park frequented by petitioner, Kathy Ryan and their other friends; (6) both victims appeared to have been murdered at a location separate from where they were found and both appeared to have been transported to the location where they were found by a vehicle or some other means; (7) there were cigarette butts at both crime scenes; (8) both victims were nude; (9) both victims were lying on their backs; (10) both victims were young Caucasians, appearing to be sixteen to twenty years of age; (11) both victims had similar physical characteristics, "that being that they had shoulder-length, long strawberry-blond hair, they were both well developed in the bust and they both appeared to be about five foot four, 125 pounds"; (12) both victims appeared to have been strangled or suffocated; (13) both victims had puncture wounds to the nipples of the breasts; (14) both victims had trauma to the mouth and facial regions; (15) the public hair on both victims had been burned; (16) both victims had bloody discharges from the vagina and rectum, indicating each may have been raped or sodomized; and (16) tape residue was found on the ankles and wrists of Edna Bristol, while black electrical tape was found near Kathy Ryan's body (1 RT 284A-285A; *see also* 1 RT 292A.)  In addition, the murders took place five days apart.  *People v. Hernandez*, 47 Cal. 3d 315, 328 (1988).  Some evidence also connected petitioner to both victims.  Diva Sarzyinski told an investigating officer that she was with petitioner and victim Kathy Ryan on the night leading up to Ryan's murder.  (1 RT 70A-71A.)

1    *e.g.*, *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007) ("[P]robable cause
2    means a fair probability that contraband or evidence of a crime will be found in a
3    particular place, based on the totality of the circumstances.") (internal quotation
4    marks and citations omitted); *see also Maryland v. Pringle*, 540 U.S. 366, 370-71
5    (2003) ("The probable-cause standard is a practical, nontechnical conception that
6    deals with the factual and practical considerations of everyday life on which
7    reasonable and prudent men, not legal technicians, act . . . . The probable-cause
8    standard is incapable of precise definition or quantification into percentages
9    because it deals with probabilities and depends on the totality of the
10   circumstances.") (internal quotation marks and citations and omitted); *Texas v.*
11   *Brown*, 460 U.S. 730, 742 (1983) ("[P]robable cause is a flexible, common-sense
12   standard . . . . A practical, nontechnical probability that incriminating evidence is
13   involved is all that is required.") (internal quotation marks and citation omitted).
14   Petitioner has failed to show a reasonable probability that the evidence recovered
15   from the van would have been suppressed, and, consequently, that petitioner
16   would have been acquitted on any charges, had trial counsel challenged whether
17   the police could see the color of the carpet fibers from outside petitioner's van.
18        Accordingly, the Court DENIES Claim 5(D)(5).

19        **5.    Counsel's failure to investigate and present evidence of**
20             **potential *Miranda* violations (Claim 5(D)(6))**

21        It is difficult to understand exactly what petitioner alleges in Claim 5(D)(6).
22   Petitioner seems to contend that trial counsel failed to investigate and present
23   available evidence to support petitioner's assertion that the police delayed advising
24   petitioner of his rights and that the police refused to honor petitioner's request for
25   an attorney.  This evidence allegedly consists of police reports concerning
26
27   _____
28   Sarzyinski also told the same investigating officer that she saw victim Edna Bristol with
     petitioner at El Dorado Park about a month prior to Bristol's murder.  (*Id.* at 71A-72A, 87A-
     88A.)

98

petitioner's interrogation in a separate pair of murders in San Luis Obispo County. The police reports purportedly state that petitioner was not explicitly advised of his rights and that the police ignored petitioner's request for counsel during petitioner's interrogation for the murders in San Luis Obispo County. (The parties have filed a joint stipulation that petitioner was never charged with those crimes.) Petitioner alleges that the reports show that the Long Beach police and the San Luis Obispo County police, in separate interrogations, similarly mistreated petitioner by delaying the advisement of his rights and by not honoring his request for counsel promptly. Petitioner contends that this acknowledgment "is highly probative of whether Mr. Hernandez was denied his right to counsel at the time he was interrogated by the Long Beach police." (Petr's 8/24/08 Brief at 24.) Petitioner suggests that if counsel had discovered and presented this evidence during the suppression motion, petitioner's confession would have been suppressed and he would have been acquitted.

As stated, petitioner must show that counsel performed deficiently and that this deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

This claim fails. Petitioner has not cited to the alleged police reports in the petition or his merits briefing, and a thorough search of the records and briefs did not uncover any such reports. Because the alleged police reports are unavailable for the Court's inspection, the Court cannot evaluate the alleged factual underpinnings of this claim. Even if such reports exist, it is difficult to imagine that they contain an admission that the police violated petitioner's rights. (*See, e.g.*, 2 RT 343A-346A, 348A-349A, 2 RT 493A-95A (detailing testimony by police officers that they read petitioner his rights about ten minutes after they apprehended him and that petitioner did not request an attorney). Moreover, even if the Long Beach police officers advised their San Luis Obispo County counterparts that petitioner "behaved similarly" when he was arrested for the Long Beach murders, that fact by itself does not suggest that the Long Beach police

1   violated petitioner's rights when they interrogated him about the murders of Kathy

2   Ryn and Edna Bristol.  It is just as likely that petitioner acted similarly in the two

3   interrogations because he was being questioned about a double murder that could

4   lead to capital charges, as it is to presume that his behavior was related to the

5   police failing to *Mirandize* him and or to provide counsel.  Petitioner's claim of

6   deficiency is unsupported by the record and fails as both conclusory and

7   speculative.  *Jones*, 66 F.3d at 204-05 ("It is well-settled that 'conclusory

8   allegations which are not supported by a statement of specific facts do not warrant

9   habeas relief.'") (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)); *cf.*

10  *Allison*, 431 U.S. at 75 n.7 (holding that the petition must allege facts that

11  demonstrate the possibility of constitutional error).

12       Similarly, petitioner cannot show prejudice.  Even assuming that counsel

13  performed deficiently, petitioner would have to show that (1) absent counsel's

14  failure to discover the police reports, which were purportedly withheld, and

15  (2) excepting counsel's consequent failure to offer the police reports in support of

16  the motion to suppress, the trial court would have suppressed the confession, and

17  petitioner would have been acquitted.  That possibility is too attenuated and

18  speculative to support a finding of prejudice, particularly when the trial court held

19  an extensive hearing on the legality of petitioner's confession.  *Cooks*, 660 F.2d at

20  740 (holding that petitioner's claim of prejudice amounted to "mere speculation").

21       Accordingly, the Court DENIES Claim 5(D)(6).

22       **6.      Counsel's failure to argue to that petitioner's arraignment**

23            **was unreasonably delayed in support of the motion to**

24            **suppress (Claim 5(D)(8))**

25       In Claim 5(D)(8), petitioner alleges that trial counsel failed to move to

26  suppress petitioner's February 6, 1981 confession on the grounds that his

27  arraignment had been unreasonably delayed.

28       The Court laid out the relevant facts in its summary judgment order:

1

2

3

4

5

6

7

          Petitioner was arrested at his residence at approximately 2:10 p.m. on February 4, 1981.  He was advised of his *Miranda* rights.  The advisement and petitioner's waiver were recorded on audiotape.  (1 RT 307A.)  The police interviewed petitioner until 8:21 p.m. that evening.  During the interview, petitioner made many incriminating statements.  He then agreed to provide blood, saliva and hair samples.  Petitioner was taken to a hospital for that purpose.  In the early morning hours of February 6, 1981, he was again interviewed by police.  Before the interview, petitioner was reminded of his constitutional rights and asked if he remembered those rights.  (1 RT 313A.)  He agreed to provide a dental impression and was taken to the hospital for that purpose.

8

(Summary Judgment Order at 24.)

9

10

11

12

13

14

15

16

17

18

19

        "[T]he Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest."  *County of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) (citing *Gerstein v. Pugh*, 420 U.S. 103, 124 (1974)).  Specifically, "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." *McLaughlin*, 400 U.S. at 56; *but see McLaughlin*, 400 U.S. at 56-57 (explaining that the 48-hour rule will generally provide immunity from systematic challenges, but that it will not bar a claim where the individual can prove that despite providing a probable cause determination within 48 hours, that determination was still delayed unreasonably).

20

21

22

23

24

25

26

27

        Petitioner argues that he was not arraigned within 48 hours of his arrest, as required by *McLaughlin* and California Penal Code Section 825.  In fact, petitioner contends that he was not arraigned until March 4, 1981, a full month after his arrest.  (Petr's 8/23/08 Brief at 26.)  Petitioner therefore alleges that trial counsel was ineffective for failing to argue that the unreasonable delay in his arraignment was only for the purpose of investigation and that, therefore, petitioner's February 6, 1981 confession should have been suppressed because it was the fruit of the poisonous tree.  (Petr's 8/23/08 Brief at 27.)

28

        Petitioner must demonstrate that counsel performed deficiently and that this

1    deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

2        Petitioner cannot prevail on this claim. Petitioner cannot demonstrate that

3    counsel was deficient for failing to argue that the February 6, 1981 confession

4    should have been suppressed based on an unreasonable delay in arraignment. The

5    facts show that petitioner was arrested at about 2:10 p.m. on February 4, 1981. He

6    began to give the police a tape-recorded confession that same day at 7:38 p.m.

7    Petitioner then offered another confession in the early morning hours of February

8    6, 1981. Both of these confessions fall within the 48-hour rule, as the time for a

9    probable cause determination would not have expired until 2:10 p.m. on February

10    6, 1981. In other words, neither confession was made "past the time that the delay

11    was unreasonable." *Cf. Anderson v. Calderon*, 232 F.3d 1053, 1071 (9th Cir.

12    2000). Therefore, counsel was not deficient for failing to argue at the suppression

13    hearing that the February 6, 1981 confession should have been suppressed because

14    there was an unreasonable delay in petitioner's arraignment.

15        Accordingly, the Court DENIES Claim 5(D)(8).

16         **7.**     **Counsel's failure to challenge State's theory that petitioner**

17             **used a baseball bat to assault victims (Claim 5(D)(10))**

18        In Claim 5(D)(10), petitioner argues that trial counsel failed to challenge the

19    State's contention that petitioner sexually assaulted the victims with a baseball bat.

20        At trial, the State presented the testimony of Joan Dr. Shipley, a pathologist

21    who worked for the Los Angeles County medical examiner. (9 RT 1968-89.)

22    When asked whether the condition of the victims' bodies was consistent with or

23    excluded penetration by a penis, Dr. Shipley testified that the damage to the anus

24    and vagina of both victims indicated "a very severe degree of trauma, and the

25    wounds in both girls [were] extremely similar and extremely rare." (9 RT 2030.)

26    She also described the injuries as "very extensive," and stated that "in ten years'

27    experience, it's almost been unique to find it in these two cases, and it certainly

28    suggests a very large object and repetitive injuries." (*Id.*) When asked,

1    Dr. Shipley opined that the wounds could be consistent with a baseball bat. (*Id.*)

2         The prosecution also called Barbara Johnson, a forensic serologist for the

3    Los Angeles County Sheriff's Department. (10 RT 2323-33.) Johnson testified

4    that she found human blood on the baseball bat retrieved from petitioner's van.

5    (*Id.* at 2394.) The blood "was on the side of the bat and about the middle portion

6    of the bat." (*Id.* at 2491.) She checked the rest of the bat for blood but did not

7    find any. (*Id.* at 2492.) She also examined a "white crusty stain at the end of the

8    bat" for semen but did not detect any. (*Id.*) Finally, Johnson testified that the

9    blood on the baseball bat was likely petitioner's blood. (*Id.* at 2496.)

10        Again, petitioner must show that counsel performed deficiently and that this

11   deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

12        Petitioner's claim cannot prevail. Even if trial counsel's failure to challenge

13   the prosecutor's intimation that petitioner used a baseball bat to assault both

14   victims was deficient, petitioner cannot show prejudice. Any lay person could

15   have concluded based on the evidence presented that the baseball bat was not used

16   to assault the victims. If petitioner used the baseball bat to assault the victims, one

17   would expect the bat to contain more than a small amount of blood, and that blood

18   would not be only in the center of the bat but would extend from either end of the

19   bat. Moreover, the blood found in the center of the baseball bat was petitioner's

20   blood rather than the blood of one of the victim's. A small amount of the

21   petitioner's blood in the center of the baseball bat is not consistent with the bat

22   being used to sodomize or otherwise assault the victims.

23        Accordingly, the Court DENIES Claim 5(D)(10).

24              **8.    Counsel's failure to obtain all discovery (Claim 5(D)(11))**

25        In Claim 5(D)(11), petitioner contends that trial counsel failed to move to

26   discover or obtain a complete record of all the material in the possession of the

27   State, particularly all of the notes and reports made by the police and the coroner,

28   among others. Trial counsel also failed to obtain clinical notes and records of the

103

scientific tests performed by the State, as well as the conditions in which the physical evidence was maintained prior to testing.

As with other IAC claims, petitioner must show that counsel performed deficiently and that this deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

Petitioner cannot prevail on this claim because he cannot show prejudice. The physical evidence helped to establish petitioner's identity as the assailant, which was not an issue at trial. Petitioner confessed to the murders, and that confession was admitted. Petitioner's defense at trial was not mistaken identity but that he accidentally killed the victims, that he suffered from diminished capacity or both. To demonstrate prejudice, petitioner would have to show that the physical evidence was kept in conditions that compromised its integrity and that the degraded quality of the evidence resulted in prejudice to petitioner. Petitioner does not make such a claim, nor does he attempt to prove anything of the sort. Trial counsel's alleged errors with respect to the physical evidence would not have made a difference in the outcome at trial.

Petitioner does not point to evidence to show what counsel would have discovered had he obtained all of the materials in the State's possession at the time of trial. Perhaps petitioner means to suggest that trial counsel would have cross examined the witnesses more effectively had he possessed a more complete record, but such an interpretation is born in conjecture and speculation. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.")

Accordingly, the Court DENIES Claim 5(D)(11).

### 9.   Counsel's failure to have physical evidence tested independently (Claim 5(D)(12))

In Claim 5(D)(12), petitioner alleges that trial counsel failed to obtain an independent evaluation of the State's testing of the physical evidence, including

hair samples, saliva, blood, bite marks, vaginal swabs, and then unreasonably failed to move to exclude that evidence.  Petitioner contends that this error both allowed the jury to rely upon false and materially misleading information and prevented trial counsel from moving to exclude petitioner's confession on grounds that it was unreliable and the product of impermissible interrogation tactics by the police.

Petitioner must demonstrate both that counsel performed deficiently and that this deficient performance prejudiced petitioner.  *Wiggins*, 539 U.S. at 521.

Petitioner cannot prevail on this claim.  As with Claim 5(D)(11), the physical evidence corroborated petitioner's identity, but that was not an issue at trial because petitioner confessed.  Petitioner has not shown how trial counsel's failure to conduct an independent evaluation of the physical evidence caused the jury to rely upon false and materially misleading information or how this alleged occurrence prejudiced him.  This speculative allegation cannot support relief. *Jones*, 66 F.3d at 204-05; *cf. Allison*, 431 U.S. at 75 n.7.  Moreover, petitioner's claim that trial counsel's failure to conduct an independent evaluation of the evidence prevented trial counsel from moving to exclude petitioner's confession on grounds that it was unreliable and the product of impermissible interrogation tactics by the police fails.  Trial counsel did move to suppress the evidence on these grounds.  (Partial Summary Judgment Order (Oct. 2, 1997) at 29-30 (granting summary judgment to respondent on portion of Claim 5(D)(14) concerning trial counsel's failure to object to petitioner's confession as unreliable due to coercive police tactics).)

Accordingly, the Court DENIES Claim 5(D)(12).

### 10.    Counsel's failure to investigate the reliability of petitioner's statement (Claim 5(D)(15))

In Claim 5(D)(15), petitioner argues that trial counsel failed to make an inquiry into the reliability of petitioner's statement to the police that he placed one

1   of his victims on the cowling of the van, given the absence of corroborating

2   evidence in the pathologist's reports.  Petitioner alleges that this error allowed the

3   jury to be subject to false impression testimony.

4        To prevail on this claim, petitioner must show that counsel performed

5   deficiently and that this deficient performance prejudiced petitioner.  *Wiggins*, 539

6   U.S. at 521.

7        It is unclear what petitioner is alleging that counsel should have done to

8   inquire into the reliability of petitioner's statement.  Petitioner's claim also

9   assumes that a tangible injury to Bristol's body would have resulted and been

10  visible if petitioner in fact placed Bristol's body on the hot cowling, which may

11  not be the case.  Again, conclusory allegations do not support habeas relief.

12  *James*, 24 F.3d at 26.

13       Accordingly, the Court  DENIES Claim 5(D)(15).

### 11.   Counsel's failure to adequately cross examine a State

### witness (Claim 5(D)(16))

16       In Claim 5(D)(16), petitioner alleges that trial counsel inadequately cross

17  examined a police officer called to testify for the State because trial counsel

18  elicited testimony that the police officer was a polygrapher.  Petitioner has

19  withdrawn this claim.  Accordingly, the Court  DENIES Claim 5(D)(16).

### 12.   Counsel's failure to call Cliff Williams (Claim 5(D)(17))

21       In Claim 5(D)(17), petitioner contends that trial counsel failed to secure the

22  presence of a critical defense witness, Cliff Williams, at trial.

23       Officer Williams was a twelve-year veteran of the Long Beach Police

24  Department who retired after being injured in the line of duty.  His daughter,

25  Heidi, was engaged to petitioner at the time of the crimes.  Trial counsel had

26  interviewed Officer Williams several times before trial.  Officer Williams told trial

27  counsel that he liked petitioner and that petitioner had a future if he applied

28  himself.  Officer Williams agreed to testify on petitioner's behalf, and trial counsel

told the jury in his penalty phase opening argument that he intended to call Officer Williams.  At some point during trial, Officer Williams expressed his concern that testifying for petitioner would have an adverse impact on Officer Williams's real estate business, which relied in large part on business from Long Beach police officers.  Thus, Officer Williams informed trial counsel that he did not want to testify at trial.  Although counsel had subpoenaed Officer Williams to testify three times, once for each trial date, trial counsel did not put Officer Williams on the stand.

Again, petitioner must demonstrate that counsel performed deficiently and that this deficient performance prejudiced petitioner.  *Wiggins*, 539 U.S. at 521.

Respondent argues that trial counsel made a tactical decision not to call Officer Williams because he had become an unwilling character witness.  Petitioner counters, convincingly, that counsel's failure to call Officer Williams was not tactical, citing numerous times to trial counsel's eleven-volume deposition transcript. (*See, e.g.*, 9 CDD 27.)  Counsel also explained how he tended to use subpoenas:

> [I]f I am sure that they are going to testify and they are going to testify, good for me.  Then what happens is I don't bother to subpoena them because they are going to show up and they are going to testify anyway and a subpoena might make them mad.  That is not the situation with a police officer.
>
> A police officer may very well—and this is just my experience and it may not match up with anyone else's —a police officer sometimes has to have an excuse to testify because if he doesn't have an excuse his fellow officers are going to get angry with him.
>
> So, as a consequence what you do is you give him, no matter how helpful he wants to be and it appears that he is going to be, you put a piece of paper in his hand and say, here, you are subpoenaed and then he has to testify.  The other officers understand that and generally that is good enough.  That is why they tell the truth.

(9 CDD 48-49.)  Trial counsel's failure to call Officer Williams was neither strategic nor reasonable.

Trial counsel stated in his opening argument that he intended to call three

1   non-family character witnesses during the penalty phase:  (1) Kimberly Parker, a

2   friend of petitioner's; (2) Heidi Williams Brown, petitioner's fiancée at the time of

3   the crime; and (3) Cliff Williams, Heidi's father.  Trial counsel did in fact call

4   Parker and Brown.  Parker testified that petitioner convinced her that she should

5   stop drinking alcohol and smoking marijuana because she had Diabetes.  (14 RT

6   3608-09.)  Brown testified that she had been engaged to petitioner, that they had

7   "normal" sexual relations and that the only time he displayed any type of violence

8   was when she once hit him very hard with a pipe, causing welts, and petitioner

9   slapped her in response.  (14 RT 3615-16, 3618.)  The evidence from both Parker

10  and Brown consumed less than fourteen pages of transcripts, including cross

11  examination.  Counsel then failed to call Office Williams, potentially his most

12  effective and credible character witness, despite telling the jury in his opening

13  statement that he intended to put Officer Williams on the stand and even though

14  Officer Williams had been subpoenaed for trial.  Counsel's failure to put Officer

15  Williams on the stand was deficient.

16        Officer Williams provided the following evidentiary hearing testimony:

17

18        I knew Francis Hernandez very well when he was a young man.
      Francis dated my daughter Heidi.  Francis was a good kid, and I had a
      favorable opinion of him.  When Francis was arrested for murder, it
19    was truly a shock for all of us.

20

21        Before Francis's trial, his attorney met with me because he
      wanted to know what I thought of Francis.  I answered Francis's
      attorney's questions truthfully, and the attorney asked me to testify on
22    Francis's behalf at his murder trial.  I agreed to do so, but I later
      changed my mind.  If I had testified at Francis's trial, or at any trial, I
23    would certainly have told the truth.

24  (Williams 6/22/03 Decl. at 1, ¶¶ 1-2.)

25        Again, the prejudice inquiry requires the Court to assess all of the mitigating

26  evidence, both that presented at trial and as part of the evidentiary hearing, and

27  then to reweigh that evidence against the State's case in aggravation.  *Williams*

28  *(Terry)*, 529 U.S. at 398.  Putting Officer Williams, an experienced police officer

injured in the line of duty, on the stand to testify as to petitioner's character likely

would have carried more weight with the jury than the very limited character

evidence presented.  Officer Williams clearly had strong character evidence to

offer.  His daughter had been engaged to petitioner just before the crime occurred,

and Officer Williams had spent a lot of time with petitioner.  Despite petitioner's

brutal murders of other young women, Officer Williams would have testified that

he knew petitioner well at the time of the crime, that he had a positive opinion of

petitioner and that petitioner had a future if he applied himself.  The positive,

coherent character testimony from Officer Williams would have bolstered the

evidence presented, particularly compared to the thin mitigation case presented.

Moreover, the absence of Officer Williams's testimony after trial counsel

specifically told the jury he was going to put Officer Williams on the stand likely

had a substantial negative impact on the penalty phase evidence actually presented

at trial.

Nevertheless, petitioner has not established a reasonable probability that the

testimony of one police officer who held a positive view of petitioner would have

caused the jury to vote for life instead of death.  Officer Williams's testimony

could not overcome the brutal circumstances of the crime, coupled with

petitioner's callous and unfeeling penalty phase testimony.

Accordingly, the Court DENIES Claim 5(D)(17), but will consider

counsel's deficiency in the cumulative error analysis.

### 13.    Counsel's failure to object to the admission of prejudicial character evidence (Claim 5(D)(19))

In Claim 5(D)(19), petitioner argues that trial counsel failed to object

to the introduction of highly prejudicial character evidence that on the night of

Edna Bristol's murder, petitioner went looking for a homosexual to assault, found

one and then beat him up and robbed him.  Petitioner further contends that trial

counsel failed to object to the prosecutor's argument based on that testimony.

Again, petitioner must demonstrate that counsel performed deficiently and that this deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

The portion of the confession to which petitioner objects is the following:

> I was driving down the street. I had just—uh—I was drunk. I was in a weird mood and thinking about a lot of things and just decided to go out and find—find myself a homosexual to beat up on, and I just found one. I just got through robbing him for his last ten dollars.

(Confession Transcript at 3.)

Petitioner contends that his assault of the homosexual, an uncharged offense, was admitted as improper character evidence. Cal. Evid. Code §1101(a). Petitioner argues that none of the exceptions, including motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, applies. Cal. Evid. Code § 1101(b). Arguably, the intent and accident exceptions may apply. Petitioner's intent to rape and intent to kill were disputed material issues at trial. *See People v. Robbins*, 248 Cal. Rptr. 172, 178 (1988) (citing *People v. Kelley*, 57 Cal. Rptr. 363, 372 (1967) ("Such evidence is admissible in cases where the proof of defendant's intent is ambiguous, as when he admits the acts and denies the necessary intent because of mistake or accident.").) Petitioner said that he had consensual sex with Edna Bristol but also stated that he "guessed maybe [Edna] thought" that he "ha[d] her . . . forcibly." (Confession Transcript at 5.) He confessed that he covered her nose and mouth with a rag but that he "might have held it there too long" and she stopped moving. (*Id.* at 6.) He thought she was still alive when he left her body at Marshall Junior High. (*Id.*)

The admissibility of the uncharged conduct "depends on three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or *policy* requiring the exclusion of the relevant evidence." *People v. Thompson*, 165 Cal. Rptr. 289, 294 (1980).

110

1    First, the evidence in question—here, petitioner's attack on a homosexual—

2    must be material to the intent issues disputed at trial.  *Robbins*, 248 Cal. Rptr. at

3    178.  "To be relevant, an uncharged offense must tend logically, naturally and by

4    reasonable inference to prove the issue(s) on which it is offered."  *Id.*  The

5    California Supreme Court has "long recognized that if a person acts similarly in

6    similar situations, he probably harbors the same intent in each instance, and that

7    such prior conduct may be relevant circumstantial evidence of the actor's most

8    recent intent."  *Id.* (citation and internal quotation marks omitted).  Moreover,

9    "[t]he inference to be drawn is not that the actor is *disposed* to commit such acts;

10   instead, the inference to be drawn is that, in light of the first event, the actor, at the

11   time of the second event, must have had the intent attributed to him by the

12   prosecution."  *Id*.  Petitioner's attack on the gay man, just before he picked up

13   Edna Bristol, suggests that petitioner may have been seeking out individuals he

14   perceived as vulnerable in order to take advantage of them.  At this level of

15   generality, petitioner's uncharged conduct does have some relevance to his intent

16   to rape and murder Edna Bristol later that same night.

17       However, the uncharged offense also must have a tendency to prove intent

18   or disprove accident.  In short, the uncharged conduct must be "substantially

19   similar" to the charged offense.  *Robbins*, 248 Cal. Rptr. at 179.  The charged and

20   uncharged conduct must be fairly similar.  *See, e.g., People v. Carter*, 23 Cal. Rptr.

21   2d 888, 894 (Cal. Ct. App. 1993) (finding killings substantially similar where both

22   victims were homosexual men of about the same age, both met defendant in public

23   places, both went with defendant to more secluded locations where they were

24   robbed and killed, the killings were close together in time, both victims were shot

25   in the head at close range by the same gun, both victim's cars were ransacked and

26   left in public places, both victims were robbed of their credit cards and defendant

27   used both victim's credit cards immediately); *People v. Delgado*, 13 Cal. Rptr. 2d

28   703, 708 (Cal. Ct. App. 1992) (finding prior uncharged conduct "sufficiently

1   similar" to prove intent where both uncharged and charged conduct involved

2   burglary of a residence through a window, and items taken as repayment for a debt

3   included a VCR in a pillowcase and stolen jewelry).

4        Here, there is insufficient "similarity in time, place and potential motive" to

5   make petitioner's testimony that he beat up and robbed a gay man admissible to

6   prove whether petitioner intended to rape and murder Edna Bristol later that night.

7   *See People v. Curry*, 142 Cal. Rptr. 649, 651 (Cal. Ct. App. 1977).  The uncharged

8   conduct does not tend to prove intent to rape or kill.  On this basis alone, counsel

9   could have successfully challenged the admission of the uncharged conduct as

10   impermissible character evidence.

11        Even if the acts were substantially similar, the Court also should consider

12   any policy or rule that would require exclusion of the evidence.  For example,

13   "[e]vidence may be excluded under Evidence Code Section 352 if its probative

14   value is 'substantially outweighed by the probability that its admission would

15   create substantial danger of undue prejudice, of confusing the issues, or of

16   misleading the jury."  *People v. Lindberg*, 45 Cal. 4th 1, 22-23 (2008) (citation and

17   internal quotation marks omitted).  In addition, "[b]ecause substantial prejudice is

18   inherent in the case of uncharged offenses, such evidence is admissible only if it

19   has substantial probative value."  *Id.* (citation and internal quotation marks

20   omitted); *see also People v. Soper*, 45 Cal. 5th 759, 773 ("It is therefore

21   appropriate, when the evidence is of an *uncharged* offense, to place on *the People*

22   the burden of establishing that the evidence has *substantial* probative value that

23   clearly outweighs its inherent prejudicial effect." (citation and internal quotation

24   marks omitted).)

25        Evidence that petitioner went out looking for a gay man to assault, found

26   one and then proceeded to assault and rob him has little materiality to the intent

27   questions at issue at trial.  Specifically, petitioner's assault and robbery of a gay

28   man has little probative value, if any, to determining whether petitioner intended to

rape and murder Edna Bristol a short time later.  The prejudicial effect of this

evidence outweighs any probative value it might have.  Trial counsel failed to

object to the admission of this evidence.  His failure to do so was deficient.

Petitioner also alleges that trial counsel failed to object when the prosecutor

incorporated petitioner's assault of the gay man into his closing arguments.  In the

guilt phase, the prosecutor used the incident to try to prove intent to rape,

sodomize and murder Edna Bristol.

> [Y]ou can tell what his intent was, because he admits to the police officers that he was angry that night, he was upset, he wanted to hurt somebody; that, in fact, he picked up a homosexual, beat him up, robbed him of his last five dollars or ten dollars, whatever it was. He then went out looking again, and he saw Edna Bristol over here on Broadway, as opposed to the homosexual on Ocean, picked her up . . . . [H]e is out to hurt people.  Now, you don't think rape is only an act of sex.  It's an act of violence.  That's what occurred here.  He is out to hurt people.  That's his intention.  Okay . . . . For example:  'I was driving down the street . . . I was in a weird mood and thinking about a lot of things and just decided to go out and find—find myself a homosexual to beat up on, and I just found one.'—indicating he is angry, he is frustrated and he wants to hurt somebody.

(12 RT 3126, 13 RT 3187.)

In his penalty phase argument, the prosecutor argued that petitioner was not

remorseful but, rather, callous and abnormal.  (14 RT 3636-38.)  The prosecutor

read excerpts from petitioner's confession that minimized or downplayed the

events surrounding Edna Bristol's murder.  The prosecutor then contrasted those

statements with other evidence that petitioner actually committed a worse or more

violent act.  As one example of petitioner's lack of remorse, the prosecutor argued,

"He doesn't tell you that 'I went out looking for someone to beat up,' as he told

the police that night he met Edna, that he wanted to take out his frustrations on

someone to cause them pain." (14 RT 3639.)  The prosecution integrated

inadmissible evidence of petitioner's attack on a gay man into its closing argument

at both the guilt and penalty phases.  Trial counsel performed below the standard

of care both by failing to object to the admission of evidence about petitioner's

113

1    attack on the gay man and by failing to object to the prosecutor's argument relying

2    on that evidence.

3        Petitioner also must show prejudice.  *Wiggins*, 539 U.S. at 521.  Petitioner

4    must show a reasonable probability that but for counsel's failure to object to the

5    evidence or the prosecutor's argument about it, petitioner would have been

6    acquitted or that he would have received a life sentence.  *Strickland* 466 U.S. at

7    694.  Petitioner cannot show that had trial counsel successfully excluded the

8    inadmissible conduct evidence that the jury would have acquitted.  Ample

9    evidence, including portions of petitioner's confession, viewed together with the

10   condition of the victim's bodies, suggested that petitioner intended to rape,

11   sodomize and kill Edna Bristol.  Similarly, while the prosecutor relied in part on

12   prior conduct evidence to argue that petitioner had no remorse and deserved the

13   death penalty, the prosecutor also relied on many other pieces of evidence,

14   including petitioner's confession, the condition of the victims' bodies and

15   petitioner's penalty phase testimony.  Counsel's failure to object to and exclude

16   this erroneously admitted evidence is not sufficient on its own to warrant guilt or

17   penalty phase relief.

18       Accordingly, the Court DENIES Claim 5(D)(19) but will consider counsel's

19   deficiency in the cumulative error analysis.

20       **14.    Trial counsel's failure to investigate the victims (Claims**

21       **5(D)(20), 5(D)(21) & 5(D)(34))**

22       In Claim 5(D)(20), petitioner challenges trial counsel's failure to conduct

23   any investigation into the medical condition of Edna Bristol, including her level of

24   intoxication and her prior heart condition.  In Claim 5(D)(34), petitioner contends

25   that trial counsel failed to investigate the condition of both victims and that had he

26   done so, he would have discovered an alternate explanation for Bristol's death that

27   corroborated petitioner's statement to police that he did not intend to kill her and

28   his belief that she was alive when he left her.  In Claim 5(D)(21), petitioner argues

114

1    that trial counsel failed to conduct any investigation into Bristol's arrest and

2    juvenile records.  Petitioner alleges that both Bristol's level of intoxication and her

3    prior criminal records would have supported petitioner's defense that he believed

4    Bristol consented to sexual intercourse.

5          As stated, petitioner must show that counsel performed deficiently and that

6    this deficient performance prejudiced petitioner.  *Wiggins*, 539 U.S. at 521.

7          Petitioner cannot prevail on these claims.  First, petitioner's allegations of

8    deficiency are conclusory.  Petitioner fails to point to facts in the record indicating

9    what Bristol's level of intoxication was at the time of the crime, that she suffered

10   from a heart condition that or that she had an arrest or juvenile record.  Petitioner

11   also fails to tie the alleged facts that counsel failed to investigate to a prejudicial

12   claim of deficiency.  As pled, the Court can only speculate as to how the facts,

13   whatever they may be, show that counsel conducted an inadequate investigation.

14   Petitioner has only put forth conclusory allegations of deficiency.  *James*, 24 F.3d

15   at 26; *see also Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970) (holding

16   that "conclusory statements are no substitute for proper allegations of fact" and

17   that [a]llegations of fact, rather than conclusions, are required").  Without clear

18   allegations of deficiency, the Court cannot evaluate the potential prejudice to

19   petitioner.  *Cooks*, 660 F.2d at 740.  Moreover, the condition of Bristol's body

20   suggests that she was strangled and that she did not consent to sexual intercourse.

21   At the very least, the condition of her body may have reasonably informed

22   counsel's decision not to pursue an alternate theory of death or a defense of

23   voluntary intercourse, undercutting petitioner's claim of deficiency.  Alternatively,

24   the condition of Bristol's body likely would have caused the jury to reject a claim

25   of consensual sex, substantially weakening any potential prejudice.

26         Accordingly, the Court  DENIES Claims 5(D)(20), 5(D)(21) and 5(D)(34).

27

28

### 15.   Counsel's failure to exercise peremptories on jurors who were victims of crime (Claim 5(D)(23))

In Claim 5(D)(23), petitioner challenges trial counsel's failure to remove several jurors who had previously been the victims of crime, despite having peremptory challenges remaining.

Again, petitioner must demonstrate that counsel performed deficiently and that this deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.  In order to evaluate deficiency and prejudice, the Court must consider whether any of the jurors was biased. *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2003) ("Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased.").

The Sixth Amendment guarantees the accused "a fair trial by a panel of impartial, indifferent jurors." *United States v. Eubanks*, 591 F.2d 513, 516 (quoting *Irvin v. Dowd*, 366 U.S. 717 (1961)).  "The principle way in which this right to trial by 'indifferent' jurors is secured is through the system of challenges exercised during voir dire." *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977).  In determining whether a juror suffered from implied or presumed bias, the Court must consider whether there existed the "potential for substantial emotional involvement, adversely affecting impartiality." *Allsup*, 566 F.2d at 71, 72 (holding that jurors who work for the same bank that was robbed in the crime underlying the trial were biased).  To put it another way, the Court must evaluate whether "this is one of 'those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.'" *Tinsley v. Borg*, 895  F.2d 520, 527 (9th Cir. 1991) (quoting *Person v. Miller*, 854 F.2d 656,664 (94th Cir. 1988)).  Notably, the Ninth Circuit has "been willing to presume bias where a juror or his close relatives have been

personally involved in a situation involving a similar fact pattern." *See Tinsley*, 895 F.3d at 528.

A review of the voir dire transcript with respect to six of the nine jurors shows that counsel did not perform deficiently. While each of these six jurors, or one of their close relatives, was a crime victim, the crimes were unrelated to petitioner's charges at trial. Accordingly, trial counsel had reason to believe that the jurors would be impartial. (7 RT 1524-34 (Juror Caudel was robbed at the wine wholesaler where he worked 12 years before trial); 7 RT 1604-1612 (Juror Maltin was robbed at gunpoint at the grocery store where he worked more than two years before trial); 7 RT 1348-1355 (Juror Prosser had a tape deck stolen out of her car "a long time ago"); 7 RT 1417-25 (Juror Lamont's grandparents' home was burglarized twice in three months about seven years prior to trial); 8 RT 1706-14 (Juror McClister's home was burglarized eight years prior to trial); 8 RT 1698-04 (Juror Howard was robbed of a transistor radio as a young teenager).) Based on the crimes involved and the voir dire responses, it appears that none of these six jurors was biased. As to these jurors, petitioner's claim fails.

The remaining three jurors present a closer question. On voir dire, Juror Manchester offered that her home had been burglarized seven years prior to trial. (7 RT 1466.) Her husband caught the perpetrator, and her husband also served as a witness at the subsequent trial. (7 RT 1470.) In addition, when asked if there were any reason she did not want to serve on this case, Juror Manchester talked about how her son's godmother was raped two months before. (7 RT 1471.) She described her son's godmother as someone to whom she was "very close" and that she had "deep feelings" about the rape. (7 RT 1471, 1473.) She said that she "would try the best [she] could" to be fair and impartial but that she felt doing so "would be difficult." (7 RT 1473, 1472; *see also* 7 RT 1474, 1475 ("I cannot just come out and say I would not be fair, because I feel basically I am a fair person. I would do the best I could to keep the cases separate . . . . I cannot guarantee it.").)

1    Juror Manchester said that she could separate the facts associated with the two

2    crimes but that her "personal involvement" was the sticking point.  (7 RT 1473;

3    *see also* 17 RT 1473 ("The facts I could separate, but the feelings would be

4    difficult for me.").)  While she stated that her friend asked her to attend the trial of

5    her accused rapist, Juror Manchester also stated that she would not feel guilty if

6    she voted to acquit petitioner.  (17 RT 1476.)

7         Juror Howes testified that when she was 23-years-old, a known sex offender

8    threw a boulder through her window after "trying to break in for about two

9    months."  (7 RT 1566.)  He attempted to talk his way into her house while she

10   waited for the police to arrive.  (7 RT 1581.)  Juror Howes was a retired nurse at

11   the time of trial, so this incident took place decades before trial.  In addition,

12   Juror Howes talked about the rape and murder of her son's boss's 12-year-old

13   daughter, an incident that took place three of four years prior to trial.  (7 RT 1574.)

14   She described the relationship between her son and his boss as a friendship.  (7 RT

15   1574, 1575.)  She stated that she saw her son's boss and his wife several times a

16   year, both when she had lunch with her son and at family parties.  (7 RT 1575.)

17   Juror Howes stated that she thought she had put the girl's rape and murder "out of

18   [her] mind," but that she was afraid that she would not be able to be a fair and

19   impartial juror because the cases were "very similar."  (7 RT 1576.)  She said it

20   was "all coming back now" and that it was "going to progress," and that she was

21   afraid and unsure of how she might react.  (7 RT 1577.)  She also said that she felt

22   very angry at and hostile toward the person who raped and murdered the 12-year-

23   old girl.  (7 RT 1577.)  When asked, she sated that she would be uncomfortable

24   having herself as a juror, given the circumstances.  (7 RT 1579.)  On the other

25   hand, Juror Howes also stated that she could try to decide the case based only on

26   the facts presented but that she was "just a little concerned about it."  (7 RT 1577,

27   1580.)  She also stated that her feelings about the 12-year-old girl being murdered

28   were "[t]he same" as the reaction she would have to seeing on television that a 23-

1   year-old stranger had been raped and murdered and that she did not blame
2   petitioner for what happened to the daughter of her son's boss.  (7 RT 1585, 1586.)
3   Juror Howes said that she thought she could listen to the evidence and decide the
4   case accordingly.  (7 RT 1588.)

5       When asked if there was any reason she could not serve, Juror Wagner
6   stated that "[w]e have had one experience with my son and his friend a year ago,
7   but you or someone might think it would prejudice me, but I think I can be very
8   fair in spite of it having happened."  (6 RT 1242.)  She then described how about a
9   year before trial, her son and his then-girlfriend (now fiancée) were approached by
10  two men at the beach.  (6 RT 1242.)  The men asked for matches, which her son
11  provided.  (6 RT 1242.)  The men then pulled a gun and attempted to rape Juror
12  Wagner's future daughter-in-law.  (6 RT 1242.)  Juror Wagner stated several times
13  that she could set aside that incident and still be fair and impartial (6 RT 1243.)

14      The Ninth Circuit's analysis in *Fields v. Brown* forecloses petitioner's
15  claim.  In that case, a juror named Floyd Hilliard disclosed during voir dire that his
16  wife had been kidnapped, beaten, assaulted and robbed.  Hilliard meant the word
17  "assaulted" to mean that his wife had been raped, but he testified at an evidentiary
18  hearing that people were not as open about sexual assault at the time of his jury
19  service as they were at the time of the evidentiary hearing.  Had he been asked for
20  more detail about the crime, he would have explained that she had been raped.  An
21  en banc panel denied petitioner's claim that implied or presumed bias could be
22  attributed to Hilliard, even though the petitioner had been tried for robbery, rape
23  and murder.  *Fields v. Brown*, 503 F.3d 775, 773 (9th Cir. 2007) (en banc).  The
24  Court held that while it had recognized that "bias may be implied where close
25  relatives of a juror 'have been personally involved in a situation involving a
26  similar fact pattern,'" the Circuit had "never done so when the juror was honest on
27  voir dire" and "declined to do so" in *Fields*.  *Fields*, 503 F.3d at 773 (citing
28  *Tinsley*, 895 F.2d at 528; *Eubanks*, 591 F.2d at 517; *Dyer* 151 F.3d 970, 982 (9th

1    Cir. 1998 (en banc)).  The Court explained that the juror's "honest disclosure on

2    voir dire about what happened to his wife was more than sufficient for follow-up

3    that would have fleshed out whether the relationship between his wife's experience

4    and some of the crimes charged was such that it is highly unlikely that the average

5    person could remain impartial in his deliberations." *Fields*, 503 F.3d at 773

6    (internal quotation marks and citation omitted).  The Court provided the following

7    helpful passage:

8

9        [W]e see no basis for implying bias as a matter of law solely because
         Hilliard was the spouse of a rape victim.  As a practical matter, many

10       prospective jurors have close family members or friends who have
         suffered similar encounters.  It is the role of voir dire to ferret out

11       such relationships, and to develop the extent to which the juror's
         ability to be impartial in the particular case is actually, or

12       presumptively, affected.  For those revelations that occur during voir
         dire, the remedy is a cause challenge . . . .  Being the spouse of a rape

13       victim is not, in and of itself, such an 'extreme' or 'extraordinary'
         situation that it should automatically disqualify one from serving on a

14       jury in a case that involves rape.  It cannot be said that the average
         person in Hilliard's position would be highly unlikely to remain impartial

15       whether he acknowledged it or not.  Rather, the effect of the spouse's
         experience on the juror's impartiality depends on purely personal

16       considerations that can vary from cases to case, including, for
         example, the similarity of the spouse's experience to the facts of the

17       case, the nature of the experience, its contemporaneous and
         continuing impact, the couple's relationship, how the individual

18       handles it, and so forth.  Given Hilliard's honest response on voir dire
         that revealed a potentially disqualifying relationship, but not an

19       extreme or extraordinary one . . . we see no basis for inferring bias
         now as a matter of law.

20    *Fields*, 503 F.3d at 774-75.  As in *Fields*, Jurors Manchester, Howes and Wagner

21    each admitted on voir dire that someone with whom they had a personal

22    relationship had been the victim of rape or attempted rape.  They each brought up

23    the issue on their own, and both trial counsel and the prosecutor had the

24    opportunity to question the jurors about the incidents.  Moreover, the rape or

25    attempted rape victims were not close relatives of the jurors.  The closest

26    relationship was that of Juror Wagner to her son's fiancée.  While Juror

27    Manchester described her friendship with her son's godmother as close, they were

28    not relatives.  Juror Howes had concerns about the rape of her son's boss's

120

1   daughter.  Even if her son and his boss were very close friends, Juror Howes was
2   not a very close friend of the victim's parents.  Given the spontaneous honesty of
3   the jurors, counsel had the opportunity to elicit questions on voir dire that would
4   demonstrate actual or implied bias.  Like *Fields*, the fact that a person in each of
5   the juror's lives had been the victim of rape or  attempted rape is not enough, by
6   itself, to support a finding of implied bias. Petitioner has not shown that any of the
7   jurors has an extreme or extraordinary disqualifying relationship.  *See Fields*, 503
8   F.3d at 775.   Because petitioner has failed to establish that Jurors Manchester,
9   Howes or Wagner were biased, petitioner cannot prevail on this claim.  "The
10  impartiality of the jury was not undermined by [Jurors Manchester, Howes and
11  Wagner] being seated as . . . juror[s].  Replacement of one unbiased juror with
12  another unbiased juror should not alter the outcome." *Fields*, 503 F.3d at 776.
13         Accordingly, the Court DENIES Claim 5(D)(23).

                    **16.    Counsel's failure to conduct adequate discovery (Claim**
                            **5(D)(33))**

16         In Claim 5(D)(33), petitioner claims that counsel failed to conduct adequate
17  discovery, resulting in counsel failing to locate or identify exculpatory evidence.
18         Petitioner must demonstrate that counsel performed deficiently and that this
19  deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.
20         Petitioner cannot prevail on this vague and conclusory claim.  He fails to
21  allege how counsel's discovery was inadequate and presumes that whatever
22  discovery counsel should have conducted would have led to the allegedly
23  exculpatory evidence.  Moreover, petitioner fails to specify what kind of
24  exculpatory evidence counsel failed to locate.  He states only that it "includ[ed]
25  statements made to the state's polygrapher by witnesses and other information
26  relevant to their credibility.  (Pet. at 52.)  Petitioner does not provide the source or
27  content of these statements.  "Conclusory allegations which are not supported by a
28  statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d

                                        121

1  20, 26 (9th Cir. 1994).

2        Accordingly, the Court DENIES Claim 5(D)(33).

3        **17.    Counsel's failure to investigate the people with the victims**

4              **before their deaths (Claim 5(D)(35))**

5        In Claim 5(D)(35), petitioner contends that trial counsel failed to locate the

6  individuals who were with the victims before their deaths, arguing that those

7  people could have caused the injuries to the victims, or that they could have been

8  the source of the bodily fluids found in, on or near the victims.  In addition,

9  petitioner argues that trial counsel failed to seek independent testing of the

10 physical evidence used to establish the elements of the charged offenses.

11       Petitioner must demonstrate that counsel performed deficiently and that this

12 deficient performance prejudiced petitioner.  *Wiggins*, 539 U.S. at 521.

13       Petitioner likely cannot show deficiency or prejudice.  In the case of Kathy

14 Ryan, the evidence presented at trial documented that Ryan and petitioner were

15 with a group of friends who played pool and drank beer at Big John's Pizza Parlor.

16 The evidence also showed that Ryan and petitioner left the restaurant at the same

17 time and got in a car with some other friends.  The group dropped petitioner off at

18 a liquor store where he had parked his van and then dropped off Ryan at her home.

19 According to petitioner's confession, petitioner then picked up Ryan at her home.

20 She was found dead hours later.  Some of the people with Ryan before her death

21 testified at trial about the events leading up to her death.  No evidence was

22 presented at trial about Bristol's whereabouts before petitioner picked her up while

23 she was hitchhiking.

24       The jury heard evidence about who was with Ryan before she died.

25 However, petitioner has not pointed to any record evidence to show that one of

26 those individuals, or perhaps another person, was the source of the bodily fluids

27 found in, on or near Ryan, or that any other person killed her.  Nor has petitioner

28 pointed to evidence to show that anyone besides petitioner was with Bristol before

1  she died.  Petitioner has failed to point to evidence that would support a theory that

2  someone else injured the victims, killed them or both.

3          Moreover, petitioner argues that trial counsel should have had the physical

4  evidence tested independently.  Again, however, petitioner fails to allege what

5  such independent testing would have uncovered.

6          Petitioner's unsubstantiated allegations are vague, conclusory and

7  speculative.  Despite the suggestion otherwise in petitioner's brief, he must point

8  to specific allegations and the resulting prejudice to prevail on this claim.  He has

9  failed to do so.  *See, e.g.*, *Jones* 66 F.3d at 204-05 (holding that relief is

10 unwarranted on the basis of conclusory allegations and without specific allegations

11 of fact); *cf. Allison*, 431 U.S. 63, 75 n.7 (1977) ("[T]he petition is expected to state

12 facts that point to a real possibility of constitutional error.") (citation and internal

13 quotation marks omitted); *see also Borg*, 24 F.3d at 26; *Boehme v. Maxwell*, 423

14 F.2d 1056, 1058 (9th Cir. 1970) (holding that "conclusory statements are no

15 substitute for proper allegations of fact" and that [a]llegations of fact, rather than

16 conclusions, are required"); *see also Cooks*, 660 F.2d at 740 (denying relief

17 because petitioner's claim of prejudice was speculative).

18         Accordingly, the Court DENIES Claim 5(D)(35).

19         **18.    Counsel's failure to inform the court that his funding**

20                **request included sensitive information (Claim 5(D)(37))**

21         In Claim 5(D)(37), petitioner alleges that counsel failed to inform the trial

22 court that his ex parte requests for funding violated California Penal Code Section

23 987.9.  This error resulted in the prosecution being able to obtain information

24 about petitioner's strategy and potential witnesses, including petitioner's

25 statements to an expert witness.  In addition, petitioner argues that trial counsel

26 failed to take any action to correct the violation of petitioner's Fifth and Sixth

27 Amendment rights, and also failed to request a hearing to ascertain the magnitude

28 of the violations or to seek an appropriate remedy.

1       Petitioner must demonstrate that counsel performed deficiently and that this

2  deficient performance prejudiced petitioner.  *Wiggins*, 539 U.S. at 521.

3       Petitioner cannot prevail on this claim, as he can show neither deficiency

4  nor prejudice.  Petitioner failed to provide record citations to the funding

5  application or applications in question.  The Clerk's Transcripts include a

6  document entitled "Reimbursement Cost Estimate Affidavit for Investigations,

7  Experts and Others (987.9 PC)."  (1 CT 174, 175.)  Petitioner claims that

8  Dr. Davis's pre-trial report was attached to the application, but it is not attached to

9  the version contained in the Court's copy of the Clerk's Transcript.  In fact, the

10  application has very minimal information.  The request is dated July 10, 1981, but

11  signed July 22, 1981.  It includes a request for overtime as well as out-of-county

12  travel.  In addition, it requests funding for a psychiatrist, a psychologist and a

13  neurosurgeon.  The funding is requested for the investigation and preparation of

14  psychological defenses and for the penalty phase.  (1 CT 174.)  Petitioner cannot

15  show deficiency for a host of reasons.  First, it is not at all clear that this document

16  is the one about which petitioner complains.  If another document is relevant,

17  petitioner has failed to point to that document in the record.  Second, it is not clear

18  on the face of the document that it was filed at all, let alone under seal.  Petitioner

19  bears the burden of establishing that counsel performed deficiently and has failed

20  to do so here.  *Strickland*, 466 U.S. at 688 ("When a convicted defendant

21  complains of the ineffectiveness of counsel's assistance, the defendant must show

22  that counsel's representation fell below an objective standard of reasonableness.").

23       Even if the Court were to presume a finding a deficiency, petitioner cannot

24  show prejudice.  Petitioner has shown neither the information the prosecution

25  gained access to through the funding application, nor the way in which the State

26  used that information to its advantage.

27       Accordingly, the Court DENIES Claim 5(D)(37).

28

19.  **Counsel's failure to prepare for trial due to alcoholism (Claim 5(D)(38))**

In Claim 5(D)(38), petitioner argues that trial counsel failed to prepare for trial because he was suffering from alcoholism in the months before trial. Petitioner adds that counsel's alcoholism impaired his ability to objectively evaluate the force of Dr. Rayyes' testimony and the need for further investigation.

Petitioner must demonstrate that counsel performed deficiently and that this deficient performance prejudiced petitioner. *Wiggins*, 539 U.S. at 521.

This claim fails. The fact that trial counsel was suffering from alcoholism at the time of trial is not relevant to the objective inquiry of whether counsel's performance was reasonable. *Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995). The Court need not "inquire into the source of [trial counsel's] alleged shortcomings." *Id.* The Court granted summary judgment to respondent on Claim 5(A), which similarly asserted that trial counsel's affliction with esophageal cancer at the time of trial deprived petitioner of his right to constitutionally adequate counsel. Petitioner contended that counsel underwent surgery in the months preceding trial, which left him unable to read, write or fully concentrate and that the chemotherapy treatments he received throughout trial caused trial counsel to suffer nausea, retching, vomiting, gastrointestinal disorders, hair loss and fatigue so severe that he had to sleep during the noon recess. (Summary Judgment Order at 17.) The Court concluded that "[p]etitioner's claim of IAC will stand or fall based on whether counsel provided deficient performance and whether petitioner suffered prejudice from the alleged deficiencies . . . [, but] petitioner cannot obtain relief merely because his attorney was ill during the trial." (Summary Judgment Order at 19.) The same is true with respect to Claim 5(D)(38). The fact that trial counsel suffered from alcoholism at the time of trial cannot support relief on its own.

Petitioner also complains, however, that counsel's alcoholism impacted

125

1  counsel's "ability to objectively evaluate the force of Dr. Rayyes' testimony and
2  the need for further investigation." (Pet. at 54.) It is difficult to determine what
3  petitioner contends here. The most charitable reading of the claim is as follows:
4  Dr. Rayyes was a gastroenterologist who specialized in treating alcoholics and
5  who had treated trial counsel and his wife, both recovering alcoholics. Perhaps
6  petitioner means to contend that because Dr. Rayyes had been intimately involved
7  in trial counsel's life, trial counsel overvalued Dr. Rayyes and relied on
8  Dr. Rayyes's testimony to petitioner's detriment when trial counsel really should
9  have conducted further investigation and hired an alternate or more qualified
10 expert.

11     Dr. Rayyes testified at trial that he was a gastroenterologist who specialized
12 in the diagnosis and treatment of alcoholism and other drug addictions. (12 RT
13 3055.) He also testified that he had authored five or six articles "in the general
14 area of alcoholism with a particular view of the medical complications and
15 behavior complications." (12 RT 3056.) Dr. Rayyes offered testimony that
16 petitioner was an alcoholic. (12 RT 3058.) Dr. Rayyess based this opinion on his
17 in-person evaluation of petitioner. He also testified that, considering the amount
18 of alcohol and marijuana petitioner consumed on the night of both crimes,
19 petitioner would be severely impaired and, accordingly, unable to form the specific
20 intent to kill. (12 RT 3069, 3070.)

21     While there may be questions about whether a gastroenterologist is the most
22 qualified person to testify about alcoholism and its effects, including whether an
23 alcoholic who has been drinking can form the specific intent to kill, the
24 prosecution did not challenge Dr. Rayyes's credibility or qualifications to evaluate
25 petitioner and to offer the opinions he gave at trial. Taken at face value, it does not
26 appear that trial counsel miscalculated the potential force of Dr. Rayyes's
27 testimony or that he should have conducted further investigation into another
28 expert. Dr. Rayyes offered testimony that petitioner was an alcoholic, that he

1   would have been severely impaired at the time of both crimes and that,

2   accordingly, he could not form the specific intent to commit the crimes.  Counsel's

3   decision to put Dr. Rayyes on the stand rather than another expert does not seem

4   so objectively unreasonable that it would warrant a finding of deficiency.  In other

5   words, counsel's decision to use Dr. Rayyes as an expert on alcoholism did not fall

6   below an objective standard of care.  *Strickland*, 466 U.S. at 688.

7          Accordingly, the Court DENIES Claim 5(D)(38).

8                  **20.    Additional claims of IAC (Claim 5(D)(39))**

9          In Claim 5(D)(39), petitioner contends that trial counsel committed

10   additional acts or omissions that resulted in prejudice to petitioner.

11          First, petitioner alleges that trial counsel failed to put Laura Kostiuk, a

12   friend of victim Kathy Ryan's, on the stand.  Kostiuk told counsel that Ryan had

13   sexual relations with petitioner in the past.  Counsel testified that Kostiuk "would

14   have been a great witness because the issue was whether or not Francis had

15   voluntary or involuntary sexual intercourse with Kathy.  Same thing was also true

16   of the other decedent, but Kathy was the big one.  It was one that I could do a lot

17   with and didn't."  (10 CDD 38.)  Trial counsel subpoenaed Kostiuk for the original

18   trial date but did not subpoena her for the actual trial.

19          Counsel was not deficient.  Even if counsel put Kostiuk on the stand, the

20   jury could have concluded that petitioner raped Ryan based on the condition of her

21   body.  Moreover, a finding of consensual sex with Ryan would not have negated

22   the rape as to Bristol.  Counsel was not deficient, and petitioner suffered no

23   prejudice.  *See Rupe*, 93 F.3d at 1445; *see also. Roe v. Flores-Ortega*, 528 U.S.

24   470, 485 (2000) (holding that "the failure to take futile action can never be

25   deficient performance); *cf Miller v. Keeney*, 882 F.2d 1428, 1434-35 (9th Cir.

26   1989) (noting that a petitioner who challenges a futile objection fails both

27   *Strickland* prongs).

28          Petitioner also asserts that trial counsel failed to present evidence he knew

127

about the circumstances of petitioner's life just before the crimes.  An investigator

submitted a report to counsel that stated:   "These interviews provide some insight

as to why Hernandez might have been prompted to begin killing when he did.  An

unstable personality coupled with rejection of his parental figures, the Williams,

and the final rejection of Heidi Williams, his future wife, just overloaded the

thought process."  (10 CDD P00331 (Ex. 28).)  Counsel should have been aware,

therefore, that petitioner was under incredible stress at the time of the crime.  Trial

counsel conducted no further investigation into petitioner's situation, and he

apparently did not inform his experts about the circumstance of petitioner's life.

As Dr. Clausen summarized in the social history she prepared for petitioner,

from April 1980 until his arrest for the underlying crimes in 1981, petitioner:

> was an eighteen-year-old, unemployed, parolee who was homeless,
> isolated from his family, drug addicted and living in a van.  Other
> than an uncertain relationship with a girlfriend and the continued
> association with a homeless, drug abusing friend, Francis had little
> social support or contact.  He no longer shared a home with either of
> his parents.  He was not in school.  He was not incarcerated.  He was
> not in any of the various forms of treatment that teachers, social
> workers, and mental health professionals had been urging for him
> since he was a toddler . . . .  Francis was a young man with insufficient
> social and psychological resources attempting to grapple with
> unmanageable stressors.

(Clausen Decl. at 86, ¶ 217.)  Counsel did not make an informed decision to forgo

putting on this sort of evidence, as he mistakenly believed that petitioner was still

in a relationship with Heidi at the time of the crimes.  (10 CDD 44-46.)  Counsel's

failure to investigate and present the circumstances of petitioner's life, and to

inform his experts about those circumstances, was deficient.  Expert testimony

about the stress petitioner was experiencing at the time of the crimes and how

those stresses may have affected his conduct would certainly have been helpful to

the jury.  In addition to possibly evoking sympathy, it also would offer an

explanation for the murders:  Petitioner, who already suffered from emotional

instability, felt unable to cope with the intense abandonment he felt and was

1    stressed to his breaking point.  This kind of testimony may have caused the jury to

2    come to a different verdict.  *See, e.g.*, *Caro*, 280 F.3d at 1258 (finding prejudicial

3    the exclusion of expert testimony that would have reduced petitioner's moral

4    culpability).  While a prejudicial omission, the excluded testimony is not sufficient

5    on its own to undermine confidence in the penalty phase verdict, given the brutal

6    circumstances of the crime and petitioner's penalty phase testimony.

7         Accordingly, the Court DENIES Claim 5(D)(39) but will consider counsel's

8    deficiency in the cumulative error analysis.

9              **21.   Cumulative error (Claim 5(D)(40))**

10        In Claim 5(D)(40), petitioner alleges cumulative error from counsel's many

11   instances of deficient performance.

12                   **a.   Guilt phase**

13        The Court has found many deficiencies in counsel's performance at the

14   guilt phase.  Counsel failed to realize that a diminished capacity defense due to

15   petitioner's mental condition was available, and he failed to investigate and

16   present that defense.  Counsel also failed to investigate petitioner's biological

17   family, and such an investigation would have alerted petitioner's experts to the

18   circumstances of petitioner's prenatal development and birth, as well as the

19   prevalence of mental illness in petitioner's biological family.  Information about

20   petitioner's biological family could have changed the outcome of petitioner's

21   psychological evaluations, lending additional support to a diminished capacity

22   defense.  Moreover, counsel failed to investigate and present evidence about the

23   dysfunctional home in which petitioner was raised, which also would have helped

24   explain petitioner's psychological problems and, consequently, supported a

25   diminished capacity defense at guilt.  Along the same lines, counsel failed to

26   investigate or present evidence about petitioner's neurological deficits and mental

27   impairments.  Evidence that petitioner suffered brain damage also would have

28   buttressed a claim of diminished capacity at the guilt phase.  Counsel did not retain

a social historian or otherwise gather the information necessary to create a social history for petitioner.  Furthermore, trial counsel failed to present the jury with evidence about the stressful circumstances at play in petitioner's life right before the crimes took place.  Finally, counsel failed to object to the admission of evidence that petitioner wanted to find a homosexual to beat up and rob on the night of Edna Bristol's murder, and he further failed to object to the prosecutor's argument about that act.

Counsel's performance at the guilt phase resulted in many errors and omissions.  While counsel did present evidence in support of a diminished capacity defense based on intoxication, he failed to pursue the best possible defense at guilt: that due to mental deficiency, neurological deficits and inadequate parenting, petitioner lacked the capacity to form the specific intent to rape and kill his victims.  Counsel testified that he spent the bulk of his time preparing for the guilt phase, a surprising approach given petitioner's confession and the circumstantial evidence implicating petitioner.  (*See* 1 CDD 11.)  Although counsel chose to focus the majority of his energy on the guilt phase, counsel inexplicably failed to conduct an adequate investigation, to provide his experts with relevant information and to prevent the jury from hearing prejudicial character evidence that made petitioner seem cruel and unfeeling.  These mistakes were certainly harmful.  Despite these many errors, however, petitioner has not shown the probability of a different outcome at the guilt phase.  Petitioner's confession still would have been admitted, even without counsel's various deficiencies.  Evidence of petitioner's diminished capacity due to mental condition likely would have been insufficient to overcome the confession.  The jury rejected a diminished capacity defense based on intoxication.  Moreover, the jurors may have been aware that the electorate had voted to eliminate the defense of diminished capacity due to mental defect eighteen months before trial.  The publicity concerning that referendum may have created an environment inhospitable to a diminished capacity defense based on

130

mental condition.  Petitioner's cumulative IAC claim based on counsel's guilt

phase performance fails.

### b.  Penalty phase

Petitioner also alleges cumulative IAC based on counsel's performance at

the penalty phase.  Counsel performed deficiently at the penalty phase in the

following ways:  by failing to investigate and present evidence about petitioner's

biological family; failing to investigate and present evidence about the

dysfunctional nature of petitioner's adopted family; failing to present evidence of

petitioner's mental condition known to counsel at the time of trial; failing to

question experts about documents in counsel's possession, such as adoption,

Montessori and counseling records from petitioner's childhood that trial counsel

had prepared as exhibits for trial; failing to investigate and present evidence of

petitioner's neurological and mental impairment; failing to retain a social historian

or to otherwise gather the information necessary to putting together petitioner's

social history; putting petitioner on the stand at penalty, but asking him only about

the circumstances of the crime and failing to put on expert testimony to explain his

cool affect; failing to call Officer Williams to testify as a character witness; failing

to object to evidence that petitioner wanted to find and did find a homosexual to

beat up and rob on the night of Edna Bristol's murder and failing to object to the

prosecutor's argument about that event; and failing to present evidence about the

stressful and chaotic circumstances in petitioner's life at the time of the crimes.

Counsel testified that these decisions were not strategic.

Counsel also testified that petitioner's trial was his first death penalty trial.

He was "out of [his] element and did not know what [he] was supposed to do for

the penalty phase."  (1 CDD 11.)  Counsel explained that "Judge Mullendore

agreed at the beginning of the trial to give me a few days between the guilt verdict

and the beginning of the penalty phase to get my case together."  (*Id.*)  Those days

were not enough.  Counsel's omissions "clearly demonstrate that trial counsel did

1    not fulfill [his] obligation to conduct a thorough investigation of [petitioner's]

2    background.  *Williams* (*Terry*), 529 U.S. at 396 (quoting 1 ABA Standards for

3    Criminal Justice 4-4.1, cmt, p. 4-55 (2d ed. 1980)).  The evidence presented at the

4    penalty phase was incoherent, jumbled and woefully incomplete.  The jury did not

5    hear any evidence about petitioner's unfortunate beginning.  The jury did not

6    know that petitioner was conceived by a 14-year-old girl who used drugs and

7    alcohol habitually during her pregnancy.  Nor did the jury learn that petitioner's

8    birth father was an unemployed, incarcerated 18-year-old who beat the mother of

9    his baby while she carried petitioner.  The jury did not learn that petitioner's

10   biological parents and extended families suffered from many serious mental

11   illnesses.  The jurors did not know that petitioner was born with forceps, long

12   known to cause neurological damage.  Neither the jury nor petitioner's

13   psychological experts knew any of this information.

14       While counsel put on testimony that petitioner's adoptive mother, Naomi,

15   suffered from schizophrenia, the jury did not hear any testimony about the effect

16   that Naomi's severe mentally disability had on petitioner as an infant, child and

17   adolescent.  The jury did not hear evidence about the abuse petitioner endured,

18   including his mother sitting on him to calm him down, tying him up as a form of

19   play and administering enemas as a way to cleanse him and keep him calm.  The

20   jury did not hear about how petitioner's father encouraged petitioner to engage in

21   age-inappropriate behavior, such as boxing and turning off a circuit breaker at age

22   five, backing a car out of the driveway at age eight and driving a motorcycle,

23   without a license, at age fifteen.  Petitioner was involved in numerous accidents

24   from a young age, many involving head injuries.  Petitioner was largely neglected

25   or ignored and was basically on his own from a young age.  The jury did not hear

26   this evidence.

27       Counsel had, in his possession, evidence that petitioner suffered from

28   serious psychological problems based on Dr. Maloney's pre-trial evaluation of

1   petitioner.  Counsel did not elicit this testimony during trial.  Counsel prepared

2   various exhibits for trial, including petitioner's records from the Montessori school

3   he attended as a youngster, the records from the Hernandez family's attempt to

4   adopt a second child and the records from the St. Thomas More Clinic, where

5   petitioner had a psychological evaluation at age five.  These records showed that

6   petitioner exhibited signs of mental illness and neurological damage as young

7   child.  The jury did not hear any of this evidence.

8          In addition to the documentary clues that petitioner suffered from mental

9   illness since childhood, Dr. Maloney told counsel that petitioner was psychotic at

10  one time.  Dr. Girsh told counsel that there might be a neurological or organic

11  basis for petitioner's behavior and that petitioner had dyslexia.  Counsel knew that

12  petitioner started using alcohol and drugs in elementary school, and that he became

13  a heavy user of mind-altering substances in his teen years.  Torelli's file shows that

14  Torelli planned to consult a psychiatrist and neurosurgeon.  (1 CT 174.)

15  Moreover, as discussed, counsel did not know, but should have known, that

16  petitioner was subjected to drugs, alcohol and violence in utero, and that he was

17  delivered with the help of forceps.  Counsel did not arrange for a neurological

18  examination of petitioner, which would have shown that petitioner suffers from

19  brain damage.  This brain damage impairs petitioner's ability to perceive emotion

20  accurately and to give an appropriate emotional response.  Expert testimony

21  explaining these problems could have mitigated petitioner's perceived culpability.

22         Counsel did not retain a social historian, nor did he take other steps to gather

23  the information necessary to create a social history for petitioner.  Because of

24  counsel's failures, the jury did not get an accurate sense of petitioner's life.

25         Trial counsel put petitioner on the stand at the penalty phase.  Counsel

26  proceeded to ask petitioner only about the circumstances of the crime, rather than

27  about his background or upbringing.  Petitioner testified that he could not

28  remember many details of the crimes, though he had confessed to them.  On cross-

examination, the prosecutor impeached petitioner with his confession, noting the many ways in which petitioner's penalty phase testimony seemed false or self-serving.  To make matters worse, counsel's inadequate investigation did not allow petitioner's mental health experts to offer testimony that would explain petitioner's bizarre affect as he testified.  Had counsel conducted an adequate investigation, petitioner's experts would have had information about petitioner's biological family and his dysfunctional home life, and petitioner would have had a neurological examination.  This additional information would have allowed an expert to explain why petitioner may have been unable to perceive his victims' fear or anger accurately and why he could not react appropriately during the crimes.  With adequate investigation and a neurological exam, petitioner also could have offered testimony that petitioner had a history of dissociating, which was a coping mechanism he adopted in childhood.  An expert could have testified that petitioner likely dissociated during the crimes.  This fact would have explained why his confession appeared so detailed but why he could not remember many things when he testified at the penalty phase.

Counsel also failed to call Officer Williams to testify, despite subpoenaing him for trial.  Officer Williams, a former police officer injured in the line of duty, would have testified that he knew petitioner well, approved of petitioner's relationship with Officer Williams's daughter and thought petitioner had a future if he applied himself.

Counsel also failed to object to testimony and related argument regarding petitioner's statements in his confession that he went out looking for a homosexual to rob and beat up before Edna Bristol's murder.  This testimony tended to show that petitioner was a violent bully, preying on vulnerable people without any empathy for their defenseless position.  This impermissible character evidence only served to make petitioner seem like a callous monster.

Finally, counsel failed to put on evidence, in his possession, that petitioner

134

was experiencing an incredible amount of stress in the weeks leading up to his crimes.  Petitioner was eighteen, unemployed and on parole from the California Youth Authority.  His father had sold the family home to move in with his girlfriend and gave petitioner a van to live in.  Petitioner was forced to give up his dog because the dog could not live in his van.  Petitioner's fiancée miscarried and then broke up with petitioner.  Shortly afterwards, his fiancée's parents broke off contact with petitioner.  Petitioner was abusing drugs and alcohol regularly.  His only consistent social support was a friend who was homeless and drug-addicted.  Petitioner did not have regular contact with his parents.  He was not enrolled in school.  He did not have the structure of a job or incarceration.  He was a young adult suffering from brain damage and bipolar disorder with inadequate resources to cope with the incredible stress in his life.

The jury did not hear any of this evidence.  "Instead, the jurors . . . saw only glimmers of [petitioner's] history, and received no evidence about its significance vis-a-vis mitigating circumstances.  *Ainsworth*, 268 F.3d at 874 (internal quotation marks omitted).  As in *Rompilla*, the mitigating evidence that could have been presented "bears no relation to the few naked pleas for mercy actually put before the jury."  *Rompilla*, 545 U.S. at 393.  "[T]he undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [petitioner's] culpability."  *Id.* (internal quotation marks omitted).

Counsel failed to present a compelling narrative of petitioner's life.  With adequate investigation and preparation, counsel could have told a story of genetic vulnerability, exacerbating environmental factors, child neglect, sexual abuse that bore a strong relationship to the crimes and the many negative effects of being raised by a severely mentally ill mother and an oblivious, unequipped father.  Petitioner's biological mother gave him up so that he could have a chance, but petitioner was adopted into a horrible situation.  His adoptive parents failed him.  Despite awareness by various institutions that petitioner was a troubled, unwell

135

child, he remained in the care of his abusive, inadequate parents.  Petitioner had

little to no chance to develop into a normal, well-adjusted young man.  "It goes

without saying that the undiscovered mitigating evidence, taken as a whole, might

well have influenced the jury's appraisal of [petitioner's] culpability, and the

likelihood of a different result if the evidence had gone in is sufficient to

undermine confidence in the outcome actually reached at sentencing."  *Rompilla v.*

*Beard*, 545 U.S. at 393 (internal quotation marks omitted); *compare Pinholster*,

131 S.Ct. at 1408-10 (denying petition where prosecution presented extensive

aggravating evidence, mother provided detailed testimony about petitioner's bad

childhood at trial and the habeas proceedings revealed little additional evidence

that was either mitigating or not cumulative).

     The cumulative effect of trial counsel's errors at the penalty phase compel a

conclusion that petitioner suffered the ineffective assistance of trial counsel.

*United States v. Tucker*, 716 F.2d 576, 595 (9th Cir. 1983) ("a court may find

unfairness—and thus prejudice—from the totality of counsel's errors and

omissions.").  The brutal nature of the crimes does not foreclose a finding of

prejudice.  *See, e.g.*, *Lambright v. Schriro*, 490 F.3d 1103, 1121-27 (9th Cir.

2007); *Summerlin*, 427 F.3d at 643; *Stankewitz*, 365 F.3d at 723, 724-35;

*Ainsworth*, 268 F.3d at 878; *see also Douglas* v. Woodford, 316 F.3d 1079, 1091

(9th Cir. 2003) ("The gruesome nature of the killing did not necessarily mean the

death penalty was unavoidable.").

     In addition to counsel's many errors, the Court is aware of the personal

circumstances counsel faced at the time of trial.  Counsel was appointed to

represent petitioner in March of 1982.  Petitioner's trial began a year later.  In

December of 1982, a little more than three months before trial, counsel was

diagnosed with esophageal cancer.  Esophageal cancer had a recovery rate of only

two percent at the time.  Counsel had surgery to have part of his stomach and

esophagus removed the same month as his diagnosis.  Counsel's doctors believed

136

that excessive drinking and smoking had caused counsel's cancer.  Accordingly,
counsel's wife organized an intervention while counsel recovered from surgery in
the hospital.  During that timeframe, counsel took a lot of pain medication,
including Percodan.  He sometimes took up to eight a day.  He also began a course
of weekly chemotherapy.  Counsel was unable to work on petitioner's case from
early December until mid-February.  His time cards to not include any entries from
December 3, 1982 through February 16, 1983.  (1 CDD 8-9.)

When counsel returned to work in February 1983, he discussed his
condition with the trial judge in chambers:

> He was a friend of mine and I think he called me into
> chambers, commented that I was not looking too well and asked if I
> wanted to be relieved.  I think this discussion was off the record.  I
> told him I thought I was okay but that I wouldn't hold it against him if
> he decided to appoint someone else.  I wasn't feeling very well, but
> Judge Mullendore was a friend and I felt badly the case had already
> been delayed because of the Public Defender's conflict, and I did not
> want to be the cause of further delay.  I also think that I was in denial
> about the seriousness of my situation and did not want to believe that
> I was not well enough to try the case.  I had no idea at that point how
> debilitating the chemotherapy treatment would be.

(1 CDD 9-10.)  The trial court appointed a second attorney to assist counsel.  His
"role was a limited one; he was not appointed to play an active part in the trial but
only to assist me by picking up transcripts, taking notes and other odds and ends.
During trial, he was like a baby sitter; he would drive me to his house during the
noon recess so that I could take a nap.  He did not participate in any of the strategic
decisions but basically functioned as a 'gofer.'"  (1 CDD 10.)

As trial continued, the cumulative effects of the chemotherapy wore on
counsel.  He recalls: "I was very tired all the time . . . .  I could not eat during the
day, because I would throw up or be afraid that I would throw up.  When I tried to
eat at night, I would throw up or get dry heaves.  My weight dropped from 180 to
135, and my focus and attention were off[.]  [M]y hair turned grey and I stopped

137

washing it because I did not want to lose it." (1 CDD 11.)  He describes his work habits both prior to and during trial:

> When I was in trial prior to my illness, I would work on the case all the time—at lunch, after dinner and on week-ends, and my life would revolve around the trial.  My work habits were much different during Francis'[s] trial.  I was tired and barely made it through the day.  I would nap at lunchtime and could only work for about an hour at the end of the court day and then I would go home, try to eat and sleep.  My life revolved around chemotherapy:  I was preoccupied with when I would take it, when I would see the doctors, when I would get my blood tests, and that sort of thing.  At that point, my survival was very much in doubt.  It was a very difficult time, and the chemotherapy did such a job on me that five years later it caused my wife to refuse chemotherapy to treat her cancer and she died as a result.

(1 CDD 11-12.)

The Court granted summary judgment to respondent based on petitioner's claim that counsel's illness, on its own, denied petitioner the effective assistance of counsel.  (Summary Judgment Order at 16-19.)  It is still the case that counsel's serious illness during trial preparation, trial and sentencing does not stand alone as a basis for habeas relief.  However, counsel's illness does help explain the many deficiencies at trial:  "Having cancer was a death warrant and I had a lot of things that I had planned to do that I simply forgot to do, didn't do, a lot of things changed in one hell of a hurry."  (10 CDD 37-38.)  Moreover, many court's have recognized that an attorney's physical or mental illness may impair counsel's judgment.  *See, e.g.*, *Tippins v. Walker*, 77 F.3d 682, 686 (2nd Cir. 1996) (recognizing that the effectiveness of counsel depends in part on the attorney being present and attentive); *Gravley v. Mills*, 87 F.3d 779, 786 (6th Cir. 1996) (recognizing that many of counsel's mistakes may be attributed to medication and that counsel's illness "had to have been a major distraction" during trial); *see also Smith v. Ylst*, 826 F.2d 872, 876 (9th Cir. 1987) ("Although there is some merit to

the argument that a mentally unstable attorney may make errors of judgment that are essentially unidentifiable by a reviewing court, it is reasonable to treat such cases under the general rule requiring a showing of prejudice . . . . We believe it . . . . prudent to evaluate the attorney's actual conduct of a trial in light of allegations of mental incompetence.")

Counsel's many errors, committed when he was unable to perform competently, resulted in constitutionally inadequate representation. "Here, [petitioner] has alleged mitigating facts that might well have rebalanced the scale against death for some jurors." *Stankewitz*, 365 F.3d at 275.

Accordingly, the Court GRANTS Claim 5(D)(40).

**D.    Juror Misconduct Claims & Related IAC Claims**

**1.    Juror Wagner's contact with her minister during deliberations (Claims 4(A)(1) & Claim 4(A)(7)(d))**

In Claims 4(A)(1) and 4(A)(7)(d), petitioner contends that Juror Louise Wagner consulted with her minister during a weekend break in the penalty phase deliberations and that this instance of juror misconduct prejudiced him.

#### a.    Relevant Facts

The Court held an evidentiary hearing on this claim. Prior to the evidentiary hearing, Juror Wagner signed conflicting declarations. In the first declaration, which petitioner submitted, Juror Wagner made the following statements:

> During the trial, after the guilt phase and while the penalty phase was ongoing, I met with my Episcopalian Priest at our Church, St. Francis Episcopal Church, in Palos Verdes Estate, California. It was a Sunday and I had a private discussion with my priest the Reverend Mr. Robert A. TOURIGNEY, since retired. There were no other persons present at the time of our discussion . . . .

> The conversation with my priest gave me an opportunity to talk to someone. During my discussion with the Reverend Mr. Tourigney, I told him that I was a juror in a criminal trial. I told him that I was agonizing over the fact that I had to make a decision that could mean life or death for the individual on trial. The only comment Reverend

Tourigney made was to say that the only thing I had to consider was whether or not there was a possibility of rehabilitation.  He made no other statements.

(8/9/90 Declaration of Louise M. Wagner ("Wagner Decl. 1"), ¶ 3-4.)  About four months later, Juror Wagner signed a second declaration, which respondent obtained.  She clarified her earlier declaration, as follows:

> In Paragraph 4, it states, in part, "The only comment Reverend Tourigney made was to say that the only thing I had to consider was whether or not there was a possibility of rehabilitation.  He made no other comments."  ¶  This statement is misleading to the extent that I should consider *only* rehabilitation or that I could not consider anything else.  The Reverend Tourigney never said to only consider rehabilitation.  ¶  The more accurate statement would be that "The Reverend Tourigney said that I had to consider whether or not there was a possibility of rehabilitation, and that any decision on the outcome of any trial would be mine and mine alone."  ¶  The meeting with Rev. Tourigney took place after Sunday mass in the Coffee Room with perhaps 100-150 people milling about.  The Reverend Tourigney spent less than 60 seconds with me, while mingling about the room to greet church-goers.

(12/14/89 Declaration of Louise M. Wagner ("Wagner Decl. 2"), ¶ 3-6.)  In response to Juror Wagner's second declaration, petitioner submitted the declaration of Edward O'Shea, a private investigator who obtained Juror Wagner's first declaration and who attested to its accuracy.

The Court granted an evidentiary hearing in part because the facts concerning what Rev. Tourigney told Juror Wagner were in dispute.  The Court reasoned that if Rev. Tourigney in fact told Juror Wagner to consider *only* rehabilitation, that advice would have been in direct contravention of the law, which requires a capital jury at the sentencing phase to "be able to consider and give effect to all mitigating evidence offered by [the] petitioner."  (Order Granting Petitioner's Motion for Evidentiary Hearing in Part and Denying Motion in Part ("Evidentiary Hearing Order"), filed Dec. 21, 1999 (Docket No. 119) at 10-11

1  (citations and internal quotation marks omitted).)

2       As part of the evidence taken at the evidentiary hearing, the parties deposed

3  all of the surviving jurors, including Juror Wagner.  Juror Wagner attended mass

4  each Sunday at St. Francis Episcopal, and she respected Rev. Tourigney, who

5  served as the rector of the church.  (Wagner Depo. at 17, 21-22.)  On Sunday, May

6  8, 1983, during a weekend break in the penalty phase deliberations, Juror Wagner

7  attended services at St. Francis.  (*Id.* at 21.)  That day, Juror Wagner spoke with

8  Rev. Tourigney during coffee time after mass.  (*Id.* at 20, 29.)  She did not have "a

9  private, special meeting" with Rev. Tourigney, but, instead, the two spoke just a

10  couple of sentences during a brief encounter.  (*Id.* at 29; *see also id.* at 30 ("I

11  didn't have a private discussion with him . . . . He was standing off to the side and

12  I went over and said what was on my mind, and then he came back with one

13  sentence.").)  Juror Wagner recalls that Rev. Tourigney told her that the "[m]ain

14  thing was the decision would be whether he—the guilty one could be rehabilitated

15  or not."  (Wagner Depo. at 37-38.)  She explained further that, "He—he indicated

16  that my decision should be based on whether I felt he could be rehabilitated or

17  not."  (*Id.* at 38.)  "He led me to believe that was the main thing in making the

18  decision, in making my decision . . . . That was the one sentence that he spoke to

19  me."  (*Id.* at 38-39.)  "I told you he said one sentence . . . If he [was] capable of

20  being rehabilitated."  (*Id.* at 48.)

21       Counsel for respondent questioned Juror Wagner about her second

22  declaration.  As discussed, respondent obtained Juror Wagner's second declaration

23  to clarify her earlier statement that Rev. Tourigney told Juror Wagner that the

24  "only thing" she needed to consider was whether or not petitioner could be

25  rehabilitated.  The second declaration, specifically paragraph 5 of that declaration,

26  qualified Juror Wager's first statement as follows:  "The more accurate statement

27  would be that 'The Reverend Tourigney said that I had to consider whether or not

28  there was a possibility of rehabilitation, and that any decisions on the outcome of

1  any trial would be mine and mine alone.'" (Wagner Decl. 2 at ¶ 5.)  After reading

2  paragraph 5 during her deposition, however, Juror Wagner stated, "I don't think he

3  ever said that, and I never thought it."  (Wagner Depo. at 37.)  This testimony

4  effectively repudiates Juror Wagner's second declaration, which modified her

5  original statement that Rev. Tourigney told her that the only thing she needed to

6  consider was rehabilitation.

7      The parties also deposed Edward O'Shea, a private investigator.  O'Shea

8  worked with the Philadelphia Police Department for twenty-five years, fifteen of

9  those years as a detective.  (O'Shea Decl. at 5.)  He became a private investigator

10  in 1984 and still worked in that trade at the time of his deposition in 2000.  (*Id.*)

11  He interviewed Juror Wagner, with her husband present, three times in 1989.  (*Id.*

12  at 7-8.)  Juror Wagner told O'Shea that Rev. Tourigney said that "the only thing

13  she had to worry about was whether or not the defendant could be rehabilitated,

14  that "the only thing [she] had to consider was whether or not there was a

15  possibility of rehabilitation."  (*Id.* at 8-9.)  At the second meeting, Juror Wagner

16  told O'Shea that "the priest told her the only thing that she would have to worry

17  about was whether or not the defendant could be rehabilitated."  (*Id.* at 11.)

18  O'Shea used his notes to draft an affidavit.  (*Id.*)  He met with Mr. and Mrs.

19  Wagner a third time on August 9, 1989.  (*Id.*)  First, Mr. Wagner, an attorney,

20  reviewed the affidavit, followed by Juror Wagner.  (*Id.*)  According to O'Shea,

21  "[b]oth took great pains in reading it.  Both—there was nothing in the affidavit

22  that they questioned or asked."  (*Id.* at 12.)  He also said, "They read it, and upon

23  completion of reading it, they both agreed that it was an exact replica of what the

24  contents of her statement was on the 4th.  There was no problem in signing it.

25  They were very amicable."  (*Id.*)

26      During the evidentiary hearing, the parties also explored whether

27  Juror Wager told the other jurors about her conversation with Rev. Tourigney.

28  When asked whether she mentioned her conversation with Rev. Tourigney to the

142

other jurors, Juror Wagner provided this confusing answer: "No. They had made their decisions, so I tell them about we've—what are they, think I might have." (Wagner Depo. at 26.) It is unclear whether Juror Wagner told the other jurors about the substance of her conversation with Rev. Tourigney. It seems as if she qualified her initial answer, "No" that she did not tell the other jurors with the last phrase, "think I might have." George Barber, the foreman, testified that he remembered a female juror entering the jury room during the penalty phase deliberations and announcing that she had consulted with her minister about the case. (Barber Depo. at 14-15.) He believes that Juror Wagner made the announcement "in the jury room at the first part of the day." (*Id.* at 15.) Juror Barber stated that "maybe [the jury] hadn't started deliberating," but that Juror Wagner said it "while we were all in there." (*Id.*; *see also* Barber Depo. at 16 ("To the best of my memory, it would be that it happened at the jury room."), 55 (testifying that Juror Wagner's statement that she talked to her minister "was before the trial was over").) Juror Karen McCracken testified that she remembered a juror having consulted with a reverend during trial. (McCracken Depo. at 30.) She remembered that the incident occurred during the penalty phase of trial and that the juror discussed her consultation with the minister in the jury room, but she could not definitively pinpoint when it happened. (*Id.* at 30, 46.) Juror McCracken did not remember Juror Wagner discussing the particulars of her conversation with her minister. (*Id.* at 31.)

In sum, the evidence shows the following: Juror Wagner attended her church during the weekend recess in penalty phase deliberations. She briefly consulted with the rector of her church, who told her either that the "only thing" or "main thing" she had to consider in deciding on the appropriate penalty was whether petitioner could be rehabilitated. Juror Wagner announced to the jury, in the jury room, that she had consulted her minister, but she probably did not share the details of the conversation with her fellow jurors.

1          **b.      Applicable law**

2          "The Sixth Amendment guarantees criminal defendants a verdict by

3   impartial, indifferent jurors." *Dyer*, 151 F.3d at 973; *see also Fields*, 503 F.3d at

4   772 (stating that a defendant's right to a fair trial means that he or she is entitled to

5   "a jury capable and willing to decide the case solely on the evidence before it.")

6   (internal quotation marks and citation omitted).  "Jury exposure to facts not in

7   evidence deprives a defendant of the rights to confrontation, cross-examination

8   and assistance of counsel embodied in the Sixth Amendment." *Eslaminia v.*

9   *White*, 136 F.3d 1234, 1237 (9th Cir. 1998).

10         Not every constitutional error supports the grant of a habeas petition,

11  however. *Eslaminia*, 136 F.3d at 1237.  No "bright line test exists to assist courts

12  in determining whether a petitioner has suffered prejudice from juror misconduct."

13  *Mancuso v. Olivarez*, 292 F.3d 939, 950 (9th Cir. 2002), *as amended on denial of*

14  *rehearing*.  The key question becomes whether the constitutional error "had a

15  substantial and injurious effect or influence in determining the jury's verdict."

16  *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993) (citing *Kotteakos v. United*

17  *States*, 328 U.S. 750, 776 (1946)).  The Court should place "great weight on the

18  nature of the extraneous information that has been introduced into deliberations."

19  *Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000), *as amended on denial of*

20  *rehearing* (internal quotation marks and citation omitted).  "Juror misconduct

21  which warrants relief generally relates directly to a material aspect of the case."

22  *Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir. 1997) (internal quotation

23  marks and citation omitted), *overruled on other grounds by Payton v. Woodford*,

24  346 F.3d 1204, 1218 (9th Cir. 2003) (en banc), *reversed on other grounds by*

25  *Brown v. Payton*, 544 U.S. 133 (2005).

26         Various factors help determine "whether the prosecution has successfully

27  rebutted the presumption of prejudice arising from the introduction of extraneous

28  evidence." *Dickson*, 849 F.3d at 406.  These factors include (1) whether the

144

material was actually received; (2) the length of time the information was available to the jury; (3) the extent to which the jurors discussed and considered the information; (4) whether the material was introduced before a verdict was reached; and (5) any other matters which may bear on the issue. *Jeffries v. Wood*, 114 F.3d 1484, 1492 (9th Cir. 1997) (en banc) (citing *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)).  While instructive, these considerations do not definitively decide the issue of prejudice. *Dickson*, 849 F.2d 406; *see also Jeffries*, 114 F.3d at 1489-90 (holding that other "factors might . . . suggest that the potential prejudice of the extrinsic information was diminished in a particular case and therefore that the extrinsic evidence did not substantially and injuriously affect the verdict."). The Court also may take into account (1) whether the prejudicial statement was ambiguously phrased; (2) whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; (3) whether a curative instruction was given or some other step taken to ameliorate the prejudice; (4) the trial context; and (5) whether the statement was insufficiently prejudicial given the issues and evidence in the case. *Id.* at 1491-92.  An error that does not have a substantial and injurious effect on the outcome of the trial is deemed harmless. *Eslaminia*, 136 F.3d at 1237 (citing *Bonin*, 59 F.3d at 824).

The Court must limit the evidence it considers in evaluating the jury's exposure to improper evidence and the prejudice flowing from that error. *Sassounian*, 230 F.3d at 1108.  Federal Rule of Evidence 606(b) states:

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.  But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form.  A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

145

1   Fed. R. Evid. 606(b). "A long line of precedent distinguishes between juror

2   testimony about the consideration of extrinsic evidence, which may be considered

3   by a reviewing court, and juror testimony about the subjective effect of evidence

4   on the particular juror, which may not." *Sassounian*, 230 F.3d at 1108. In short,

5   "the question of prejudice is an objective, rather than a subjective, one." *Dickson*,

6   849 F.2d at 406; *see also Rodriguez*, 125 F.3d at 744 ("We are not to consider

7   evidence concerning the subjective impact of extrinsic evidence on the

8   deliberation process, and instead focus on an objective inquiry into the potential

9   for prejudice from the extraneous information.") The Court must therefore ignore

10  Juror Wagner's testimony about how the conversation she had with her minister

11  actually influenced her during the deliberative process, although such testimony

12  would provide "the most direct evidence of prejudice." *Sassounian*, 230 F.3d at

13  1109. This lends an "Alice in Wonderland quality to the discussion of whether

14  [petitioner] was actually prejudiced by the admitted jury misconduct," but it is

15  nevertheless what the law requires. *Id.* (internal quotation marks and citation

16  omitted).

### c.   Analysis

18      The facts demonstrate that an error took place during the penalty phase.

19  Juror Wagner sought advice from her rector, Rev. Tourigney, who told Juror

20  Wagner that rehabilitation was either the "only" or the "main" thing she had to

21  consider. Juror Wagner was therefore exposed to extraneous information. The

22  Court must look to the many factors enumerated in the case law to determine if

23  this error had a substantial and injurious effect on the penalty phase verdict.

24      First, the Court considers whether the material was actually received. It

25  was. Rev. Tourigney told Juror Wagner either that the "only" thing or the "main"

26  thing she should consider was petitioner's potential for rehabilitation. The day

27  after her encounter with her rector, Juror Wagner announced to the jury that she

28  had consulted her minister, but she did not share the details of their conversation.

Second, the Court must evaluate the length of time the information was available to the jury.  Juror Wagner talked to Rev. Tourigney on Sunday after mass, so the information was available to her for a full day.  She returned to deliberate with the jury the next morning.  Juror Wagner announced to her fellow jurors that she consulted with Rev. Tourigney "at the first part of the day." (Barber Depo. at 15.)  Deliberations began at 9:30 a.m., and the jury returned with a verdict a few minutes after noon.  (14 RT 3690.)  The jurors knew Juror Wagner had consulted with her minister for several hours before they reached a verdict, but they did not know what Juror Wagner and the reverend discussed.

Third, the Court looks at the extent to which the jurors discussed and considered the information.  In this case, the jury did not discuss or consider the advice Juror Wagner received from Rev. Tourigney because she did not share the details of her conversation with the jury.  The jury may have considered the fact that Juror Wagner consulted her minister in its penalty phase deliberations.

Fourth, the Court should inquire whether the material was introduced before a verdict was reached.  The jury learned that Juror Wagner consulted Rev. Tourigney for advice on how to vote in the penalty phase before the jury reached a penalty phase verdict.  She told her fellow jurors that she had consulted her minister at the beginning of the last day of deliberations, and the court read the penalty verdict just after noon.

In addition, the Court may consider a handful of other factors.  First, the statement by Rev. Tourigney, as reported by Juror Wagner, was not ambiguously phrased.  He told her that whether petitioner could be rehabilitated was the "only" or "main" thing she needed to consider.  The parties have spent a considerable amount of post-hearing briefing arguing about whether Rev. Tourigney used the words "only thing" or "main thing" when he talked to Juror Wagner.  Juror Wagner appears to have used the words "only thing" or "main thing" interchangeably in describing her conversation with Rev. Tourigney.  The

147

1   distinction between the two phrases is one that makes little difference to the
2   ultimate outcome in any event, as discussed below.

3          Second, Rev. Tourigney's statement that Juror Wagner should consider
4   rehabilitation as the "only" or "main" thing was neither admissible evidence nor
5   cumulative of other evidence adduced at trial.  Also as discussed below,
6   Rev. Tourigney's statements were in contravention to the law, so they certainly
7   would not have been admissible.  His focus on rehabilitation did not constitute
8   cumulative evidence, though the parties did elicit some evidence regarding
9   rehabilitation at the penalty phase, and the prosecutor repeatedly mentioned the
10  issue in his closing.  That issue also is discussed below.

11         Third, no curative instruction or other action was taken to ameliorate the
12  prejudice because neither the court, nor the attorneys knew about Juror Wagner's
13  communication with her minister.

14         Lastly, the Court evaluates whether Rev. Tourigney's advice to Juror
15  Wagner was insufficiently prejudicial given the issues and evidence in the case.
16  While only Juror Wagner was exposed to Rev. Tourigney's advice on how to
17  approach the penalty phase deliberations, the Constitution guarantees petitioner's
18  right "to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."
19  *Parker v. Gladden*, 385 U.S. 363, 366 (1966); *see also Dyer*, 151 F.3d at 973
20  ("The bias or prejudice of even a single juror would violate [petitioner's] right to a
21  fair trial."); *Dickson*, 849 F.3d at 408 ("If only one juror was unduly biased or
22  improperly influenced, [petitioner] was deprived of his Sixth Amendment right to
23  an impartial panel.").  Moreover, Rev. Tourigney spoke to Juror Wagner about an
24  issue directly related to a material aspect of the case, namely whether or not she
25  should vote for life in prison or the death penalty.  *See Rodriguez*, 125 F.3d at 744
26  ("Juror misconduct which warrants relief generally relates directly to a material
27  aspect of the case.") (internal quotation marks and citation omitted).

28         Furthermore, Rev. Tourigney's advice directly contravened the law, whether

148

1    he told Juror Wagner that rehabilitation remained the "only thing" or the "main

2    thing" she had to consider.  "The Eighth Amendment requires that the jury be able

3    to consider and give effect to all relevant mitigating evidence offered by

4    petitioner."  *Boyde v. California*, 494 U.S. 370, 377-78 (1990) (citing *Lockett v.*

5    *Ohio*, 438 U.S. 586 (1978)).  Advice that Juror Wagner had to consider *only*

6    rehabilitation to the exclusion of other mitigating evidence would have violated

7    the constitutional mandate that jurors be allowed to consider all relevant mitigating

8    evidence presented by petitioner at trial.

9         Likewise, if Rev. Tourigney advised Juror Wagner to consider rehabilitation

10   as the "main thing," such advice also would have violated the Constitution.  The

11   California Supreme Court has held that the 1978 death penalty statute at force in

12   this case must not be construed to "require[] jurors to render a death verdict on the

13   basis of some arithmetical formula, or . . . to impose death on any basis other than

14   their own judgment that such a verdict was appropriate."  *People v. Brown*, 40 Cal.

15   3d 512, 540 (1985).  The *Brown* Court also held that the use of the word

16   "weighing" in the death penalty statute

18        is a metaphor for a process which by nature is incapable of precise
          description.  The word connotes a mental balancing process, but
19        certainly not one which calls for a mere mechanical counting of
          factors on each side of the imaginary "scale," or the arbitrary
20        assignment of "weights" to any of them. *Each juror is free to assign*
          *whatever moral or sympathetic value he deems appropriate to each*
21        *and all of the various factors he is permitted to consider*, including
          factor (k) . . . . By directing that the jury 'shall" impose the death
22        penalty if it finds that aggravating factors "outweigh" mitigating, the
          statute should not be understood to require any voter to vote for the
23        death penalty unless, upon completion of the "weighing" process, he
          decides that death is the appropriate penalty under all the
24        circumstances.

25   *Id.* at 541 (emphasis added).  The *Brown* Court also held that the "jury must be

26   free to reject death if it decides on the basis of *any* constitutionally relevant

27   evidence or observation that it is not the appropriate penalty" and that "the

28   decision is the responsibility of the jury and no one else."  *Id.* at 540.

Rev. Tourigney usurped Juror Wagner's role by advising her to consider rehabilitation as the only or main thing in her analysis. His advice suggested that rehabilitation was the most important factor, and *he* assigned it the weight *he* thought it should have, when that task is the exclusive province of the individual jurors. Petitioner's interest in Juror Wagner following the California death penalty statute as construed by the California Supreme Court does not involve "the denial of a procedural right of exclusively state concern." *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Stated another way, "where . . . a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law." *Id.* "The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." *Id.* Rev. Tourigney advised Juror Wagner to elevate one consideration, whether or not petitioner could be rehabilitated, over all of the other factors contained in the death penalty statute. This advice directed Juror Wagner to act outside her statutory discretion, as contemplated by California law. "Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." *Hicks*, 447 U.S. at 346.

To complicate matters, rehabilitation was an issue at the penalty phase. Petitioner presented weak evidence of rehabilitation. Petitioner put his paternal aunt—who saw him only a few times a year for his entire life—on the stand. Petitioner's counsel asked if she felt that she could help petitioner lead a productive life in prison. She testified:

> I know it is possible. I think Francis has the potential, given his own motivation. ¶ If he is capable of making his own motivation for his deciding to do this and, second, if he can get the help that he needs. I believe he needs strict supervision and that he needs to be in

150

> a very structured environment and that he needs not to be free to do as he pleases for a very long time.  ¶  I also believe that he needs a great deal of psychiatric help.  I don't know what kind of thing can be arranged in the future, but I do know that once I get my nursing degree, I will be in a position to afford to pay for his private psychiatric care, if such a thing is available.

(14 RT 3559-60.)  Petitioner also put on two mental health experts, each of whom offered testimony that petitioner may do well in a controlled prison setting. Dr. Girsh, a clinical and forensic psychologist, testified that she had "no indication that [petitioner] would be difficult" in a structured prison setting.  (14 RT 3589-90.)  Dr. Maloney, a clinical psychologist, testified that "this type of person does well if they have extreme limits" and that the structure of prison "may not alter the underlying problem but would alter the behavior."  (14 RT 3479, 3484.)  On cross examination, the prosecutor elicited testimony from Dr. Maloney that "[i]f they did offer [petitioner] treatment in the prison system . . . there is a possibility of changing the underlying situation," but his realistic hope for that possibility was moderate based on "what's available in the prison system."  (14 RT 3484.)

Trial counsel did not argue rehabilitation per se in his closing argument, though he did twice mention that petitioner probably would do well in a structured prison setting.  (14 RT 3666, 3679.)  In the prosecutor's closing argument, however, he repeatedly mentioned the issue of rehabilitation.  (14 RT 3635 ("Psychologists have testified to what [petitioner] is, and considering the basis of his background as to how he got there and how he can, if he can, change."), 3648 ("Do you think he will change in principle?  Dr. Maloney was asked if he had any realistic hope for this.  You saw him.  He testified.  His answer:  Moderate, given what's available."), 3648 ("Given what's available, will he change?  Will anybody change once their personality problems have become fixed?  Maybe.  His mother is hopeful that, given religious beliefs, maybe this will help, if not psychological treatment.  Presumably, both will be provided, if not by the prison facilities, by the aunt who has a degree in theology and sociology, has worked with women in

151

1  rehabilitation type settings before, and hopefully will commit herself to the

2  defendant and change him."), 3677 ("Consider what he has done in the past, what

3  he is now as seen here, and what you think he can ever be."))

4          The evidence presented in the penalty phase, taken together with the

5  prosecutor's focus on rehabilitation during his closing argument, increases the

6  likelihood that Rev. Tourigney's advice had a substantial and injurious effect or

7  influence on the penalty phase verdict.  The sum total of the rehabilitation

8  evidence presented included two psychologists testifying that petitioner may

9  function well in a highly structured prison setting; one psychologist testifying that

10  he had a moderate hope for the possibility of petitioner's rehabilitation during

11  incarceration, but that he worried about the quality of care petitioner would

12  receive; and a paternal aunt without a close relationship with petitioner who

13  believed that petitioner could have a productive life while incarcerated, if he

14  became motivated to do so and if he received psychiatric care.  This evidence

15  failed to present a compelling case for rehabilitation, which may explain why

16  counsel did not argue the issue in his closing.

17          Given the poor evidence and the prosecutor's focus on rehabilitation,

18  Rev. Tourigney's advice may have invited Juror Wagner to erroneously consider

19  petitioner's poor prospects for rehabilitation as an aggravating factor.  However,

20  the California Supreme Court has limited the jury's consideration of aggravating

21  factors to those enumerated in the statute.  *People v. Boyde*, 38 Cal. 3d 762, 773

22  (1985) ("By . . . requiring the jury to decide the appropriateness of the death

23  penalty by a process of weighing the specific factors listed in the statute, the

24  initiative necessarily implied that matters not within the statutory list are not

25  entitled to any weight in the penalty determination.")  A prosecutor may rely only

26  on the statutorily enumerated aggravating factors listed in California Penal Code

27  Section 190.3.  *Boyde*, 38 Cal. 3d at 775-76.  While the prosecution may attempt to

28  rebut evidence of rehabilitation introduced by a defendant, it may not rely on

petitioner's poor prospects for rehabilitation as an affirmative aggravating factor. *See* Cal. Pen. Code § 190.3; *People v. Benson*, 52 Cal. 3d 754 (1990) (holding that future dangerousness is not a statutory aggravating factor but that prosecutor could attempt to rebut evidence admitted to show defendant would act peaceably in prison).

Moreover, the prosecutor may argue that petitioner failed to put on affirmative evidence of rehabilitation, but may not argue that the jury can consider the paucity of evidence on the subject as a positive aggravating factor. *See, e.g.*, *People v. Crittenden*, 9 Cal. 4th 83, 149 (1994) (holding that "the prosecutor may not argue that the absence of a mitigating factor constitutes the presence of an aggravating factor"). Rev. Tourigney's open-ended advice that the only or main thing Juror Wager had to consider was whether petitioner could be rehabilitated may have caused Juror Wagner to believe that she could consider the evidence concerning rehabilitation, which tended to show that petitioner had a slim chance at reforming himself, as a nonstatutory aggravating factor. Again, petitioner has an individual liberty interest in Juror Wagner exercising her discretion as limited by the California death penalty statute. *Hicks*, 447 U.S. at 346. Rev. Tourigney's advice could have impermissibly encouraged Juror Wagner to consider the low likelihood of petitioner being rehabilitated as an aggravating factor, resulting in an "arbitrary disregard of petitioner's right to liberty," and a consequent "denial of due process of law." *Id.*

In evaluating prejudice, "'[t]he inquiry cannot be merely whether there was enough to support the result.'" *Olivarez*, 292 F.3d at 950 (quoting *Kotteakos*, 238 U.S. at 765). The question the Court must answer is whether Juror Wagner's consultation with Rev. Tourigney, and his attendant advice that rehabilitation was the only or main thing she should consider in deciding whether to vote for the death penalty, "had a substantial influence." *Olivarez*, 292 F.3d at 950 (citation and internal quotation marks omitted). If the Court answers that question in the

1    affirmative, or if the Court "is left in grave doubt, the conviction cannot stand."

2    *Olivarez*, 292 F.3d at 939 950 (citation and internal quotation marks omitted).  Put

3    another way, "[w]here the record is so evenly balanced that a conscientious judge

4    is in grave doubt as to the harmlessness of an error, the error is not harmless and

5    relief should be granted."  *Jeffries*, 114 F.3d at 1489-90; *see also O'Neal v.*

6    *McAninch*, 513 U.S. 432, 435 (1995) ("By 'grave doubt' we mean that, in the

7    judge's mind, the matter is so evenly balanced that he feels himself in virtual

8    equipoise as to the harmlessness of the error.")  Given the nature of the advice

9    Rev. Tourigney offered Juror Wagner, its materiality to the penalty phase

10   deliberations and the degree to which the prosecutor focused on petitioner's

11   inability to be rehabilitated, the Court is left with grave doubt as to the

12   harmlessness of this error.  Juror Wagner's consultation of her minister had a

13   substantial and injurious effect on the penalty phase verdict.

14       Accordingly, the Court GRANTS Claims 4(A)(1) and 4(A)(7)(d).

15       **2.    Jury's exposure to prejudicial newspaper article (Claims**

16       **4(A)(2), & 5(D)(18), 5(D)(24) & 5(D)(25))**

17       In Claim 4(A)(2), petitioner claims that the jury was exposed to the contents

18   of a prejudicial newspaper article that identified petitioner as a suspect in the

19   strangulation of two girls in an unrelated case.  Petitioner contends that this error

20   caused him substantial and injurious prejudice at the penalty phase.  In Claim

21   5(D)(18), petitioner alleges that trial counsel failed to minimize the impact of false

22   reports that petitioner was linked to a criminal investigation in San Luis Obispo.

23   In Claim 5(D)(24), petitioner claims that trial counsel failed to renew his request to

24   sequester the jury during the penalty phase. In Claim 5(D)(25), petitioner claims

25   that trial counsel failed to challenge several jurors, even though he knew or should

26   have known that they had been exposed to the newspaper article.

27       The Court held an evidentiary hearing on Claim 4(A)(2).  The order

28   granting an evidentiary hearing stated the following:

Petitioner has alleged facts which, if proven, would entitle him to relief. Petitioner alleges that the jurors were exposed to extrinsic evidence that he was the key suspect in two other strangulation murders in San Luis Obispo County. This information was prejudicial because Petitioner had just been convicted of strangling his victims in the instant case. Furthermore, if what Petitioner alleges is true, the jury had this information throughout the pendency of the penalty phase, during which it was instructed to consider whether aggravating circumstances, such as prior acts of violence committed by petitioner, outweighed any mitigating evidence. Extrinsic evidence that Petitioner was being charged with other strangulation murders, therefore, was directly related to a material aspect of the case. *See Rodriguez v. Marshall*, 125 F.3d at 744 ("Juror misconduct which warrants relief generally relates 'directly to a material aspect of the case'") (citations omitted).

Moreover, Petitioner did not receive a full and fair hearing regarding this issue in state court. Although the state trial court conducted a hearing, it was not complete. Specifically, the trial court failed to ask two jurors, Juror Thornton and Juror Bovee, whether they had "heard anything" pertaining to the article. In their declarations taken after the trial, however, Juror Thornton and Juror Bovee stated that they had heard other jurors discussing the contents [of] the article in the jury room. Because Petitioner has alleged facts which, if proved, would entitle him to relief, and he did not receive a full and fair hearing regarding this issue in state court, this court grants his motion for an evidentiary hearing on this claim.

(Evidentiary Hearing Order at 16.)

### a.      Relevant Facts

The guilt phase concluded on Monday, April 25, 1983. (13 RT 3267-84.) The trial court dismissed the jury with instructions to return for the penalty phase on Thursday, April 28, 1983. (13 RT 3288.) That Thursday morning, an article about petitioner appeared on the front page of the *Independent Press Telegram*, a Long Beach newspaper, with the headline, "L.B. Killer Faces New Charge." (Petition for Writ of Habeas Corpus (filed in the Supreme Court of the State of California), Exh. L.) Next to the headline appeared a photo of petitioner, bearing a caption with his name and the words "Strong Suspect." ( *Id.)* The article continued on the back page of the front section of the paper with the headline,

155

1    "L.B. Murderer Facing New Charge." (*Id.*)  The article focused on petitioner's

2    connection to the strangulation murder of two preschool-aged girls in San Miguel.

3    (*Id.*)  The article quoted a sheriff's detective as describing the unsolved San

4    Miguel murders as having "very similar characteristics" to the Long Beach

5    murders because all of the victims had been strangled.  (*Id.*)  It also reported that

6    sheriffs detectives had confirmed that petitioner was in San Miguel on the day the

7    little girls disappeared and that he drove the same van used in the Long Beach

8    crimes. (*Id.*)  The article stated that detectives investigating the San Miguel

9    murders attempted to interview petitioner about the crimes, but he refused to make

10   a statement.  (*Id.*)  In addition, the article stated that in his taped confession

11   regarding the Long Beach murders, petitioner asked for psychiatric help and told

12   authorities, "'I never did anything like that (before) in my whole life.'" (*Id.*)  The

13   parties have stipulated that petitioner is not considered a suspect in the San Miguel

14   murders.  (Stipulation as to Facts Regarding Juror Misconduct, p. 1-2, ¶ 1 (filed

15   July 26, 2002)).

16        When the trial reconvened on Thursday, April 28th, petitioner's counsel

17   moved for selection of a new penalty phase jury based in part on the newspaper

18   article that appeared in the *Independent Press Telegram*.  (13 RT 3290-91.)  The

19   trial court recessed until Monday, May 2, 1983, when it took up the motion.  (13

20   RT 3292.)  Petitioner's counsel stated his concern that five of the jurors lived in

21   Long Beach and that three of them took the *Independent Press-Telegram*.  (13 RT

22   3293-94.)  After some back and forth, the trial court agreed to question the jurors

23   individually about whether they had read any articles about petitioner since

24   returning the guilty verdict.  (13 RT 3297.)

25        On voir dire, Juror Huffman stated that she saw a headline before she could

26   stop herself but that she did not read the article.  (13 RT 3301.)  When she saw

27   petitioner's name, she turned away.  (13 RT 3301.)  Juror Bovee stated that she

28   saw petitioner's picture on the front page of the paper and that she read the caption

156

1   underneath the photo.  (13 RT 3304- 3305.)  Juror Thornton admitted that he read

2   the entire article.  (13 RT 3308.)  Juror Barber stated that he did not read anything

3   about petitioner but that he heard there was something in the news, though "they

4   didn't tell [him] what it was."  (13 RT 3306.)  When asked by the trial court,

5   "There was no discussion as to what it was, is that right?" Juror Barber responded,

6   "No."  (13 RT 3306.)  The rest of the jurors stated that they had not read anything

7   about petitioner.  (13 RT 3303, 3306-07, 3307, 3308-09, 3309, 3309-10, 3310,

8   3311, 3312, 3313.)  At the conclusion of voir dire, the trial court concluded that

9   Jurors Huffman, Bovee and Thornton were exposed to the article and excused all

10  of them from service.  (13 RT 3313-14.)

11      Petitioner's counsel argued that Juror Barber also had been potentially

12  exposed to the article and asked that the trial court question him again.  13 RT

13  3317-19.)  The trial court obliged:

15      Q:   Mr. Barber, you indicated that you had heard there was
             an article in the newspaper naming the defendant, is that
16           correct?

17      A:   Yes.

18      Q:   Did they mention what the subject of that article was
19           concerning . . . ?

20      A:   No, only that it took the first page of the newspaper.

21      Q:   Was there any mention of the subject matter at all?

22      A:   No.

23      Q:   There was no discussion about it, is that correct?

24

25      A:   Just something that was about the first page, though.
             The headlines in the newspaper is what they—

26
        Q:   In other words, is the court stating this fairly:
27           ¶ Someone told you there was an article on the first page
             of the paper and a headline, and *you discussed the*
28           *defendant, is that correct*?

157

A:  Well, what they said was—his wife is cutting out—doing the editing of the paper prior to him reading it, and he said, "There must have been something important in there, because she cuts out all the stuff that has to do with this trial."  And it was on the front page of the paper, so he didn't read what was there, and he said that she only cuts out just the articles, and she cut out the whole front page, so—

Q:  So they took his paper, huh?

(13 RT 3319-20 (emphasis added).)  It is unclear if the italicized portion of the quote indicates an error in the transcription or if the trial court erred in speaking. The trial court concluded that Juror Barber had not been exposed to the article and retained him on the jury.

The Court granted an evidentiary hearing to explore whether the jurors learned about or discussed the newspaper article on the day it appeared in the paper, as suggested by the declarations of Jurors Thornton and Bovee obtained in 1990 and 1989, respectively.  Juror Thornton's declaration stated that on the morning the article appeared in the *Independent Press Telegram*, "I entered the jury room but was unable to sit at the table because not only were all the regular jurors present, but also all of the alternates."  (Reply Brief in Support of Petition for Writ of Habeas Corpus (filed in the Supreme Court of the State of California), Exh. F ("Thornton Decl.") at 1, ¶ 3.)  He continued, "On that occasion, I heard the jurors discuss the contents of a newspaper article stating that Francis Hernandez had been implicated in the murder of two other girls in Northern California." (Thornton Decl. at 1, ¶ 3.)  Juror Bovee's declaration recounts that "a fellow juror who I believe was Mr. Thornton, entered the jury room and stated aloud to all the jurors who were present that he had read a newspaper article that stated that Francis Hernandez had been implicated in the murder of two other girls in Northern California."  (Petition for Writ of Habeas Corpus (filed in the Supreme Court of the State of California), Exh. E ("Bovee Decl. 1") at 1, ¶ 3.)  The

declaration also stated that "the jury foreman, who I believe was Mr. Barber, told Mr. Thornton to say no more." (*Id.*) Two months later, Juror Bovee provided an additional declaration. In the second declaration, Juror Bovee said that she wished to clarify paragraph three of her original declaration, quoted above. (Reply Brief in Support of Petition for Writ of Habeas Corpus (filed in the Supreme Court of the State of California), Exh. F ("Bovee Decl. 2") at 1, ¶ 3.) The second declaration stated, "A juror told the jury that he had read a newspaper article that implicated Francis Hernandez in the murder of two other girls in Northern California. I recall that there were several jurors present—more than six jurors and possibly all." (*Id.*) The substance of this second declaration is very similar to the first one.

The parties deposed all of the surviving jurors as part of the evidentiary hearing. Jurors Thornton and Huffman died before they could be deposed. Juror Bovee testified in line with her declarations that a "good-sized," "colored" man named Fred, who she believed to be Juror Thornton, said that he saw an article in the paper indicating that petitioner "was going to be charged in another case." (Bovee Depo at 10.) She testified that she believed the juror made the statement in the jury room, that he directed his statement to Foreman Barber and that he did not speak loudly when he talked to Foreman Barber. (*Id.* at 14, 52.) Juror Bovee further testified that the juror's statements specifically referred to petitioner being implicated in two other murders. (*Id.* at 31, 32, 33.)

Juror Barber testified that "sometime in the morning—I don't remember his name. It's a black man. I can't remember his name. He came in and stated that he read something in the newspaper about the case." (Barber Depo. at 18.) He continued, "And I tried to stop him right quick and say we're not supposed to do that. You know we're not supposed to do that. And then I wrote a note to the bailiff to tell the judge that there was a problem." (*Id.*; *see also id.* at 43 ("I don't remember what the words were other than he read the newspaper, which we

weren't supposed to do, and I stopped him right away.  We're not supposed to do that, and I sent him up to the judge.  They were very clear that we weren't supposed to read newspapers or watch television.").)  Juror Barber testified that he did not know what the content of the article was at that time and that he did not learn about the content of the article until after the trial concluded.  (Barber Depo. at 18, 26.)  Later, however, he offered the following testimony, which suggests that Juror Thornton said more than just that he read an article about petitioner without any mention of its content:

> The thing I remember is the man was sitting down in the jury room and started talking about it.  He wasn't even at the table.  He was sitting against the wall and started talking about that, the newspaper thing, and as soon as I heard what the conversation was
>
> about or his talking or the conversation, I immediately said, hey, stop it, or wait.  Tried to stop the words before they got any further.  Whatever it was that he had said, I tried to stop him immediately."

(*Id.* at 51.)

Finally, the parties deposed Juror Rosemarie McClister Jasinksi.  Juror Jasinski became a penalty phase juror when the trial court dismissed Jurors Bovee, Thornton and Huffman.  The following exchange took place during her deposition:

> Q:    Do you recall a time in the jury room with some or all of the other jurors when one of the jurors made reference to a newspaper article that said in substance that Francis Hernandez was implicated in the murder of a couple other young women in Northern California?
>
> A:    I'm not sure how that was brought out, but I do remember hearing it, and it was—it was kind of disturbing to hear it, but there was a woman on the jury—and I'm sorry, I don't remember her name.  She was maybe in her fifties.  I think she worked with computers.  But she was kind of one of the leaders, and she—I remember her saying, "He isn't being tried for that here.  If they choose to try him, it will be a separate trial, so we need to get back on our focus to this trial," and I think everybody—everybody did.
>
> Q:    So there was no real discussion about it other than the—one of the jurors bringing out that he had read the article and the substance of the article?

1

2

3

4

    A:    I don't remember if they said they read it or how it was brought up, but it was something about two young women that were murdered in Northern California and someone—or it was thought that it was similar circumstances in the way that they were killed.

5

    Q:    And Francis Hernandez was the suspect?

6

    A:    Right.

7

(Jasinski Depo. at 12-13.)  She also testified that she "couldn't tell you the

8

number, but there were jurors present when it was discussed.  I couldn't say if it

9

was five or six or if it was all of us.  I don't remember."  (*Id.* at 17.)

10

    The rest of the deposition is largely focused on attempting to pin down

11

exactly where and when Juror Jasinski remembers hearing about the newspaper

12

article.  Respondent attempted to elicit testimony that she may have learned about

13

the contents of the article after her jury service ended, but Juror Jasinski repeatedly

14

testified that she learned about the petitioner's purported connection to the double

15

murder in the deliberation room.  (*Id.* at 39 ("[T]he comment was in the

16

deliberation room."), 40 ("I feel like it was said in the deliberation room, but it

17

may have been said another time when we were together."), 41 ("I just feel it was

18

in the deliberation room."), 55 (". . . but I believe it was in the jury room that it

19

was said that he was accused of this."), 56 ("Because we didn't have discussions

20

like that outside of the deliberation room . . . to my mind that would mean we were

21

in the deliberation room."), 59 ("I'm remembering that it was in the jury

22

room . . . ."), 91 ("We were in the jury room when I first heard about it."), 93

23

("Beyond a reasonable doubt this happened in the penalty phase in the jury

24

room."), 94 ("I'm—I'm fairly certain it happened in the jury room.").)

25

    Juror Jasinski is less certain about the timing of the statement, but the sum

26

total of her testimony suggests that she heard about the article during the penalty

27

phase, or some time after the guilt phase verdict but before the penalty phase

28

verdict.  For example, the following exchange took place during her deposition:

| | | |
|---|---|---|
| Q: | Do you—can you specifically— remember when this incident occurred? |
| A: | Seems to me it was in the penalty phase. |
| Q: | And was it before your verdict? |
| A: | I believe it was. |
| Q: | Was it before the judge questioned all of the—was it before you were placed on the jury as an alternate—I mean as a sitting juror as opposed to an alternate? |
| A: | I couldn't answer that because I was brought in just to—right there between the two, and I don't remember the date of exactly when the newspaper article happened, so I—I can't answer that. |

(Jasinski Depo. at 45.)  In the end, Juror Jasinski offered consistent testimony that she heard about the contents of the newspaper article sometime after it was printed but before the penalty phase verdict, but she could not remember if it came to her attention before or after the trial court questioned the jurors about the article.  Her best testimony on this point is that "[b]eyond a reasonable doubt this happened in the penalty phase in the jury room."  (*Id.* at 93.)

Juror Jasinski's testimony suggests that she heard about petitioner's purported involvement with the double murder in San Miguel before the conclusion of the penalty phase, which supports petitioner's theory that the jury was exposed to the newspaper article when Juror Thornton talked about it in the jury room.  Juror Jasinski's version of the facts is consistent with Juror Bovee's account that she heard Juror Thornton announce to Juror Barber that he read the article and that other jurors were in the vicinity at the time.  It is also corroborates Juror Barber's deposition testimony that Juror Barber overheard Juror Thornton having a conversation about the newspaper article, and he stopped that conversation as soon as he heard what it was about.

In summary, the evidence shows the following:  Jurors Bovee and Barber offered testimony that Juror Thornton entered the jury room on April 28th and

162

1   announced that he read a newspaper article about petitioner.  Both Jurors Bovee

2   and Jaskinski testified that they heard discussion about the contents of the

3   newspaper article in the deliberation room after the guilt phase verdict but before

4   the penalty phase verdict.  Juror Thornton's declaration states that Juror Thornton

5   heard jurors discussing the contents of the newspaper article when he entered the

6   jury room on April 28th.  While Juror Barber testified that he did not learn about

7   the contents of the newspaper article, he also testified that he overheard Juror

8   Thornton having a conversation about the newspaper article and that he intervened

9   as "soon as [he] heard what the conversation was about."  (Barber Depo. at 51.)

10  This testimony suggests that even though Juror Barber may not have internalized

11  the contents of the article, it is more likely than not that Juror Thornton discussed

12  the contents of the article when he announced that he read it.

13               **b.        Analysis of Claim 4(A)(2)**

14       Petitioner has demonstrated that the jury was exposed to the contents of the

15  newspaper article that implicated him in the strangulation of two girls in an

16  unrelated case.  The jurors learned this information after the guilt phase, but before

17  returning a penalty phase verdict.  The Court must consider whether this

18  extraneous information had a substantial and injurious effect on the verdict.

19       First, petitioner has shown that the jury actually received the information.

20  Juror Thornton announced that he read the article implicating petitioner in the San

21  Miguel murders, and Jurors Bovee and Jasinski remember hearing about the

22  allegations made against petitioner in the jury deliberation room before they

23  reached a penalty phase verdict.

24       Second, the evidence strongly suggests that the jury learned about the

25  contents of the incriminating newspaper article on August 28th, or several days

26  before the penalty phase began.   Accordingly, the jury knew about the information

27  for the entire penalty phase.

28       Third, the evidence does not demonstrate that the jurors discussed or

163

1   considered the allegations that petitioner committed similar murders during

2   deliberation.  The only evidence that the jury could have considered or discussed

3   the evidence during deliberation is that of Juror Jasinski, who testified that one of

4   the women on the jury refocused the jury's attention on the case at hand when the

5   allegations came up.  (Jasinski Depo at 12-13.)  As discussed, however, the most

6   likely scenario based on the collective testimony of the jurors is that the jury

7   learned about the newspaper article and its contents on the day it appeared in the

8   paper and that this comment about focusing on the case at hand happened at that

9   time, which was not during deliberations.  The extent to which the jury discussed

10   the article at all, even outside deliberations, seems minimal.  (*See, e.g.*, Jasinski

11   Depo. at 75 (describing the commentary about the newspaper article as a "fleeting

12   comment."))  Fourth, as mentioned, the article came to the jury's attention before it

13   reached the penalty phase verdict.

14          In addition, the prejudicial statements about petitioner being a suspect in the

15   strangulation of two additional women did not appear ambiguously phrased.  The

16   jurors who testified about the contents of the incriminating article seemed to have

17   the same understanding about the allegations against petitioner.  Moreover, the

18   information in the article was not otherwise admissible or cumulative of other

19   evidence adduced at trial.  While the trial court did attempt to ameliorate the

20   prejudicial effect of the article by questioning all the jurors about whether they

21   read the article or heard petitioner discussed, the trial court conducted an

22   inadequate examination.  The trial court did not seem to know that any of the

23   jurors had mentioned or discussed the newspaper article in the jury room.  The trial

24   court failed to ask Jurors Thornton and Bovee if they heard anything about the

25   article, and the questioning seemed to ask the jurors only if they heard petitioner

26   discussed, not if they heard mention of a newspaper article about him.  In addition,

27   the parties have stipulated that petitioner is not a suspect in the strangulation

28   murder of the two girls in San Miguel, making the prejudicial impact of the

164

1  newspaper article quite marked.

2      As the Court stated in its order granting an evidentiary hearing on this claim,

3  the information contained in the incriminating newspaper article "was prejudicial

4  because Petitioner had just been convicted of strangling his victims in the instant

5  case." (Evidentiary Hearing Order at 15.)  Also, as stated in that order, "the jury

6  had this information throughout the pendency of the penalty phase, during which it

7  was instructed to consider whether aggravating circumstances, such as prior acts of

8  violence committed by petitioner, outweighed any mitigating evidence." (*Id.*)  For

9  that reason, the "extrinsic evidence that Petitioner was being charged with other

10  strangulation murders . . . was directly related to a material aspect of the case."

11  (*Id.* (citing *See Rodriguez*, 125 F.3d at 744).

12      In evaluating prejudice, the Court does not consider whether the State

13  presented enough aggravating evidence to support the death verdict.  *See Olivarez*,

14  292 F.3d at 950.  Instead, the Court must ponder whether the jury's exposure to the

15  *Independent Press Telegram* article, published in the interim between the guilt and

16  penalty phases, and which erroneously implicated petitioner in the strangulation of

17  two girls in an unrelated case, had a substantial and injurious effect on the verdict.

18  It did.  Because of (1) the highly prejudicial nature of the newspaper article

19  implicating petitioner in two unrelated murders, similar to the ones for which the

20  jury had just found him guilty; (2) evidence showing that two jurors remember

21  learning about this article in the deliberation room after the guilt verdict, but

22  before the penalty verdict; and (3) the fact that petitioner did not commit the

23  murders linked to him in the April 28th article, this error likely had a substantial

24  and injurious effect on the penalty phase verdict.  *See Rodriguez*, 125 F.3d at 745

25  ("Reversible error commonly occurs where there is a direct and rational

26  connection between the extrinsic material and a prejudicial jury conclusion, and

27  where the misconduct relates directly to a material aspect of the case." (internal

28  quotation marks and citations omitted).

1    Accordingly, the Court GRANTS Claim 4(A)(2).

2        c.    **Analysis of Claims 5(D)(18), 5(D)(24) & 5(D)(25)**

3    Relatedly, petitioner claims that trial counsel failed to locate the source of

4    the *Independent Press Telegram* article that falsely accused petitioner of unrelated

5    crimes in northern California.  Petitioner also claims that trial counsel "failed to

6    take adequate steps to minimize the impact these fake reports had on the exposed

7    jurors who were unaware of the falsity of the reports."  (Pet. at 48.)  In addition,

8    petitioner claims that at the end of the guilt phase, trial counsel failed to renew his

9    request to sequester the jury during the penalty phase.  Petitioner also contends

10   that trial counsel failed to challenge several unnamed jurors, even though he knew

11   or should have known that they had been exposed to a prejudicial newspaper

12   article.

13   To obtain relief on these IAC claims, petitioner must show that counsel

14   performed deficiently and that this deficient performance prejudiced petitioner.

15   *Wiggins*, 539 U.S. at 521.

16   Petitioner cannot prevail on these claims.  As discussed regarding Claim

17   4(A)(2), trial counsel moved for selection of a new penalty phase jury based on the

18   newspaper article.  Trial counsel also successfully convinced the trial court to

19   question the jurors individually about the article.  Based on that inquiry, the trial

20   court excused three jurors from service.  Trial counsel, still concerned that Juror

21   Barber was exposed to the article, asked the trial court to question him yet again.

22   The trial court did so.  While the trial court ultimately kept Juror Barber on the

23   jury, it was over the objection of trial counsel.  Petitioner contends in Claim

24   5(D)(25) that trial counsel failed to challenge "several jurors even though he knew

25   or should have known that they had been exposed to th[e] prejudicial newspaper

26   article."  Petitioner does not name these jurors, and the record reflects that trial

27   counsel repeatedly, persistently and successfully sought to investigate and remedy

28   the jury's exposure to the damaging article.  Moreover, in Claim 5(D)(18),

166

1   petitioner points to counsel's alleged failure to look for the source of the article as
2   deficient.  Reasonable trial counsel could have concluded that adequate
3   representation necessitated an attempt to look into and remedy the jurors' exposure
4   to the article, but not an effort to locate the source of the article.  Counsel's
5   performance is not deficient because the trial court conducted an inadequate
6   inquiry into the jurors' exposure to the newspaper article, or because some of the
7   jurors may have been less than honest about their exposure to the article.  Counsel
8   performed adequately, given the circumstances and the information available to
9   him.  Claims 5(D)(18) and 5(D)(25) fail.

10         Finally, in Claim 5(D)(24), petitioner criticizes as deficient counsel's failure
11   to renew his motion to sequester the jury at the end of the guilt phase.  Reasonable
12   counsel could have concluded that the trial court's earlier denial of a motion to
13   sequester the jury made a renewed motion futile.  *Rupe*, 93 F.3d at 1440 (holding
14   that failure to take futile action is not ineffective).  While sequestering the jury
15   would have prevented the jury's exposure to the prejudicial newspaper article,
16   petitioner cannot show a likelihood that the trial court would have granted a
17   motion to sequester the jury.  Petitioner's claim of deficiency is too speculative to
18   support relief.  *Cf. Cooks*, 660 F.2d at 740 (holding that petitioner's claim of
19   prejudice amounted to "mere speculation").

20         Accordingly, the Court DENIES Claims 5(D)(18), 5(D)(24) and 5(D)(25).

21   **3.   Foreman's exposure to an allegation that petitioner**
22   **committed an uncharged rape (Claim 4(A)(3))**

23         In Claim 4(A)(3), petitioner contends that an alternate juror was approached
24   by one of his tenants, and that tenant informed the alternate that petitioner had
25   raped the tenant's mother.  The tenant's mother identified petitioner when she saw
26   his picture in the newspaper.  Petitioner further contends that the alternate
27   approached the foreman and relayed this conversation to him before the penalty
28   phase concluded.  Petitioner contends that this error prejudiced him at the penalty

phase.

The Court held an evidentiary hearing on this claim. The order granting an evidentiary hearing stated the following:

> In this case, Petitioner has alleged facts which, if proved, show that he is entitled to relief. Petitioner was charged with raping and murdering both of his victims. Petitioner claims that Juror Barber was exposed to uncontroverted extrinsic evidence that Petitioner had committed a previous rape. Evidence that a criminal defendant has committed a prior similar offense is, by its nature, intrinsically prejudicial and necessarily has a substantial and injurious effect on the verdict. *Jeffries v. Wood*, 114 F.3d at 1491.

> Moreover, evidence that Petitioner had committed a prior rape was directly related to a material aspect of the case. *See Rodriguez v. Marshall*, 125 F.3d at 744 ("Juror misconduct which warrants relief generally relates 'directly to a material aspect of the case'") (citations omitted). Prior to deliberations, the trial court instructed the jurors to consider "the presence or absence of criminal activity by the defendant which involved the use . . . of force or violence" in deciding whether to sentence Petitioner to death. (RT 3682-84). Whether Petitioner had committed a prior rape was evidence of criminal activity involving the use of force or violence. Petitioner also did not receive a hearing regarding this issue in state court. Because Petitioner has alleged facts which, if true, would entitle him to relief, and he was not afforded a full and fair hearing on this issue in state court, this court grants Petitioner's motion for an evidentiary hearing regarding this claim.

(Evidentiary Hearing Order at 12-13.)

### a.    Relevant Facts

On January 3, 1990, alternate juror Edward Howard provided a declaration. It stated, in part:

> After the verdict of guilt had been entered, but prior to the penalty phase, we, the jurors, met in the quad area near the courthouse to celebrate that we were done with that part of the trial. It was a

1    major relief for everyone.[9]

2         It was at about this same time that one of my tenants
     approached me and said that she had read the newspaper article.  She
3    stated that her mother had seen the photograph of Mr. Hernandez in
     the newspaper and knew that it was the man who had raped her at one
4    time.  Shortly after this incident I mentioned the forgoing to the jury
     foreman.  At the get together in the quad area is when I made mention
5    of [it].[10]

6    (Reply Brief in Support of Petition for Writ of Habeas Corpus (filed in the

7    Supreme Court of the State of California), Exh. B ("Howard Decl.") at 1-2, ¶¶ 3-

8    5.)

9         In addition, Juror Howard added the following hand-written paragraph to

10   the end of his declaration:

11

12        I remember that when I told the foreman what my tenant had
     told me, I made sure to let him know that he was the only person
13   other than my wife whom I told about this and I also tried to explain
     that I didn't (did not) want to influence him and he assured me that by
14   the evidence the jury had been presented that something like this
     would have *no* influence on his decision.

15

16   (Howard Decl. at 2.)

17        The parties deposed Juror Howard ten years after he provided his initial

18   declaration.  The main issue at his deposition concerned when Juror Howard told

19   Juror Barber about the conversation with his tenant.  Juror Howard repeatedly

20   testified that he told Juror Barber about the conversation with his tenant after the

21   guilt phase concluded—specifically, after the article appeared in the paper—but

22

23   [9]     Juror Howard crossed out the next typed sentence, which read, "It was at that time that
24   we discussed a newspaper article implicating Mr. Hernandez in other murders."  (Reply Brief in
     Support of Petition for Writ of Habeas Corpus (filed in the Supreme Court of the State of
25   California), Exh. B ("Howard Decl.") at 1, ¶ 4.)

26   [10]    The last quoted sentence ("At the get together in the quad area is when I made mention of
27   [it]") was hand-written by Juror Howard.  He also crossed out a typed sentence that read,
     "Though I do not believe that this incident influenced the jury's decision, I cannot help but
28   wonder whether the penalty phase verdict would have been different had I not mentioned it."
     (Howard Decl. at 2, ¶ 5.)

before the jury reached a penalty verdict.  (*See, e.g.*, Howard Depo. at 25 ("Q: So it was—it was—the conversation you've told us about with Mr. Barber telling him about the tenant and the tenant's mother was, as I understand it, prior to the time the jury went into deliberations to determine what penalty he receives? A: Correct."), 26 ("From my recollection, it occurred after he had been found guilty, but prior to being sentenced—"), 26 (testifying that the conversation could have happened on any of the days the jury heard penalty phase testimony), 40 ("The conversation between me and Mr. Barber took place after the article in *The Press Telegram* and before the death penalty was returned."), 41 ("I—I know that a conversation took place between me and Mr. Barber.  I know it was after the article in *The Press Telegram*.  As to what specific day or—that, I can't say.  I know it was before he was sentenced—before the jury came back with the sentence."), 43 ("The conversation between me and Mr. Barber, I know it occurred after Mr. Hernandez was found guilty and prior to his being found—or prior to his being sentenced to death.  ¶  Now, as far as which particular day, that, I'm sorry, I can't recall.  But I know it was after he had been found guilty and prior to when he was sentenced to death."), 60 ("I believe that what took place was after the guilty verdict had been rendered, we all met—we, the jury, got together in the—in a quad area near the courthouse.  We were relieved because we were done with a lot of the trial.  But this was prior to his being sentenced.  Now, as of today, my exact recollection as to when—whether this took place before any testimony was given in the penalty phase or not, I'm not sure."), 67 ("Well, I know I told him—I told him during the trial about what one of my tenants had told me . . . .  Well, I know I told him during the trial near the courthouse about what the tenant had told me about her mother being raped, and she was pretty sure that it was Hernandez that had done it.  I know that took place during the trial.").

Juror Howard also testified that he was not sure when he told Juror Barber that he (Juror Howard) was concerned that the conversation would influence Juror

170

Barber's decision about whether to vote for the death penalty.  That portion of the
conversation could have happened before or after the penalty verdict.  (Howard
Depo. at 21, 22-25, 44 ("The only part of the conversation with Mr. Barber that I
have a question [about] is whether it took place at that time or after the trial
was—whether I asked him whether that had influenced his decision or not."), 63
("[W]hether I told him . . . that I did not want to influence him—I'm not sure
whether that took place when we were at the quad or whether that took place after
the trial was completely over with."))

          In addition, the parties deposed Juror Barber.  Juror Barber could not
remember the conversation with Juror Howard.  (*See, e.g.*, Barber Depo. at 21 ("Q:
Do you remember that at one of these get-togethers there was an alternate juror
who told you that he was a landlord, and he had been confronted by a tenant who
had told him that her mother had seen a picture of Hernandez in the newspaper and
was convinced that Hernandez had raped her mother?  A: I don't remember that at
all.")).  On further examination, Juror Barber offered testimony that while he could
not remember the conversation, that did mean that it did not happen.  (*Id.* at 40-41
("Q: Is it accurate that you told [petitioner's counsel] earlier this year that you
could not say the conversation did not occur?  A: Yes, that's right.  Q: You just
weren't sure one way or the other?  A: That's an accurate statement.  Q: And that's
an accurate statement today?  A: Yes.").)  In addition, however, Juror Barber
testified that if Juror Howard had talked to him about the tenant's allegation, he
probably would have remembered it:

> Q:   Now going back to this statement about the tenant, and
>      you indicated that in a conversation with [petitioner's
>      counsel] you had stated that you couldn't foreclose the
>      possibility that that could have happened.  Do you have
>      any actual memory of that conversation?
>
> A:   Not at all.
>
> Q:   And do you have any actual memory of him later coming
>      to you and saying, geez, I hope I didn't influence your

1           vote?

2       A:    Not at all.

3       Q:    And would that have been the type of conversation that you think—in your present state of mind, do you think that that would have been the type of conversation that would have stood out?

A:    Yes, it would.  That was one of the things like the newspaper, that if someone had said that to me that was significant enough that I would have remembered it and probably told the judge.

8  (Barber Depo. at 49-50.)  Although Juror Barber testified that this conversation is

9  the kind that he would have remembered, he also admitted that while he knew that

10  Juror Wagner consulted her minister about how to vote in the penalty phase, he did

11  not think it was necessary to report that communication to the trial judge.  (*Id.* at

12  15.)  Additionally, Juror Barber testified that he reported to the trial court that

13  Juror Thornton read the newspaper article implicating petitioner in the double

14  strangulation of two girls in Northern California, but nothing in the record

15  indicates that he actually reported this incident.  (*Id.* at 18 ("And then I wrote a

16  note to the bailiff to tell the judge that there was a problem.").)  The record does

17  not contain a note from Juror Barber to the trial court, nor does the transcript

18  suggest that he gave a note to the judge.  Neither the trial judge nor the attorneys

19  mention such a note, and the voir dire conducted regarding the newspaper article

20  does not refer to a note from Juror Barber or to the incident in which Juror

21  Thornton announced that he read about petitioner in the paper.  As discussed, the

22  questions on voir dire were directed more toward whether the jurors saw the

23  newspaper article rather than whether they heard a juror announce in the jury room

24  that he read such an article.  These discrepancies raise questions about the

25  credibility of Juror Barber's testimony.  The Court need not determine Juror

26  Barber's credibility, however, because the analysis of each of the juror misconduct

27

28

1   claims is essentially the same, regardless of the credibility determination.[11]

2       The Court must reconcile the following evidence:  (1) Juror Howard's

3   unyielding contention that he informed Juror Barber about the conversation Juror

4   Howard had with his tenant, in which the tenant accused petitioner of having raped

5   her mother and (2) Juror Barber's testimony (a) that he does not recall the

6   conversation with Juror Howard, (b) that even though he does not recall the

7   conversation, it still could have happened and (c) that if the conversation did

8   happen, it was "significant enough that [he] would have remembered it and

9   probably told the judge." (Barber Depo. at 50.)  Respondent argues that petitioner

10  has failed to meet his burden of proof.  He contends that Juror Barber's testimony

11  that he cannot remember the conversation with Juror Howard effectively cancels

12  out Juror Howard's recollection that the conversation occurred.  He also points out

13  that Juror Howard's certainty in his memory that the conversation with Juror

14  Barber took place is of little consequence.  Respondent's position is unavailing.

15  Juror Howard firmly remembers that he informed Juror Barber about the tenant's

16  allegation before the jury returned a penalty phase verdict. (*See, e.g.*, Howard

17  Depo. at 40, 41, 43.

18      Moreover, Juror Howard repeatedly testified that he has harbored guilt for

19  many years because he knew that his initial interaction with his tenant and his

20  subsequent conversation with Juror Barber violated the judge's admonition not to

21  _____

22  [11]    The evidence concerning Claim 4(A)(1) that is attributable *only* to Juror Barber concerns
    the exact timing of Juror Wagner's telling the jury that she consulted her minister over the

23  weekend.  This evidence is not in dispute.  The record makes plain that Juror Wagner consulted
    her minister on Sunday after mass.  The jury reconvened to deliberate the next day and returned

24  a verdict around lunchtime.  Juror Wagner told her fellow jurors that she consulted her minister
    sometime Monday morning.  Depending on whether she shared this information at the start of

25  deliberations or toward the end, the jury had this information for a range of several minutes to
    several hours.  This timeframe makes little, if any, appreciable difference to the analysis.

26  Similarly, a negative credibility determination would not affect Claim  4(A)(2).  Even without
    deducing from Juror Barber's testimony that Juror Thornton probably discussed the contents of

27  the newspaper article, both Jurors Bovee and Thornton testified that they heard the contents of
    the newspaper article discussed in the deliberation room after the guilt phase verdict but before

28  the penalty phase verdict.  Juror Barber's testimony on that point is not required.

1   discuss the case outside deliberations and that these events were potentially

2   harmful to petitioner.  (*See, e.g.*, Howard Depo. at 44 ("But the judge was very,

3   very specific about what we were supposed to do and not supposed to do, and he

4   was very, very firm.  And I tried within—I tried as much as possible to abide by

5   the judge.  I know I—this conversation has sat on my mind for a long time because

6   I know it was probably improper for me to do.  But it did occur."), 74 ("The fact

7   that I shared the information with the juror is what weighed on me.  Because I felt

8   it was improper for me to do that, but it was done.  There was nothing I could do

9   that's going to retract it, but it was done.  But I felt uncomfortable with that.").

10  Petitioner has demonstrated by a preponderance of the evidence that Juror Howard

11  did in fact inform Juror Barber about the conversation with the tenant before the

12  jury returned its penalty phase verdict,  given (1) the force of Juror Howard's

13  unwavering testimony, (2) the strong feelings of guilt Juror Howard has harbored

14  since the trial because he knew that his conversations with both his tenant and

15  Juror Barber were improper and potentially prejudicial because they occurred

16  before the jury returned a penalty phase verdict and (3) the questions surrounding

17  Juror Barber's memory of the events.

18                     **b.     Analysis**

19          The evidence shows that Juror Howard's tenant told Juror Howard that

20  petitioner raped the tenant's mother.  The alleged victim recognized petitioner

21  when she saw his photo in the paper.  Juror Howard adamantly remembers

22  recounting this conversation to Juror Barber after it occurred but before the penalty

23  phase concluded.  Juror Barber does not remember the conversation.

24          Again, the Court must look to a constellation of factors to determine

25  whether Juror Barber's exposure to an accusation that petitioner raped the mother

26  of one of Juror Howard's tenants had a substantial and injurious effect on the

27  verdict.

28          As discussed, there is some dispute about whether Juror Barber actually

174

1    received the information that one of Juror Howard's tenants accused petitioner of

2    raping her mother.  The sum total of the evidence shows, however, that it is more

3    likely than not that Juror Barber learned about Juror Howard's conversation with

4    his tenant, although Juror Barber did not remember it at his deposition in 2000.

5    Second, Juror Barber probably knew about the rape allegation for most or all of the

6    penalty phase.  Third, the parties have not put forth any evidence that the jury

7    discussed or considered this rape allegation, and none of the jurors deposed in

8    2000 recalls discussing this issue in deliberations.  Fourth, Juror Howard testified

9    repeatedly that he informed Juror Barber about the conversation with his tenant

10   before the jury reached a penalty phase verdict.  The timing of his tenant's

11   confrontation with him, and his subsequent conversation with Juror Barber,

12   weighed on him for many years because he knew the conversations were

13   unauthorized communications that took place during trial and that could influence

14   the penalty phase verdict.

15        In addition, the accusation that petitioner raped the mother of one of Juror

16   Howard's tenants was not ambiguously phrased.  The tenant seemed sure that

17   petitioner was the same man who raped her mother.  The tenant's mother identified

18   petitioner based on a photo in the newspaper, close in time to the publication of the

19   article linking petitioner to two other murders.  The accusation was not ambiguous.

20   Moreover, an unproven, unsubstantiated rape allegation with which petitioner was

21   never charged was not otherwise admissible or merely cumulative of other

22   evidence introduced at trial.  Because neither the trial court nor the parties were

23   aware that Juror Howard had this communication with his tenant or that he shared

24   what he heard about petitioner with Juror Barber, the court did not give a curative

25   instruction or take any other step to ameliorate the prejudice to petitioner.

26        Finally, and most importantly, the rape allegation had the potential for great

27   prejudice, given the issues and evidence in the case.  As stated in the Court's order

28   granting an evidentiary hearing, "[e]vidence that [petitioner] has committed a prior

175

1    similar offense is, by its nature, intrinsically prejudicial and necessarily has a

2    substantial and injurious effect on the verdict." (Evidentiary Hearing Order at 12

3    (citing *Jeffries v. Wood*, 114 F.3d at 1491.))  Furthermore, and also as stated in the

4    Court's order granting an evidentiary hearing, "evidence that [p]etitioner had

5    committed a prior rape was directly related to a material aspect of the case."

6    (Evidentiary Hearing Order at 12 (citing *Rodriguez v. Marshall*, 125 F.3d at 744

7    ("Juror misconduct which warrants relief generally relates directly to a material

8    aspect of the case.") (internal quotation marks and citations omitted)).  As the

9    order granting the evidentiary hearing additionally stated, "Prior to deliberations,

10   the trial court instructed the jurors to consider 'the presence or absence of criminal

11   activity by the defendant which involved the use . . . of force or violence' in

12   deciding whether to sentence [p]etitioner to death." (Evidentiary Hearing Order  at

13   12 (citing RT 3682-84).)  If petitioner had committed a prior rape, that certainly

14   would have been evidence of criminal activity involving the use of force or

15   violence.

16        Juror Barber received extraneous, prejudicial information that another

17   woman accused petitioner of raping her after seeing petitioner's picture in the

18   paper.  Petitioner stood trial for raping, sodomizing and murdering two women.

19   The jury heard extensive evidence about the rape allegations.  Juror Barber voted

20   with the other jurors at the guilt phase to convict petitioner of rape, and the

21   circumstances of the crime, including the rapes, were an aggravating factor at the

22   penalty phase.  During the penalty phase, the jurors were instructed to consider the

23   presence or absence of prior criminal acts involving force or violence.

24   Juror Barber's exposure to this additional rape allegation had a substantial and

25   injurious effect on the verdict.  The Constitution protects petitioner's right to be

26   tried by twelve impartial jurors.  While only Juror Barber was exposed to the rape

27   allegation, the Constitution guarantees petitioner's right "to be tried by 12, not 9 or

28   even 10, impartial and unprejudiced jurors." *Parker*, 385 U.S. at 366; *see also*

176

1    *Dyer*, 151 F.3d at 973; *Dickson*, 849 F.3d at  408.

2          Accordingly, the Court GRANTS Claim 4(A)(3).

3          **4.     Jury's understanding of LWOP (Claim 4(A)(4))**

4          In Claim 4(A)(4), petitioner contends that the jury was informed and

5    believed that life without the possibility of parole ("LWOP") did not exclude the

6    possibility of parole, and, accordingly, several jurors voted for the death penalty in

7    order to foreclose the possibility of petitioner's release.

8          Petitioner cites to the declarations of two jurors and the deposition of a third

9    juror in support of this claim.  As discussed, however, juror testimony impeaching

10   a verdict is inadmissible.  *Tanner v. United States*, 483 U.S. 107, 116–27 (1987)

11   (discussing the prohibition on jury testimony to impeach a verdict); Fed. R. Evid. §

12   606(b).  In fact, the Ninth Circuit has excluded juror testimony in a very similar set

13   of circumstances.  *Belmontes v. Brown*, 414 F.3d 1094, 1124 (9th Cir. 2005), *rev'd*

14   *on other grounds by Ayres v. Belmontes*, 549 U.S. 7 (2006)); *McDowell v.*

15   *Calderon*, 107 F.3d 1351, 1365–68 (9th Cir.), *rev'd on other grounds by*

16   *McDowell v. Calderon*, 130 F.3d 833 (9th Cir. 1997) (en banc).  The only possibly

17   applicable exception to the prohibition on juror testimony to impeach a verdict,

18   which allows for evidence of "whether extraneous prejudicial information was

19   improperly brought to the jury's attention," does not apply.  Fed. R. Evid. §

20   606(b)(1); *see also McDowell*, 107 F.3d at 1367 ("The type of after-acquired

21   information that potentially taints a jury verdict should be carefully distinguished

22   from the *general knowledge, opinions, feelings and bias that every juror carries*

23   *into the jury room*.") (emphasis added) (internal quotation marks and citation

24   omitted).  The declarations appear to "reflect[] [the jurors'] belief[s] about the

25   consequences of the sentence of death and [their] motive in voting for it."

26   *McDowell*, 107 F.3d at 1368.  Again, testimony "regarding the deliberative

27   process, the motives of individual jurors and conduct during deliberations is

28   inadmissible."  *Id.* at 1367 (internal quotation marks and citations omitted).

1    Moreover, the trial court instructed the jury, among other things, that "[i]t is
2  the law of [California] that the penalty for a defendant found guilty of murder of
3  the first degree shall be death or confinement in the state prison *for life without*
4  *possibility of parole* in any case in which the special circumstances charged in this
5  case have been specially found to be true."  (14 RT 3681 (emphasis added).)  The
6  trial court also stated, "It is now your duty to determine which of the two penalties,
7  death or confinement in the state prison *for life without possibility of parole*, shall
8  be imposed on the defendant."  (14 RT 3684 (emphasis added).)  The Court must
9  presume that the jurors followed the instructions as given.  *Francis v. Franklin*,
10  471 U.S. 307, 324 n.9 (1985) ("[W]e adhere to the crucial assumption underlying
11  our constitutional system of trial by jury that jurors carefully follow
12  instructions."). Petitioner has failed to demonstrate his entitlement to relief.

13    Accordingly, the Court DENIES Claim 4(A)(4).

14    **5.    Jurors' consideration of mitigating evidence (Claim**
15        **4(A)(5))**

16    In Claim 4(A)(5), petitioner contends that several jurors believed they were
17  required to impose the death penalty if they found petitioner guilty of two murders
18  and, accordingly, those jurors did not consider any mitigating evidence.

19    In support of this claim, petitioner points to a juror declaration.  As stated,
20  the Court cannot consider juror testimony impeaching a verdict.  *Tanner*, 483 U.S.
21  at 116–27; Fed. R. Evid. § 606(b).  Petitioner does not contend that the jury's
22  alleged misunderstanding of the law resulted from the jury's exposure to
23  extraneous prejudicial information improperly brought to its attention.
24  Accordingly, no exception to Federal Rule of Evidence 606(b) applies.

25    Petitioner has failed to demonstrate his entitlement to relief.  Accordingly,
26  the Court DENIES Claim 4(A)(5).

27

28

1
2

**6.      Juror Howes' consideration of mitigating evidence (Claim 4(A)(6) & 4(B)(1))**

3       In Claim 4(A)(6), petitioner contends that Juror Viola Howes decided to
4   vote for the death penalty at the end of the guilt phase and, therefore, did not
5   consider any of the mitigating evidence presented at the penalty phase.  Relatedly,
6   in Claim 4(B)(1), petitioner contends that Juror Howes concealed material
7   information at voir dire when she said that she would give both sides a fair and
8   impartial trial based on the evidence presented, that she would keep an open mind
9   and that she would follow the law as provided by the trial court because she later
10  gave no consideration to the mitigating evidence presented at the penalty phase.

11       Again, petitioner attempts to rely on a juror declaration in support of this
12  claim, and, again, juror testimony impeaching a verdict is inadmissible.  *Tanner*,
13  483 U.S. at 116–27; Fed. R. Evid. § 606(b).  As with Claim 4(A)(5), petitioner
14  does not allege that Juror Howe's failure to follow the instructions as given or to
15  adhere to her oath as a juror had anything to do with her exposure to extraneous
16  prejudicial information improperly brought to her attention.  Thus, no exception to
17  Federal Rule of Evidence 606(b) applies, and petitioner has again failed to
18  demonstrate his entitlement to relief.

19       Accordingly, the Court DENIES Claims 4(A)(6) and 4(B)(1).

20       **7.      Jury's consideration of the Bible (Claim 4(A)(7)(c))**

21       In Claim 4(A)(7)(c), petitioner contends that one or two Bibles were present
22  in the jury room throughout deliberations and that the jurors discussed and
23  considered the Bible in their deliberations.  He argues that this consultation of the
24  Bible during penalty phase deliberations prejudiced him.

25       Petitioner puts forth weak and inadmissible evidence that the jurors had a
26  Bible in the deliberation room and that they actually consulted it.  First, petitioner
27  points to the declaration of Juror Viola B. Howes.  Juror Howes' declaration states
28  in relevant part:

1

2

3

4

> I recall that Louise Wagner had considerable difficulty in imposing the death penalty.  During the deliberations, there was a Bible present which I believe was brought into the jury room by Mrs. Wagner.  I recall statements having been made by Mrs. Wagner regarding her plans to attempt to "save" Mr. Hernandez'[s] soul.

5

6

7

(Howes Decl. p. 2, ¶ 4.)  Read most generously to petitioner, this declaration states only that a Bible was in the deliberation room, but not that the jury looked at or considered it.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Petitioner also alleges that religion played a large role in the trial, compounding whatever error took place with respect to the Bible.  One juror gave defense counsel a Bible at the conclusion of the trial so that he could give it to petitioner. (Wagner Decl. 1 at ¶ 5.)  Another juror recalled that both Jurors Wagner and Glenn held strong religious views.  Specifically, Juror Wagner talked of visiting petitioner to save him.  Juror Glenn sent a short, written prayer into the deliberation room to be read at the beginning of guilt phase deliberations each day when she was an alternate, and she said a short prayer herself at the start of penalty phase deliberations when she was a juror.  (Lamont-Soliman Decl. at ¶¶ 5, 6.) Petitioner argues, "Juror Glenn based her beliefs upon the teachings of the Bible, and shared those beliefs during deliberations.  Glenn believed in the Old Testament teaching of 'an eye for an eye and a tooth for a tooth.'" (Petr's 8/23/07 Brief at 11.)  As support for his characterization of Juror Glenn, petitioner cites to the declaration of J. Bruce Robertson, one of his attorneys on federal habeas. (Petition for Writ of Habeas Corpus (filed in California Supreme Court), Exh. J, at 8.)  That declaration describes a conversation that an investigator had with Juror Glenn, as relayed by the investigator to the attorney.  (*Id.*)  Petitioner relies on quadruple hearsay, and no exception applies.  Finally, petitioner points to the record to show that the prosecutor referred to religion at least eight times in his closing argument. (Petr's 8/23/07 Brief at 11.)  However, petitioner falls far short of showing by a preponderance of the evidence that the jury considered the Bible

1    in its deliberations.  *See Johnson v. Zerbst*, 304 U.S. 458, 468 (1938) (applying the

2    "preponderance of the evidence" standard to an IAC claim on habeas), *overruled*

3    *on other grounds by Edwards v. Arizona*, 451 U.S. 477 (1981).

4         Even if the Court were to presume that a Bible was present in the jury

5    deliberation room at the penalty phase *and* that the jurors consulted the Bible,

6    petitioner likely cannot make a showing of substantial and injurious influence on

7    the penalty phase verdict.  Looking to the *Jeffries* factors, petitioner has not shown

8    that the jurors actually consulted the Bible, nor did he provide a time-frame for

9    how long the jury would have reviewed the Bible or the extent to which the jurors

10   discussed or considered it.  *See Jeffries* 114 F.3d at 1492.  Moreover, petitioner has

11   not shown what Biblical text the jury consulted, let alone whether it was

12   ambiguously phrased.  The passages from the Bible, if the jury actually consulted

13   any, certainly were not otherwise admissible, nor cumulative of other evidence

14   introduced at trial.  The trial court obviously did not issue a curative instruction or

15   take an alternate step to ameliorate the prejudice because it was not aware of the

16   jury's alleged consultation of the Bible.  *See id.* at 1491-92.  While some of the

17   factors suggest that consultation of the Bible may have caused some prejudice to

18   petitioner, he has failed to show that the effect would have been substantial or

19   injurious.  *See, e.g. Fields*, 503 F.3d at 779-83 (holding that an individual's

20   consultation of the Bible, which he used to create a list of reasons "for" and

21   "against" the death penalty that he shared with his fellow jurors during the penalty

22   phase deliberations, did not have a substantial and injurious influence in

23   determining the jury's verdict).

24        Accordingly, the Court DENIES Claim 4(A)(7)(c).

25            **8.    Jurors' confrontation by victims' families outside**

26                   **courtroom (Claim 4(A)(8))**

27        In Claim 4(A)(8), petitioner contends that members of the victims' families

28   confronted jurors in the hallway, telling them to vote for the death penalty.  He

181

1    argues that this encounter caused him prejudice.

2          The trial court held a hearing on this incident.  During the guilt phase,

3    Juror Thornton told the bailiff that a woman approached him and asked him which

4    side he was on.  (11 RT 2760.)  The trial court questioned Juror Thornton, who

5    stated:

6
7                Well, as I was standing outside waiting for the—the door was
           closed here, so we was waiting for someone to open the door to the
8          right, so the lady came up and she says—asked me which side I was
           on, and I say, "I'm not supposed to say anything.  You know, not
9          supposed to talk."  ¶  So then [Juror Thornton] told her, says, "We
           not supposed to say anything to anyone."  ¶  And then she said that, "I hope
10         that—" let's see.  How did she say that?—I—maybe he can think of it, but
           she said something that she hope he gets the maximum or something.  I
11         don't know.

12   (11 RT 2798-99.)  Juror Thornton testified that the woman's statement did not

13   intimidate him.  (11 RT 2799.)  He also testified that the encounter would not

14   affect his decision and that he could disregard the woman's comments.  (11 RT

15   2800.)

16         The trial court also questioned Juror Howard, an alternate.  He testified:

17
18               I was standing there and we were talking, and a lady
           approached [Juror Thornton], and I didn't really hear the discussion,
19         but I heard her ask—I did hear her, and after a couple of minutes
           there, I heard her ask him what his opinion was, how he felt about it,
20         and I could tell me was trying to back off of it.  ¶  He's a quiet person,
           anyhow, and he was trying to get away from it, and I just—I spoke
21         up.  I told her—I says, "We are not allowed to talk about it," and she
           backed off.  ¶  Then somebody else said—another woman that was
22         there said, "Yeah, they are jurors.  They think they are better than
           everybody," and about that time, I knocked on the door so we could
23         get into the jury room, because the courtroom was locked and that
           door was locked.  I knocked on the door, and the typists in there let us
24         in, and I called everybody that was waiting over here at the doorway
           over, and we all went in.

25   (11 RT 2802-03.)  Juror Howard also testified that the exchange would not affect

26   his ability to be fair and impartial and that he had "no problem" with deciding the

27   case solely on the evidence produced at trial.  (11 RT 2803.)  When asked whether

28   he could "put [it] out of his mind," he said, "I don't know about putting it out of

                                            182

1   my mind, but as far as the case, I can decide the case on the evidence that's here."

2   (11 RT 2804.)

3       The trial court also inquired of Juror Bovee:

4

5       [T]his lady just came up—there was two ladies, and they just came walking up, and she said to me, "Do you know where the Hernandez trial is?" and I just pointed to the door. ¶ So then she said

6   to me—she says, "I hope he gets the chair." ¶ So with that, I turned my back to her and walked away, and then she came over and said she

7   was sorry, so I turned my back to her again, and then there was other members of the jury came up and I went on in with them.

8

9   (11 RT 2807.)  She then testified that the woman's statements did not intimidate

10  her and that she could give both sides a fair and impartial trial.  (11 RT 2807-08.)

11      Finally, the trial court questioned the two women who made the statements

12  to the jurors.  (11 RT 2809-17.)  The trial court also informed them that if they

13  spoke to the jurors again, the trial court would fine or incarcerate them.  (11 RT

14  2814, 2816-17.)

15      The Court must look to the many factors already discussed to evaluate the

16  potential prejudice from the women's statements that they hoped petitioner would

17  receive the death penalty and that the jurors thought they were better than

18  everyone else.  The jurors actually received the information, as demonstrated by

19  the trial court's inquiry into the matter.  The trial court excused Jurors Thornton

20  and Bovee before the penalty phase because they were exposed to the newspaper

21  article implicating petitioner in two unrelated murders.  Juror Howard, an

22  alternate, never deliberated at either phase.  Therefore, the jurors had the

23  information from the point the statements were made during the guilt phase

24  through the guilt phase deliberations.  While the jurors received the information

25  before they reached a guilt phase verdict, petitioner has not produced evidence to

26  suggest that the jurors discussed or considered the statements made to Jurors

27  Thornton, Howard and Bovee.  In addition, the statements were not ambiguously

28  phrased, nor did they comprise otherwise admissible or cumulative evidence.

183

While the trial court did not give a curative instruction, it did question the jurors exposed to the statements to determine what effect, if any, the encounter would have on the jurors' ability to decide the case fairly.  The trial court also admonished the two women who made the statements and threatened them with either incarceration or fines if they talked to the jurors or if they discussed the case in front of them.  This admonishment did not serve to ameliorate the statements already made, but would potentially guard against future statements made by the same individuals.

The statement about the jurors thinking they were "better than everybody" seems insufficiently prejudicial to have any effect on the outcome of the trial.  The statement that one of the women hoped petitioner "got the chair," could have had a prejudicially influenced the penalty phase verdict.  However, the three jurors all testified—and the trial court implicitly found that testimony credible—that the statement did not intimidate them, that it would not influence the proceedings and that it would not cause them to act unfairly or partially.  In addition, the statement about the electric chair most likely would have influenced the penalty phase, but none of the jurors who heard the statement deliberated at the penalty phase.  It appears that the statements, while potentially prejudicial, did not have a substantial or injurious effect on the verdict.  An error that does not have a substantial and injurious effect on the outcome of the trial is deemed harmless.  *Eslaminia*, 136 F.3d at 1237 (citing *Bonin*, 59 F.3d at 824).

Accordingly, the Court DENIES Claim 4(A)(8) on the merit.

**E.    Other Claims**

      **1.    Prosecutor's argument concerning age and religion (Claims 7 & 5(D)(28))**

In Claim 7, petitioner argues that the trial court's penalty phase instructions, coupled with the prosecutor's closing argument, improperly permitted the jury to consider petitioner's age at the time of the crime and his religious beliefs as

184

aggravating factors.  He contends that the jury therefore considered constitutionally impermissible factors as aggravating evidence.  In addition, petitioner contends that trial counsel's failure to object to the prosecutor's argument concerning age and religion resulted in IAC.

### a.    Age

Petitioner alleges that the prosecutor argued that petitioner's age could be an aggravating factor by categorizing life without parole as the more severe penalty because petitioner would spend so many years in prison because he was eighteen at the time of the crimes.  Petitioner takes the position that age should be viewed solely as mitigating.  Petitioner also argues that factor (I) is constitutionally overbroad and void for vagueness as applied in this case.

California Penal Code Section 190.3 is California's death penalty statute.  It lists eleven factors that a jury must take into account in determining whether the appropriate punishment in a death-eligible case is the death penalty or life imprisonment without the possibility of parole.  Factor (I) concerns "the age of the defendant at the time of the crime."  Cal. Penal Code § 190.3(I).

The prosecutor listed all of the factors listed in Section 190.3 during his closing argument.  After doing so, the prosecutor stated:

> Now, those are the guidelines and the factors by which we tell our representatives of our community that they are to decide in a particular case the choise [*sic*] to make between life without parole or the death penalty.

> Viewing these various factors, one can see that, from the different philosophical, religious or moral view, one can consider a factor in aggravation or a factor in mitigation.  It's up to the jury, the representatives of this community, to decide that.

> For example, age.  Some people would say that, "Oh, the person is young.  He should not be killed.  That would be too much of a cruel and inhuman punishment for someone so young."

> Another point of view or philosophy would be to lock one who is young up for the rest of their life without the possibility of parole would be too cruel and inhuman to make a person suffer for that long.

185

1        Another way of viewing age could be the person who is
2    elderly, who commits a crime under the conditions in which the
    ultimate penalty can be imposed, if the person doesn't have much
3    longer to live.  The time in which is left to change that individual so
    that he can become a contributing, albeit in prison, member of society
    is too short to change, and, therefore, kill him; or a person who is
4    elderly doesn't have that long to live anyway.  Don't kill him.

5        Whether his age is a factor in mitigation or aggravation really
    depends on a philosophical view, religious or cultural background.
6

7    (14 RT 3633-34.)

8        The Supreme Court has rejected a void-for-vagueness challenge to factor

9    (I).  *Tuilaepa v. California*, 512 U.S. 967 (1994).  In *Tuilaepa*, the petitioner

10   argued that "the age factor is equivocal and that in the typical case the prosecution

11   argues in favor of the death penalty based on the defendant's age, no matter how

12   old or young he was at the time of the crime."  *Tuilaepa*, 512 U.S. at 977.  The

13   Court rejected the petitioner's challenge:

14

15       It is neither surprising nor remarkable that the relevance of the
    defendant's age can pose a dilemma for the sentencer.  But the
16   difficulty in application is not equivalent to vagueness.  Both the
    prosecution and the defense may present valid arguments as to the
17   significance of the defendant's age in a particular case.  Competing
    arguments by adversary parties bring perspective to a problem, and
    thus serve to promote a more reasoned decision, providing guidance
18   as to a factor jurors most likely would discuss in any event.  We find
    no constitutional deficiency in factor (I).
19

20   *Tuilaepa*, 512 U.S. at 977.

21       Petitioner does not just challenge factor (I) as vague on its face but as

22   unconstitutionally vague and overbroad as applied to his case.  A review of the

23   record, however, does not show any significant differences between what

24   petitioner argues here and what the petitioner argued in *Tuilaepa*. As the Supreme

25   Court held in *Tuilaepa*, the prosecutor presented valid arguments about how the

26   jury could view petitioner's age in this case in an attempt to give the jury

27   perspective on how to view the factor.  512 U.S. at 977.  Petitioner has failed to

28   demonstrate that factor (I) was either unconstitutionally overbroad or vague as

1    applied to his particular case.

2         Moreover, the ultimate question the Court must answer in evaluating the

3    effect of the prosecutor's argument is not whether "the prosecutor's remarks were

4    undesirable or even universally condemned," but "whether the prosecutor's

5    comments so infected the trial with unfairness as to make the resulting conviction

6    a denial of due process," *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  It does

7    not appear that the prosecutor's argument deprived the petitioner of a fair trial

8    pursuant to this standard.  The prosecutor's argument about age "did not

9    manipulate or misstate the evidence, nor did it implicate other specific rights of the

10   accused such as the right to counsel or the right to remain silent."  *Darden*, 477

11   U.S. at 182.  As the Supreme Court has held, the age of a defendant at the time of

12   the crime can pose a dilemma to the sentencer, but the prosecutor did not urge the

13   jury to consider age only as an aggravating factor.  Nor did the jury instructions do

14   so.  The prosecutor's argument that petitioner's age might influence the jury's

15   penalty verdict in several different ways was not improper and, therefore, did not

16   infect the trial with unfairness.

17        Accordingly, the Court DENIES this portion of Claim 7.

18                     **b.    Religious views**

19        Petitioner contends that the prosecutor impermissibly encouraged the jury to

20   consider petitioner's religious beliefs as a factor in favor of the death penalty.

21        During the penalty phase, petitioner's mother testified about petitioner's

22   religious beliefs.  Her testimony proceeded as follows:

23

24        Q:    And now you are asking the jury in this case now to save the
               life of your son is that correct?

25        A:    Yes.

26        Q:    And do you feel that your son has some good things that he can
               contribute, even if he is in prison for the rest of his life?

27

28        A:    Yes.

187

Q:   And you feel that he might have an opportunity to be saved?

A:   Yes.

Q:   In other words, saved by—from his religious or his religious scruples may save him, is that correct?

A:   Yes.

Q:   So he might have an opportunity to go to some place in the hereinafter, is that correct?

(13 RT 3349.)  The prosecutor used that testimony during his closing argument to suggest that petitioner's religious beliefs were not a reason to spare his life and exercise mercy.  Instead, the prosecutor argued, a death sentence would not prevent petitioner from being saved and that it actually might give him a definitive time during which he could repent and make peace with God.  Specifically, the prosecutor argued:

> Or you have a variety of philosophies, religious point of view of there is a life after death, as expressed by his mother . . . ¶ From that point of view, religious view of a life hereafter, whether it be reincarnation or Heaven or Hell, whatever it's termed, we all know at least one thing, we're going to die some day.  It's just a question of when.  ¶  It's just a question of what frame of mind and spirit we're in when we die.  ¶  Is it going to come unexpectedly when we have no choice, perhaps at a given moment as to what condition we're in?  ¶ Is it going to be when we know we're going to die, we can know the exact moment, and if you wish to make peace, you can do so?  And if you don't, so be it.  It's your choice.  ¶  I urge you, ladies and gentleman of the jury, that this defendant, there is no reason not to impose the death penalty.

(14 RT 3650-51.)

The California Supreme Court considered and rejected this claim on direct appeal:

> Defendant objects to the prosecutor's reference to defendant's religion.  He argues that the prosecutor was making the "subtle argument" that perhaps because of defendant's religious beliefs, death would be a preferable penalty.  We do not agree.  The prosecutor's discussion of this subject was certainly not gratuitous, as defendant's adoptive mother had testified that her son's life should be spared because he had "some good things that he can contribute, even if he is in prison for the rest of his life."  She agreed with defense counsel's

188

suggestion that defendant might be "saved" due to his religious principles, but the context was in terms of life without possibility of parole, not death.  The prosecutor's remarks responded to this argument in mitigation by asserting, in essence, that defendant's religious beliefs might save him anyway, and hence defendant's alleged religious beliefs did not constitute a reason not to impose the death penalty.  The prosecutor certainly did not argue religion as an aggravating factor of itself militating in favor of the death penalty.

*Hernandez*, 47 Cal. 3d 363 (internal citations omitted).

The jury was instructed pursuant to California Penal Code Section 190.3, which lists the factors the jury must take into account in considering whether to impose the death penalty or life in prison.  (3 CT 682-83 (CALJIC No. 8.84.1, tracking California Penal Code Section 190.3))  Petitioner's religious beliefs are not a statutorily enumerated aggravating factor in Section 190.3.

The most charitable reading of petitioner's claim is that the prosecutor argued that religion was an aggravating factor *and* that petitioner did not do anything to open the door to this characterization.  Because religion does not appear as a factor listed in 190.3, the prosecutor's argument that the jury should view petitioner's religious beliefs as an additional, non-statutory aggravating factor would constitute impermissible or improper argument.  Petitioner's contention fails.

First, the transcript does not reflect that the prosecutor argued that petitioner's religious beliefs were an aggravating factor.  Instead, the record shows that the prosecutor argued that the jury could view petitioner's religious beliefs as a mitigating factor but still decide that the death penalty did not prevent petitioner from being saved.  In other words, the jury could view petitioner's religious convictions and his desire for repentance as mitigating, but could still vote for the death penalty because the death penalty by itself would not act as an impediment to petitioner being saved.  *See Hernandez*, 47 Cal. 3d 363 ("The prosecutor certainly did not argue religion as an aggravating factor of itself militating in favor of the death penalty.").

Second, and more definitive, petitioner opened the door to the prosecutor's

189

1    argument about religion by putting on his mother's testimony.  Petitioner put his

2    mother on the stand to testify that petitioner's religious convictions qualified as

3    mitigating pursuant to factor (k).  Cal. Pen. Cod § 190.3 (k) ("Any other

4    circumstance which extenuates the gravity of the crime even though it is not a

5    legal excuse for the crime.")  The line of questioning that defense counsel engaged

6    in with petitioner's mother shows that petitioner meant his mother's testimony to

7    provide the jury with an additional reason to spare his life:  his religious beliefs.

8    (13 RT 3349.)  The prosecutor's argument, therefore, appears to qualify as a

9    proper rebuttal to the mitigating evidence petitioner presented during the penalty

10   phase.  *See People v. Rundle*, 43 Cal. 4th 76, 192 (2008) ("No misconduct

11   occurred . . . . [T]he prosecutor's comment constituted proper rebuttal to the

12   character evidence presented by the defense in mitigation, and not a suggestion

13   that this was an aggravating factor."), *overruled on other grounds by People v.*

14   *Doolin*, 45 Cal. 4th 390, 421 n.22 (2009)  Petitioner fails to cite to any

15   case—federal or otherwise— that would support a different conclusion.

16          Even if the prosecutor erred by attempting to re-characterize petitioner's

17   mitigating testimony about his religious beliefs, the Court again must determine

18   whether the prosecutor's argument so infected the trial with unfairness that it

19   resulted in a denial of petitioner's due process rights.  *Darden*, 477 U.S. at 181.

20   As with the prosecutor's argument concerning petitioner's young age at the time of

21   the crime, the prosecutor did not deprive petitioner of a fair trial.  The prosecutor's

22   statement to the jury that a death sentence would not prevent petitioner from being

23   saved "did not manipulate or misstate the evidence."  *Darden*, 477 U.S. at 182.

24   The prosecutor offered the jurors a way to acknowledge or even accept petitioner's

25   religious views but still vote for the death penalty.  Because the prosecutor appears

26   to have engaged in a proper rebuttal argument, petitioner cannot establish that the

27   argument infected his trial with unfairness, and, accordingly, petitioner did not

28   suffer a denial of his due process rights.

1    Accordingly, the Court DENIES this portion of Claim 7.

2          **c.    IAC (Claim 5(D)(28)**

3    Petitioner argues that trial counsel failed to object to the prosecutor's

4    argument that age and religion could be viewed as aggravating or mitigating.

5          To bring a successful IAC claim, petitioner must show that counsel

6    performed deficiently and that this deficient performance prejudiced petitioner.

7    *Wiggins*, 539 U.S. at 521.

8          Petitioner has failed to show deficiency with respect to counsel's failure to

9    object to the prosecutor's argument about either age or religion.  As discussed, the

10   prosecutor did not err in arguing that petitioner's age could qualify as either an

11   aggravating or a mitigating factor, nor did he err in arguing in rebuttal that the jury

12   could accept petitioner's religious beliefs as a mitigating factor but still vote in

13   favor of the death penalty.  Petitioner cannot show that counsel performed

14   deficiently by failing to object to the prosecutor's argument, when that argument

15   was not erroneous.  Even if the Court were to presume that counsel performed

16   deficiently by failing to object to the prosecutor's argument, petitioner has failed

17   to make any showing of prejudice related to counsel's failure to object.

18         Accordingly, the Court DENIES Claim 5(D)(28).

19         **2.    Prosecutor's argument regarding the "ultimate penalty"**

20              **(Claims 8 & 5(D)(29))**

21         In Claim 8, petitioner contends that the prosecutor improperly argued that

22   the jury could decide that life imprisonment was the ultimate penalty, an argument

23   which minimized the jury's sense of responsibility.  Accordingly, the jury imposed

24   the death penalty in an arbitrary and capricious manner and deprived petitioner of

25   his right to a fair, reliable and non-arbitrary penalty phase verdict.  Relatedly, in

26   Claim 5(D)(29), petitioner contends that trial counsel failed to object to the

27   prosecutor's argument that life without possibility of parole, rather than death, was

28   the ultimate penalty.

191

### a.      Prosecutor's argument

In his closing argument, the prosecutor stated the following:

>       In this society, we have set up a condition or sanction that if you take another person's life under certain conditions, that sanction will be the ultimate penalty.  Now, I say ultimate penalty because the problem with our society is we come from such diverse cultural backgrounds, philosophical backgrounds, religious backgrounds and theoretical backgrounds that we can't decide what is the ultimate penalty for taking another person's life under certain conditions.

>       There are those in our society that believe, if you take another person's life, you pay for it with your life:  a tooth for a tooth, an eye for an eye.  There are those that, for whatever reasons, feel that perhaps the ultimate penalty is torture, locking somebody up as an animal in a cage for the rest of their life.

>       It varies depending on your philosophy, depending upon your background, your cultural background, your religious attitudes, your religious views.  All of those things vary.

>       That's our problem in society, is we cannot decide what is the ultimate penalty, but what our society, our community has done, has said, that taking into consideration our various views, philosophies, religious backgrounds, we at least can decide that the ultimate penalty is either death or locking a person up in a cage for the rest of their life, in prison without possibility of parole for the rest of their life.

>       Now in setting up these rules of society, our society, our community has decided that the person or persons that will enforce that sanction will be the community itself, ala the jury members, the people selected from the community.

>       Now, because we have a vast variety of backgrounds in what is the ultimate penalty, we have, and you will notice, in voir dire eliminated those on the extremes, those that will say, "If you kill, you die," or those that say, "I will never kill."  We have attempted to bring within our definition of ultimate penalty those persons that will view society's ultimate penalty from various points of view and not automatically decide which within those ultimate penalties will be imposed.

>       So we have selected, presumably, as best we can, a cross section of the members of our community, twelve jurors coming from various walks of life, various cultural backgrounds, various philosophical backgrounds, various religious backgrounds in order to

1    decide this.

2         Now, society has stated that our ultimate penalty will satisfy
3    our conditions of punishment, protection of society, because, if you
     lock a person up or you kill them, society will be protected.
4
     (14 RT 3625-28. )
5
6         Petitioner relies on *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985), in

7    support of his position.  He cites it to suggest that the prosecutor erred in arguing

8    to the jury that a life sentence without the possibility of parole, rather than a death

9    sentence, might be the ultimate penalty.  In fact, *Caldwell* does not stand for that

10   proposition.  In *Caldwell*, the Supreme Court held that the prosecutor erred by

11   implying to the jury that it was not making the ultimate decision to sentence a

12   defendant to death because an appellate court would review the decision.  *Id.*  The

13   Court held that "it is constitutionally impermissible to rest a death sentence on a

14   determination made by a sentencer who has been led to believe that the

15   responsibility for determining the appropriateness of the defendant's death rests

16   elsewhere."  *Id.*  The holding in *Caldwell* differs markedly from the situation

17   petitioner challenges here:  the prosecutor's argument that life imprisonment,

18   rather than a death sentence, may be the ultimate penalty.  Petitioner has not

19   pointed to any source of law prohibiting or even questioning the prosecutor's
     argument that life in prison might be the ultimate penalty.
20
21        Even if the Court presumes error, petitioner cannot obtain relief unless the

22   prosecutor's argument so infected the trial with unfairness that it resulted in a

23   denial of petitioner's due process rights.  *Darden*, 477 U.S. at 181.  Petitioner has

24   failed to show how the prosecutor's argument was so unfair that it violated his due

25   process rights.  In fact, petitioner's briefing on this claim includes only one

26   sentence with a citation to *Caldwell v. Mississippi*, a case that is not on point.

27   (Petr's 8/23/07 Brief at 51.)  Petitioner states only that the prosecutor erred by

28   arguing that life imprisonment may be the ultimate punishment, and he excludes
     any discussion of prejudice in his briefing. Given the circumstances of the crimes,

1   it seems unlikely that the prosecutor's argument about life imprisonment had any

2   appreciable affect on the outcome of the penalty phase.

3        Accordingly, the Court DENIES Claim 8.

4        **b.   IAC**

5        In addition to his claim that the prosecutor erred in arguing that death is the

6   ultimate punishment, petitioner also brings an IAC claim, alleging that counsel

7   "failed to object to the prosecutor's argument that life without possibility of

8   parole, rather than death, was the ultimate penalty." (Pet. at 51.) Petitioner's IAC

9   claim fails.

10       Again, petitioner must show deficiency and prejudice. *Wiggins*, 539 U.S. at

11  521. Petitioner has failed to establish either.

12       Petitioner has not shown that the prosecutor erred by arguing that life

13  without parole may be the true ultimate penalty in this case, and, as discussed, his

14  reliance on *Caldwell* in order to make that point is misplaced. Petitioner's IAC

15  claim based on counsel's failure to object to the prosecutor's argument, which

16  petitioner has not shown was erroneous, likewise fails. It would be very difficult

17  for petitioner to establish that counsel performed deficiently by failing to object to

18  a line of argument that was not erroneous. Even if the Court presumed that the

19  prosecutor erred by making such an argument, and, therefore, that trial counsel

20  erred by failing to object to that line of argument, petitioner has not shown by a

21  reasonable probability that but for counsel's failure to object, the jury would have

22  voted for life without parole. In fact, objecting to the prosecutor's line of

23  argument may have called more attention to the prosecutor's argument about the

24  relative severity of the two punishments. Even if it did not bring unwanted

25  attention to the prosecutor's argument, petitioner has not argued convincingly that

26  counsel's objection to the argument, which the trial court may have overruled,

27  would have overcome the aggravating evidence in this case.

28       Accordingly, the Court DENIES this portion of Claim 5(D)(29).

### 3.   Prosecutor's argument about aggravating and mitigating factors (Claim 11(1)-(2))

In Claims 11(1) and 11(2), petitioner alleges that the prosecutor improperly argued that the factors set forth in subsections (a) through (k) of California Penal Code Section 190.3 could be considered aggravating or mitigating.  Petitioner argues that factors (d) through (k) can only be mitigating pursuant to California law.  Relatedly, in Claim 5(D)(28), petitioner brings an IAC claim based on trial counsel's failure to object.

Petitioner contends that "the prosecutor urged the jurors to apply their own subjective definition of aggravation and mitigation, based on their philosophical or religious views and cultural backgrounds."  (Petr's 2/1/08 Brief at 7.)  As discussed, the Court is not called upon to evaluate whether "the prosecutor's remarks were undesirable or even universally condemned."  *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted).  Rather, the relevant inquiry is "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Petitioner cannot show that the prosecutor's closing argument denied him a fair trial.  *See Darden*, 477 U.S. at 182 (holding that the prosecutor's argument did not manipulate or misstate evidence, nor did it implicate other specifically enumerated rights of the accused).  First, petitioner's characterization of the prosecutor's argument is questionable.  In the portions of the record cited to by petitioner, the prosecutor only discusses factor (I), which relates to age.  (14 RT 3633-34; *see also People v.* Hernandez, 47 Cal. 3d at 364 (describing the challenged portions of the prosecutor's closing argument as discussing only age and finding "no reasonable probability that any potential error in the prosecutor's remarks affected the jury's sentencing decision"); Claim 7, *supra*,  (denying petitioner's claims challenging prosecutor's argument regarding age and religion)).  In addition, a review of the transcript

1   shows that the prosecutor did not catalogue each factor in the statute and then

2   argue that the jury should consider the absence of evidence for any of those factors

3   as aggravating.  Nor did the prosecutor suggest that the jury should consider a

4   particular mitigating factor aggravating.  Moreover, the instructions given at trial

5   properly directed the jury's discretion at sentencing.  (*See infra* Discussion of

6   Claims 11(3)-11(5).)       Petitioner's related IAC claim challenging counsel's

7   failure to object to the prosecutor's argument cannot prevail.  Because the

8   prosecutor's argument did not violate petitioner's constitutional rights, trial

9   counsel cannot be deficient for failure to object to the argument.  Even if the Court

10   presumed deficiency, petitioner has made no showing of prejudice.  By extension,

11   the failure to object to permissible or proper argument cannot form the basis of an

12   IAC claim.  *Cf. United States v. Bosch*, 914 F.2d 1239, 1247 (9th Cir. 1990)

13   (holding that failure to object to admissible evidence was not unreasonable or

14   prejudicial).

15          Accordingly, the Court DENIES Claims 11(1), 11(2) and 5(D)(28).

16          **4.      Jury instructions regarding the absence of evidence (Claims**

17                  **11(3)-(5))**

18          In Claims 11(3) through 11(5), petitioner alleges that the trial court erred in

19   failing to instruct the jury that the absence of evidence as to any factor rendered

20   that factor irrelevant.  In other words, petitioner claims that the prosecutor's

21   argument that all of the factors could be aggravating or mitigating, challenged in

22   Claim 11(1) and 11(2), was exacerbated by the absence of an instruction stating

23   that the lack of evidence on any factor rendered that factor irrelevant rather than

24   aggravating.

25          The following instruction was given at trial:

26

27               Under the laws of this state, you must now determine which of
          the said penalties shall be imposed on the defendant.

28
                 In determining which penalty is to be imposed on defendant, you

shall consider all of the evidence which has been received during any part of the trial of this case [except as you may be hereafter instructed].  You shall consider, take into account and be guided by the following facts, *if applicable*:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects of intoxication.

(I) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

(3 CT 631-633 (former CALJIC 8.84.1) (emphasis added); 14 RT 3681-83.)

The law of the Ninth Circuit forecloses petitioner's claim.  In *Bonin v.*

197

*Calderon*, the petitioner challenged jury instructions that "listed the statutory mitigating circumstances and instructed the jury to consider the listed factors that were applicable." *Bonin*, 59 F.3d at 848. The petitioner challenged the instruction as allowing the jury to consider the absence of numerous possible mitigating circumstances to be aggravating circumstances. *Id.* The Ninth Circuit held that "[t]he cautionary words 'if applicable' warned the jury that not all of the factors would be relevant and that the absence of a factor made it inapplicable rather than an aggravating factor." *Id.*; *see also Williams v. Calderon*, 52 F.3d 1465, 1481 (9th Cir. 1995) (upholding as constitutional an instruction that read to the jury the entire list of factors relevant to the sentencing decision, even when some did not apply given the inclusion of the words "if applicable"). The jury instruction used at trial did not violate petitioner's right to a fair, reliable and non-arbitrary penalty determination.

Accordingly, the Court DENIES Claims 11(3), 11(4) and 11(5).

### 5. Confession coerced by threat of polygraph
### (Claims 5(D)(14), 27(7)-(8), 27(12) & 28)

In Claims 27(7) and 27(8), petitioner alleges that his confession was coerced by improper and highly suspect use of a polygraph examination. Petitioner also argues that his mental state, age and the general circumstances at the time, coupled with the threat of a polygraph examination, coerced petitioner to confess. In Claim 28, petitioner argues that his conviction should be vacated because his confession was involuntary and, therefore, his confession was improperly admitted against him at the guilt and penalty phases of his trial. In Claim 27(12), petitioner argues that he was denied the opportunity to fully and fairly litigate these challenges to his confession. The Court denied respondent's motion for summary judgment on these claims. (Summary Judgment Order at 86.) In Claim 5(D)(7), petitioner contends that trial counsel's failure to discover the true nature and extent of petitioner's disabilities caused counsel to forego additional meritorious grounds in

198

1  support of the motion to suppress, specifically that petitioner was incompetent to

2  confess.  In Claim 5(D)(14), petitioner contends that trial counsel unreasonably

3  failed to object to the admissibility of petitioner's confession because it was

4  unreliable and inaccurate due to petitioner's mental impairments.  Petitioner also

5  alleges that trial counsel failed to present evidence or argue that damaging

6  admissions about the circumstances of the offense were inconsistent with other

7  evidence.

8          Petitioner does not seem to claim that any problem existed with respect to

9  the waiver of his rights.  Instead, he appears to argue that several circumstances,

10  coupled with his young age and mental infirmity, made his confession involuntary.

11  He contends that after being interrogated for some time, he was taken to a

12  polygraph examiner "where he was told the truth would be learned."  (Pet. at 142.)

13  Petitioner confessed shortly thereafter without ever taking a polygraph exam.

14  Petitioner argues that the police used the threat of a polygraph exam as an

15  investigative technique designed to elicit a confession.  (*Id.*)  Moreover, petitioner

16  argues that he confessed because he held a false expectation of leniency.

17  Petitioner claims the police implied that he would be given  psychiatric treatment

18  and that he would spend only ten to fifteen years in a mental hospital in exchange

19  for his statement.  (Petr's 8/23/08 Brief at 74.)

20          The Court must determine whether petitioner's confession was voluntary.

21  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) ("'Is the confession the

22  product of an essentially free and unconstrained choice by its maker? . . . If it is

23  not, if his will has been overborne and his capacity for self-determination critically

24  impaired, the use of his confession offends due process.'") (quoting *Culombe v.*

25  *Connecticut*, 367 U.S. 568, 602 (1961)).  The voluntariness of petitioner's

26  confession raises a legal question rather than "one of simple historical fact."

27  *Miller v. Fenton*, 474 U.S. 104, 115-16 (1985); *see also Arizona v. Fulminante*,

28  499 U.S. 279, 287 (1991).  The ultimate legal issue of voluntariness differs from

1   "subsidiary factual questions," for example, "whether in fact the police engaged in

2   the intimidation tactics alleged." *Miller*, 474 U.S. at 106, 108 n.3, 110-12; *see also*

3   *Rupe*, 93 F.3d at 1444 ("[S]ubsidiary questions, such as the length of the

4   interrogation or defendant's prior experience with the legal system, are factual

5   matters on which [the Court] defer[s] to the state court").

6         In considering the voluntariness of petitioner's confession, the Court must

7   assess "the totality of the surrounding circumstances," which includes "both the

8   characteristics of the accused and the details of the interrogation." *Bustamonte*,

9   412 U.S. at 226.  The key component of a finding of involuntariness is "police

10  overreaching" or "coercive police misconduct." *Colorado v. Connelly*, 479 U.S.

11  157, 164 (1986); *see also Hutto v. Ross*, 429 U.S. 28 (1976) (per curium) ("The

12  test is whether the confession was extracted by any sort of threats or violence, [or]

13  obtained by any direct or implied promises, however slight, [or] by the exertion of

14  any improper influence.") (internal quotation marks and citation omitted).  In fact,

15  "[a]bsent police conduct causally related to the confession, there is simply no basis

16  for concluding that any state actor has deprived a criminal defendant of due

17  process of law." *Id.*

18        Inducements generally serve to invalidate a confession.  *See, e.g.*, *Brady v.*

19  *United States*, 397 U.S. 742, 754 (holding that when the accused is "in custody,

20  alone and unrepresented by counsel . . . even a mild promise of leniency [has been]

21  deemed sufficient to bar the confession . . . because defendants at such times are

22  too sensitive to inducement and the possible impact on them too great to ignore

23  and too difficult to assess."); *see also Williamson v. United States*, 512 U.S. 594,

24  620 (1994) ("[I]n cases where the statement was made under circumstances where

25  it is likely that the declarant had a significant motivation to obtain favorable

26  treatment, as when the government made an explicit offer of leniency in exchange

27  for declarant's admission of guilt, the entire statement should be inadmissible.")

28  (Kennedy, J., concurring); *Haynes v. Washington*, 373 U.S. 503, 505-13 (1963)

(finding confession involuntary where police promised the accused that he could call his wife after he was booked and told him he would be booked after he gave a signed confession); *but see United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) (noting that the Circuit has held that "the police generally may offer to tell the prosecutor about the defendant's cooperation and suggest that cooperation may increase the likelihood of a more lenient sentence").

The uncontroverted facts include the following:  The police arrested petitioner at his father's home at two o'clock in the afternoon.  (2 RT 430A.)  The police Los Angeles for the Long Beach police station an hour later.  (2 RT 346A, 439A.)  The officers arrived with petitioner in Long Beach at twenty minutes to four and interviewed petitioner for thirty-five minutes.  (2 RT 348A.)  Petitioner agreed to take a polygraph exam.  (2 RT 349A, 440A, 441A.)  Someone took petitioner to the polygraph office at twenty minutes to five, less than three hours after petitioner's arrest.  (2 RT 441A.)   According to the polygraph examiner, petitioner said that understood that he was not required to take a polygraph examination.  (2 RT 415A.)  The examiner told petitioner what kinds of questions would be asked, such as, "Do you know for sure who caused the death of either of these girls?" and "Did you in any way cause the death of either [of] those girls?" (2 RT 415A, 442A.)  Petitioner waived his rights.  (2 RT 415A, 442A.)  Petitioner confessed.  (2 RT 415A-16A, 444A.)

Some of the events are disputed.  The examiner testified that he told petitioner that he (the examiner) was not there "to BS" petitioner in any way. (2 RT 415A.)  However, petitioner testified that the examiner told him that the polygraph was just a formality because the examiner could tell by petitioner's slumped posture that petitioner was guilty.  (2 RT 442A.)  Petitioner also testified that "the hint and suggestion" of psychiatric help "was there" if he cooperated. (2 RT 446A.)  However, both interrogating officers testified that they did not make any statements to petitioner about him being crazy or needing psychiatric care or

1   help.  (2 RT 363A-64A, 495A.)  Officer Colette also testified that he and Officer

2   Wren did not tell petitioner that the courts were lenient with people who

3   committed crimes when they were crazy or that those individuals probably would

4   be sent to psychiatric facilities.  (2 RT 364A, 495A; *see also* 2 RT 352A (officer

5   testifying that petitioner's ability to call his father was not contingent on a

6   confession, stating "this isn't a deal.")

7        Petitioner has failed to show by a preponderance of the evidence that the

8   officers induced him to confess.  *See Johnson*, 304 U.S. at 468 (applying the

9   "preponderance of the evidence" standard on habeas).  The only evidence of

10  inducement is petitioner's testimony during a hearing on a motion to suppress

11  petitioner's confession, which took place at the time of trial.  The interrogating

12  officers testified at that hearing and disputed petitioner's version of events.

13  Petitioner has not offered any evidence of inducement on habeas and accordingly

14  has failed to met his burden of showing that the officers induced him to confess by

15  implying he would receive treatment, a shorter sentence or both if he confessed.

16       The totality of the circumstances lead to a conclusion that petitioner

17  confessed voluntarily.   Petitioner has shown neither inducement nor coercion.

18  *See, e.g.*, *Fulminante*, 499 U.S. at 287-88 (holding that the interrogating officer's

19  promise to protect the defendant from a credible threat of physical violence

20  rendered the confession involuntary); *Culombe*, 367 U.S. at 631-32 (holding

21  confession involuntary where accused was held for four days before confession,

22  questioned every day with the stated intention of obtaining a confession, not

23  advised of his right to remain silent, denied a lawyer even though he requested one

24  and confronted with his wife and daughter at the police station in an encounter that

25  left him sobbing), *Reck v. Pate*, 367 U.S. 433, 440 (1961) (invalidating confession

26  as involuntary where accused was held without adequate food, without counsel,

27  without the assistance of family or friends, incommunicado and physically

28  weakened and in intense pain); *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)

1  (finding coercion where the prisoner was insane and incompetent at the time of

2  confession and where the interrogation lasted eight to nine hours, the accused was

3  without counsel or an advocate and the sheriff, rather than the accused, composed

4  the confession); *Payne v. Arkansas*, 356 U.S. 560, 561 (1958) (finding confession

5  involuntary where "a mentally dull 19-year-old youth" was arrested without a

6  warrant, not advised of his rights to remain silent or to counsel, held for three days

7  without counsel or an advisor, prohibited from making a phone call, denied food

8  for long periods of time and told by the chief of police that if he confessed, the

9  police would attempt to protect him from an angry mob), *overruled on other*

10  *grounds by Fulminante*, 499 U.S. at 310; *Watts v. Indiana*, 338 U.S. 49, 53-54

11  (1949) (holding that solitary confinement for the first two days following arrest,

12  coupled with interrogation for five nights, intermittent daytime interrogations, no

13  hearing before a magistrate, no advisement of constitutional rights, no counsel or

14  professional aid and inadequate rest and food resulted in a confession secured

15  "through the pressure of unrelenting interrogation"); *see also Culombe*, 367 U.S. at

16  584 622 (cataloguing the kinds of factual scenarios that support a finding of

17  involuntariness, including physical brutality, threats of physical brutality, "terror-

18  arousing" interrogation, the shuttling of prisoners from jail to jail, torture, sleep

19  deprivation, starvation, threat of a lynch mob or "gruel[]ing, intensely unrelaxing

20  questioning over protracted periods").

21      Because "coercive police activity is a necessary predicate to the finding that

22  a confession is not 'voluntary' within the meaning of the Due Process Clause of

23  the Fourteenth Amendment," petitioner's claim fails. *Connelly*, 479 U.S. at 167.

24  Petitioner's argument that his mental state and age at the time of the confession

25  militate in favor of a finding of involuntariness also fall short. "[W]hile mental

26  condition is surely relevant to an individual's susceptibility to police coercion,

27  mere examination of the confessant's state of mind can never conclude the due

28  process inquiry." *Connelly*, 479 U.S. at 165. Petitioner has failed to show

1  coercion by the police, a necessary predicate to relief.

2       In addition, petitioner's claim of IAC fails.  Petitioner has not put forth any

3  evidence that his mental condition prevented him from confessing voluntarily, or

4  that his condition resulted in an unreliable or inaccurate confession.  Counsel,

5  therefore, was not deficient for failing to argue that petitioner's mental deficiencies

6  resulted in an inaccurate or unreliable confession.  Furthermore, without evidence

7  that petitioner was too mentally infirm to make a valid confession, an argument

8  that the confession was invalid on that basis, likely would have failed.

9       In Claim 27(12), petitioner alleges that "[i]n the proceedings below, [he]

10  was not given an opportunity to full and finally litigate these issues, which call

11  into question petitioner's confession and the veracity and credibility of the lead

12  investigator" fails.  (Pet. at 143.)  Petitioner litigated this issue in the trial court at a

13  hearing on the motion to suppress his confession.  Petitioner and the interrogating

14  officers testified at the hearing.  Petitioner has failed to allege in what way the

15  hearing was incomplete or unfair.  His conclusory allegations do not warrant relief.

16  *Jones*, 66 F.3d at 204-05 (holding that conclusory allegations without specific

17  factual allegations are insufficient to support habeas relief); *cf. Allison*, 431 U.S.

18  63, 75 n.7 (1977) ("[T]he petition is expected to state facts that point to a real

19  possibility of constitutional error.") (citation and internal quotation marks

20  omitted).

21       Accordingly, the Court DENIES Claims 5(D)(7), 5(D)(14), 27(7), 27(8),

22  27(12) and 28.

23           **6.**    **Prosecutorial and police overreaching (Claims 27(10) &**

24             **27(13)**

25       In Claims 27(10) and 27(13), petitioner contends that prosecutorial and

26  police overreaching resulted in his unfair conviction.

27       Specifically, petitioner contends in Claim 27(10) that the "police and

28  prosecution failed to provide trial counsel with policy reports, investigation

1   reports, crime lab reports, and other pertinent and perhaps exculpatory

2   documentation after their initial production of material to trial counsel, despite

3   their continuing obligation to do so." (Pet. at 143.)  In Claim 27(13), petitioner

4   alleges that the "overreaching of the police and prosecution is further evidenced by

5   the destruction of some forensic evidence and documentation, including a number

6   of test tubes." (Pet. at 144.)  Petitioner fails to point to the reports and exculpatory

7   documentation the police and prosecution failed to turn over.  He also fails to

8   allege what test tubes were destroyed.  Petitioner's conclusory allegations cannot

9   support habeas relief.  *Jones*, 66 F.3d at 204-05 (holding that conclusory

10  allegations without specific factual allegations are insufficient to support habeas

11  relief).  Moreover, "the petition is expected to state facts that point to a real

12  possibility of constitutional error."  *Allison*, 431 U.S. 63, 75 n.7 (1977) (citation

13  and internal quotation marks omitted).

14          Accordingly, the Court DENIES Claims 27(10) and (13).

15                  **7.      Instructional error (Claim 30**)

16          It is unclear what petitioner seeks in Claim 30.  It appears that petitioner

17  argues one of two things.  Most simply, he may argue that he is entitled to a new

18  penalty phase trial if the Court grants penalty phase relief.  Alternatively, he may

19  bring a substantive claim that he is entitled to a new penalty phase trial because the

20  California Supreme Court invalidated one of his multiple murder special

21  circumstances, and the jury's erroneous consideration of two multiple murder

22  special circumstances—coupled with jury instructions that included language that

23  the jury "shall" impose death if the aggravating circumstances outweighed the

24  mitigating circumstances—violated his Eighth and Fourteenth Amendment rights.

25          In denying summary judgment to respondent on this claim, the Court read

26  the claim as petitioner asking for a new penalty phase trial if the Court grants

27  penalty relief to petitioner.  The relevant part of the order states:

28                  First, the claim will not become relevant until and unless the

                                              205

1
2
3
4
5
6
7
8
9
10

> Court vacates one of the petitioner's convictions. The Court can address the claim at that time. Second, petitioner's claim is supported by common sense. The jury decided to impose the death penalty based on the circumstances of the crime and the special circumstances found to be true. If petitioner's conviction for one of the murders, rapes, or sodomies was overturned, it is reasonably likely that the jury, without the evidence of one or more of those crimes presented to them, would not have voted to impose a death sentence. Even though he is under two separate death sentences, the evidence of the crimes was introduced in one trial and the jury relied on the evidence of two murders, two rapes, and two sodomies to vote for the death penalty. It is difficult to state with certainty that the jury would have made the same decision had it been presented with only one set of crimes. Finally, petitioner's claim is intelligible. While he presents no authority to support the request, it is clear what he is asking for—a new penalty trial if any of his convictions are overturned.

11

(Summary Judgment Order at 90.)

12
13
14
15
16
17
18

It seems however, that petitioner meant to make a more nuanced argument advanced in the briefing filed on August 23, 2007. The crux of petitioner's contention appears to be that (1) because the California Supreme Court invalidated one of the multiple murder special circumstances found true by the jury *and* (2) because the trial court gave the jury an instruction that appeared to require the jury to impose the death penalty if the aggravating factors outweighed the mitigating factors by using "shall" language, petitioner is entitled to a new penalty phase trial.

19
20
21
22
23
24

In support of this argument, petitioner relies on several sources. First, he points to the jury instructions issued at trial. The jury received CALJIC No. 8.84.1, which tracks California Penal Code 190.3, the California death penalty statute. (3 CT 682-83.) The jury also received a modified version CALJIC 8.84.2.1, which stated:

25
26

> It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant.

27
28

> After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and

1   mitigating circumstances upon which you have been instructed.

2         If you conclude that the aggravating circumstances outweigh
3   the mitigating circumstances, you *shall* impose a sentence of death.
    However, if you determine that the mitigating circumstances
4   outweigh the aggravating circumstances, you *shall* impose a sentence
    of confinement in the state prison for life without possibility of
5   parole.

6   (3 CT 684-85 (emphasis added).)  Petitioner argues that the instructions gave the

7   jury the impression that it had to mechanically weigh the aggravating factors

8   against the mitigating factors and that it had no choice but to impose the death

9   penalty if the aggravating factors outweighed the mitigating factors.

10        In *Boyde v. California*, the Supreme Court held that the very same "shall"

11  language used during petitioner's trial did not violate the Eighth Amendment.  494

12  U.S. 370, 376-77 (1989).  The Court held that *Bylstone v. Pennsylvania*, 494 U.S.

13  299 (1990), decided the same term, foreclosed  petitioner's claim in *Boyde*.

14  *Boyde*, 494 U.S. at 377.  "In *Blystone*, [the Supreme Court] rejected a challenge to

15  an instruction with similar mandatory language, holding that '[t]he requirement of

16  individualized sentencing in capital cases is satisfied by allowing the jury to

17  consider all relevant mitigating evidence.'"  *Boyde*, 494 U.S. at 377 (quoting

18  *Blystone*, 494 U.S. at 307).  The Supreme Court held that "there is no

19  constitutional requirement of unfettered sentencing discretion in the jury, and

20  States are free to structure and shape consideration of mitigating evidence 'in an

21  effort to achieve a more rational and equitable administration of the death

22  penalty.'"  *Boyde*, 494 U.S. at 377 (quoting *Franklin v. Lynaugh*, 487 U.S. 164,

23  181 (1988) (plurality opinion)).

24        In accordance with *Boyde*, and as admitted by the parties, the penalty phase

25  instructions used at petitioner's trial allowed the jury to consider mitigating

26  evidence.  (3 CT 682-85.)  Moreover, a review of the closing arguments shows that

27  both the prosecutor and defense counsel discussed a number of things the jury

28  should consider in making its decision, implying that the process did not involve a

1   straightforward, mechanical comparison of the weight of the mitigating factors

2   against the weight of the aggravating factors.[12]

3        A review of the transcript is not dispositive in this case, however.  Petitioner

4   not only challenges the mandatory "shall" language in the instruction, but also the

5   instruction's language *combined with* the improper consideration by the jury of

6   two multiple murder special circumstances, one of which the California Supreme

7   Court invalidated on appeal.  *Hernandez*, 47 Cal. 3d at 357.  In finding error but no

8   prejudice, the California Supreme Court concluded as follows:  "The jury was not

9   told to mechanically count up aggravating factors.  It was not confused as to the

---

[12]   The prosecutor emphasized the importance of each juror's diverse philosophies, views and experiences in the deliberative process.  (14 RT 3625, 3626, 3627, 3628-29, 3630, 3633.)  While the prosecutor repeated the "shall impose" language contained in CALJIC 8.84.2, the prosecutor also stated that the decision between the death penalty and life imprisonment was not an automatic one.  (*Id.* at 3628 ("We have decided that it would not be automatic.  We, as a society, have stated it will not be life without parole, it will not be death.  It is not an automatic decision.").)  The prosecutor explained to the jury that, "It is not based upon general philosophies of an individual as to what the ultimate punishment, the ultimate protection of society, or the ultimate deterrents in general.  We have, in selecting the representatives of our community to decide this, told them you decide it as to this individual, as to what the ultimate punishment shall be, the ultimate protection shall be, or the ultimate deterrent shall be as to this person."  (*Id.* at 3628-29.)  The prosecutor also stated, "Depending upon the cultural backgrounds, philosophical views, religious attitudes, thoughts concerning psychiatry, thoughts concerning religion, thoughts concerning sociological theories, behavior motivation, things like this, decide based upon certain circumstances what is an aggravation and what is a mitigation, and then, if one outweighs the other, impose one or the other of the ultimate sentences."  (*Id.* at 3630.)  The prosecutor also asked the jury, "In this particular case, should this defendant be given life without possibility of parole, as requested by the relatives and friends of the defendant, the hope that he may become a contributing member of society some day?  Should you end all hope with the death penalty?"  (*Id.* at 3640.)  He continued, "There are various philosophies—protection, deterrence, punishment.  We have a wide variety of philosophies in our society.  Depending on how you view these factors, as applied to this defendant, you decide.  What should you do?"  (*Id.*)

    Defense counsel tried to appeal to each individual juror.  He stated, "What happens is you have your own individual conscience . . . .  You don't represent the community at all.  What you do, you represent each one of you individually, and when each one of you—or if each one of you decides that Frances Hernandez should die, then each one of you has to be responsible for that decision."  (*Id.* at 3655.)  He continued, "You have to live with the decision that you individually made for the rest of your lives.  There is no way that you can avoid that."  (*Id.* at 3670; *see also id.* at 3671 ("It is a decision which is your own individual determination which you have to live with for the rest of your lives.").)  He emphasized that each juror was "one hundred percent responsible for the decision" he or she would make, and that it took a unanimous decision by all twelve jurors to impose the death penalty.  (14 RT 3656, 3656-66.)  Defense counsel concluded by urging the jury to find that the mitigating circumstances outweighed the aggravating circumstances.  (*Id.* at 3671, 3673.)

1   number of victims.  It is inconceivable that finding true one more multiple-murder

2   special circumstances than was strictly correct had any influence on the outcome

3   of the deliberations at the penalty phase." *Id.*

4          Petitioner takes issue with the state court's finding that the error did not

5   cause him prejudice.  He cites to *Daniels v. Woodford*, in which the Ninth Circuit

6   found prejudice from the very error in petitioner's case, namely, the erroneous

7   consideration of two multiple murder special circumstances together with the

8   "shall" jury instruction used in petitioner's case.  428 F.3d 1181, 1212-14 (9th Cir.

9   2005).  The Circuit found that because of the mandatory language requiring the

10  imposition of the death penalty if the jury found that the aggravating factors

11  outweighed the mitigating factors, the so-called "double counting error" was not

12  harmless.  *Id.* at 1214 ("As the Supreme Court has noted, when the sentencing

13  body is told to weigh an invalid factor in its decision, a reviewing court may not

14  assume it would have made no difference if the thumb had been removed from

15  death's side of the scale.") (internal quotation marks and citation omitted).  The

16  Ninth Circuit concluded that "[w]hen coupled with other penalty phase

17  errors . . . the trial court's failure to instruct the jury that it could not double count

18  the multiple-murder special circumstance gave the jury one more improper reason

19  to tip the scales against [petitioner]." *Daniels*, 428 F.3d at 1214.  *Daniels* held that

20  the cumulative prejudice of the "double counting" error along with the "shall"

21  language in the jury instruction and other penalty phase errors "so infected the

22  [proceedings] with unfairness as to make the death sentence invalid." *Id.* at 1214

23  (internal quotation marks and citation omitted).  The extra multiple murder special

24  circumstance coupled with the use of the mandatory language in the jury

25  instructions amounted to a constitutional error in petitioner's case. *Daniels*, 428

26  F.3d at 1212-14.  It is likely that the combined error caused at least some prejudice

27  to petitioner, but the impact of the error is part of a cumulative error analysis. *Id.*

28  (finding cumulative error).

1    Accordingly, the Court DENIES Claim 30 but will consider this error in the

2    cumulative error analysis.

3              **8.    Cumulative error**

4         The Court also must consider the cumulative effect of the constitutional

5    errors that occurred at petitioner's trial. *United States v. Frederick*, 78 F.3d 1370,

6    1381 (9th Cir. 1996) (citing *United States v. Green,* 648 F.2d 587, 597 (9th Cir.

7    1981)); *see also Kwan Fai Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (per

8    curiam) ("We need not [] decide whether these deficiencies alone meet the

9    prejudice standard because other significant errors occurred that, considered

10   cumulatively, compel affirmance of the district court's grant of habeas corpus as to

11   the sentence of death."); *Harris*, 64 F.3d at 1439 ("By finding cumulative

12   prejudice, we obviate the need to analyze the prejudicial effect of each

13   deficiency.").  While counsel's deficient performance at the penalty phase and

14   several instances of juror misconduct entitle petitioner to relief, the Court also

15   finds that the cumulative effect of these errors, along with the penalty phase

16   instructional error raised in Claim 30, caused petitioner unconstitutional prejudice

17   at the penalty phase.  Counsel's deficiencies resulted in an incoherent hodgepodge

18   of mitigating evidence that failed to present evidence of petitioner's poor start in

19   life, his unfortunate circumstances growing up and his serious mental and

20   neurological deficiencies.  In addition, one juror consulted her minister during

21   penalty phase deliberations and was advised to elevate petitioner's potential for

22   rehabilitation over all other considerations.  Some of the jurors who deliberated at

23   the penalty phase were exposed to a newspaper article linking petitioner to two

24   strangulation murders similar to those for which he faced the death penalty.

25   Petitioner did not commit the murders.  Also before penalty phase deliberations

26   concluded, an alternate juror informed the foreman that petitioner was accused of

27   committing another uncharged rape.  Finally, the trial court instructed the jury that

28   it shall impose the death penalty upon finding that aggravating circumstances

outweighed mitigating circumstances *and* the jury improperly considered two multiple murder circumstances, one of which was vacated on appeal.  These combined errors resulted in a constitutionally infirm penalty phase trial.  *See Parle v. Runnels*, 505 F.3d 922, 927 n.6 ( "In analyzing prejudice in a case in which it is questionable whether any single trial error examined in isolation is sufficiently prejudicial to warrant reversal, [the Ninth Circuit] has recognized the importance of considering the cumulative effect of multiple errors and not simply conducting a balkanized, issue-by-issue harmless error review.") (internal quotation marks and citations omitted); *see also Daniels v. Woodford*, 428 F.3d 1181, 1214 (9th Cir. 2005) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.") (internal quotation marks omitted).

Accordingly, the Court GRANTS petitioner's claim of cumulative error at the penalty phase.

## III.   Order

1.   For the foregoing reasons, the Court hereby **GRANTS** the petition for writ of habeas corpus on the basis of Claims 4(A)(1), 4(A)(7)(d), 4(A)(2), 4(A)(3), 5(C)(7), 5(D)(27), 5(D)(32), 5(D)(40) and cumulative error.  The Court orders that the sentence of death in the matter of *People v. Francis Hernandez*, Case No. A-022813 in the California Superior Court for the County of Los Angeles, be **VACATED**.

2.   All other claims are **DENIED**.

**IT IS SO ORDERED.**

Dated: August 16, 2011.

_Ronald S W Lew_

_____

Ronald S. W. Lew
United States District Judge

211

# NOTICE PARTY SERVICE LIST

**Case No.** _____   **Case Title** _____

**Title of Document** _____

| | |
|---|---|
| | ADR |
| | BAP (Bankruptcy Appellate Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | MDL Panel |
| | Ninth Circuit Court of Appeal |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

| | |
|---|---|
| | ***ADD NEW NOTICE PARTY*** **(if sending by fax, mailing address must also be provided)** |

Name:

Firm:

Address (*include suite or floor*):



*E-mail:

*Fax No.:

\* For CIVIL cases only

| ***JUDGE / MAGISTRATE JUDGE (list below):*** |
|---|
| |
| |
| |
| |

**Initials of Deputy Clerk** _____